|   |   |
|---|---|
| HAL L. BAUME, ESQ.<br>New Jersey Bar No. 028741977<br>[*pro hac vice pending*]<br>DEANNA FORBUSH, ESQ.<br>Nevada Bar No. 6646<br>FOX ROTHSCHILD, LLP<br>3800 Howard Hughes Parkway, Suite 500<br>Las Vegas, Nevada  89169<br>Telephone:  (702) 262-6899<br>Facsimile:   (702) 597-5503<br>Email: hbaume@foxrothschild.com<br>          dforbush@foxrothschild.com<br>[Proposed] Counsel for FX Luxury Las Vegas I, LLC | Electronically Filed April 21, 2010 |

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>FX LUXURY LAS VEGAS I, LLC,<br>a Nevada limited liability company,<br><br>Debtor. | Case No.  BK-S-10-17015-BAM<br>Chapter 11<br><br>**DECLARATION OF DAVID L. JEWKES IN SUPPORT OF DEBTOR'S APPLICATION FOR ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF COMMERCE CRG OF NV, LLC, DOING BUSINESS AS CCRG/CUSHMAN & WAKEFIELD ALLIANCE, AS PROPERTY MANAGER FOR REAL PROPERTY BELONGING TO THE ESTATE, EFFECTIVE AS OF THE PETITION DATE**<br><br>Hearing Date:    **OST REQUEST PENDING**<br>Hearing Time:   **OST REQUEST PENDING** |

DAVID L. JEWKES, Managing Director of CRG of NV, LLC doing business as CCRG/Cushman & Wakefield Alliance ("Cushman & Wakefield"), engaged in providing property management services, submits the following statement in accordance with section 329 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and being duly sworn, deposes and declares under the penalty of perjury:

LV1 1188548v2 04/21/10

1

1. I am over the age of 18, am mentally competent, have personal knowledge of the facts in this matter, except where stated as based upon information and belief, and if called upon to testify, could and would do so.

2. I make this Declaration in support of the Application for Order Authorizing the Employment and Retention of Commerce CRG of NV, LLC, Doing Business as CCRG/Cushman & Wakefield Alliance, as Property Manager For Real Property Belonging to the Estate, Effective as of the Petition Date (the "Application"), filed by FX Luxury Las Vegas I, LLC ("FX" or "Debtor") in the above-captioned chapter 11 proceeding (the "Chapter 11 Case"), whereby Debtor seeks authorization to enter into the proposed property management agreement (the "Proposed Property Management Agreement") attached hereto as **Exhibit 1**.

3. I am the Managing Director of CRG of NV, LLC doing business as CCRG/Cushman & Wakefield Alliance ("Cushman & Wakefield") with offices located at 3800 Howard Hughes Parkway, Suite 1200, Las Vegas, Nevada 89169. Cushman & Wakefield has 140 owned- and alliance-offices in the Americas, delivering specialized local expertise and a broad service platform to its clients. Cushman & Wakefield's landlord representation team evaluates market conditions, including tenant relocations, levels of occupancy in a target area, rental rates, proposed development and other real estate trends and develops a comprehensive positioning and leasing program for the property to better understand tenants' needs and thus position and lease properties for landlords more effectively.

4. In my capacity as Managing Director of Cushman & Wakefield, I am responsible for overseeing services provided by Cushman & Wakefield, pursuant to the Exclusive Management Agreement (the "Pre-Petition Management Agreement") entered into on or about June 22, 2009, by and between Cushman & Wakefield and Larry L. Bertsch in his capacity as Receiver, appointed by order of the Eighth Judicial District Court, in Clark County Nevada, Case A09-591831, for certain properties owned by FX. A true and correct copy of the Pre-Petition Management Agreement is attached hereto as **Exhibit 2**.

///

///

LV1 1188548v2 04/21/10

1    5.    Due to its arrangement with the Receiver prior to the commencement of the Chapter 11 Case, Cushman & Wakefield is familiar with the Properties and their ongoing needs and is uniquely qualified to serve in a property manager capacity for Debtor in this Chapter 11 Case.

6.    As more fully set forth in the Proposed Property Management Agreement, Debtor proposes to employ and retain Cushman & Wakefield to render all necessary property management services to Debtor with respect to all of Debtor's Properties, except for the real property upon which a Travelodge motel is situated, including, but not limited to:

(a)    Managing and maintaining the Properties in compliance with all local, county, state and federal laws;

(b)    Managing all leases, subleases, licenses, concessions, tenancy and other agreements affecting the use or occupancy of the Properties;

(c)    Performing all necessary services including without limitation employing, supervising, discharging and paying employees;[1]

(d)    Overseeing contractors who are making repairs;

(e)    Maintaining and operating all common areas and facilities;

(f)    Using commercially reasonably efforts to obtain tenants and performing all other services and acts necessary for the proper management of the Properties; and

(g)    Providing any other services requested by Debtor as the Debtor and Cushman & Wakefield shall mutually agree.

See Exhibit 1.

7.    Cushman & Wakefield will not be the exclusive leasing agent for the Properties or entitled to any commissions post-petition unless it procures post-petition a new (not renewal) tenant, with which the Debtor executes a lease. Id.

