HAL L. BAUME, ESQ.
New Jersey Bar No. 028741977
[*pro hac vice pending*]
DEANNA FORBUSH, ESQ.
Nevada Bar No. 6646
FOX ROTHSCHILD, LLP
3800 Howard Hughes Parkway,  Suite 500
Las Vegas, Nevada  89169
Telephone:  (702) 262-6899
Facsimile:   (702) 597-5503
Email: hbaume@foxrothschild.com
          dforbush@foxrothschild.com
[*Proposed*] *Counsel for FX Luxury Las Vegas I, LLC*

Electronically Filed April 21, 2010

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>FX LUXURY LAS VEGAS I, LLC,<br>a Nevada limited liability company,<br><br>                    Debtor. | Case No.  BK-S-10-17015-MAB<br><br>Chapter 11<br><br>**MOTION FOR APPROVAL OF STIPULATION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 363 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (A) AUTHORIZING AND APPROVING DEBTOR'S (1) USE OF CASH COLLATERAL, AND (2) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (B) SCHEDULING A FINAL HEARING**<br><br>Hearing Date:     April 23, 2010<br>Hearing Time:     2:30 P.M. (PDT) |

       FX Luxury Las Vegas I, LLC, ("Debtor" or "FX I"), the debtor and debtor-in-possession in the above-captioned case (the "Chapter 11 Case"), hereby submits this motion (the "Cash Collateral Motion"), for entry of an interim order (the "Interim Cash Collateral Order")[1] and final order (the "Final Cash Collateral Order"), pursuant to sections 105(a), 361, 362, and 363 of title 11 of the

---

[1]  Capitalized terms used herein and not otherwise defined have the meanings ascribed to them in the Interim Cash Collateral Order.

VG1 35735v2 04/21/10

1    United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rules 2002,

2    4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):   (a)

3    authorizing and approving Debtor's (i) use of the cash collateral (as defined in Section 363(a) of the

4    Bankruptcy Code, the "Cash Collateral") of its prepetition lenders, and (ii) the grant of certain

5    adequate protection to such prepetition lenders; and (b) scheduling the final hearing with respect to

6    the relief requested herein.   To the extent the relief requested in this Cash Collateral Motion is

7    inconsistent with the proposed Interim Cash Collateral Order and Final Cash Collateral Order

8    (collectively, the "Cash Collateral Orders"), as agreed upon by and between Debtor, the First Lien

9    Agent[2] and the First Lien Lenders , the relief afforded by the Cash Collateral Orders should govern.

10   As all of Debtor's cash (whether held by the Debtor, Receiver or First Lien Agent and

11   including all funds contained in the Prepetition Accounts) is Cash Collateral, Debtor's use of Cash

12   Collateral is critical to the Debtor's ability to continue operating as a going concern during the

13   course of this Chapter 11 Case thereby maximizing the value of Debtor's assets for the benefit of its

14   estate, its creditors and its equity interest holders.   Cash Collateral will be used to fund ongoing

15   expenses of operation, including, without limitation, employee payroll expenses and costs of

16   administering the Debtors' estate, including without limitation, fees assessed by the Office of the

17   United States Trustee and the Clerk of Court and fees and expenses of estate professionals.   Indeed,

18   absent sufficient funds to support the Debtor's business operations, the value of the Debtor's assets

19   will deteriorate substantially and any chance for a meaningful recovery by Debtor's estate, creditors

20   and equity interest holders would be imperiled.

21   All income generated by Debtor's real property assets was intended to be, and probably is,

22   Cash Collateral of the Senior Group (defined below).  Accordingly, Debtor and the Senior Group

23   have entered into that certain Stipulation for Entry of Interim and Final Orders Pursuant to 11

24   U.S.C. §§ 105, 361, 362, and 363 and Fed. R. Bankr. P. 2002, 4001 and 9014 (A) Authorizing and

25   Approving Debtor's (1) Use of Cash Collateral, and (2) Granting Adequate Protection to Prepetition

26   Secured Parties; and (B) Scheduling a Final Hearing (the "Cash Collateral Stipulation"), attached

28   [2] Unless otherwise defined herein, all capitalized terms shall have the same meaning ascribed in the Cash Collateral Orders.

VG1 35735v2 04/21/10

2

hereto as **Exhibit A**, by which Debtor consented to provide certain adequate protection to the Senior Group in consideration for the Senior Group's consent to Debtor's use of Cash Collateral, pursuant to the proposed form of Interim Cash Collateral Order attached hereto as **Exhibit B**. The Interim Cash Collateral Order also grants junior adequate protection to Second Lien Lenders that is comparable to the adequate protection granted to the First Lien Lenders even though the Debtor believes based on independent third-party appraisals that the Second Lien Lenders are undersecured. However, pursuant to that certain Amended and Restated Intercreditor Agreement dated as of July 6, 2007, the Second Lien Lenders are deemed to consent to Debtor's use of cash collateral so long as they receive comparable junior liens as the First Lien Lenders. By making this Cash Collateral Motion and entering into the Cash Collateral Stipulation, Debtor is not waiving the right to seek Court authority to compensate professionals retained by the estate. Debtor believes the Court's approval of the Cash Collateral Stipulation and entry of an Interim Cash Collateral Order providing for the authorization and approval of Debtor's use of Cash Collateral and granting adequate protection to its prepetition secured lenders, pending the Final Hearing, is in the best interests of the Debtor's estate, its creditors and its equity interest holders.

This Cash Collateral Motion is supported by the following points and authorities, the Omnibus Declaration of Mitchell J. Nelson Filed in Support of First Day Motions (the "Omnibus Declaration"), filed concurrently herewith and in support hereof, and any documentary evidence or arguments of counsel presented to the Court at, or before, a hearing on this Cash Collateral Motion, if any.

Pursuant to the terms of the Intercreditor Agreement, Second Lien Lenders are prohibited from objecting to any cash collateral order that grants to the Second Lien Lenders junior adequate protection that is comparable to the adequate protection granted to the First Lien Lenders.

