HAL L. BAUME, ESQ.
New Jersey Bar No. 028741977
[*pro hac vice pending*]
DEANNA FORBUSH, ESQ.
Nevada Bar No. 6646
FOX ROTHSCHILD, LLP
3800 Howard Hughes Parkway,  Suite 500
Las Vegas, Nevada  89169
Telephone:  (702) 262-6899
Facsimile:  (702) 597-5503
Email: hbaume@foxrothschild.com
         dforbush@foxrothschild.com
*[Proposed] Counsel for FX Luxury Las Vegas I, LLC*

| Electronically Filed April 21, 2010 |

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.  BK-S-10-17015-MAB |
| FX LUXURY LAS VEGAS I, LLC, a Nevada limited liability company, | Chapter 11 |
| | **OMNIBUS DECLARATION OF MITCHELL J. NELSON FILED IN SUPPORT OF FIRST DAY MOTIONS** |
| Debtor. | Hearing Date:    **April 23, 2010**<br>Hearing Time:    **2:30 p.m. PDT** |

MITCHELL J. NELSON, being duly sworn, hereby deposes and declares under penalty of perjury:

1.      I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2.      I am the President of FX Luxury Las Vegas I, LLC (fka Metroflag BP, LLC) ("Debtor" or "FX I").  I am also Executive Vice President and General Counsel of FX Real Estate and Entertainment, Inc. ("FX Real Estate") and have served in that capacity since December 31, 2007.  Except as otherwise limited herein, I make the following statements based upon my personal knowledge, belief and where applicable, upon the business records of Debtor, and its non-debtor affiliates, in support of the motions filed by FX I, debtor and debtor-in-possession, on the first day of the above-captioned chapter 11 bankruptcy case.  To the extent

1

that the statements below relate to, or describe, the operation and management of the Properties (hereinafter defined) after June 19, 2009, then such statements are based on information and reports furnished by the Receiver (hereinafter defined). All statements below referencing or describing the First Lien Loan, the First Lien Loan Documents, the Second Lien Loan and the Second Lien Loan Documents (all such terms hereinafter defined) are based on information furnished by the First Lien Agent (hereinafter defined) or the Second Lien Agent (hereinafter defined), as applicable, and are qualified in their entirety by the terms and conditions of the First Lien Loan Documents or the Second Lien Loan Documents, as applicable. All statements containing legal conclusions herein are based on advice from counsel.

3.     On April 21, 2010 (the "Petition Date"), FX I[1] filed a voluntary petition for relief initiating the above-captioned chapter 11 proceeding (the "Chapter 11 Case").

**A.     Debtor's Capital Structure.**

4.     FX I is a limited liability company formed under the laws of the state of Nevada on December 26, 2001. FX I is wholly owned by FX Luxury, LLC ("FX LLC"), a non-debtor limited liability company formed under the laws of the state of Delaware on April 13, 2007.

5.     FX, LLC is, in turn, owned by (i) FXL, Inc., a non-debtor corporation incorporated under the laws of the State of Delaware on December 21, 2009, which is wholly owned by FX Real Estate and Entertainment, Inc. ("FX Real Estate"), a non-debtor publicly traded C-corporation incorporated under the laws of the state of Delaware on June 15, 2007, and (ii) FXL Priority Corp., a non-debtor corporation formed under the laws of the state of Delaware on December 21, 2009. A chart outlining the ownership structure of FX I and its affiliated companies is attached hereto as **Exhibit 1** and is incorporated herein by this reference. A history of the Debtor's business operations and its non-debtor affiliates is detailed in the most recent

---

[1] In August 2008, FX I changed its name from Metroflag BP, LLC, to FX Luxury Las Vegas I, LLC. At the same time, affiliated entities BP Parent, LLC, and Metroflag Cable, LLC, changed their names to FX Luxury Las Vegas Parent, LLC ("Las Vegas Parent"), and FX Luxury Las Vegas II, LLC ("FX II"), respectively. On November 5, 2009, FX II merged its assets and operations into FX I. Subsequently, also on November 5, 2009, Las Vegas Parent merged its assets and operations into FX I. The merger of FX II and Las Vegas Parent into FX I accomplished a more accurate reflection of the actual business operations of the entities, which have always been consolidated and effectively operated as a single enterprise.

LV1 1188551v2 04/21/10

public filing for FX Real Estate, which is attached hereto as **Exhibit 2** and is incorporated herein by this reference.

### B. Debtor's Business Operations.

6.      Debtor owns and operates real property consisting of nine contiguous tax parcels,[2] in turn comprised of six leasable parcels, covering approximately 17.72 contiguous acres of land (the "Properties" or "Real Property Collateral") located on the world famous Las Vegas Strip.  The Properties lie at the southeast corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada and extend south almost to Tropicana Avenue.  The Properties are currently comprised of a motel operation and several commercial and retail tenants with a mix of short- and long-term leases, including well-known establishments such as Smith & Wollensky, McDonald's, Fatburger, Walgreen's, and Sunglass Hut.  Prepetition, the Debtor and its affiliates had commenced design and planning for a redevelopment plan for the Properties that included a hotel, casino, entertainment, retail, commercial and residential development project.  As a result of the disruption of the capital markets and the economic downturn in the United States in general, and Las Vegas in particular, the Debtor decided not to proceed with its originally proposed plan of redevelopment.

7.      The  Properties consist of six parcels described as follows:

a) Parcel 1 – is comprised of 0.996 acres.  One tenant currently occupies parcel 1.  The lease is terminable at any time by either party upon one hundred twenty (120) days' prior written notice and without the payment of a termination fee.

b) Parcel 2 – is comprised of 5.135 acres.  The land is occupied by a Travelodge motel, which FX I owns in fee, as well as several retail, billboard and parking lot tenants.  The Travelodge motel is being operated by WW Lodging Limited, LLC ("WW Lodging"), pursuant to a management agreement.  The management agreement is terminable upon thirty (30) days' prior notice and a termination fee equal to 4% of the trailing twelve (12) months room revenue multiplied by 200%.  The property's retail, billboard and parking lot leases are month-to-month.

---

[2]  The Assessor's Office for Clark County, Nevada identifies the tax parcels by Assessor Parcel Numbers 162-21-301-001, 162-21-301-003, 162-21-301-009, 162-21-301-014, 162-21-301-016, 162-21-301-017, 162-21-301-018, 162-21-301-019 and 162-21-301-020.

3

c) <u>Parcel 3</u> – is comprised of 2.356 acres.  This parcel currently hosts the Hawaiian Marketplace, which consists of multiple retail tenants.  All but six of the leases on this property are terminable at any time upon thirty (30) days (in one instance one hundred eighty (180) days) advance written notice and without payment of a termination fee.  All six leases not terminable with notice are terminable by FX I at any time upon the exercise of options to either repurchase, recapture or relocate the premises.

d) <u>Parcel 4</u> – is comprised of 4.49 acres.  It is currently occupied by several tenants.  The leases are month-to-month, except for a lease with a single tenant whose lease term expires in July 2014.

e) <u>Parcel 5</u> – is comprised of 3.008 acres.  The property accommodates 51,414 square feet of retail space and is currently occupied by several restaurant and retail tenants.  One lease term expires in January 2012, but is terminable earlier upon one hundred twenty (120) days advance written notice and requires payment of an early termination fee of $200,000.  A second lease term expires in August 2012, with the tenant holding an option to extend the lease for an additional five years.  A third lease term expires in May 2059.

f) <u>Parcel 6</u> - is comprised of 1.765 acres.  The property accommodates 2,094 square feet of retail space and is currently occupied by a restaurant and several retail tenants.  One lease term expires in December 2013, another lease term expires in April 2011 and a third lease term expires in February 2014, with the tenant holding an option to extend the lease term for an additional five years.  A fourth lease term expires in May 2045.

**1.    Tenants, Rental Income and Expenses.**

8.    There are a total of 90 leaseable spaces with 63 occupied spaces and 27 vacant spaces as of March 2010, at which time the Properties were generating approximately $1,263,569.58 in monthly revenues from rents, billboards, parking, common area maintenance charges and other sources.  <u>See</u> Properties' Rent Roll dated March, 2010 (the "<u>Rent Roll</u>").  A true and correct copy of the Rent Roll is attached hereto as **Exhibit 3** and is incorporated herein by this reference.

9.    The annualized revenue for the Properties, as of March, 2010, is projected to reach $15,908,274.99.  <u>See</u> Rent Roll.

10.    As reported to Debtor by the Receiver, the Properties' operational expenses for February 2010 totaled $319,973.95 for utilities, receiver fees, general administration, maintenance, repairs, and property management. <u>See</u> Report from Receiver dated March 6, 2010 ("<u>Receiver's Report</u>"), at Exhibit A.  A true and correct copy of the Receiver's Report is

4

1    attached hereto as **Exhibit 4** and is incorporated herein by this reference.  The operational

2    expenses described above do not include debt service payments, professionals fees, insurance

3    costs, or real property taxes and assessments.

4                    **2.**        **Motel Operations.**

5            11.      The motel situated on the Properties is branded as a Travelodge and is a 125-

6    room limited service motel wholly owned by Debtor and managed by WW Lodging Limited,

7    LLC ("WW Lodging"), pursuant to a management agreement between the parties.  Pursuant to

8    the management agreement, all Travelodge employees are employed directly by WW Lodging.

9            12.      To the best of my knowledge, as of the Petition Date, FX I was receiving no

10   revenues from the Travelodge operation and WW Lodging controlled all revenues and paid the

11   expenses.  No income was distributed to Debtor.  Revenues available for distribution, if any,

12   would have been sent directly to a lockbox account controlled by Landesbank Baden-

13   Wurttemberg, New York Branch, as administrative agent and as collateral agent for the senior

14   secured lenders (the "First Lien Lenders") holding a first lien against the Properties.