8.    Cushman & Wakefield is willing to act as Debtor's property manager in the Chapter 11 Case and to continue managing the Properties.

9.    Except as otherwise may be set forth herein, the members, brokers, counsel, agents and associates of Cushman & Wakefield:

(a)    do not have any other connection with Debtor, its affiliates, its creditors or any other party in interest, or their respective attorneys

---

[1] It is proposed that on-site staffing and annual salaries for employees to by managed by Cushman & Wakefield be limited to: (a) Property Manager ($92,500 current annual salary subject to increase); (b) Property Assistant ($52,615.61 current annual salary subject to increase); and (c) Maintenance Engineer ($69,726.67 current annual salary subject to increase). See Exhibit 1, at Exhibit A.

3

LV1 1188548v2 04/21/10

|   |   |   |
|---|---|---|
| 1 |   | and accountants, the United States Trustee or any person employed thereby; |
| 2 |   |   |
| 3 | (b) | are "disinterested persons," as that term is defined in Bankruptcy Code Section 101(14); and |
| 4 |   |   |
| 5 | (c) | do not hold or represent any interest adverse to the estate. |

10. Neither Cushman & Wakefield nor any of the brokers or agents at the company:

 (a) hold or represent an interest adverse to Debtor's estate;

 (b) is or was a creditor, an equity security holder or an insider of Debtor;

 (c) is or was an investment banker for any outstanding security of Debtor;

 (d) is or was, within three years before the Petition Date, an investment banker for a security of Debtor, or an attorney for investment banker in connection with the offer, sale or issuance of any security of Debtor;

 (e) is or was, within two years before the Petition Date, a director, officer or employee of Debtor or of an investment banker of Debtor; or has an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in Debtor or an investment banker specified in the foregoing paragraphs, or for any other reason.

11. Further, no broker, agent or manager at Cushman & Wakefield has any connection with:

 (a) any United States District Judge or United States Bankruptcy Judge for the District of Nevada; or

 (b) the United States Trustee for such district or to any known employee in the office thereof.

12. Consistent with industry standards and as set forth in the Proposed Property Management Agreement, Cushman & Wakefield proposes to charge Debtor a Management Fee equal to the greater of (i) two and a quarter percent (2.25%) of the Properties' gross revenues derived from the operation of the Properties in each operating month (or portion thereof), as determined in the Proposed Property Management Agreement; and (ii) seventeen Thousand Five

4

1  Hundred Dollars ($17,500).  <u>See</u> Exhibit 1, § 3.3.

2  ///

3      13.    Additionally, Cushman & Wakefield will be reimbursed for:

         (a)    costs and expenses incurred in managing the Properties, including compensation, fees and expenses paid or reimbursed to all consultants, professionals, and other specialists rendering services to the Properties, but only if incurred with the prior written consent of Debtor and the First Lien Agent and, to the extent required, with Court approval; and

         (b)    direct compensation for the salaries, overhead and benefits of Cushman & Wakefield's employees, which shall not exceed the base salaries identified in Exhibit A to the Proposed Property Management Agreement.

<u>See</u> Exhibit 1, § 3.4.

      14.    As noted above, Cushman & Wakefield will not be entitled to any commissions unless it procures post-petition a new (not renewal) tenant, with which Debtor executes a lease. However, if Cushman & Wakefield procures a new lease post-petition, a commission will be paid consistent with the schedule set forth at Exhibit B to the Proposed Property Management Agreement and shall be equal to six percent (6%) of the base rent for the first 60 months of the lease term, and three percent (3%) for each additional year or fraction thereof.  Exhibit 1, at Exhibit B.  In the event that a new post-petition lease procured by Cushman & Wakefield is for one year or less then the commission paid shall be equal to one (1) month's base rent.  <u>Id</u>.

      15.    Cushman & Wakefield has no agreement with any other entity to share any compensation received nor will any be made, except as may be permitted under Bankruptcy Code Section 504(b)(1) or as described herein and in the Application.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

     Executed this 21st day of April 2010.

                                    *s/ David L. Jewkes*
                                 DAVID L. JEWKES, MANAGING DIRECTOR
                                 COMMERCE CRG OF NV, LLC DBA
                                 CCRG/CUSHMAN & WAKEFIELD

LV1 1188548v2 04/21/10

*Exhibit 2*



# EXCLUSIVE MANAGEMENT AGREEMENT



An independently owned and operated member of the
CUSHMAN & WAKEFIELD
ALLIANCE

# EXCLUSIVE MANAGEMENT AGREEMENT

This EXCLUSIVE MANAGEMENT AGREEMENT (this "*Agreement*") dated as of June _, 2009, by and between Larry L. Bertsch in his capacity as Receiver pursuant to that certain Order Appointing Receiver submitted to the District Court of Clark County June 22, 2009 in Landesbank Baden-Württemberg, New York Branch, et al. v. FX Luxury Las Vegas I, LLC et al., Case No. 09-591834 (hereinafter referred to as "*Receiver*") and Commerce CRG of NV, LLC, doing business as CCRG/Cushman & Wakefield (hereinafter referred to as "*Manager*").