**SUMMARY OF MATERIAL TERMS PURSUANT TO BANKRUPTCY RULE 4001**

Pursuant to Bankruptcy Rules 4001(b) and (d), the principal provisions of the Interim Cash Collateral Order are as follows (capitalized terms used but not immediately defined herein shall have the meanings ascribed to them later in this Cash Collateral Motion, in the Cash Collateral Stipulation or in the Interim Cash Collateral Order, as the case may be):

VG1 35735v2 04/21/10

(a)    ***Parties with Interest in Cash Collateral.***  The parties with interest in Cash Collateral are:  Landesbank Baden-Württemberg, New York Branch ("LBBW"), as the administrative agent and the collateral agent (in such capacity, the "First Lien Agent") and a lender, together with the other lenders from time to time party thereto (together with the First Lien Agent, the "Senior Group"), under the First Lien Credit Agreement (defined below).

(Interim Order, Finding I)

(b)    ***Purpose of Use of Cash Collateral.***  Debtor shall use Cash Collateral and any other collateral in which the First Lien Agent, on behalf of the First Lien Lenders, purports to have a lien or security interest (together with the Cash Collateral, the "Prepetition Collateral"), to satisfy only the following expenses:

(i)    the Debtor's ongoing general corporate and working capital expenses, to pay operating costs and other expenses and to make adequate protection payments to the First Lien Agent, pursuant to the budget annexed to the Interim Order as Exhibit 1 (or any revised budget approved in writing by the Debtor and the First Lien Agent with the consent of the First Lien Lenders, the "Budget");

(ii)    Expenses related to items provided for in the Budget without exceeding in any category or line item:  (y) two hundred per cent (200%) of the budgeted amount for the Borrower's Professional Fees (defined below) for the applicable period which have accrued and are payable (subject in all cases to the Fee Cap and the prior payment of any Lender's Fees then due), and (z) one hundred and ten per cent (110%) of the budgeted amounts for any item (other than the Borrower's Professional Fees) for the applicable period, (any such excess amount a "Permitted Variance");  and

(iii)    Expenses approved in writing by the First Lien Agent, pursuant to any Supplemental Budget Request.

( Interim Order, ¶ 1)

(c)    ***Adequate Protection to First Lien Lenders***.   The First Lien Agent shall receive, for the benefit of the First Lien Lenders, for and equal in amount to the aggregate diminution in value of the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of Cash Collateral or any other Prepetition Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code (collectively, the "First Lien Lender Adequate Protection Obligations"):

(i)    Replacement Liens (as defined in the Interim Cash Collateral Order)[3] on all Postpetition Collateral, with the Replacement Liens having the same relative priorities among and between the First Lien Agent, the First Lien

---

[3] The Replacement Liens shall not be subject to equitable subordination under section 510 of the Bankruptcy Code and shall not be subject to sections 549 or 550 of the Bankruptcy Code.

VG1 35735v2 04/21/10

Lenders, the Second Lien Agent and the Second Lien Lenders as set forth in the Security Agreements, in the Intercreditor Agreement and in the Co-Lender Agreement, subject and subordinate only to (i) the Carveout (as defined below) and (ii) liens encumbering such Postpetition Collateral (other than liens in favor of the First Lien Agent and the Second Lien Agent to secure the Prepetition Secured Indebtedness) that were properly perfected as of the Petition Date and senior to the liens granted in favor of the First Lien Agent and the Second Lien Agent to secure the Prepetition Secured Indebtedness (provided, however, that in the event any liens senior in priority to the prepetition security interests and liens held by the Prepetition Lenders are avoided or subordinated, the subordinated and avoided liens will not be preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code and the security interests and liens of Prepetition Lenders will be elevated in priority);

(ii)    The First Lien Lender Adequate Protection Obligations shall constitute allowed administrative expense claims under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "First Lien Lender 507(b) Claims") and shall be paid with priority over any and all (i) administrative expenses (other than the Carveout) of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code and (ii) unsecured claims, in each case against the Debtor, now existing or hereafter arising of any kind or nature.  The First Lien Lender 507(b) Claims shall at all times be senior to the rights of the Debtor, and any successor trustee or any creditor, in this chapter 11 case or any subsequent case under the Bankruptcy Code.   Subject only to the Carveout, no cost or expense of administration under Sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of this chapter 11 case pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the First Lien Lender 507(b) Claims arising out of the First Lien Lender Adequate Protection Obligations;

(iii)    Through the occurrence of a Termination Event, interest on the unpaid balance of the First Lien Prepetition Indebtedness from time to time outstanding payable at the LIBOR plus Liquidity Spread rate referenced in the Lockup Agreement (which during the pendency of the Debtor's chapter 11 case shall be deemed to be one-month LIBOR plus 150 basis points, subject to a final adjustment and true-up at the conclusion of the case based on a good faith calculation by the First Lien Agent of the LIBOR plus Liquidity Spread rate applicable during the pendency of the case) and paid by Debtor to the First Lien Agent for the benefit of the First Lien Lenders;

(iv)    Through the occurrence of a Termination Event, cash payment of all fees and disbursements of the First Lien Agent and the First Lien Lenders under the First Lien Credit Agreement (and the First Lien Loan Documents) incurred after the Petition Date including, but not limited to, the reasonable fees owed and amounts to be paid or reimbursed for professionals (including,

but not limited to, the reasonable fees and disbursements of counsel and consultants, including legal and financial consultants and any other consultants or professionals referred to in the First Lien Credit Agreement and the First Lien Loan Documents) for the First Lien Agent and the First Lien Lenders pursuant to the First Lien Credit Agreement and the First Lien Loan Documents; and

(v)    with respect to all payments described in the preceding paragraphs (iii) and (iv) (the "First Lien Lender Adequate Protection Payments"), the First Lien Agent and Debtor shall be permitted to cause such First Lien Lender Adequate Protection Payments to be made to the First Lien Lenders, in all cases subject to paragraph (d) below.