15                   **C.**        **The Loans Against the Properties.**

16           13.      Pursuant to the terms of that certain Amended and Restated Credit Agreement,

17   dated as of July 6, 2007 (as amended, the "First Lien Credit Agreement;" together with the

18   Loan Documents (as defined in the First Lien Credit Agreement), the "First Lien Loan

19   Documents"), by and among Metroflag BP, LLC (subsequently renamed FX Luxury Las Vegas

20   I, LLC) and Metroflag Cable, LLC (subsequently renamed FX Luxury Las Vegas II, LLC and

21   merged into the Debtor on November 5, 2009), as borrowers (collectively, the "Borrowers"),

22   BP Parent, LLC (subsequently renamed FX Luxury Las Vegas Parent, LLC and merged into

23   the Debtor on November 5, 2009), as guarantor ("Guarantor"), the lenders party thereto

24   (collectively, the parties from time to time holding the indebtedness under the First Lien Credit

25   Agreement, the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch ("Credit

26   Suisse"), as administrative agent and collateral agent for the First Lien Lenders, the Borrowers

27   borrowed $280,000,000 (the "First Lien Loan"), which loan was secured by, among other

28   things, a first lien security interest in the Real Property Collateral pursuant to that certain First

LV1 1188551v2 04/21/10

Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of May 11, 2007, and recorded on May 11, 2007, in Book 20070511 as Instrument 0004533 in the Official Records of Clark County, Nevada, by Borrowers in favor of First American Title Insurance Company, as trustee (the "Security Trustee") for the benefit of Credit Suisse as administrative agent and as collateral agent for the First Lien Lenders, as amended by that certain First Amendment to First Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of July 6, 2007, and recorded on July 6, 2007, in Book 20070706 as Instrument 0004184, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for First Lien Lenders (as amended, amended and restated, supplemented and modified from time to time, the "First Lien Deed of Trust").

14.    Pursuant to the terms of that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended, the "Second Lien Credit Agreement;" together with the Loan Documents (as defined in the Second Lien Credit Agreement), the "Second Lien Loan Documents"), by and among the Borrowers, as borrowers, Guarantor, the lenders party thereto (collectively, the parties from time to time holding the indebtedness under the Second Lien Credit Agreement, the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Lenders"), and NexBank SSB, as successor in interest to Credit Suisse, as second lien administrative agent and collateral agent (the "Second Lien Agent" and collectively with the First Lien Agent (as hereinafter defined), the "Agents"), the Borrowers borrowed $195,000,000, which loan was secured by a second lien security interest in the Real Property Collateral pursuant to that certain Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of May 11, 2007, and recorded on May 11, 2007, in Book 20070511 as Instrument 0004536 in the Official Records of Clark County, Nevada, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for the Second Lien Lenders, as amended by that certain First Amendment to Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of July 6, 2007, and recorded on July 6, 2007, in

6

Book 20070706 as Instrument 0004185 in the Official Records of Clark County, Nevada, by Borrowers in favor of the Security Trustee for the benefit of Credit Suisse, as administrative agent and collateral agent for the Second Lien Lenders (as amended, amended and restated, modified or supplemented from time to time, the "Second Lien Deed of Trust").

15.     Pursuant to the terms of that certain Co-Lender Agreement, dated as of July 6, 2007, by and between Column Financial, Inc., Münchener Hypothekenbank eG ("MHB") and Deutsche Hypothekenbank (Actien-Gesellschaft) ("Deutsche Hypo"), (i) the First Lien Loan was split into two tranches, an A tranche (the "Note A Tranche") in the amount of $250,000,000, and a B Tranche (the "Note B Tranche") in the amount of $30,000,000, with the Note B Tranche to at all times be junior, subject and subordinate to the Note A Tranche, (ii) Deutsche Hypo acquired its interest in the Note A Tranche in an amount equal to $125,000,000 and (iii) MHB acquired its interest in the Note A Tranche in an amount equal to $125,000,000 and its interest in the Note B Tranche in an amount equal to $30,000,000.

16.     Pursuant to the terms of that certain Assignment Agreement, dated as of December 17, 2007, (i) Deutsche Hypo assigned a portion of its interest in the Note A Tranche in an amount of $80,000,000 to Landesbank Baden-Württemberg ("LBBW") and (ii) MHB assigned a portion of its interest in the Note A Tranche in an amount of $50,000,000 to LBBW and LBBW acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

17.     Pursuant to the terms of that certain Assignment Agreement, dated as of June 25, 2009, MHB assigned a portion of its interest in the Note A Tranche in an amount of $50,000,000 to Great Lakes Reinsurance (UK) PLC ("Great Lakes") and Great Lakes acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

18.     The beneficial interests under the First Deed of Trust were subsequently assigned to Landesbank Baden-Wurttemberg, New York Branch ("First Lien Agent," together with the First Lien Lenders, the "Senior Group"), as administrative agent and as collateral agent on behalf of the First Lien Lenders, by recordation on March 23, 2009, of an Assignment of Deed

of Trust ("Assignment") dated March 20, 2009, as Book No. 20090323, Instrument 0004872, in the Official Records.

19.    Pursuant to the terms of that certain Appointment of Successor Administrative Agent and Collateral Agent, dated as of December 22, 2008, Landesbank Baden-Württemberg, New York Branch, succeeded Credit Suisse as the administrative agent and the collateral agent under the First Lien Credit Agreement.

20.    Pursuant to the terms of each of (i) the First Lien Deed of Trust, (ii) the Second Lien Deed of Trust, (iii) that certain Pledge and Security Agreement, dated as of May 11, 2007, by the Debtor in favor of the First Lien Agent, the First Lien Collateral Documents (as defined in that certain Amended and Restated Intercreditor Agreement, dated as of July 6, 2007 (the "Intercreditor Agreement"), by and between Guarantor, Borrowers, the First Lien Agent (as successor in interest to Credit Suisse) and the Second Lien Agent), (iv) that certain Pledge and Security Agreement, dated as of May 11, 2007, by the Debtor in favor of the Second Lien Agent and (v) the Second Lien Collateral Documents (as defined in the Intercreditor Agreement) (such documents (i)-(v), collectively, the "Security Agreements"), the Borrowers granted to (I) the First Lien Agent for the benefit of the First Lien Lenders, and (II) the Second Lien Agent for the benefit of the Second Lien Lenders, in each case in accordance with the priorities set forth in the Intercreditor Agreement, security interests in and liens on the Real Property Collateral and all of the other Collateral (as defined in the Intercreditor Agreement), in each case to secure the obligations under the FX Loan Documents (all of the collateral described in the Security Agreements being the "Prepetition Collateral").  A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit 5** and is incorporated herein by this reference.

21.    Pursuant to the terms of the First Lien Deed of Trust, the Borrowers absolutely and unconditionally assigned their rights to receive all Rents (as defined in the Security Agreements) derived from the Prepetition Collateral as well as any future leases to the First Lien Agent for the benefit of the First Lien Lenders.

///

8

1

**D.**     **Events Leading Up to Bankruptcy.**

2     22.    The current global financial crisis has had a particularly grave impact on the Las

3 Vegas real estate market, including a substantial reduction in the number of visitors and per

4 visitor spending, the abandonment of, and/or loan defaults related to, several major new hotel

5 and casino development projects as well as publicly expressed concerns regarding the financial

6 viability of several of the largest hotel and casino operators in the Las Vegas market.

7     23.    The current economic climate has also adversely affected the Properties'

8 commercial leasing activities and, as a result, Debtor has failed to maintain its previously high

9 tenant occupancy rates amid these market conditions.  In addition, market forecasts indicate

10 Las Vegas may experience a prolonged decline in the development of new hotels and other

11 entertainment venues, which could adversely affect any potential redevelopment of the

12 Properties for the foreseeable future.

13     24.    On the Maturity Date (as defined in the First Lien Credit Agreement), the

14 Borrowers failed to repay the principal, interest, and other amounts due under the First Lien

15 Loan.  That failure constituted an Event of Default (i) under Section 7.1 of the First Lien Credit

16 Agreement, and (ii) under Section 5.1 of the First Lien Deed of Trust.

17     25.    On January 6, 2009, the First Lien Agent delivered a letter to the Borrowers

18 confirming that an Event of Default (as defined in the First Lien Credit Agreement) had

19 occurred.

20     26.    Under Section 2.3 of the First Lien Deed of Trust, upon the occurrence of an

21 Event of Default, the Borrowers' license to collect Rents would "automatically and

22 immediately terminate" upon the giving of a notice by First Lien Agent, and First Lien Agent

23 would be entitled to "receive and collect the Rents personally or through an agent."

24     27.    Following the Borrowers' Default, First Lien Agent exercised its rights under the

25 assignment of rents in the First Lien Deed of Trust and NRS Chapter 107A.  First Lien Agent

26 delivered a letter to the Borrowers dated January 28, 2009, in which First Lien Agent: (i)

27 revoked the Borrowers' license to collect, receive, use and enjoy the Rents, and (ii) instructed

28 the Borrowers to deposit any Rents which they might receive into a certain "Lockbox Account"

LV1 1188551v2 04/21/10

pledged to First Lien Agent (the "<u>Agent Cash Management Account</u>").  On or about the same date, First Lien Agent sent the tenants (the "<u>Tenants</u>") leasing space at the Real Property Collateral a notice substantially in accordance with the form set forth in NRS 107A.290, instructing the Tenants to pay Rents directly to First Lien Agent instead of to the Borrowers.

28.    On June 23, 2009, the Eighth Judicial District Court of Nevada entered an order (the "<u>Receivership Order</u>") appointing Larry L. Bertsch as a receiver (the "<u>Receiver</u>") with respect to the Real Property Collateral.

29.    The ongoing financial crisis has severely affected Debtor's ability to repay, refinance, extend or otherwise modify the past-due Loans and fund short-term liquidity needs. Debtor's prepetition cash flows and cash on hand are simply not sufficient to repay the Loans secured by the Properties.