## WITNESSETH:

In consideration of the mutual promises and covenants hereinafter contained, Receiver and Manager hereby agree to the following:

## ARTICLE I

## DEFINITIONS

1.1    <u>Definitions</u>. As used herein, the following terms shall have the respective meanings indicated below:

"Agent":    Landesbank Baden-Württemberg, New York Branch (as successor in interest to Credit Suisse, Cayman Islands Branch), as administrative agent and collateral agent under the Credit Agreement

"Credit Agreement":    That certain Amended and Restated Credit Agreement dated as of July 6, 2007 by and among FX Luxury Las Vegas I, LLC (as successor-in-interest to Metroflag BP, LLC), FX Luxury Las Vegas II, LLC (as successor in interest to Metroflag Cable, LLC), FX Luxury Parent, LLC (as successor in interest to BP Parent, LLC), the lenders party thereto and Landesbank Baden-Württemberg, New York Branch (as successor in interest to Credit Suisse, Cayman Islands Branch), as Administrative Agent ("Agent").

"Impositions":    All taxes, assessments, water, sewer or other similar rents, rates and charges, levies, license fees, permit fees, inspection fees and other authorization fees and charges which at any time may be assessed, levied, confirmed or imposed on the Property or the operation thereof.

"Manager":    CCRG/Cushman & Wakefield

"Property":    The real property consisting of nine contiguous parcels comprising the Southeast corner of Las Vegas Boulevard and Harmon Avenue, Las Vegas, Nevada, improved with various commercial buildings, including a hotel, restaurants, and retail buildings, and further identified through Assessor's Parcel Numbers 162-21-301-001, 162-21-301-003, 162-21-301-009, 162-21-301-014, 162-21-301-016, 162-21-301-017, 162-21-301-018, 162-21-301-019, and 162-21-301-020; <u>provided</u>, <u>however</u>, that for purposes of this Agreement, Property shall not include the real property that includes the lodging facility known as the Travelodge motel more particularly described in, and governed by, the Hotel Management Agreement.

"Receivership Estate":    All assets, income, rents and leases of the Property that are held and managed by Receiver in accordance with the that certain Order Appointing Receiver submitted to the District Court of Clark County on June 22, 2009 in Landesbank Baden-Württemberg, New York Branch, et al. v. FX Luxury Las Vegas I, LLC et al, Case No. 09-591231B, attached hereto as <u>Exhibit 1</u> (hereinafter, the "*Court Order*"), including, without limitation, any funds received by Receiver from Agent as contemplated under this Agreement.

All other capitalized terms used herein shall have the meanings ascribed to such terms as set forth in this Agreement or, if not defined herein, the meanings ascribed to such terms in the Credit Agreement.

1.2    <u>References</u>. Except as otherwise specifically indicated, all references to Articles, Section and Subsection numbers refer to Articles, Sections and Subsections of this Agreement, and all references to Exhibits

Page 2 of 13



A, B and C refer to the Exhibits attached hereto. The words "herein," "hereof," "hereunder," "hereinafter" and words of similar import, refer to this Agreement as a whole and not to any particular Section or Subsection hereof.

## ARTICLE II

## TERM

2.1     Initial Term; Automatic Renewal. The term of this Agreement shall commence on the date hereof (the "**Commencement Date**") and, unless otherwise terminated in accordance with this Section 2.1 or by order of the court governing the Receivership Estate, said term shall continue through the date that is one year from the Commencement Date (such one year period, the "*Initial Term*"). Upon the expiration date, this Agreement will automatically renew each year for one (1) year terms (the Initial Term as extended by any such renewal, the "**Term**") unless sooner terminated in accordance with the provisions hereof.

2.2     Termination Rights. Receiver may terminate this Agreement for any or no reason at all upon fifteen (15) days prior written notice to Manager; provided, however, that a termination by Receiver resulting from a breach by Manager of any covenant or obligation of Manager set forth in this Agreement and/or due to Manager's gross negligence, willful misconduct or fraud shall be deemed a "for cause" termination for purposes of Section 2.4 of this Agreement. Manager may terminate this Agreement upon written notice to Receiver at least sixty (60) days prior to the expiration of the Term.

2.3     Effect of Termination. The termination of this Agreement under the provisions of this Article II shall not affect the rights of the terminating party with respect to any damages it has suffered as a result of any breach of this Agreement, nor shall it affect the rights of either party with respect to liability or claims accrued, or arising out of events occurring, prior to the date of termination. Upon any termination of this Agreement under Sections 2.1 and 2.2 of this Agreement, all rights of Manager to receive any additional fees under Section 3.3 shall cease and terminate and all rights to receive any additional leasing commissions under Section 4.3 shall terminate, except with respect to leases which have actually been executed prior to the date of such termination or leases with tenants which Manager notifies Receiver that Manager is negotiating with, and which leases are executed within six (6) months of Manager's termination. Manager shall provide Receiver with a written list of said prospective tenants within ten (10) days of termination.