( Interim Order, ¶ 5)

(d)    ***Payment of Adequate Protection to First Lien Lenders.***  On the ninth business day of any calendar month, any cash held in the Debtor's Operating Account or the Agent Cash Management Account (but excluding cash held in the Travelodge Account, Security Deposit Account or cash retained on account of Chapter 11 Reserves), shall be applied by the Debtor and the First Lien Agent in the following order of priority (set forth more fully in the Interim Order): first, to pay Permitted Expenditures accrued in the preceding month or to establish reserves for Excess Funded Cash and the Opex Holdback; second, to costs and expenses of the First Lien Agent and the First Lien Lenders (including those of their respective counsel and other advisors for work relating to the chapter 11 case) in the preceding month; third, subject to the availability of sufficient funds for the next Monthly Funding Amount, to permitted expenses of the Debtor for the preceding calendar month; and fourth, adequate protection payments on account of interest accrued on the unpaid balance of the First Lien Prepetition Indebtedness at the Cost of Funds Rate, for the preceding calendar month; *provided*, *however*, that any such amounts shall be held in reserve by the First Lien Agent in the Agent Cash Management Account until certain benchmarks are met after which time any adequate protection payments on account of interest described in this priority "*fourth*" shall be payable to the First Lien Agent for the benefit of the First Lien Lenders.

( Interim Order, ¶ 6)

(e)    ***Adequate Protection to Second Lien Holders***.  The Second Lien Agent shall receive, for the benefit of the Second Lien Holders, for and equal in amount to the aggregate diminution in value of the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of Cash Collateral or any other Prepetition Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code (collectively, the "Second Lien Holder Adequate Protection Obligations"):

(i)    Effective and perfected as of the Petition Date and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or other agreements, Replacement Liens on the Postpetition Collateral, having the same relative priorities

6

among and between the Second Lien Agent, the Second Lien Holders, the First Lien Agent and the First Lien Lenders as set forth in the Security Agreements, in the Intercreditor Agreement and in the Co-Lender Agreement, subject and subordinate only to (i) the Replacement Liens granted to the First Lien Agent pursuant to preceding paragraph (c), (ii) the Carveout, and (iii) liens encumbering such Postpetition Collateral (other than liens in favor of the Second Lien Agent to secure the Prepetition Secured Indebtedness) that were properly perfected as of the Petition Date and senior to the liens granted in favor of the First Lien Agent or the Second Lien Agent to secure the Prepetition Secured Indebtedness (provided, however, that in the event any liens senior in priority to the prepetition security interests and liens held by the Prepetition Lenders are avoided or subordinated, the subordinated and avoided liens will not be preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code and the security interests and liens of Prepetition Lenders will be elevated in priority); and

(ii)     The Second Lien Holder Adequate Protection Obligations shall constitute allowed administrative expense claims under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "Second Lien Holder 507(b) Claims") and shall be junior in priority to the First Lien Lender 507(b) Claims, but otherwise shall be paid with priority over any and all (i) administrative expenses (other than the Permitted Expenditures and the Carveout) of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code and (ii) unsecured claims, in each case against Debtor, now existing or hereafter arising of any kind or nature.  The Second Lien Holder 507(b) Claims shall at all times be senior to the rights of the Debtor, and any successor trustee or any creditor (other than the First Lien Lenders), in this chapter 11 case or any subsequent case under the Bankruptcy Code.   Subject only to the Permitted Expenditures and the Carveout and the First Lien Lender 507(b) Claims, no cost or expense of administration under Sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of this chapter 11 case pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the Second Lien Holder 507(b) Claims of the Second Lien Agent arising out of the Second Lien Holder Adequate Protection Obligations.

( Interim Order, ¶  7)

(f)     **Stipulations; Releases by Debtors**.   Debtor has stipulated that no Cash Collateral or Prepetition Collateral may be used to (i) object to, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any liens or claims (other than with respect to the proper amount thereof and the amount of collateral securing such claims, if any) granted under the Interim Cash Collateral Order or the Security Agreements, (ii) assert any Challenges or other causes of action against the First Lien Agent, the First Lien Lenders, their predecessors or their respective agents, affiliates, representatives, attorneys or advisors related to the First Lien Loan Documents or the First Lien Prepetition Indebtedness, (iii) prevent, hinder

7

or otherwise delay any First Lien Agent's assertion, enforcement or realization on the Cash Collateral or the Prepetition Collateral (including, without limitation, through the filing of any motion to lift or modify the automatic stay for the purpose of pursuing state law remedies against such collateral), or (iv) seek to modify any of the rights granted to the First Lien Agent or the First Lien Lenders hereunder or under the First Lien Loan Documents, as applicable; subject to the right of any other party-in-interest to investigate and commence suit against the First Lien Agent and the First Lien Lenders in the time frame permitted under the Cash Collateral Orders.

( Interim Order, Recital W, ¶¶ 18-19)

      (g)    ***Carve-Out***.  The adequate protection payments and claims provided for herein and in the Interim Cash Collateral Order shall be subject to the estate's payment (of (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Statutory Fees"), (ii) the aggregate allowed unpaid fees and expenses payable under Sections 330 and 331 of the Bankruptcy Code to professional persons (including the Debtor's ordinary course professionals, the Debtor's sales agent and the Debtor's financial advisors) retained by the Debtor or any statutory committee appointed in this Chapter 11 Case pursuant to an order of the Court and the reasonable expenses of the members of such committee, in each case, solely with respect to services provided to the Debtor or work performed with respect to the Debtor, and subject to the limitations set forth in the Interim Cash Collateral Order (including the Fee Cap), in an amount for all such professional persons and such committee members in the aggregate not to exceed, after application of any and all retainers, $250,000; and (iii) in the event of conversion of the Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, the reasonable fees and expenses of a chapter 7 trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed an additional $125,000; provided, however, that under no circumstances shall the Carveout be used to pay professional fees and/or disbursements incurred at any time in connection with: (A) the prosecution of any Challenges (as defined in the Interim Cash Collateral Order) against the First Lien Agent and the First Lien Lenders, their predecessors or their respective affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with matters related to the First Lien Loan Documents, the Security Agreements, the First Lien Prepetition Indebtedness or the Prepetition Collateral, or (B) contesting any motion of the First Lien Agent seeking to modify or lift the automatic stay or to shorten, modify or otherwise alter the Debtor's exclusive periods for solicitation of acceptances of a plan of reorganization under Section 1121 of the Bankruptcy Code; provided, further, that the Carveout shall be available to pay professional fees and/or disbursements incurred in connection with the investigation of any potential Challenges in an amount not to exceed $50,000. So long as a Termination Event (as defined in the Interim Cash Collateral Order) has not occurred (or has been waived), and solely to the extent that they are Permitted Expenditures which have been funded by the First Lien Agent, the Debtor shall be permitted to pay (1) the Statutory Fees and (2) compensation and reimbursement of expenses allowed and payable under Section 330 and 331 of the Bankruptcy Code and/or any orders of this Court (which in no event shall exceed the Fee Cap (as defined on Exhibit B-1 to the Lockup

8

Agreement)), as the same may be due and payable; provided that the payment of items described by clauses (1) and (2) of this sentence shall not reduce the Carveout, except with respect to payments under clause (2) which shall always be subject to the Fee Cap.