30.    As a result of the financial conditions being experienced in the Las Vegas real estate market, FX I abandoned plans to redevelop the Properties.  Based upon the abandonment of the redevelopment plans, a valuation report obtained for the Properties from an independent appraisal firm combined with certain assumptions made by management, FX I recorded prepetition impairment charges totaling $414.9 million against the Properties thereby reducing their carrying value to an estimated liquidation value of $137.7 million as of December 31, 2009.  Debtor believes the prepetition impairment charges were reasonable given the current and projected state of the Las Vegas real estate market, in the context of a foreclosure liquidation.

31.    A distressed sale or foreclosure of the Properties by the First Lien Lenders at or near the estimated liquidation and adjusted carrying value of $137.7 million as of December 31, 2009, would be insufficient to fully repay the outstanding amounts currently due and owing under the Loans and, therefore, would result in FX I receiving no net cash proceeds.

32.    While the Properties are generating revenues in excess of Debtor's First Lien Loan debt service obligations, the ongoing financial crisis in the Las Vegas tourism and real estate markets has resulted in the depressed leasing capacity of the Properties which has, in turn, severely impacted Debtor's ability to re-negotiate or repay the past-due amounts currently

due and owing on the Loans.  All of these factors have combined to necessitate the Debtor's filing a chapter 11 petition to seek protection from its creditors and an opportunity to pursue an orderly sale process.

33.    On October 27, 2009, FX I, FX II, Las Vegas Parent,[3] Senior Group, LIRA Property Owner, LLC, a Delaware limited liability company, and LIRA LLC, a Delaware limited liability company entered into that certain Lock Up and Plan Support Agreement (as amended, supplemented or modified from time to time in accordance with the terms thereof, the "Lock Up and Plan Support Agreement").

34.    Following the execution of the Lock Up and Plan Support Agreement, the Debtor, New Parent and the Senior Group entered into discussions with certain Second Lien Lenders to explore the possibility of a consensual, three-party arrangement with respect to the filing of an alternative prepackaged Chapter 11 Case and, in connection therewith, the Senior Group, certain of the Second Lien Lenders, NexBank, SSB, as administrative agent and collateral agent under the Second Lien Credit Agreement, the Debtor and the New Parent entered into that certain Lock Up and Plan Support Agreement, dated as of December 18, 2009 (as amended, supplemented or otherwise modified, the "Tri-Party Lock Up Agreement"). Contemporaneously with the execution of the Tri-Party Lock Up Agreement, the parties to the two-party Lock Up and Plan Support Agreement executed that certain Standstill Agreement, dated December 18, 2009 (the "Standstill Agreement"), pursuant to which the parties agreed *inter alia* (i) to defer and stay certain activity required to be undertaken under the two-party Lock Up and Plan Support Agreement and the documents executed and delivered in connection therewith to allow for the negotiation and documentation of the transactions contemplated by the Tri-Party Lock Up Agreement and (ii) to preserve the two-party Lock Up and Plan Support Agreement and, in the event of the termination of the Tri-Party Lock Up Agreement, to proceed with the transactions contemplated thereby (with certain modifications and amendments), in each case, on the terms and conditions set forth in the Standstill Agreement.

---

[3] FX II and Las Vegas Parent have subsequently merged into the Debtor on November 5, 2009.  See supra n 1.

LV1 1188551v2 04/21/10

After almost two months of negotiations, the parties to the Tri-Party Lock Up Agreement were unable to reach agreement on the documentation and transactions contemplated thereunder.  On February 12, 2010, the Tri-Party Lock Up Agreement automatically terminated pursuant to  the terms thereof.

35.    Subsequent to the termination of the Tri-Party Lock Up Agreement and pursuant to the requirements of the Standstill Agreement, the parties to the two-party Lock Up and Plan Support Agreement executed that certain First Amendment to the Lock Up and Plan Support Agreement, dated as of April 16, 2010, and modified several of the previously agreed to documents to reflect the passage of time.  A true and correct copy of the Lock Up and Plan Support Agreement together with all amendments, supplements and modifications thereto is attached hereto as **Exhibit 6**.  The Lock Up and Plan Support Agreement provides the general framework for this chapter 11 proceeding whereby the Debtor shall be to allowed to use the First Lien Lenders' cash collateral, have the opportunity to market and sell the Properties and, if no qualified bidders come forth at a reduced minimum bid price of $256,000,000, proceed with its plan of liquidation.

**E.    Stipulation for Use of Cash Collateral.**[4]

36.    Without prejudice to the rights of any other party, the Debtor admits, stipulates, and agrees that:

(i)    the First Lien Loan Documents are in default and have been in default since December 19, 2008 and the Debtor failed to repay the First Lien Loan at maturity on January 6, 2009;

(ii)    as of the Petition Date, the Debtor was indebted and liable to the First Lien Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $259,000,000 for loans made under the First Lien Credit Agreement,[5] plus interest thereon, fees and expenses (including any reasonable attorneys' and advisors' fees that are chargeable or reimbursable under the First Lien Credit Agreement and the First Lien Loan

---

[4] All capitalized terms in Section E not otherwise defined in Section E shall have the meaning ascribed in the form of the Interim Cash Collateral Order (defined herein).

[5] Pursuant to their rights to exercise remedies under the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement), the First Lien Lenders recovered approximately $21,000,000 in principal from the collateral proceeds following the Default.

Documents) (all such indebtedness set forth in this paragraph (ii), the "<u>First Lien Prepetition Indebtedness</u>");

(iii)    as of the Petition Date, the Debtor was indebted and liable to the Second Lien Lenders, in the aggregate principal amount of not less than approximately $195,000,000 for loans made under the Second Lien Credit Agreement (the "<u>Second Lien Prepetition Indebtedness;</u>" and together with the First Lien Prepetition Indebtedness, the "<u>Prepetition Secured Indebtedness</u>"),

(iv)    the First Lien Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with its terms (other than in respect of the stay of enforcement against the Debtor arising from Section 362 of the Bankruptcy Code);

(v)    the liens and security interests granted to the First Lien Agent pursuant to and in connection with the First Lien Loan Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, control agreements, assignments (including assignments of rents, revenue, income, issues and profits) and other security documents executed by the Debtor in favor of the First Lien Agent, for its benefit and for the benefit of the First Lien Lenders, are (a) valid, binding, perfected, enforceable, first-priority liens and security interests in the tangible and intangible property constituting the Prepetition Collateral, (b) not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including any "equities of the case" assertions under section 552(b) of the Bankruptcy Code) and (c) subject and subordinate only to (I) the Carveout (as defined herein), solely with respect to the cash of the Debtor (whether held by the Debtor or the First Lien Agent), and (II) valid, perfected and unavoidable liens to the extent such liens are senior to the liens of the First Lien Agent on the Prepetition Collateral;

(vi)    as of the Petition Date, all of the Debtor's cash is held in (a) the Agent Cash Management Account; (b) the FX Las Vegas I, LLC account at Bank of America (Account No. 004964929401) (the "<u>Debtor's Operating Account</u>"); (c) the Metroflag Travelodge Checking Account at the Bank of America (Account No. 004961612371) (the "<u>Travelodge Account</u>");  and (d) a restricted account[6] held by the Receiver holding security deposits received from certain Tenants, which security deposits are to be turned over to Debtor who will open a new, restricted account to hold the Tenants' deposits (the "<u>Security Deposit Account,</u>" and together with the Debtor's Operating Account and the Travelodge Account, the "<u>Prepetition Accounts</u>"); and I am not aware of any other accounts in the name of

---

[6] The Security Deposit Account is subject to the Stipulation for Turnover of Certain Assets Held by Receiver to Debtor in Possession between Debtor, Receiver and the First Lien Agent, which was previously submitted contemporaneously with the Cash Collateral Motion for the Court's consideration for the termination of the receivership, turnover of assets by the Receiver to Debtor and release of the Receiver's prepetition claims against the Debtor.

LV1 1188551v2 04/21/10

the Debtor, the Borrowers, Guarantor or Receiver, which contained any cash on the Petition Date;[7] and

(vii)    subject to any waivers, modifications or temporary forbearances provided for under the Lock Up and Plan Support Agreement, all guaranties, sureties and other third party obligations owed to or for the benefit of the First Lien Lenders under the First Lien Loan Documents or other documents related thereto remain in full force and effect and the Debtor will refrain, and will cause its affiliates to refrain, from taking any steps to release or terminate any such obligations.

37.    The Debtor has an immediate need to use the Cash Collateral in order to operate the Real Property Collateral.  Without the ability to utilize the Cash Collateral, the value of the Prepetition Collateral will deteriorate substantially.  The First Lien Agent and the Debtor have negotiated at arm's length and in good faith regarding the use of the Cash Collateral to fund the Debtor's business and agree that entry of the proposed Interim Cash Collateral Order (defined below) is in the best interests of the Debtor, its estate and its creditors and equity holder.

38.    Accordingly, Debtor filed contemporaneously herewith a motion (the "Cash Collateral Motion") seeking approval, pursuant to Bankruptcy Code Sections 105, 361, 362 and 363, and Bankruptcy Rules 2002, 4001(b), 4001(d) and 9014, of the stipulation (the "Cash Collateral Stipulation") entered into by and between Debtor and the First Lien Agent, on behalf of the First Lien Lenders, setting forth terms and conditions for Debtor's use of Cash Collateral and entry of an interim order (the "Interim Cash Collateral Order") and a final order (the "Final Cash Collateral Order," together with the Interim Cash Collateral Order, the "Cash Collateral Orders")[8] authorizing Debtor's use of Cash Collateral and grant of adequate protection to the Prepetition Secured Lenders on an interim and final basis, and setting a final hearing.

39.    In the Debtor's business judgment, the terms of the proposed adequate protection arrangements and use of the Cash Collateral set forth in the Cash Collateral Orders are fair and

---

[7]  Pursuant to section 3.13 of the Lock Up and Plan Support Agreement, immediately prior to the Petition Date, certain funds that previously had been held in the Agent Cash Management Account were transferred to fund the initial operating expenses of the Debtor pursuant to paragraph 3 of the proposed Initial Cash Collateral Order and the remaining funds were applied to pay certain accrued interest and legal fees and expenses of the First Lien Lenders.