2.4     Non-interference with Manager's Business. In the event that Receiver terminates this Agreement pursuant to Section 2.2 other than a "for cause" termination (as defined in Section 2.2), he shall not, for a period of six (6) months after the effective date of such termination, knowingly hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business with the intention of benefiting from such proprietary information and knowledge with respect to the management of the Property and the Receivership Estate; provided, however, that in the event that: (1) Larry L. Bertsch's capacity as Receiver as set forth in the Court Order is terminated, either by foreclosure sale, order of the court governing the Receivership Estate, applicable law or other means or (2) this Agreement is terminated by Receiver "for cause", the terms of this Section 2.4 shall be of no further force or effect with respect to Receiver or Mr. Larry L. Bertsch and his affiliates. Notwithstanding the foregoing, this Section 2.4 shall at no time be deemed to apply to Mr. Larry L. Bertsch or his affiliates in connection with any receiverships or other property management business being conducted by such parties outside of its capacity as Receiver for the Property and the Receivership Estate. In the event of an actual or threatened breach of this covenant by Receiver, Manager shall be entitled to seek injunctive relief by petitioning the court governing the Receivership Estate.

## ARTICLE III

## MANAGER AUTHORITY AND DUTIES OF MANAGER

3.1     Employment of Manager. Receiver hereby designates Manager as its sole and exclusive managing agent for the operation and management of, and brokering of leasing at, the Property in accordance with the terms of this Agreement. Manager hereby accepts and agrees to perform all services necessary for the care, protection, maintenance, operation and leasing of the Property in accordance with the terms of this Agreement. Nothing contained in the foregoing shall be deemed to limit or restrict Receiver's power, authority and responsibility as set forth in the Court Order.

**COMMERCE CRG**
FULL SERVICE COMMERCIAL REAL ESTATE    CUSHMAN & WAKEFIELD. ALLIANCE

3.2 <u>Manager's Duties</u>. Manager shall perform all covenants and agreements contained in this Agreement in a careful and diligent manner, provided that Manager shall not be required to expend money in excess of that available to be expended by Manager hereunder and shall exercise its professional competence in managing the Property at a standard not less than that of a manager of a first class shopping center facility in the area in which the Property is located. Manager shall make available the advice, expertise and judgment of its organization relating to the management, operation, leasing, maintenance and repair of the Property and the Receivership Estate.

Manager shall manage, maintain and operate the Property in compliance with (i) all local, county, state and federal laws, orders, rules, ordinances and jurisdiction over the Property; (ii) the provisions of the Credit Agreement, Deed of Trust and all other Loan Documents as the same shall be in effect from time to time and affect the use, occupancy and maintenance of the Property; (iii) the provisions of all insurance policies as the same shall affect the Property to the extent such insurance is procured by or delivered to Manager; and (iv) all leases, subleases, licenses, concessions, tenancy and other agreements affecting the use or occupancy of the Property (collectively, the "**Leases**").

Manager shall perform, all services necessary for the care, protection, maintenance and operation of the Property, including, without limitation, the following:

(a) Hold, operate, manage and lease the Property;

(b) employ, supervise, discharge, and pay Manager's employees, which employees shall be limited to those set forth on Exhibit C (collectively, "**Manager's Employees**") and which employees' salaries shall not exceed the base salaries listed on <u>Exhibit C</u>;

(c) oversee any contractors who are making repairs, decorations, revisions, alterations and improvements to the Property as are necessary for the proper maintenance thereof in good order, condition and repair;

(d) maintain and operate all common areas and facilities in the Property;

(e) when requested by Receiver, apply for, obtain, and maintain, at the expense of the Receivership Estate all licenses and permits required in connection with the operation and management of the Property; provided that Receiver agrees to execute and deliver any and all applications and other documents and to otherwise cooperate to the fullest extent with Manager in applying for, obtaining, and maintaining such licenses and permits;

(f) to the best of Manager's ability, preserve the Receivership Estate and the Property from loss, removal, material injury, destruction, substantial waste or loss of income;

(g) use commercially reasonable efforts to obtain from all tenants under the Leases evidence of the insurance required to be maintained by such tenants thereunder;

(h) use commercially reasonable efforts to implement the Budget and transfer rents and other sums received on behalf of Owner in accordance with the terms hereof; and

(i) perform all other services and acts, in addition to the foregoing, necessary for the proper management of the Property.

3.3 <u>Management Fees</u>. In consideration of the management services to be rendered by Manager under this Article III, Receiver shall pay to Manager, on a monthly basis, a fee (the "**Management Fee**") equal to the greater of (i) two and a quarter percent ( 2.25 %) of the gross revenues and (ii) Seventeen Thousand Five Hundred Dollars ($17,500.00) (determined as hereinafter provided) derived from the operation of the Property in each operating month. A one-time set up fee of Nine Thousand Five Hundred Dollars ($9,500.00) is due upon execution of this Agreement. For the above purposes only, the term "**gross revenues**" shall mean and include all revenues and income for minimum rents, percentage rents and parking rents excluding, however,

(a) the net proceeds of the sale of any of the Property or the Receivership Estate, and of borrowings of the Receivership Estate, and the net proceeds from casualty to or condemnation of the Property or the Receivership Estate;

(b) the termination fees paid and received pursuant to any formula or an explicit amount set forth in any Lease;

Page 4 of 13



(c) proceeds received pursuant to any insurance policies, including without limitation, any insurance policies held by tenants under the Leases; and

(d) any reversal of any contingency or tax reserve.