( Interim Order ¶ 11)

(h)    **Automatic Stay**.    The automatic stay imposed by Section 362 of the Bankruptcy Code shall be modified to the extent necessary, if any, to authorize any payment under the Interim Cash Collateral Order and to implement and effectuate its terms and conditions.    Further, the Debtor shall be authorized and directed to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements necessary to effectuate the terms and conditions of the Interim Cash Collateral Order.

( Interim Order ¶ 23)

(i)    **Termination of Right to Use Cash Collateral**.    Debtor's right to use Cash Collateral shall terminate upon (i) the occurrence of a Termination Event and proper notice of such occurrence by the First Lien Agent under the Interim Cash Collateral Order, unless otherwise agreed to in writing by the First Lien Agent; or (ii) entry of an order by the Court appointing a trustee or examiner in the Chapter 11 Case.

( Interim Order, ¶¶ 13-14])

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.

## FACTUAL BACKGROUND

**A.    General Background and Overview.**

1.    On April 21, 2010 (the "<u>Petition Date</u>"), FX I filed a voluntary petition for relief initiating the Chapter 11 Case.  Debtor continues to operate its business and manage its properties as debtor and debtors-in-possession, pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.    No trustee or examiner has been appointed in this Chapter 11 Case, and no committees have been appointed or designated by the United States Trustee.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b) (2).

VG1 35735v2 04/21/10

4.     The statutory predicates for the relief requested herein are Bankruptcy Code 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001(b), 4001(d) and 9014, and Rule 4001 of the Local Rules of Bankruptcy Procedure and Practice for the United States District Court for the District of Nevada (the "Local Rules").

5.     Facts concerning the Debtor and its real property assets in general and events leading to Debtor's bankruptcy filing are detailed in the Omnibus Declaration and McHenry Declaration, which are incorporated for all purposes herein by this reference.

**B.     The Prepetition Secured Indebtedness.**

6.     Debtor is the owner of certain real property consisting of nine contiguous tax parcels,[4] in turn comprised of six leasable parcels, covering approximately 17.72 acres, located at the southeast corner of Las Vegas Boulevard and Harmon Avenue, Las Vegas, Nevada (the "Real Property Collateral").

7.     Pursuant to the terms of that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended, the "First Lien Credit Agreement;" together with the Loan Documents (as defined in the First Lien Credit Agreement), the "First Lien Loan Documents"), by and among Metroflag BP, LLC (subsequently renamed FX Luxury Las Vegas I, LLC) and Metroflag Cable, LLC (subsequently renamed FX Luxury Las Vegas II, LLC and merged into the Debtor on November 5, 2009), as borrowers (collectively, the "Borrowers"), BP Parent, LLC (subsequently renamed FX Luxury Las Vegas Parent, LLC and merged into the Debtor on November 5, 2009), as guarantor ("Guarantor"),[5] the lenders party thereto (collectively, the parties from time to time holding the indebtedness under the First Lien Credit Agreement, the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch ("Credit Suisse"), as administrative agent and collateral agent for the First Lien Lenders, the Borrowers borrowed $280,000,000 (the "First Lien Loan"), which loan was secured by, among other things, a first lien security interest in the Real Property Collateral pursuant to that certain First Lien Deed of Trust, Security Agreement,

---

[4]  The Assessor's Office for Clark County, Nevada identifies the tax parcels by Assessor Parcel Numbers 162-21-301-001, 162-21-301-003, 162-21-301-009, 162-21-301-014, 162-21-301-016, 162-21-301-017, 162-21-301-018, 162-21-301-019 and 162-21-301-020.

[5]  On November 5, 2009, the Borrowers and the Guarantor merged with the Debtor being the surviving entity.

VG1 35735v2 04/21/10

Assignment of Rents and Leases and Fixture Filing, dated as of May 11, 2007, and recorded on May 11, 2007, in Book 20070511 as Instrument 0004533 in the Official Records of Clark County, Nevada, by Borrowers in favor of First American Title Insurance Company, as trustee (the "<u>Security Trustee</u>")[6] for the benefit of Credit Suisse as administrative agent and as collateral agent for the First Lien Lenders, as amended by that certain First Amendment to First Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of July 6, 2007, and recorded on July 6, 2007, in Book 20070706 as Instrument 0004184, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for First Lien Lenders (as amended, amended and restated, supplemented and modified from time to time, the "<u>First Lien Deed of Trust</u>").

8.       Pursuant to the terms of that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended, the "<u>Second Lien Credit Agreement</u>"; together with the Loan Documents (as defined in the Second Lien Credit Agreement), the "<u>Second Lien Loan Documents</u>"), by and among the Borrowers, as borrowers, Guarantor, the lenders party thereto (collectively, the parties from time to time holding the indebtedness under the Second Lien Credit Agreement, the "<u>Second Lien Lenders</u>" and together with the First Lien Lenders, the "<u>Prepetition Lenders</u>"), and NexBank SSB, as successor in interest to Credit Suisse, as second lien administrative agent and collateral agent (the "<u>Second Lien Agent</u>" and collectively with the First Lien Agent (as hereinafter defined), the "<u>Agents</u>"), the Borrowers borrowed $195,000,000, which loan was secured by a second lien security interest in the Real Property Collateral pursuant to that certain Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of May 11, 2007, and recorded on May 11, 2007, in Book 20070511 as Instrument 0004536 in the Official Records of Clark County, Nevada, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for the Second Lien Lenders, as amended by that certain First Amendment to Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of July 6, 2007,

---

[6] Nevada Title Company, a Nevada corporation, was substituted in place of First American Title Insurance Company, the original Trustee under the First Lien Deed of Trust, pursuant to a Substitution of Trustee recorded on April 9, 2009 in Book 20090409 as Instrument 0003049 in the Official Records of Clark County, Nevada.