[8]  The proposed forms of Interim Cash Collateral Order and Final Cash Collateral Order are attached to the Cash Collateral Motion as Exhibit B and Exhibit C, respectively.

14

reasonable under the circumstances, are supported by reasonably equivalent value and fair consideration and are likely to minimize disputes and litigation as between Debtor and the First Lien Agent and First Lien Lenders and are stipulated to and agreed by such parties. Accordingly, in Debtor's business judgment, entry of the Cash Collateral Orders in this Chapter 11 Case is in the best interests of Debtor, its estate, its creditors and equity holder.

40.    The reliance of the First Lien Agent, the First Lien Lenders and the Debtor on the Cash Collateral Stipulation, the Interim Cash Collateral Order and the Final Cash Collateral Order is and will be in good faith.

**F.    Cash Management Procedures.**[9]

41.    Debtor implemented a cash management system to provide an efficient means of moving funds through its corporate structure to cover its expenses and debts, as well as provide funds on an as-needed basis.    Postpetition, Debtor proposes to retain its current cash management system and its prepetition bank accounts ("Cash Management System"). However, Debtor has already modified its cash management system to a certain degree due to its initiation of the Chapter 11 Case, including entering into the Lock Up and Plan Support Agreement.

42.    Debtor's Cash Management System is similar to those employed by corporate enterprises of comparable size.    Many corporate enterprises use cash management systems because such systems provide numerous benefits.    Among these benefits is the ability to control corporate funds and ensure cash availability, to reduce administrative expenses, and to have easy access to timely and accurate financial information.    The most important benefit of maintaining Debtor's current Cash Management System is to avoid disruption of Debtor's ability to meet its obligations to the First Lien Lenders.

43.    To avoid the operational and administrative paralysis that would necessarily result if Debtor closed its prepetition bank accounts that are integral to its Cash Management System and to ensure as smooth a transition into chapter 11 as possible, Debtor seeks authority

by way of the motion for authority to maintain its Cash Management System, including its Prepetition Accounts, filed contemporaneously herewith.

44.    Debtor's Prepetition Accounts, including the Security Deposit Account,[10] and the Agent Cash Management Account are subject to a security interest in favor of the First Lien Lenders, and all of the funds received by Debtor prepetition were deposited into the Prepetition Accounts on a daily basis.[11]

45.    Prepetition and prior to the entry of the Receivership Order, at the beginning of each month, Debtor made requests to the First Lien Agent for a transfer of funds from the Agent Cash Management Account into either the Debtor's Operating Account or Travelodge Account, as applicable, for payment of the Properties' operating expenses, including Debtor's payment of payroll, payroll taxes and benefits for its employees.[12]  Upon review of such transfer requests, the First Lien Agent would generally authorize the transfer of the amounts requested.  Debtor is informed and believes that the Receiver for the Properties followed this procedure in the ordinary course of the Properties' operations following the entry of the Receivership Order, up to and including the Petition Date.

46.    Immediately prior to the Petition Date, the First Lien Agent funded the Operating Account in an amount sufficient to establish a reserve for the first month of the Debtor's

///

///

---

[9] All capitalized terms in Section F not otherwise defined in Section F shall have the meaning ascribed in the Emergency Motion for Order Authorizing Maintenance of Certain Cash Management Procedures and Certain Prepetition Bank Accounts, filed concurrently herewith.

[10] The Security Deposit Account shall remain a segregated account subject to a lien in favor of the First Lien Agent for the benefit of the First Lien Lenders as set forth in the Interim Cash Collateral Order (as defined herein). To the extent that the Debtor becomes entitled to any security deposits in the Security Deposit Account (whether because of Tenant breach under a lease or otherwise), such security deposits shall be transferred to the Agent Cash Management Account as soon as is reasonably practicable, to be held and distributed to the terms of the Interim Cash Collateral Order or other order of the Bankruptcy Court.  If, at any time, Debtor believes that a Tenant has become entitled to all or any part of a security deposit held in the Security Deposit Account, Debtor shall provide at least five (5) days' written notice to each Objection Notice Party of Debtor's intent to return such security deposit.

[11] Pursuant to section 3.13 of the Lock Up and Plan Support Agreement, immediately prior to the Petition Date, certain funds that previously had been held in the Agent Cash Management Account were transferred to fund the initial operating expenses of the Debtor pursuant to paragraph 3 of the proposed Interim Cash Collateral Order and the remaining funds were applied to pay certain accrued interest and legal fees and expenses of the First Lien Lenders.

[12] As noted at paragraph 11 herein, all Travelodge employees are employed directly by WW Lodging pursuant to a management agreement between Debtor and WW Lodging.

LV1 1188551v2 04/21/10

1   operating expenses during the Chapter 11 Case, as provided under the budget (the "<u>Budget</u>")

2   attached to the Interim Order.[13]

3          47.    Pursuant to and as part of the consideration for the Lock Up and Plan Support

4   Agreement, Debtor agreed that the First Lien Agent shall be entitled to collect and retain from

5   the existing Agent Cash Management Account all fees and expenses incurred by the First Lien

6   Agent in connection with the First Lien Loan prior to the Petition Date (including a reasonable

7   estimate of such fees and expenses as of such date).  <u>See</u> Lock Up and Plan Support Agreement,

8   at § 3.13.  In addition, as provided by the Lock Up and Plan Support Agreement, interest on the

9   First Lien Loan was pro rated to account for the filing of Debtor's chapter 11 petition such that

10  the interest payment for April was made immediately prior to the Petition Date, as calculated

11  therein.  Further, such interest shall continue to accrue and be payable during the pendency of

12  the Chapter 11 Case at the rate proscribed in and pursuant to the Lock Up and Plan Support

13  Agreement and the Cash Collateral Orders.

14         48.    In the ordinary course of its business, Debtor maintains books and records to

15  document, among other things, its profits and expenses (collectively, the "<u>Records</u>").  If Debtor

16  were required to comply with the Guidelines as to the Prepetition Accounts and Records, its

17  operations could be harmed by the disruption, confusion, delay, and cost that could result from

18  the closure of the Prepetition Accounts, the opening of new accounts, and new books and

19  records that the Guidelines require.

20         49.    During the pendency of this Chapter 11 Case, Debtor proposes to maintain the

21  Cash Management System, including existing Prepetition Accounts and Records, and to

22  continue using those Prepetition Accounts and Records in conjunction with the Agent Cash

23  Management Account in the same manner that it used them prior to the Petition Date – with the

24  exception that Debtor's postpetition use of the Prepetition Accounts, Records and Investment

25  Practices shall be pursuant to the terms of the Lock Up and Plan Support Agreement, the

26  Budget, and Cash Collateral Orders.

27  _____

28      [13]   The Interim Order, pursuant to the Lock Up and Plan Support Agreement, is consistent in all material respects with the form of proposed order attached as Exhibit D to the Lock Up and Plan Support Agreement, which

LV1 1188551v2 04/21/10

50.     Debtor will notify the banks holding the Prepetition Accounts of Debtor's status as a debtor-in-possession and such request will cause those banks to modify the Prepetition Accounts to reflect that they are debtor-in-possession accounts.

51.     Debtor was current on all of its property tax obligations prior to the Petition Date. Debtor's real property is located in special improvement district no. 7505, which has an outstanding aggregate unpaid balance of $160,379.85 in special assessment taxes.  Payments are required to be made to the special improvement district semi-annually, with the next installment of $12,500 due on August 1, 2010.  All of the required semi-annual payments due to the special improvement district prior to the Petition Date have been paid.  The requirements of the Bankruptcy Code and Debtor's Cash Management System will ensure that Debtor remains current on its postpetition property tax obligations.  Moreover, due to the nature of Debtor's corporate structure, Debtor does not incur federal income tax liability.  A specially designated tax account, therefore, is not necessary for the administration of this Chapter 11 Case.

52.     Debtor also requests that it be authorized to continue maintaining its Cash Management System in the manner consistent with its pre-petition practices without the need for compliance with the section 345 of the Bankruptcy Code.

**G.     Stipulation for Turnover by Receiver.**

53.     Debtor, First Lien Agent and Receiver have agreed[14] that, pursuant to Bankruptcy Code Section 543(a) and concurrent with the filing of a stipulation (the "Turnover Stipulation")[15] among them, Receiver's authority shall terminate, Receiver shall no longer serve as receiver or a custodian, and Receiver shall not make any disbursement from, or take any action, in the administration of property of the Debtor, including the Properties, and any proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the Receiver's possession, custody or control, except that the Receiver may take such action as is

---

is attached hereto as Exhibit 6.

[14]  Such agreement is set forth in section 3.4 of the Lock Up and Plan Support Agreement and was also made by stipulation filed contemporaneously herewith.

[15]  All capitalized terms in Section G not otherwise defined in Section G shall have the meaning ascribed in the form of the Stipulation Order.

1    necessary to preserve such property.  Additionally, Receiver shall no longer be an officer of the

2    Nevada District Court and shall not be an officer of the Court in this Chapter 11 Case.

3           54.    Pursuant to Bankruptcy Code Section 543(b)(1) and the Turnover Stipulation,

4    Receiver will turnover and deliver to Debtor, no later than 5:00 p.m. prevailing Pacific time on

5    the fifth (5th) day after entry of an order approving the Turnover Stipulation, any and all

6    property of the Debtor held by, or transferred to, the Receiver, or proceeds, product, offspring,

7    rents or profits of such property that is in Receiver's possession, custody or control, including,

8    but not limited to, the Prepetition Accounts.

9           55.    Pursuant to Bankruptcy Code Section 543(b)(2) and the Turnover Stipulation,

10   Receiver shall file, no later than 5:00 p.m. prevailing Pacific time on the fifth (5th) day after

11   entry of an order approving the Turnover Stipulation, an accounting with the Court detailing all

12   property of the Debtor, including the Properties and Prepetition Accounts, or proceeds, product,

13   offspring, rents, or profits of such property, that, at any time, came into the possession, custody

14   or control of Receiver.