3.4 <u>Reimbursements</u>. Receiver will reimburse Manager for the following costs and expenses incurred by Manager in the performance of its duties under this Article III:

(a) the compensation, fees and expenses paid or reimbursed to all consultants, professionals, and other specialists rendering services to the Property, with prior written consent of Receiver; and,

(b) the direct employee compensation for the salaries, overhead, and benefits of Manager's Employees, not to exceed the base salaries listed in <u>Exhibit C</u>.

Statements covering the aforesaid reimbursements shall be submitted by Manager to Receiver in each Requisition Statement (as hereinafter defined). To the extent the entire amount of compensation of other expenses reimbursable to Manager under the provisions of this Section 3.4, or under any other provisions of this Agreement, are not incurred solely for the benefit of the Property, then such expense shall be reduced by the amount that such expense is not directly related to Manager's duties with respect to the Property. Manager hereby agrees that no additional on-site positions or additional amounts in base salaries outside of those listed in <u>Exhibit C</u> will be authorized or payable without obtaining Receiver's prior written consent.

## ARTICLE IV

## SALE MARKETING & LEASING AUTHORITY AND DUTIES OF MANAGER

4.1 <u>Employment of Manager as Broker</u>. Receiver hereby employs Manager as its sole and exclusive investment sale, renting and leasing broker for the Property.

4.2 <u>Acceptance of Employment</u>. Manager hereby accepts such employment and agrees to act as Receiver's renting and leasing broker for the Property. Without limiting the generality of the foregoing, Manager may prepare lease forms (furnished by Receiver), post signs, prepare circulars and engage in advertising; <u>provided, however</u>, that Manager shall not enter into any binding agreements for new leases at the property or renewals of existing leases without Receiver's prior written consent, which consent may be withheld in Receiver's sole discretion. Receiver agrees that it will refer all inquiries regarding the leasing of space in the Property to Manager. Receiver will otherwise fully cooperate with Manager to effect leases of space at the Property to Manager. Manager in turn agrees that it will refer all inquiries received from Tenants regarding amendments or renewals to existing leases and offers for new leases at the Property to Receiver for Receiver's approval prior to entering into any binding agreements.

4.3 <u>Commissions</u>. In consideration of the renting and leasing services to be rendered hereunder, Receiver shall pay to Manager a fee equal to the fee schedule as set forth in <u>Exhibit B</u>. Said commission shall be payable fifty percent (50%) at such time as any tenant has executed a lease and Receiver has signed and accepted such lease, and fifty percent (50%) at such time as tenant has moved into and accepted its leased premises. Receiver will also pay Manager a fee equal to three percent (3%) of total rents, whether by new lease or extension (other than by extension pursuant to an option at a stated rental rate within the terms of an existing tenant lease), to tenants already occupying space at the Property. Investment sale commissions will be due at closing as set forth in <u>Exhibit A</u>.

For the avoidance of doubt, wherever in this Agreement the Receiver is obligated to pay or reimburse Manager, including without limitation Section 3.3, Section 3.4 and this Section 4.3, such obligation or duty of Receiver to make such payment is expressly contingent upon there being sufficient funds derived from the Receivership Estate or funded by Agent to meet such obligations or duties. In the event sufficient funds are not available to satisfy such obligations as set forth in the preceding sentence, neither Receiver nor Larry L. Bertsch, individually, shall be liable for failure to meet such obligations or duties; <u>provided, however</u>, that the obligation to pay or reimburse Manager for costs, fees or commissions as contemplated under this Agreement shall remain an obligation of the Receivership Estate regardless of whether there shall be sufficient funds derived from the Receivership Estate or funded by Agent at the time such obligations become due and payable.

## ARTICLE V

## INSURANCE

Page 5 of 13



5.1     Coverage. All property insurance and general liability insurance for the Property shall be obtained in accordance with the Court Order.

Manager shall procure personal property insurance to insure against loss of such property owned by Manager and located on the Property and any motor vehicle coverages and contract liability. Manager shall procure workmen's compensation insurance, including employer's liability insurance, for all employees of Manager engaged on or with respect to the Property sufficient to provide statutory benefits as required by the applicable laws of the State of Nevada, and Manager shall take all reasonable efforts to have Receiver named as an alternate employer thereunder.

Manager shall promptly give notice to the appropriate insurance companies that have issued policies on the Property of all accidents, incidents, occurrences and claims for damage arising out of or relating to the use, occupancy, management, operations and maintenance of the Property, and shall prepare and deliver to Receiver a full written report thereon, including a report of any injuries, and of any damage to or destruction of the Property and the estimated cost of repair. Manager shall promptly and in the manner required by the appropriate policy or policies of insurance, file all claims and shall use its reasonable effort to obtain payment therefor; provided, however, that Manager shall not conclude or compromise any disputed claim with respect to any property damage policy or policies in excess of an aggregate of $50,000.00 per fiscal year without the prior written consent of Receiver.

In connection with preparing the Budget, Receiver will submit to the Manager a schedule setting forth the kinds and amounts of insurance to be maintained during the ensuing calendar year in connection with the operation of the Property.