VG1 35735v2 04/21/10

and recorded on July 6, 2007, in Book 20070706 as Instrument 0004185 in the Official Records of Clark County, Nevada, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for the Second Lien Lenders (as amended, amended and restated, modified or supplemented from time to time, the "Second Lien Deed of Trust").

9.      Pursuant to the terms of that certain Co-Lender Agreement, dated as of July 6, 2007, by and between Column Financial, Inc., Münchener Hypothekenbank eG ("MHB") and Deutsche Hypothekenbank (Actien-Gesellschaft) ("Deutsche Hypo"), (i) the First Lien Loan was split into two tranches, an A tranche (the "Note A Tranche") in the amount of $250,000,000, and a B Tranche (the "Note B Tranche") in the amount of $30,000,000, with the Note B Tranche to at all times be junior, subject and subordinate to the Note A Tranche, (ii) Deutsche Hypo acquired its interest in the Note A Tranche in an amount equal to $125,000,000 and (iii) MHB acquired its interest in the Note A Tranche in an amount equal to $125,000,000 and its interest in the Note B Tranche in an amount equal to $30,000,000.

10.     Pursuant to the terms of that certain Assignment Agreement, dated as of December 17, 2007, (i) Deutsche Hypo assigned a portion of its interest in the Note A Tranche in an amount of $80,000,000 to Landesbank Baden-Württemberg ("LBBW") and (ii) MHB assigned a portion of its interest in the Note A Tranche in an amount of $50,000,000 to LBBW and LBBW acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

11.     Pursuant to the terms of that certain Assignment Agreement, dated as of June 25, 2009, MHB assigned a portion of its interest in the Note A Tranche in an amount of $50,000,000[7] to Great Lakes Reinsurance (UK) PLC ("Great Lakes") and Great Lakes acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.[8] Pursuant to the terms of that certain Appointment of Successor Administrative Agent and Collateral

---

[7]  The amount assigned to Great Lakes was $50,000,000 based on the original principal amount outstanding under the First Lien Credit Agreement and thus amounts actually owed to Great Lakes by the Debtor have ratably reduced as a result of the application of the proceeds of approximately $21,000,000 in collateral received by LBBW, MHB and Deutsche Hypo following the Default (as further described below).

[8]  Great Lakes' current exposure amounts to [$45,800,000], 20% of the outstanding loan.

VG1 35735v2 04/21/10

Agent, dated as of December 22, 2008, Landesbank Baden-Württemberg, New York Branch (the "First Lien Agent"), succeeded Credit Suisse as the administrative agent and the collateral agent under the First Lien Credit Agreement.

12. Pursuant to the terms of each of (i) the First Lien Deed of Trust, (ii) the Second Lien Deed of Trust, (iii) that certain Pledge and Security Agreement, dated as of May 11, 2007 by the Debtor in favor of the First Lien Agent, the First Lien Collateral Documents (as defined in that certain Amended and Restated Intercreditor Agreement, dated as of July 6, 2007 (the "Intercreditor Agreement") by and between Guarantor, Borrowers, the First Lien Agent (as successor in interest to Credit Suisse) and the Second Lien Agent), (iv) that certain Pledge and Security Agreement, dated as of May 11, 2007 by the Debtor in favor of the Second Lien Agent and (v) the Second Lien Collateral Documents (as defined in the Intercreditor Agreement) (such documents (i)-(v), collectively, the "Security Agreements"), the Borrowers granted to (I) the First Lien Agent for the benefit of the First Lien Lenders, and (II) the Second Lien Agent for the benefit of the Second Lien Lenders, in each case in accordance with the priorities set forth in the Intercreditor Agreement, security interests in and liens on the Real Property Collateral and all of the other Collateral (as defined in the Intercreditor Agreement), in each case to secure the obligations under the FX Loan Documents (all of the collateral described in the Security Agreements being the "Prepetition Collateral").

13. Pursuant to the terms of the First Lien Deed of Trust, the Borrowers absolutely and unconditionally assigned their rights to receive all Rents (as defined in the Security Agreements) derived from the Prepetition Collateral as well as any future leases to the First Lien Agent for the benefit of the First Lien Lenders.

14. On the Maturity Date (as defined in the First Lien Credit Agreement), the Borrowers failed to repay the principal, interest, and other amounts due under the First Lien Loan. That failure constituted an Event of Default (i) under Section 7.1 of the First Lien Credit Agreement, and (ii) under Section 5.1 of the First Lien Deed of Trust.

15. On January 6, 2009, the First Lien Agent delivered a letter to the Borrowers confirming that an Event of Default (as defined in the First Lien Credit Agreement) had occurred.

13

16.     Under Section 2.3 of the First Lien Deed of Trust, upon the occurrence of an Event of Default, the Borrowers' license to collect Rents would "automatically and immediately terminate" upon the giving of a notice by First Lien Agent, and First Lien Agent would be entitled to "receive and collect the Rents personally or through an agent."

17.     Following the Borrowers' Default, First Lien Agent exercised its rights under the assignment of rents in the First Lien Deed of Trust and NRS Chapter 107A.  First Lien Agent delivered a letter to the Borrowers dated January 28, 2009, in which First Lien Agent: (i) revoked the Borrowers' license to collect, receive, use and enjoy the Rents, and (ii) instructed the Borrowers to deposit any Rents which they might receive into a certain "Lockbox Account" pledged to First Lien Agent (the "Agent Cash Management Account").  On or about the same date, First Lien Agent sent the tenants (the "Tenants") leasing space at the Real Property Collateral a notice substantially in accordance with the form set forth in NRS 107A.290, instructing the Tenants to pay Rents directly to First Lien Agent instead of to the Borrowers.

18.     On June 23, 2009, the Eighth Judicial District Court of Nevada entered an order appointing Larry L. Bertsch as a receiver (the "Receiver") with respect to the Real Property Collateral.

19.     On October 27, 2009, the Borrowers, the Guarantor, the First Lien Lenders, and certain other parties thereto entered into that certain Lockup and Plan Support Agreement, which was amended by that certain First Amendment to the Lock Up and Plan Support Agreement, dated as of April 16, 2010 (as it may be further amended, supplemented or modified from time to time in accordance with the terms thereof, the "Lock Up and Plan Support Agreement").