15          56.    Pursuant to the Turnover Stipulation, Debtor, First Lien Agent, and Receiver

16   have also agreed that:

17          (a)    all entities to which Receiver has become obligated with respect to
     property of the Debtor, including the Properties, or proceeds, product, offspring,
18   rents or profits of such property, shall be protected, pursuant to Bankruptcy Code
     Section 543(c)(1), as may be determined by the Court;
19

20          (b)    Receiver shall be reasonably compensated for services rendered
     and reimbursed for expenses incurred, as related to the Receivership Action
21   agreed to by the First Lien Agent and Debtor and deemed appropriate by the
     Court upon application by the Receiver;
22

23          (c)    pursuant to Section 3.4 of the Lock Up and Plan Support
     Agreement and subsequent to such turnover of the Properties as described herein
24   and in the Turnover Stipulation, Receiver may be retained by the First Lien
     Lenders and the Receiver (or such other person as may be selected by the First
25   Lien Agent in the event that the Receiver shall resign or is otherwise unavailable),
     in such capacity, shall be permitted to access the Properties and shall be provided
26   reasonable access to all of the books and records of the Debtor for the purpose of
     monitoring its businesses, operations and finances (on behalf of the First Lien
27   Lenders), and for the purpose of assisting in the implementation of the auction of
     the Properties or the proposed prepackaged chapter 11 plan of liquidation (as
28

19

1
2

amended or supplemented in accordance with the terms of the Lock Up and Plan Support Agreement) filed contemporaneously herewith; and

3
4
5
6
7
8

(d)    all fees, costs and expenses incurred by the First Lien Lenders in connection with the postpetition retention of the Receiver and/or such other party in such capacity described herein shall be reimbursable by the Debtor pursuant to Section 9.2 of the First Lien Credit Agreement and in accordance with the Interim Cash Collateral Order or the Final Cash Collateral Order, as applicable; *provided, however,* that the Receiver and/or such other party shall be entitled to no more than Thirty Thousand Dollars ($30,000.00) in the aggregate, payable at a rate of no greater than five Thousand Dollars ($5,000.00) per month, for its services in accordance with the foregoing.

9

## H.    Motion to Establish Bidding Procedures and Schedule Auction.[16]

10
11
12
13
14

57.    The proposed Bidding Procedures set forth a flexible process, which will allow Debtor to maximize the value of its Assets given the time pressure it currently faces.  Debtor has determined, in its reasonable business judgment, that a sale of its Assets at this time, even without a traditional "stalking horse" bidder, under the proposed Bidding Procedures as set forth in the Bidding Procedures Motion is warranted and necessary.

15
16
17
18
19
20
21
22
23
24

58.    In order to become a "Qualified Bidder," a prospective purchaser must submit a Qualified Bid:  (a) by the Bidding Deadline; (b) for cash only or cash with a firm financing commitment, with a ten percent (10%) escrow and balance to be paid at closing; (c) in an amount not less than $256 million plus closing costs and broker fees ("Minimum Bid Threshold"); (d) that provides that the Bidder will pay all transfer taxes and title insurance incurred in connection with the Auction; (e) that provides for a purchase as-is, where-is with no substantial representations or warranties from the Debtor; (f) that is accompanied by (i) the purchase and sale agreement executed by the bidder, (ii) evidence of a deposit in escrow by the Bidding Deadline, of an amount equal to ten percent (10%) of the purchase price, (iii) proof of the bidder's ability to close escrow within thirty (30) days after entry of the Court's order

25
26

27
28

---

[16]  All capitalized terms in Section H not otherwise defined in Section H shall have the meaning ascribed in the Motion For Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (A) Approving Bidding Procedures in Connection With the Sale of Substantially All of the Assets of the Bankruptcy Estate; (B) Scheduling an Auction to Consider Competing Bids for the Assets; and (C) Approving the Form and Manner of Notice of the Auction (the "Bidding Procedures Motion"), filed concurrently herewith.

20

1   approving the sale; and (g) that details which of Debtor's executory contracts and unexpired

2   leases the Qualified Bidder will assume.

3           59.    The Second Lien Holders, whose interests in the Properties are contractually

4   subordinated to the First Lien Lenders' interests, agreed prepetition that they would not object to

5   or oppose (except possibly in the capacity as an unsecured creditor) a sale or other disposition of

6   the Properties free and clear of liens or other claims under Bankruptcy Code Section 363 or any

7   other provision of the Bankruptcy Code so long as the First Lien Loan remains outstanding and

8   the First Lien Agent has consented to such sale.  See Exhibit 5 (Intercreditor Agreement), § 6.5.

9           60.    The Intercreditor Agreement further provides that the net proceeds of any sale of

10   the Properties first be applied to discharge the First Lien Loan with all remaining proceeds of a

11   sale of the Properties, if any, to then be applied to the Second Lien Loan or that the Second Lien

12   Holders' lien shall remain on any net proceeds of such sale subject to the terms and conditions

13   of the Intercreditor Agreement.  Id., §§ 4.1, 6.5.

14        **I.**      **Motion For Order (A) Not to Convene Meeting of Creditors or Equity**

15              **Interest Holders Pursuant to 11 U.S.C. § 341 and (B) Setting Bar Dates.**[17]

16           61.    Prior to the Petition Date, as described herein, Debtor engaged in negotiations

17   over the terms of a financial restructuring with its core Creditor groups.  These negotiations

18   culminated in the Lock Up and Plan Support Agreement, pursuant to which the First Lien Agent

19   and the First Lien Lenders agreed to vote in favor of the Plan provided that certain conditions

20   and milestones were satisfied.

21           62.    On April 13, 2010, in accordance with the terms of the Lock Up and Plan

22   Support Agreement, Debtor commenced a solicitation of votes from all Classes entitled to vote

23   under the Bankruptcy Code.  The Plan has been accepted by Class 3 (First Lien Secured Claims)

24   in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

25           63.    Class 1 (Priority Claims) and Class 2 (Other Secured Claims) are deemed to have

26   accepted the Plan, and Class 4 (General Unsecured Claims) and 5 (Interests) are deemed to have

27

28       [17] All capitalized terms in Section I not otherwise defined in Section I shall have the meaning ascribed in the Motion For Order (A) Not to Convene Meeting of Creditors or Equity Interest Holders Pursuant to 11 U.S.C. § 341 and (B) Setting Bar Dates, filed concurrently herewith.

LV1 1188551v2 04/21/10

1  rejected the Plan.  Debtor believes it has satisfied the requirements of section 1129(b) of the

2  Bankruptcy Code and intends to seek confirmation of the Plan notwithstanding the rejection of

3  the Plan by Classes 4 and 5.

4         64.  Under the terms of the Plan, if there is no Sale of the Properties for at least the

5  minimum bid threshold of Two Hundred Fifty-Six Million Dollars ($256,000,000) then, on the

6  Effective Date, Holders of First Lien Secured Claims (Class 3) shall receive, in full satisfaction,

7  settlement, release and in exchange for such Allowed First Lien Secured Claims, a Pro Rata

8  Distribution of Cash in an amount equal to:  (a) the Paydown Amount; *plus* (b) the Deposit; *plus*

9  (c) any unpaid Lender's Fees through and including the Effective Date (including a reasonable

10 estimation thereof); *plus* (d) any Effective Date Cash Distributions payable to First Lien Lenders

11 as set forth in the Effective Date Funds Flow Memorandum.  In addition, New Borrower, First

12 Lien Agent and First Lien Lenders shall execute and deliver the New Secured Loan Documents,

13 which shall be deemed an additional Distribution to the lenders under the First Lien Credit

14 Agreement, on account of a partial repayment of the First Lien Secured Claims against Debtor.

15 See Plan, § 2.3(c)(ii).

16        65.  In addition, the Plan provides for the payment in full or assumption by New

17 Borrower of (i) Allowed Administrative Claims, (ii) federal, state, and local tax Claims, and (iii)

18 certain other non-tax Priority Tax Claims.  See Plan, § 2.2(a)-(b).  Holders of General

19 Unsecured Claims against Debtor will not receive any payment on account of their Claims.  See

20 Plan, § 2.3(d).  Holders of Interests will also not receive a Distribution.  See Plan, § 2.3(e).

21        66.  The Plan contemplates an orderly liquidation of Debtor to deliver the highest

22 value of its assets to Creditors.

23        67.  Under the Plan, Debtor's creditors and equity interest holders are classified as

24 follows:

25       (a)  Class 1:  Priority Claims.

26       (i)  *Claims in Class*:  Class 1 consists of all Priority Claims
against the Debtor.

27

28       (ii)  *Treatment*:  The legal and equitable rights of the Holders
of Allowed Priority Claims are unaltered by the Plan.  Each Holder of an

22

Allowed Priority Claim shall, either: (i) to the extent there are sufficient Available Funds, be paid the Allowed amount of such Claim in Cash on the Effective Date, (ii) have such Claim assumed by the New Borrower, to be paid by the New Borrower in Cash in the Allowed amount of any such Claim on the date on which such Claim is payable under applicable law or any agreement relating thereto; or (iii) receive such other treatment as is agreed by the Holder of the Allowed Priority Claim, the Debtor, the First Lien Agent and the New Borrower.

(iii)    *Impairment and Voting*:  Class 1 is not Impaired and the Holders of Allowed Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2:        Other Secured Claims.

(i)    *Claims in Class*:  Class 2 consists of Other Secured Claims against Debtor.

(ii)    *Treatment*:  Holders of Allowed Other Secured Claims shall have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code and/or assumed by New Borrower such that the Claim is rendered unimpaired, except to the extent that the Holder agrees to less favorable treatment thereof.  The failure of Debtor or any other party-in-interest (including New Borrower) to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan shall be without prejudice to the rights of New Borrower or any other party-in-interest (including First Lien Lenders) to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable) when and if such Claim is sought to be enforced.  Any Cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder, the First Lien Agent and Debtor.

(iii)    *Impairment and Voting*:  Class 2 is not Impaired, and Holders of Allowed Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 are not entitled to vote to accept or reject the Plan.

(c)    Class 3:        First Lien Secured Claims.