5.2     Policies and Endorsements. All insurance provided for under the above Section 5.1 shall be effected by valid and enforceable policies issued by one or more domestic primary insurers authorized to issue insurance in the State of Nevada. Each insurance company must have a minimum financial strength rating of "A+" or better from S&P. The party procuring any of the aforesaid kinds of insurance shall deliver certificates of insurance with existing, additional and renewal policies, to the other, and in the case of insurance about to expire, shall deliver certificates of insurance with respect to the renewal policies to the other party not less than ten (10) days prior to the respective dates of expiration.

All policies of insurance provided for under this Article V shall, to the extent obtainable, have attached thereto: (a) an endorsement that such policy shall not be canceled or materially changed without at least thirty (30) days prior written notice to Receiver and Manager.

All policies of insurance required under Section 5.1 shall name Receiver, Manager and Agent as insureds, and losses thereunder shall be payable to the parties as their respective interests may appear.

5.3     Waiver of Liability. Neither Manager or Receiver shall assert against the other and do hereby waive with respect to each other, any claims for any losses, damages, liability or expenses (including attorneys' fees) incurred or sustained by either of them on account of damage or injury to persons or property arising out of the Property, operation and/or maintenance of the Property, to the extent that the same are covered by the insurance required under this Article V; provided, however, that nothing herein shall impair Manager's and Receiver's right to indemnification as provided in Section 5.4 thereof.

5.4     Indemnification. Receiver hereby covenants and agrees to indemnify, save and hold Manager free, clear and harmless from any and all liability, cost, expenses, including attorneys' fees, judgments, claims, liens, demands and litigation of any kind whatsoever in connection with, arising out of, or by reason of the gross negligence, fraud or willful misconduct of Receiver, his officers, agents, representatives or employees. Manager hereby covenants and agrees to indemnify, save and hold Receiver free, clear and harmless from any and all liability, cost, expenses, including attorneys' fees, judgments, claims, liens, demands and litigation of any kind whatsoever in connection with, arising out of, or by reason of the gross negligence, fraud or willful misconduct of Manager, its officers, agents, representatives or employees.

## ARTICLE VI

## ACCOUNTS, RECORDS AND REPORTS

6.1     Manager's Accounts. An account for the Property will be established and funded in the amount of $5,000 at a banking institution or institutions mutually agreeable and designated by Receiver, such account to be



in Manager's name ("**Manager's Account**"). Manager will hold in Manager's Account all monies furnished by Receiver for petty cash expenditures. Receiver will replenish the Manager's account as necessary in Receiver's reasonable discretion.

    6.2    Expenditures. Receiver will pay all expenses (including without limitation the expenses referenced in the Budget, as described in greater detail in Section 6.4 of this Agreement, as such expenditures become due and owing) of the Property upon receipt of proper documentation from Manager and funding by Agent.

    6.3    Books and Records. At all times during the Term, Receiver shall maintain in accordance with generally accepted accounting principles, consistently applied, complete books, records and accounts that accurately reflect all revenues earned, funds received, expenses incurred and disbursements made in connection with Receiver's duties hereunder. Manager shall also keep current records of the leasing, operation and maintenance of the Property, including copies of all leases, contracts and agreements affecting the use and occupancy thereof. Said books and records shall be the property of Receiver, and records of Manager shall be available to Receiver, or its designated representative, for examination, inspection and audit upon reasonable prior notice during usual business hours at the office of Manager and shall be delivered to Receiver or its designated agent upon the termination of this Agreement, unless otherwise directed.

Within one hundred twenty (120) days after the end of each calendar year during the term, Manager shall cause to be delivered to Receiver financial statements and reports for the Property, containing:

    (a)    Financial statements audited, at the expense of the Receivership Estate, by certified public accountants approved by Receiver consisting of a balance sheet as of the end of the calendar year and statements of income (including all receipts of Receiver) or loss or changes in financial position of the Receivership Estate, and in comparative tabular from for the prior year; and

    (b)    A table comparing the projections, if any, previously delivered to Receiver and set forth on the Budget of the period covered by such report.

Manager shall furnish Receiver, within a reasonable period of time, such other financial information as to the Property as Receiver shall reasonably request.

All financial statements required under this Section 6.3 shall show itemized expenditures and aggregate gross receipts (broken down into minimum rent, fixed rent, percentage rent, common area maintenance and real estate taxes) and itemized revenues from other sources.

    6.4    Reports to Receiver. Upon commencing services under this Agreement, Manager shall advise Receiver of the physical condition of the Property, the status of all leases, and all necessary expenses or capital needs of the Property. Thereafter, Manager shall cooperate with Receiver to establish a short-term working budget for the Property (the "**Budget**"). The Budget shall include the following projections, which projections shall be set forth in the Budget on a per month basis:

(a) a detailed statement of all revenues estimated to be derived from the Property under all Leases;

(b) all property expenses, which shall include all costs and expenses to be incurred by or on behalf of the Receivership Estate in connection with the management, operation, maintenance or repair of the property, including without limitation, (x) all sums payable under building services contracts, including without limitation, agreements relating to air conditioning and heating, general cleaning, utilities, refuse removal, grounds and landscape maintenance, parking area maintenance, snow removal, pest control, security, telephone, window cleaning personnel, and (y) all other charges, costs and expenses of a regular nature of services and supplies provided to, or for the benefit of, the Property and in the normal operation thereof;

(c) payments required for real estate taxes and assessments levied against the Property;

(d) salaries of Manager's Representatives and all contractors, agents and service providers hired in connection with the maintenance, operation and management of the Property;

(e) projected charges for tenant improvement work and capital improvements; and

(e) premiums for any Insurance provided by Manager in accordance with the provisions of Article V.