20.     Without prejudice to the rights of any other party, the Debtor admits, stipulates, and agrees that:

      (a)     the First Lien Loan Documents are in default and have been in default since December 19, 2008 and the Debtor failed to repay the First Lien Loan at maturity on January 6, 2009;

      (b)     as of the Petition Date, the Debtor was indebted and liable to the First Lien Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $259,000,000[9] for loans made under the First Lien

---

[9] This amount does not include accrued interest or applied payments since Debtor's default.

VG1 35735v2 04/21/10

Credit Agreement,[10] plus interest thereon, fees and expenses (including any reasonable attorneys' and advisors' fees that are chargeable or reimbursable under the First Lien Credit Agreement and the First Lien Loan Documents) (all such indebtedness set forth in this paragraph (b), the "First Lien Prepetition Indebtedness");

(c)     as of the Petition Date, the Debtor was indebted and liable to the Second Lien Lenders, in the aggregate principal amount of not less than approximately $195,000,000 for loans made under the Second Lien Credit Agreement (the "Second Lien Prepetition Indebtedness," and together with the First Lien Prepetition Indebtedness, the "Prepetition Secured Indebtedness");

(d)     the First Lien Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with its terms (other than in respect of the stay of enforcement against the Debtor arising from Section 362 of the Bankruptcy Code);

(e)     the liens and security interests granted to the First Lien Agent pursuant to and in connection with the First Lien Loan Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, control agreements, assignments (including assignments of rents, revenue, income, issues and profits) and other security documents executed by the Debtor in favor of the First Lien Agent, for its benefit and for the benefit of the First Lien Lenders, are (a) valid, binding, perfected, enforceable, first priority liens and security interests in the tangible and intangible property constituting the Prepetition Collateral, (b) not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including any "equities of the case" assertions under section 552(b) of the Bankruptcy Code) and (c) subject and subordinate only to (I) the Carveout (as defined below), solely with respect to the cash of the Debtor (whether held by the Debtor or the First Lien Agent), and (II) valid, perfected and unavoidable liens to the extent such liens are senior to the liens of the First Lien Agent on the Prepetition Collateral;

(f)     as of the Petition Date, all of the Debtor's cash is held in (i) the Agent Cash Management Account; (ii) the FX Las Vegas I, LLC account at Bank of America (Account No. 004964929401) (the "Debtor's Operating Account"); (iii) the Metroflag Travelodge Checking Account at Bank of America (Account No. 004961612371) (the "Travelodge Account"); and (iv) a restricted account[11] held by the Receiver holding security deposits received from the Tenants, which are to be turned over to Debtor who will open a new, restricted account to hold the Tenants' deposits (the "Security Deposit Account," and together with the Operating Account and the Travelodge Account, the "Prepetition Accounts"); and there exist no other

---

[10] Pursuant to their rights to exercise remedies under the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement), the First Lien Lenders recovered approximately $21,000,000 in principal from the collateral proceeds following the Default.

[11] The Security Deposit Account is subject to the Stipulation for Turnover of Certain Assets Held by Receiver to Debtor in Possession between Debtor, Receiver and the First Lien Agent, which was submitted contemporaneously herewith for the Court's consideration for the termination of the receivership, turnover of assets by the Receiver to Debtor and release of the Receiver's prepetition claims against the Debtor.

15

VG1 35735v2 04/21/10

accounts in the name of the Debtor, the Borrowers or the Guarantor which contain any cash on the date hereof; and

(g)    subject to any waivers, modifications or temporary forbearances provided for under the Lock Up and Plan Support Agreement, all guaranties, sureties and other third party obligations owed to or for the benefit of the First Lien Lenders under the First Lien Loan Documents or other documents related thereto remain in full force and effect, and the Debtor will refrain, and will cause its affiliates to refrain, from taking any steps to release or terminate any such obligations.

21.    All of the Debtor's cash (whether held by the Debtor or the First Lien Agent and including all funds contained in the Prepetition Accounts) constitutes Prepetition Collateral or proceeds of the Prepetition Collateral and, therefore, is Cash Collateral.

22.    Without the ability to utilize the Cash Collateral, the value of the Prepetition Collateral will deteriorate substantially.  Accordingly, the First Lien Agent on behalf of the First Lien Lenders and the Debtor have negotiated at arm's length and in good faith regarding the use of the Cash Collateral to fund the Debtor's business.

23.    In Debtor's business judgment, entry of an Interim Cash Collateral Order and a Final Cash Collateral Order approving the Cash Collateral Stipulation and authorizing and approving Debtor's use of Cash Collateral as described herein and in the Interim Cash Collateral Order is in the best interests of the Debtor, its estate and its creditors and equity holders.

VG1 35735v2 04/21/10

## II.

### BASIS FOR RELIEF

**A.    Statutory Framework for the Use of Cash Collateral.**

Debtor's use of property of the estate is governed by Bankruptcy Code Section 363.  11 U.S.C. § 363(c)(1); see 11 U.S.C. § 1107(a) and 1108.  Bankruptcy Code Section 363(a) defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552 (b) of this title, whether existing before or after the commencement of a case under this title."  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to cash collateral providing that the trustee or debtor-in-possession may use cash collateral under subsection (c)(1) if:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2)(A) and (B).

Bankruptcy Code Section 363(e) is also relevant and provides, in pertinent part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e).

Bankruptcy Code Section 361 indicates that adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the

17

extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503 (b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Section 361 provides three non-exclusive means of providing adequate protection, where the same is required, in that adequate protection may take many forms.  3 Collier on Bankruptcy, (15th Ed. 2008), § 361.03.   Among other things, the term "indubitable equivalent" has been interpreted liberally.   In re Mocco, 176 B.R. 355 (Bankr. D. NJ. 1995) citing United States Association v. Timbers of Inwood Forest Associates, 484 U.S. 365, 378 (1988), 108 S. Ct. 626, L.Ed. 2d 740.  The use of cash collateral involves balancing the interests of the debtor and the secured creditor and the equities must thus be balanced in each case.   In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  It is recognized that "the purpose of Chapter 11 is to rehabilitate debtors and generally, access to cash collateral is necessary to operate a business."   In re Dynaco Corporation, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting In re Stein, supra, 19 B.R. at 459.  In order to encourage reorganization, a flexible approach should be used in the application of adequate protection.  In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (citing In re Martin, 761 F.2d 472 (8th Cir. 1985).   The debtor's use of cash collateral during case administration must be considered in light of the quest of a successful reorganization.   In re O'Connor, 808 F.2d 1393, 1397 (10th Cir. 1987).  Adequate protection is not intended nor need it stand as an absolute guarantee to the secured creditor that it will receive the value of its interest in the collateral; the cash collateral.  McCombs, 88 B.R. at 267 ; In re Elliott Lease Cars, Inc., 20 B.R. 893 (Bankr. D. R.I. 1982).

Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15-day period following the filing of a motion requesting authorization to use cash collateral, "only … as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business

18

1   decisions.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 449 (D. Co. 1985), 47 B.R. at 449;

2   see also, In re Ames Dept's Stores Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  The Ninth Circuit

3   Court of Appeals has recognized that immediate interim relief may be crucial to the success of a

4   corporate reorganization:

> We realize that in certain circumstances, the entire reorganization effort may
> be thwarted if emergency leave is withheld and that reorganization under the
> Bankruptcy Code is a perilous process, seldom more so that at the outset of the
> proceeding when the debtor is often without sufficient cash flow to fund a
> central business operation.  In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr.
> D. ME 1986).  It is for this reason that Congress specified that hearings
> concerning the use of cash collateral 'shall be scheduled in accordance with
> the needs of the debtor." 11 U.S.C. § 363(c)(3).

10  In re Center Wholesale, Inc., 795 F.2d 1440, 1449 n 21 (9th Cir. 1985).

11          After the 15-day period, the request for use of cash collateral is not limited to those amounts

12  necessary to prevent immediate and irreparable harm to the debtor's business.  Rather, a debtor is

13  entitled to use cash collateral that it believes prudent in the operation of its business.  See, e.g.,

14  Simasko, 47 B.R. at 449; Ames Dep't Stores, 115 B.R. at 36.

15          Debtor brings this Cash Collateral Motion to obtain the requisite permission to use cash

16  collateral for the operation of its properties and business.  Further, in compliance with Bankruptcy

17  Code Section 363(e), Debtor has provided a comprehensive proposal for the provision of adequate

18  protection to the Prepetition Lenders that, in Debtor's business judgment, provides ample protection

19  against any diminution in their respective interests in the Prepetition Collateral.  Debtor submits, as

20  demonstrated herein, that the facts and circumstances of this Chapter 11 Case justify Debtor's use

21  of Cash Collateral and the adequate protection to be provided to the Prepetition Lenders, as

22  proposed by Debtor and set forth in the Stipulation, is more than adequate.  Debtor further

23  respectfully requests that, pursuant to Bankruptcy Rule 4001(b)(2), this Court set a date and time

24  for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Cash

25  Collateral Motion on a final basis.

26  **B.      Debtor Should Be Authorized To Use Cash Collateral To Operate, Maintain and**

27  **          Preserve the Properties and to Fund the Costs of Its Operations.**

28          It is well settled that the use of cash collateral for the preservation of the value of a secured

19

1   creditor's lien is in of itself sufficient to provide adequate protection to a secured creditor for

2   use of those funds.    Federal Natl. Mortgage v. Dacon Bollingsbrook Associates Limited

3   Partnership, 153 B.R. 204; 214 (N.D. Ill. 1993); In re Triplett, 87 B.R. 25 (Bankr. W.D. Tex. 1988);

4   In re Stein, supra, In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981).  In Stein, the

5   court found that, as a general rule, a debtor may use cash collateral where such use would enhance

6   or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even

7   though the secured party had no equity cushion for protection.  The Stein court determined that the

8   use of cash collateral was necessary to the continued operations of the debtor, and that the

9   creditor's secured position could only be enhanced by the continued operation of the debtor's

10  business.

11      In In re McCombs, supra, the court determined that the debtor's use of cash collateral for

12  needed repairs, renovations, and operating expenses eliminated the risk of diminution in the

13  creditor's interest in the cash collateral and such use would more likely increase cash collateral.  Id.

14  The ordinary and customary costs of maintenance, operation and preservation of property are

15  expenses that preserve and enhance the value of the secured creditor's interest in cash collateral.

16  Id.  Such expenses are the same expenses a lender or the lender's receiver would have to pay to

17  preserve and protect the property, and thus, there should be no dispute of the appropriateness of

18  payment of such expenses for their collateral properties by the Cash Collateral Creditors holding

19  liens against the Cash Collateral Properties.  See In re Princeton Square Associates, L.P., 201 B.R.

20  90, 96 (Bankr. S.D.N.Y. 1996).  Debtor's use of Cash Collateral will preserve and maximize the

21  value of its assets, not diminish the value.

22      As consideration for its use of Cash Collateral, Debtor's proposals as and for adequate

23  protection to its Prepetition Lenders, as summarized above and more fully set forth in the proposed

24  Cash Collateral Orders attached hereto,[12] include, by way of illustration and not limitation:  (i)

25  replacement liens on the Postpetition Collateral, in the same order of priority as the Prepetition

26  Lenders' interest in the Prepetition Collateral; and (ii) Debtor's use of Cash Collateral that will first

27  fund the expenses of preserving, maintaining and operating the Debtor's real properties and,

28  _____

[12]   A form of proposed Final Cash Collateral Order is attached here to as **Exhibit C**.

20

1    subsequently, will fund other reserves and expenses, subject to the budgetary restraints and

2    oversights described in the proposed Cash Collateral Orders attached hereto.  Thus, in Debtor's

3    business judgment  the value of the Prepetition Lenders' interest in Cash Collateral will not be

4    diminished by Debtor's use, or through the passage of time.  Further, with respect to adequate

5    protection, all of the Debtor's assets are properly and sufficiently insured with the appropriate

6    parties under the Security Agreements identified as loss payees.

7         The Court has discretion to determine the extent of adequate protection the Prepetition

8    Lenders are entitled to.  In re Deico Electronics, Inc., 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992).

9    Debtor's provision of replacement liens to the extent that its use of Cash Collateral results in a

10   decrease in the value of the Prepetition Lenders' interest in Real Property Collateral.  11 U.S.C.