(i)    *Claims in Class*:  Class 3 consists of First Lien Secured Claims against Debtor.  All amounts owed under the terms of First Lien Credit Agreement, including post-petition interest at the rate prescribed in the Lock Up and Plan Support Agreement, shall be treated as Allowed

Secured Claims under the Plan. All Claims of First Lien Lenders for payment of fees and expenses to which they are entitled under the First Lien Credit Agreement or otherwise shall be treated as Allowed Class 3 Claims hereunder.

(ii)    *Treatment*: All amounts owed to First Lien Lenders shall be treated as Allowed Secured Claims. On the Effective Date, each lender under the First Lien Credit Agreement shall, in full satisfaction, settlement, release and exchange for such Allowed First Lien Secured Claims, receive a Pro Rata Distribution of Cash in an amount equal to: (a) the Paydown Amount; *plus* (b) the Deposit; *plus* (c) any unpaid Lender's Fees through and including the Effective Date (including a reasonable estimation thereof); *plus* (d) any Effective Date Cash Distributions payable to First Lien Lenders as set forth in the Effective Date Funds Flow Memorandum. In addition, New Borrower, First Lien Agent and First Lien Lenders shall execute and deliver the New Secured Loan Documents, which shall be deemed an additional Distribution to the lenders under the First Lien Credit Agreement, on account of a partial repayment of the First Lien Secured Claims against Debtor. Any funds which were received by the Holders of Class 3 Claims during the Chapter 11 Case on account of adequate protection payments pursuant to the terms of the Interim Cash Collateral Order or the Final Cash Collateral Order shall also be retained by the Holders of such Claims as Distributions in further satisfaction of such Class 3 Claims.

(iii)    *Impairment and Voting*: Class 3 is Impaired. Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

(iv)    *Co-Lender Issues:* Notwithstanding anything else contained herein, all Distributions received by Holders of Class 3 Claims shall be subject to the terms and conditions of the Co-Lender Agreement, which agreement shall remain in full force and effect and shall be unaltered by the terms of the Plan.

(d)    Class 4:    General Unsecured Claims.

(i)    *Claims in Class*: Class 4 consists of General Unsecured Claims (including the Second Lien Lenders' Claims) against Debtor.

(ii)    *Treatment*: Holders of Class 4 General Unsecured Claims shall not receive any Distribution under this Plan. Upon the Effective Date, all General Unsecured Claims shall be released without further action by Debtor or notice to Holders of General Unsecured Claims being necessary.

(iii)    *Impairment and Voting*: Class 4 is Impaired and will be deemed to reject this Plan.

(e)    Class 5:        Interests.

(i)    *Claims in Class*:  Class 5 consists of all Interests held in the Debtor.

(ii)    *Treatment*:        Holders of Class 5 Interests shall not receive any Distribution under this Plan.  Upon the Effective Date, all Interests held in Debtor shall be extinguished and cancelled without further action by Debtor or notice to Holders of Interest being necessary.

(iii)    *Impairment and Voting*:  Class 5 is Impaired and will be deemed to reject the Plan.

See Plan, § 2.3.

**J.    Employment and Retention of Property Manager .**[18]

68.    To the best of Debtor's knowledge and based upon the Verified Statement of David L. Jewkes, filed contemporaneously with the Application to Employ Cushman & Wakefield as Property Manager for Real Property Belonging to the Estate, Nunc Pro Tunc (the "Property Manager Application") and incorporated herein by this reference, prior to the Petition Date and at the Receiver's discretion and pursuant to the Receivership Order, the Receiver executed a property management agreement with Cushman & Wakefield on or about June 22, 2009 (the "Pre-Petition Management Agreement").  Pre-Petition Management Agreement; Jewkes Declaration, ¶ 4.  A true and correct copy of the Pre-Petition Management Agreement is attached as Exhibit 2 to the Jewkes Declaration and is incorporated herein by this reference.

69.    Pursuant to the Pre-Petition Management Agreement, Cushman & Wakefield was engaged as the exclusive agent for investment sale of the Properties and was obligated to actively solicit the participation of outside brokers.  Since then, I am aware of only two (2) offers[19] being made to purchase the First Lien Loan, with each offer being well below the outstanding principal amount of $259 million, as of April 16, 2010.  True and correct copies of the offer letters are attached hereto as **Exhibit 7** and **Exhibit 8** and are incorporated herein by this reference.

---

[18] All capitalized terms in Section I not otherwise defined in Section I shall have the meaning ascribed in the Property Manager Application.

[19] The first offer dated March 17, 2010, proposed purchasing the First Lien Loan for the sum of $160 million payable in the form of cash in the amount of $48 million and a seller-carry loan in the amount of $112 million while the second offer dated April 5, 2010, proposed purchasing the First Lien Loan for the sum of $180 million payable in cash.

LV1 1188551v2 04/21/10

70.    Debtor selected Cushman & Wakefield because of its excellent qualifications and its reasonable fee structure and, in light of such qualification, Debtor believes Cushman & Wakefield is well-qualified to perform the property management services described in the Jewkes Verified Statement and assist Debtor in this Chapter 11 Case.

71.    The Lock Up and Plan Support Agreement provides, among other things, that Debtor continue to employ a qualified property manager of the Properties, and that Debtor use its commercially reasonable best efforts to ensure the continued retention of Cushman & Wakefield as manager of the Properties.

72.    Accordingly, contemporaneously with this Omnibus Declaration, Debtor filed an application in conformance with the Lock Up and Plan Support Agreement seeking to obtain the Court's approval to employ and retain the services of Cushman & Wakefield, effective as of the Petition Date, to maintain, care for and protect the Properties until the Debtor's proposed prepackaged plan of liquidation can be effectuated.  A true and correct copy of the proposed property management agreement (the "Proposed Property Management Agreement") setting forth the terms and conditions under which Debtor would employ and retain Cushman & Wakefield for property management services is attached as Exhibit 1 to the Jewkes Declaration.

73.    In Debtor's business judgment, a property manager is essential to Debtor's ability to realize the value of the Properties for the benefit of all creditors and equity interest holders in this Chapter 11 Case.

74.    Retention of Cushman & Wakefield as Debtor's property manager is necessary because Debtor does not possess the requisite licensing or expertise to manage the Properties independently.  Debtor proposes that Cushman & Wakefield serve as the manager for all of its Properties, but for the real property upon which the Travelodge motel is situated.  Such services are necessary to maintain Debtor's shopping center facility, pending the proposed sale of same, and are consistent with the terms of the Lock Up and Plan Support Agreement.

75.    Debtor believes that, given the nature of the property management services to be provided by Cushman & Wakefield, the proposed compensation arrangement described in the Property Manager Application is both fair and reasonable.

26

76.     Notice of the Property Manager Application has been provided to the Office of the United States Trustee, those creditors holding the twenty (20) largest unsecured claims, the Internal Revenue Service, the Nevada Department of Taxation, the Clark County Treasurer, the Clark County Assessor, the Department of Employment, Training and Rehab, and any party which files and serves on the Debtor a request for special notice prior to entry of the Order approving this Application.  Debtor respectfully submits that such notice is appropriate under the circumstances and that no other or further notice is necessary or required.

77.     No previous request for the relief sought in the Property Manager Application has been made to this Court or any other court.

**K.     Utilities Motion.**[20]

78.     In connection with its ongoing business operations, Debtor currently obtains service from various utilities for, among other things, electricity, natural gas, water, telecommunications, sewage, trash removal and other similar services ("Utility Services")[21] from numerous companies or divisions thereof (the "Utility Providers").  A non-exhaustive list of the names and addresses of all or substantially all of the Utility Providers that were providing Utility Services to Debtor as of the Petition Date is attached hereto as **Exhibit 9**.[22]

79.     Debtor is not delinquent on the payments due to the Utility Providers, but the most current invoices are coming due and next month's invoices will include amounts due for pre-petition Utilities Services.   In connection with adequately assuring payment for future Utility Services, Debtor requests that it be authorized to pay the current invoiced amounts due to Utility Providers and to pay next month's invoices when received, including the pre-petition portion of such invoices.

---

[20] All capitalized terms in Section K not otherwise defined in Section K shall have the meaning ascribed in the Motion for Order (1) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (2) Authorizing Ordinary Course Payments to Utilities Providers; (3) Deeming Utility Providers Adequately Assured of Future Performance; and (4) Establishing Procedures for Determining Requests for Additional Adequate Assurance, filed concurrently herewith.

[21] The Bankruptcy Code does not define "utility," but Debtor reserves all rights to argue that any entity listed on the Utilities List is not a "utility" within the meaning of or entitled to the protection of Bankruptcy Code Section 366 and to argue that any such entity is compelled by contractual obligation, law or regulation, to continue to furnish services to the Debtor notwithstanding the filing of this Chapter 11 Case.

[22] Although Debtor believes that the list of Utility Providers attached hereto as Exhibit 9 is a complete list, Debtor reserves the right to supplement the list if it is determined that any Utility Provider has been omitted.

LV1 1188551v2 04/21/10

80.    Payment of current invoices would prevent the Utility Providers from arguing that Debtor is in default and forcing the Utility Providers to bear the burden of delinquencies thereby justifying the Utility Providers' request for a substantial security deposit or bond.

81.    To provide adequate assurance of payment for future Utility Services to the Utility Providers, Debtor proposes depositing a sum equal to 50% of Debtor's estimated monthly costs for Utility Services (each, a "Utility Deposit"), based upon an average of Debtor's monthly costs for the twelve (12) months immediately preceding the Petition Date, with each Utility Provider within ten (10) business days from the date of entry of an Order approving the Motion.

82.    Debtor submits that the Utility Deposit, especially if accompanied by payment of current invoices to avoid any defaults, constitutes sufficient adequate assurance to the Utility Providers.  If any Utility Provider believes additional assurance is required, it may request such additional assurance pursuant to the procedures (the "Adequate Assurance Procedures") set forth as follows:

(a)    If a Utility Provider requests additional adequate assurance within twenty (20) days from the date of entry of an Order approving the Motion, the Utility Provider must serve a written objection (the "Objection") upon Debtor setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of Debtor's payment history on each account, an explanation as to why the Utility Deposit is not adequate assurance of payment, and a request (the "Request") detailing specifically what additional adequate assurance the Utility Provider requires.