In addition to the Budget, on the first (1st) and fifteenth (15th) day of each month Manager shall provide Receiver a monthly rent roll of tenants leasing space at the Property, which rent roll shall include the unit or space being leased, the rent being charged to each such tenant (on a monthly and annualized basis), all CAM and additional rent being charged to each such tenant and a reconciliation statement showing the status of rent collections and a description of the collection efforts being made with respect to all delinquent rentals and other changes for the Property for such month (each such bi-monthly report, "**Manager's Leasing Report**").

## ARTICLE VII

## MAJOR DECISIONS

7.1    Major Decisions. Notwithstanding the powers and duties given to Manager hereunder, without the prior written consent of Receiver, no act shall be taken or sum expended or obligation incurred for and on behalf of the Property with respect to any "**Major Decision**," which term shall mean any one or more of the following:

(a)    the creation of any association of tenants for the Property, including the charter or articles under which such association shall be created;

(b)    the approval of any contracts for the furnishing of goods, utilities, maintenance or other services to the Property, if such contract shall have a term of more than three (3) months or involve an obligation for more than $2,500.00 in any three-month period;

(c)    the retention of legal counsel with respect to any matter pertaining to the Property;

(d)    the incurring of any property expense or other such expenditure relating to any line item in the most recent Property Budget in an amount greater than 5% of the amount budgeted for such line item in the subject Budget; and

(e)    entering into any new lease or lease renewal with any new or existing tenant at the Property, as applicable, or executing any binding agreement regarding the same.

Any action taken by Manager with respect to any of the above matters, and any material departures from plans, forecasts or other materials previously submitted to, and approved by Receiver, without the written consent and approval of Receiver shall be absolutely void and shall not be binding on the Property.

## ARTICLE VIII

## ASSIGNMENT

8.1    Receiver Assignments. Receiver may assign all of its right, title and interest under this Agreement to any other person at anytime without the prior written consent of Manager.

8.2    Manager Assignments. Manager may not assign this Agreement without the prior written consent of Receiver, which consent may be withheld in Receiver's sole discretion, and this Agreement and monies due or to become due hereunder may not be pledged, encumbered or otherwise hypothecated by Manager.

## ARTICLE IX

## NOTICES

9.1    In-Writing Address. All notices, demands, consents and reports provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as either of the parties hereto may hereafter specify in writing:

Receiver:    Larry L. Bertsch
             Larry L. Bertsch, CPA & Associates, LLP
             285 E. Warm Springs Road, Suite 102
             Las Vegas, Nevada 89119

Manager:     David L. Jewkes, Managing Director
             CCRG/ Cushman & Wakefield
             3800 S. Howard Hughes Parkway, #1200
             Las Vegas, Nevada 89169



9.2    Method. Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If so mailed, then such notice or other communication shall be deemed to have been received by the addressee on the third day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, or by recognized overnight courier, which notice shall be deemed received, in either case, upon delivery to the recipient party.

## ARTICLE X

## GENERAL PROVISIONS

10.1    No Partnership or Joint Venture. Nothing contained in this Agreement shall constitute or be construed to be or create a partnership or joint venture between Receiver, their successors, or assigns, on the one part; and the Manager, its successors or assigns, on the other part.

10.2    Successors and Assigns. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

10.3    Miscellaneous. The captions of individual sections are for convenience of reference only and shall not affect the construction to be given any provision hereof. This Agreement (including all exhibits hereto) contains the entire Agreement between the parties with respect to the subject matter hereof, supersedes all prior understandings, if any, with respect thereto and may not be amended, supplemented or terminated, nor shall any obligation hereunder or condition hereof be deemed waived, except by a written instrument to such effect signed by the party to be charged. The parties do not intend to confer any benefits hereunder on any person other than the parties to this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. Except as herein otherwise expressly provided, no waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligation or act hereunder shall be deemed an extension of time for the performance of any other obligation or act.

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed, all as of the day and year first above written.

Commerce CRG of NV, LLC  
dba CCRG/ Cushman & Wakefield

By: _____  
David J. Jewkes, Managing Director

Receiver:

By: _____  
Court-Appointed Receiver



## Exhibit A

### SCHEDULE OF COMMISSIONS

1. **LEASING COMMISSIONS:**

    The leasing fees shall be an amount equal to:

    #### TERM OF LESS THAN 5 YEARS

    6% of the total rents for the first 60 months of the lease term.

    #### TERM OF 5 YEARS OR MORE

    6% of the total rents for the 1st 5 years, plus

    3% of the total rents for the 2nd 5 years

    In the event that the lease (or agreement) is based upon month-to-month rent, then the commission shall be equal to one (1) month's rent.