11   §361(2).  While the proposed form of Cash Collateral Orders do not provide for adequate protection

12   payments to the Second Lien Agent or Second Lien Lenders, Debtor submits that the Replacement

13   Liens being provided the Second Lien Agent and Second Lien Lenders -- who are likely

14   undersecured -- are sufficient adequate protection to permit Debtor's use of Cash Collateral.  In re

15   Marion Street Partnership, 108 B.R. 218 (Bankr. D. Minn. 1989).

16        In the Marion Street case, the court found that the property, which was an operating building

17   that was near capacity, was being fully maintained with cash flow in sufficient sums to pay

18   operating expenses and to pay the real estate taxes and needed maintenance.  Id.  That court also

19   found that management was competent and concerned enough to keep the property intact that the

20   undersecured creditor's interest in the property was being adequately protected to the extent

21   required by law.  Id.  The court also declared that, with respect to the rents which are cash collateral

22   within the meaning of 11 U.S.C. § 363(a), the evidence indicated that the rents were not being

23   dissipated but were being used to pay the operating expenses, real estate taxes and required

24   maintenance and repair.  Id.  Accordingly, in that case, the court held that the undersecured creditor

25   failed to establish a decline in the value of its collateral or that it was not being adequately protected

26   with respect to the rents.  Id.

27        The same is true in the instant case.  Debtor does not have any unencumbered cash.  The

28   Cash Collateral Orders provide that all of Debtor's cash, all of which is Cash Collateral, be applied

1    within the constraints of the Budget and in order of priority set forth in the Cash Collateral Orders

2    that first requires payments for the Permitted Expenditures to maintain the value of the Real

3    Property Collateral for the benefit of the Prepetition Lenders.  Provided sufficient cash flows are

4    available, remaining Cash Collateral is to be used to fund reserves and pay other expenses.

5    Allowing Debtor to continue to pay for services, such as the management and operation of the

6    Travelodge, preserves Debtor's reputation with its current and prospective vendors, including hotel

7    guests, restaurant customers, and those that refer business to the Travelodge, such as travel agents.

8    In so doing, Debtor maximizes income and, accordingly, maintains the value of its business

9    (including the Travelodge) as an operating company, which will allow Debtor to maintain the

10   "going concern value" of its assets in anticipation of marketing the Real Property Collateral for sale

11   and maximizing value for its estate and its creditors.  Conversely, refusing to allow Debtor to

12   continue to pay for services, including payments to employees and for operation of the Travelodge

13   and other businesses, by barring Debtor's use of Cash Collateral will result in the immediate

14   termination of operations, employees and a sharp decline in asset value.  To date, Debtor has

15   obtained the consent of the First Lien Agent and First Lien Lenders to the use of Cash Collateral, as

16   evidenced by the Cash Collateral Stipulation, but has not yet obtained the consent of the Second

17   Lien Agent and Second Lien Lenders.  Here, as in <u>Marion Street</u>, rents and other revenues

18   generated by the Real Property Collateral are not being dissipated but were being, and will continue

19   to be, used to pay the operating expenses, real estate taxes and required maintenance and repair of

20   the Real Property Collateral.  Accordingly, Debtor submits that the Court may and should approve

21   the Cash Collateral Stipulation and Debtor's use of Cash Collateral and grants of adequate

22   protection described in the Cash Collateral Orders.

23          The reasons underlying Debtor's need to use Cash Collateral during the course of this

24   Chapter 11 Case are compelling.  As all of Debtor's cash (whether held by Debtor, Receiver or First

25   Lien Agent) is Cash Collateral, Debtor's use of Cash Collateral is required to fund day-to-day

26   business operations, including payments to employees, and to generally to sustain and maintain the

27   Real Property Collateral.  Debtor's provisions of adequate protection to the Prepetition Lenders,

28   including the provision of replacement liens to the Second Lien Agent and Second Lien Lenders, is

22

1  sufficient to permit Debtor's use of Cash Collateral.  Unless the Court authorizes Debtor's use of

2  the Cash Collateral, Debtor will be unable to pay for services and expenses necessary to continue its

3  business operations, pay its employees and maintain the value of Debtor's estate.  Indeed, absent

4  sufficient funds to support the Debtor's business operations, Debtor's ability to maximize the value

5  of its assets would be imperiled.  Therefore, approving the Cash Collateral Stipulation and entering

6  the Interim Cash Collateral Order thereby authorizing Debtor's use of Cash Collateral pending the

7  Final Hearing is in the best interests of Debtor's estate and creditors.

8                                             **III.**

9                                      **CONCLUSION**

10        Debtor respectfully submits that it has satisfied the standards applicable for its use of Cash

11  Collateral.  As described herein, Debtor's immediate access to Cash Collateral is vital to the

12  preservation of the Debtor's business.  Debtor's ability to maximize the value of its assets for the

13  benefit of the estate and Debtor's creditors depends heavily upon the expeditious approval of the

14  use of Cash Collateral.  Absent this Court's approval of the Cash Collateral Stipulation and the use

15  of Cash Collateral and granting of adequate protection provided in the Interim Cash Collateral

16  Order, Debtor faces a substantial risk of severe disruption to its business operations, irreparable

17  damage to its relationships with its vendors and customers, and the inability to maintain the value of

18  its assets.

19        WHEREFORE, for all of the foregoing reasons, Debtor respectfully requests that the Court

20  enter the Interim Cash Collateral Order in substantially the form attached hereto as Exhibit B, set a

21  date and time for the Final Hearing to consider entry of a Final Cash Collateral Order approving the

22  relief sought in this Cash Collateral Motion on a final basis, and grant such other and further relief

23  as is just and proper under the circumstances.

24

25

26

27

28

VG1 35735v2 04/21/10

23

1

2    DATED this 21st day of April 2010.

3                    **FOX ROTHSCHILD LLP**

4               By___*/s/ Deanna L. Forbush*_____

5                  HAL L. BAUME, ESQ.
                    New Jersey Bar No. 028741977

6                  [*pro hac vice pending*]
                    DEANNA FORBUSH, ESQ.

7                  Nevada Bar No. 6646
                    3800 Howard Hughes Parkway, Suite 500

8                  Las Vegas, Nevada  89169
                    Telephone:  (702) 262-6899

9                  *[Proposed] Counsel for FX Luxury Las Vegas I, LLC*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VG1 35735v2 04/21/10