(b)    The Request must be actually received by Debtor's counsel within twenty (20) days from the date of entry of the Order granting the Motion (the "Request Deadline").

(c)    Without further Order of the Court, Debtor may enter into an agreement granting additional adequate assurance to any Utility Company serving a timely Request, if Debtor, in its discretion, determines that the Request is reasonable.

(d)    If a Utility Provider requests additional adequate assurance by timely filing and serving an Objection and Debtor believes such Objection is unreasonable, Debtor shall, within ten (10) days after the Request Deadline file a motion for determination of adequate assurance of payment and set such motion for hearing.  The Utility Provider seeking a

28

Request for additional adequate assurance shall be deemed to have adequate assurance of payment (the "Motion for Determination") until the Court makes a determination at the hearing on Debtor's Motion for Determination, and the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to Debtor until the Court makes such determination.

(e)    If a Utility Provider fails to send a Request by the Request Deadline, such Utility Provider will have waived its right to make a Request and will be deemed to have received, by virtue of the Utility Deposit, adequate assurance of payment in accordance with section 366(c)(1)(A)(vi) of the Bankruptcy Code.

(f)    Based upon the establishment of the Utility Deposit, a Utility Provider will be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further assurance of payment.

83.    Debtor may also open new accounts for post-petition Utility Services with new Utility Providers (the "Future Utility Providers"). Debtor requests that Future Utility Providers shall treat Debtor like any other customer under applicable public utility regulations and that if any Future Utility Provider discriminates against Debtor on account of the bankruptcy filing, by seeking to impose an additional or higher deposit or other requirements, the Court will consider a request for relief with notice to the Future Utility Provider on an expedited basis.

**L.    Motion to Pay Prepetition Employee Payroll Claims and Tax Obligations.**[23]

84.    Debtor's business and its chances of effecting success in this Chapter 11 Case depends on its employees' motivation and morale. Failure to compensate the employees for their pre-petition wages (the "Employee Wage Claims"), prepetition health insurance, workman's compensation benefits and to honor their vacation and sick leave benefit claims (the "Employee Benefit Claims," together with the Employee Wage Claims, the "Employee Payroll Claims") will have an extremely negative impact on the employees and, therefore, Debtor's operation. Debtor could lose a significant percentage of its necessary work force if it fails to honor these claims.

---

[23] All capitalized terms in Section L not otherwise defined in Section L shall have the meaning ascribed in the Emergency Motion For Order Authorizing Debtor to Pay Prepetition Employee Payroll Claims, Employee Tax Obligations, and Employee Benefits, filed concurrently herewith.

29

85.    Debtor's pre-petition employee obligations are detailed as follows:    (1) Employee Payroll Claims in the total aggregate amount of approximately $25,583.32; and (2) Employee Tax Obligations in the total aggregate amount of approximately $1,835.64.    The amounts to be requested for payment to the Debtor's employees are equal to approximately 1.15% of the total scheduled unsecured debt and unsecured claims that will not receive any distribution under the terms of Debtor's proposed plan of liquidation.

86.    Debtor believes that the Employee Payroll Claims are priority claims under the Bankruptcy Code, which have been earned within the 180 days before the Petition Date.    The combined total of each Employee Payroll Claim is less than the $10,950.00 statutory priority amount provided in Bankruptcy Code Section 507(a).    Debtor seeks only to pay or honor Employee Payroll Claims up to the $10,950.00 priority amount, in the aggregate, per employee. Debtor shall not pay or honor any Employee Payroll Claims above that amount per employee. In addition, Debtor seeks only to pay or honor the aggregate Employee Payroll Claims for those employees who will remain with the Debtor post-petition.    Debtor also believes that the pre-petition employee tax obligations (the "Employee Tax Obligations") are priority claims under Bankruptcy Code Section 507(a)(8)(D).

87.    Prior to the Petition Date, Debtor entered into a Shared Services Agreement with its affiliate FX Luxury Management, LLC, a non-debtor entity, whereby FX Luxury Management, LLC provided, on a pass-through basis, the cost of salaries, health insurance, workman's compensation, and general office administration expenses ("Back Office Expenses") of Debtor's three (3) employees.    A true and correct copy of the Shared Services Agreement is attached hereto as **Exhibit 10**.    Pursuant to Section 365(d)(3) and by agreement with the First Lien Lenders, Debtor shall continue to receive from FX Luxury Management, LLC, and make the pass-through payments for, the Back Office Expenses.

88.    Debtor believes that its failure to pay or honor the Employee Payroll Claims, Employee Tax Obligations and the Employee Benefit Claims, in the ordinary course of business, will create discontent and resentment among its employees and would therefore undermine Debtor's ability to retain its employees.    If the Debtor cannot promptly assure its

30

employees of uninterrupted payment of the Employee Payroll Claims, Employee Tax Obligations and the Employee Benefit Claims, as described above, Debtor's business will suffer immediate and irreparable harm due to resulting employee resignations and a loss of employee goodwill, or, at the very least, the disintegration of employee morale.  Debtor's employees are the backbone of its business, and the relief requested in the Motion will allow Debtor to remain competitive in the job market in which it maintains its business.  The relief requested will also provide an incentive for employees to continue to provide quality services to Debtor.  Debtor cannot afford to lose the services of its employees during the difficult transition into this Chapter 11 Case.

89.    Debtor's business is necessarily dependent on a regular, motivated work force.  If Debtor does not honor its pre-petition payroll arrearages and accrued vacation and sick leave benefits, its employees will become disenchanted and unproductive and may ultimately seek alternative employment.  A departure of Debtor's employees would devastate Debtor's business.

90.    Debtor has determined, in the exercise of its business judgment, that paying, in the aggregate, the Employee Payroll Claims, up to the combined amount of the $10,950.00 priority for each employee; paying the Employee Tax Obligations; and honoring any outstanding payroll checks in the ordinary course of business, is in the best interests of its reorganization efforts pursuant to Bankruptcy Code Section 363(b).

**M.    Employment and Retention of Sales Agent.**[24]

91.    The Lock Up and Plan Support Agreement provides, among other things, that Debtor shall use commercially reasonable efforts to ensure that one or more real estate professionals acceptable to both First Lien Agent and Debtor, on terms and conditions reasonably acceptable to said parties, is retained during the Chapter 11 Case to market the Properties for sale after the Petition Date and, if applicable, to conduct the Auction.

92.    Accordingly, contemporaneously with this Omnibus Declaration, Debtor filed an application in conformance with the Lock Up and Plan Support Agreement seeking to obtain the

31

Court's approval to employ and retain the services of Grubb & Ellis, effective as of the Petition Date (the "Sales Agent Application"), to act as Debtor's sales and marketing agent for the Properties and, if applicable, to conduct the Auction.  A true and correct copy of the proposed sales agent letter agreement (the "Proposed Sales Agent Agreement") setting forth the terms and conditions under which Debtor would employ and retain Grubb & Ellis to act as Debtor's sales and marketing agent is attached as Exhibit A to the Singer Verified Statement.

93.    In Debtor's business judgment, a sales and marketing agent is essential to Debtor to provide the widest possible exposure for the Properties in the marketplace in order to maximize recovery for Debtor's creditors and estate to the fullest extent possible.

94.    Retention of Grubb & Ellis as Debtor's sales agent is necessary because Debtor does not possess the requisite expertise to market the Properties independently.  Debtor proposes that Grubb & Ellis serve as the marketing and sales agent for the Properties.  Debtor believes that, in light of Grubb & Ellis' experience and success in marketing distressed properties for sale, Grubb & Ellis is best suited to provide marketing services to Debtor with respect to the Properties, and the Debtor will rely on Grubb & Ellis in that regard.  Furthermore, such retention would be consistent with the terms of the Lock Up and Plan Support Agreement.

95.    The marketing services to be provided by Grubb & Ellis will include preparing and distributing sales materials, advertising the sale in local and national publications and on Grubb & Ellis' website, directly contacting qualified casino/hotel operators throughout the country, fielding all inquiries from potential purchasers, encouraging cooperation from the real estate brokerage community, assisting Debtor's professionals in negotiating purchase and sales agreements, coordinating due diligence, overseeing and coordinating escrow and closing process, and other services, as may be agreed upon by and between Debtor and Grubb & Ellis.

96.    In exchange for the above services, Grubb & Ellis will be compensated a marketing fee of $60,000 payable in $20,000 increments over a three month period, with the first payment due within 30 days of their retention as approved by this Court.  Grubb & Ellis

---

[24] All capitalized terms in Section M not otherwise defined in Section M shall have the meaning ascribed in the Application for Order Authorizing the Employment of Grubb & Ellis Las Vegas as Debtor's Sales Agent Effective

will also be reimbursed for all out of pocket expenses related to the marketing of the Properties, which shall include, without limitation, travel, vendor charges, advertising and other out-of-pocket expenses with any single expense greater than $5,000 or any expenses in the aggregate in excess of $15,000 requiring prior approval of the Debtor. If the Properties are sold in accordance with the Court approved Auction and Bidding Procedures to a bona fide unrelated third party purchaser, then Grubb & Ellis shall be entitled to a brokerage commission equal to 2.5% of the total purchase price to be paid at closing.  If a cooperating broker is involved with the sale, then Grubb & Ellis shall split any brokerage commission earned with such cooperating broker.

97.    In Debtor's business judgment, given the nature of the real estate marketing services to be provided by Grubb & Ellis, the proposed compensation arrangement is both fair and reasonable.

98.    Notice of the Sales Agent Application has been provided to the Office of the United States Trustee, those creditors holding the twenty (20) largest unsecured claims, the Internal Revenue Service, the Nevada Department of Taxation, the Clark County Treasurer, the Clark County Assessor, the Department of Employment, Training and Rehab, and any party which files and serves on the Debtor a request for special notice prior to entry of the Order approving the Sales Agent Application.  Debtor respectfully submits that such notice is appropriate under the circumstances and that no other or further notice is necessary or required.