2. **ADDITIONAL SPACE TAKEN:**

    Should the tenant occupy additional space by virtue of provisions in the lease, or through subsequent modification of such provisions, then a leasing commission shall be paid at such time as said additional space is occupied. Said leasing commission shall be computed in accordance with the provisions of this Exhibit A and by using the rates applicable as if the initial term of the lease had included said additional space.

3. **INVESTMENT SALE COMMISSIONS:**

    The investment sale commission for exclusive representation of the Property will be Three Percent (3%) of the final sales price for all or any part of the Property sold. CCRG/ Cushman & Wakefield shall cooperate and actively solicit the participation of outside Buyer representative brokers. An additional One Percent (1%) will be paid by Receiver should such outside broker be involved in procuring a Buyer.

4. In the event Receiver fails to make payments within the time limits called for herein, then from the date due until paid the delinquent payment shall bear interest at the maximum legal rate of the State of Nevada. In addition, should it become necessary for Manager to take legal action to collect payments due hereunder, and if Manager prevails in such action, Receiver shall pay all reasonable attorney fees and the court costs incurred by Manager in conjunction therewith.

5. The undersigned Receiver hereby acknowledges receipt of a copy of this Exhibit A and further agrees that it shall be binding upon the heirs, successors and assigns of the undersigned. The term Receiver when used herein shall be deemed to mean the Property of the Property.

6. The undersigned hereby authorize Manager to show the Property to its clients.

7. The laws of the State of Nevada shall govern the validity, construction, performance, and effect of this Agreement.



## EXHIBIT B
## CONSTRUCTION/PROJECT MANAGEMENT FEE SCHEDULE

1. <u>Construction/Project Management Fee:</u> The fee shall be a percentage of the cost of construction. Used herein, "cost of construction" shall include: all labor and supervision costs; costs of materials and supplies; contract price for all construction work performed by general contractors and subcontractors; fees, taxes or other charges levied by governmental or quasi-governmental agencies in connection with the issuance of all authorizations, approvals, licenses and permits necessary to undertake construction of the project; cost of all equipment and fixtures provided for in drawings and specifications; concrete, welding and other testing expenses; and, fire life safety improvements. **This fee is based on all hard and soft cost.** The fee schedule continued herein shall only apply to work and projects specifically approved by Receiver; and by this reference is made a part of that certain Property Management Agreement dated ___6-22-09___.
   *[handwritten: PROJECT MGT 6/22/09]*

2. ~~Receiver~~ Management Fee Schedule:

   | Construction Cost | Fee - % of Total Receiver Cost |
   |---|---|
   | $0 - $250,000 | 5%, plus |
   | $250,001 - $400,000 | 4%, plus |
   | $400,001 - $600,000 | 3.0%, plus |
   | Greater than $600,000 | By Negotiation |

   Example Fee Calculation for a tenant improvement with a cost of construction of $450,000:

   | Construction Cost | x | % Fee | CM Fee |
   |---|---|---|---|
   | $250,000 | | 5% | $12,500 |
   | $150,000 | | 4% | $ 6,000 |
   | $ 50,000 | | 3.0% | $ 1,500 |
   | Total Cost $450,000 | | Total PM Fee | $20,000 |

3. <u>Description of Construction/Project Management Services:</u> Receiver management shall consist of coordinating, overseeing and expediting the completion of tenant improvements and other capital construction, and shall include, but not be limited to, the following:

**Project Team Composition & Pre-Construction Activities**
   a. Assist Leasing Team in conceptual budgets for Prospects
   b. Recommend specialized team members in required disciplines
   c. Issue Requests for Proposals (RFP's) to Architects, Engineers, and other Specialty Contractors as required by project/Client
   d. Receive and analyze RFP responses and submit recommendation for Client review, approval and signature of contract(s)
   e. Prepare and Manage General Contractor bid and contract process
   f. Receive and analyze construction proposals and submit recommendation for Client review, approval and signature of contract
   g. Prepare analysis of Conceptual Plans to confirm project requirements and opportunities for Value Engineering

**Design and Construction**


An independently owned and operated member of the
CUSHMAN & WAKEFIELD ALLIANCE

a. Prepare analysis of Design Plans and subsequent Construction Documentation to confirm project requirements and opportunities for Value Engineering
b. Develop Landlord/Building Management coordination plan for project requirements
c. Establish and attend site meetings with Project Team
d. Monitor Project Schedule and progress of work and report to Client
e. Monitor Budget and report to Client
f. Monitor field activities and report to Client
g. Review monthly requests for payment from Project Vendors
h. Monitor completion of field inspections
i. Advise Client as to expected award to TCO
j. Conduct Punch List inspection with Architect and Client, (Architect to issue written documentation)
k. Monitor final sign-off of Improvements
l. Manage Close-out of Project Vendor contracts



## EXHIBIT C

### On-site staffing for the Property

- Property Manager ($60,000.00 estimated annual salary)
- Property Assistant ($33,000.00 estimated annual salary)
- Maintenance Engineer ($48,000.00 estimated annual salary)
- Assistant Maintenance Engineer ($32,000.00 estimated annual salary)

An independently owned and operated member of the
CUSHMAN & WAKEFIELD
ALLIANCE