99.    No previous request for the relief sought in the Sales Agent Application has been made to this Court or any other court.

**N.    Employment and Retention of Financial Advisors.**[25]

100.    Debtor has determined that in order to carry out the duties as provided for under Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interests of its estate to employ financial advisors.  Accordingly, on April 13, 2010, Debtor duly selected Sierra

---

as of the Petition Date, filed concurrently herewith.

[25] All capitalized terms in Section N not otherwise defined in Section N shall have the meaning ascribed in the Application for Order Authorizing the Employment and Retention of Sierra Consulting Group, LLC, as Debtor's Financial Advisors, Effective as of the Petition Date (the "Sierra Application"), filed concurrently herewith.

LV1 1188551v2 04/21/10

Consulting Group, LLC ("Sierra Consulting") to provide such financial and restructuring advisory services during this Chapter 11 Case.

101. By the Sierra Application, Debtor, as debtor-in-possession, requests authorization, pursuant to Bankruptcy Code Sections 327(a) and 328(a) and Bankruptcy Rule 2014, to employ Sierra Consulting, effective as of the Petition Date, as Debtor's financial advisors. In support of the Sierra Application, Debtor relies on the Burr Verified Statement.

102. In the Debtors' business judgment, it is necessary to employ Sierra Consulting as financial advisors in order to ensure that the interests of Debtor are adequately represented in an efficient and effective manner. Debtor believes that, in light of Sierra Consulting's involvement in corporate restructuring matters across multiple jurisdictions, Sierra Consulting is best suited to provide financial and restructuring advisory services to Debtor, and Debtor will rely on Sierra Consulting in that regard.

103. Debtor selected Sierra Consulting because of its excellent qualifications and its reasonable fee structure, which is detailed in the engagement agreement ("Sierra Engagement Agreement") attached to the Burr Verified Statement, filed concurrently herewith, as Exhibit A.

104. Debtor submits that the employment and retention of Sierra Consulting as Debtor's financial advisors is in the best interests of Debtor and its estate.

105. In light of Sierra Consulting's expertise in financial restructurings, complex/distressed mergers and acquisitions, and financings in connection with financial restructurings, together with matters requiring expert opinions and expert witness testimony and marketing distressed assets, including real property, Debtor believes Sierra Consulting is well-qualified to provide financial and restructuring advisory services to Debtor and assist Debtor in this Chapter 11 Case.

106. I am informed and believe that, except with respect to its proposed representation of the Debtor and as may be set forth herein and in the Burr Verified Statement, Sierra Consulting:

    (a)    is not a creditor or insider of the Debtor;

    (b)    does not hold or represent an interest adverse to the Debtor;

LV1 1188551v2 04/21/10

(c)     is a "disinterested person," as defined by section 101(14) and modified by section 1107(b) and used in section 328(c) of the Bankruptcy Code;

(d)     does not  represent any other creditor, party in interest, or entity in this Chapter 11 Case; and

(e)     has no connection with the Debtor, its creditors, or other parties in interest in this Chapter 11 Case, except as may be set forth in the Burr Verified Statement.

107.    Debtor respectfully submits that the proposed fee arrangement with Sierra Consulting, as described above and set forth in the Engagement Agreement, is (i) similar to (a) fee arrangements that have been authorized in other Chapter 11 cases in which Sierra Consulting has rendered services, and (b) market rates both in and out of chapter 11 proceedings; and (ii) reasonable in light of (a) industry practice, (b) Sierra Consulting's experience in reorganizations, and (c) the scope of work to be performed pursuant to Sierra Consulting's retention.  Debtor believes that, given the nature of the financial and restructuring advisory services to be provided by Sierra Consulting, the proposed compensation arrangement is both fair and reasonable.

108.    As set forth in the Engagement Letter and subject to terms and conditions therein, Debtor has agreed to indemnify (the "Indemnity Provisions") Sierra Consulting in accordance with the indemnity provisions set forth in the Engagement Agreement.  In the Debtor's business judgment, Debtor believes the Indemnity Provisions are customary and reasonable terms for Sierra Consulting's engagement as Debtor's financial advisors.

109.    Further, Debtor believes that the Indemnity Provisions are comparable to those generally obtained by financial advisory firms and for comparable engagements, both in and out of court.

110.    Notice of the Sierra Application has been provided to the Office of the United States Trustee, those creditors holding the twenty (20) largest unsecured claims, the Internal Revenue Service, the Nevada Department of Taxation, the Clark County Treasurer, the Clark County Assessor, the Department of Employment, Training and Rehab, and any party which files and serves on the Debtor a request for special notice prior to entry of the Order approving

35

1    the Sierra Application.  Debtor respectfully submits that such notice is appropriate under the

2    circumstances and that no other or further notice is necessary or required.

3          111.    No previous request for the relief sought in the Sierra Application has been made

4    to this Court or any other court.

5          **O.    Employment and Retention of Real Estate Appraiser.**[26]

6          112.    Debtor has determined that in order to carry out the duties as provided for under

7    Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interests of its

8    estate to employ a real estate appraiser.  Accordingly, on April 15, 2010, Debtor duly selected

9    Kent Appraisal Services to provide such real estate appraisal services to the Debtor as may

10   become necessary throughout these proceedings.

11         113.    By its application (the "Kent Application") filed concurrently herewith, Debtor,

12   as debtor-in-possession, requests authorization, pursuant to Bankruptcy Code Sections 327(a)

13   and 328(a) and Bankruptcy Rule 2014, to employ Kent Appraisal Services as real estate

14   appraiser for Debtor.  In support of the Kent Application, Debtor relies on the Kent Verified

15   Statement.

16         114.    Debtor submits that it is necessary to employ Kent Appraisal Services as real

17   estate appraiser because the Debtor requires professional assistance in the area in which Kent

18   holds particular expertise.  Prior to the commencement of this Chapter 11 Case, Kent Appraisal

19   Services prepared an updated appraisal on the Properties.  Therefore, Debtor believes Kent

20   Appraisal Services is most aptly situated to provide real estate appraisal services during these

21   proceedings in order to ensure that any questions or issues as to the value of the Properties can

22   be adequately addressed in the most efficient and expeditious manner possible given the time-

23   sensitive nature of this Chapter 11 Case.  Debtor believes that, in light of their expertise in

24   providing real estate appraisal services in the Las Vegas valley, Kent Appraisal Services is best

25   suited to provide such services to Debtor, and Debtor will rely on Kent Appraisal Services in

26   that regard.

27   ────────────────────

28   [26] All capitalized terms in Section N not otherwise defined in Section N shall have the meaning ascribed in the Application for Order Authorizing the Employment and Retention of Kent Appraisal Services as Debtor's Real Estate Appraiser, Effective as of the Petition Date.

36

115. Debtor selected Kent Appraisal Services because of its excellent qualifications and its reasonable fee structure.

116. I am informed and believe that, except with respect to its proposed representation of Debtor and as may be set forth herein and in the Kent Verified Statement, Kent Appraisal Services:

        (a)    is not a creditor or insider of the Debtor;

        (b)    does not hold or represent any interest adverse to Debtor that would impair it's ability to objectively perform professional services for the Debtor in accordance with section 327 of the Bankruptcy Code;

        (c)    is a "disinterested person," as defined by section 101(14) and modified by section 1107(b) and used in section 328(c) of the Bankruptcy Code;

        (d)    does not  represent any other creditor, party in interest, or entity in this Chapter 11 Case; and

        (e)    has no connection with the Debtor, its creditors, or other parties in interest in this Chapter 11 Case, except as may be set forth in the Kent Verified Statement.

117. Debtor seeks to employ and retain Kent Appraisal Services as Debtor's real estate appraiser with respect to the Properties at fees and commission rates consistent with those Kent Appraisal Services routinely charges in comparable matters.  Specifically, Debtor proposes to pay Kent Appraisal Services compensation at the hourly rate of $300, as set forth in the Kent Verified Statement and the Engagement Agreement, attached thereto as Exhibit B, to provide valuation, consultation and research services to Debtor, as may become necessary in this Chapter 11 Case, including attendance at depositions, court proceedings or other proceedings where testimony is required, and for time and expenses incurred in preparing for such proceedings.

118. Debtor respectfully submits that the proposed fee arrangement with Kent Appraisal Services, as described above and set forth in the Engagement Agreement, is (i) similar to market rates both in and out of chapter 11 proceedings; and (ii) reasonable in light of (a) industry practice, (b) Kent Appraisal Services' experience in providing valuation, consultation and research services in Clark County, Nevada, and (c) the scope of work to be performed pursuant to Kent Appraisal Services' retention.  Debtor believes that, given the nature of the

37

1  commercial real estate appraisal services to be provided by Kent Appraisal Services, the

2  proposed compensation arrangement is both fair and reasonable.

3      119.    No compensation will be paid to Kent Appraisal Services except as authorized by

4  order of this Court after notice and an opportunity for hearing.

5      120.    Notice of the Kent Application has been provided to the Office of the United

6  States Trustee, those creditors holding the twenty (20) largest unsecured claims, the Internal

7  Revenue Service, the Nevada Department of Taxation, the Clark County Treasurer, the Clark

8  County Assessor, the Department of Employment, Training and Rehab, and any party which

9  files and serves on the Debtor a request for special notice prior to entry of the Order approving

10  this Application.  Debtor respectfully submits that such notice is appropriate under the

11  circumstances and that no other or further notice is necessary or required.

12      121.    No previous request for the relief sought in the Kent Application has been made

13  to this Court or any other court.

14      Executed this 21st day of April 2010, in New York, New York.

15

16

17      _____s/ Mitchell J. Nelson_____
        MITCHELL J. NELSON, PRESIDENT
18      FX LUXURY LAS VEGAS I, LLC

19

20

21

22

23

24

25

26

27

28

LV1 1188551v2 04/21/10