*Exhibit 6*

# EXHIBIT E

# LOCK UP AND PLAN
# SUPPORT AGREEMENT

## LOCK UP AND PLAN SUPPORT AGREEMENT

THIS LOCK UP AND PLAN SUPPORT AGREEMENT (this "Agreement"), dated as of October 27, 2009, is made by and among:

(a)   The undersigned First Lien Lenders (as defined below) under that certain Amended and Restated Credit Agreement, dated as of July 6, 2007, among FX Luxury Las Vegas I, LLC (the "Debtor"), a Nevada limited-liability company (fka Metroflag BP, LLC) and FX Luxury Las Vegas II, LLC ("FX II"), a Nevada limited-liability company (fka Metroflag Cable, LLC), FX Luxury Las Vegas Parent, LLC ("Las Vegas Parent"), a Delaware limited-liability company (fka BP Parent, LLC), the banks, financial institutions and other entities listed on Exhibit A hereto (the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent for the First Lien Lenders and Credit Suisse Securities (USA) LLC, as syndication agent, sole book running manager and sole lead arranger (as further amended, modified or supplemented from time to time, the "First Lien Credit Agreement") (any capitalized term utilized herein but not defined herein shall have the same meaning as ascribed to it in the First Lien Credit Agreement);

(b)   Landesbank Baden-Württemberg, New York Branch (as successor-in-interest to Credit Suisse, Cayman Islands Branch, the "First Lien Agent" together with the First Lien Lenders, the "Senior Group");

(c)   The Debtor and FX II (collectively, "Borrowers");

(d)   Las Vegas Parent (collectively with the Borrowers, the "Debtor Parties"); and

(e)   LIRA Property Owner, LLC (the "New Borrower"), a Delaware limited liability company and LIRA LLC ("New Parent" and together with New Borrower, the "New Entities"), a Delaware limited liability company.

(each of the members of the Senior Group, the Debtor Parties and the New Entities individually a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, the Borrowers own approximately 17.71 contiguous acres of land (collectively the "Properties") located on the "Las Vegas Strip" at the southeast corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada;

WHEREAS, the Properties are encumbered by liens securing loans having an aggregate principal balance of approximately $454 million as of the date hereof, including (i) two-tranche senior secured first priority loans in the current principal amount of approximately $259 million made by the First Lien Lenders (the "First Lien Loan") pursuant to the First Lien Credit Agreement and (ii) secured second priority loans in the current principal amount of approximately $195 million made by the lenders thereof (the "Second Lien Holders") pursuant to

the Second Lien Credit Agreement (the "Second Lien Loan"; and together with the First Lien Loan, the "Loans");

WHEREAS, the First Lien Agent issued a Notice of Breach and Election to Sell which was recorded April 9, 2009 in the Clark County Recorder Office as Instrument #20090409-0003049, Foreclosure Proceeding #A9-03-0016 FCL;

WHEREAS, the First Lien Agent commenced an action in the Nevada District Court (Case No.: A-09-591831-B, Dept. No.: XIII) and obtained the appointment of a receiver (the "Receiver") pursuant to a court order dated June 22, 2009, as amended by a court order dated August 6, 2009 (the "Receivership Order");

WHEREAS, Nevada Title Company, as duly substituted Trustee (the "Trustee") under and pursuant to the First Lien Credit Agreement and the Mortgage, issued a Notice of Trustee's Sale, dated July 7, 2009 and recorded July 10, 2009 in the Clark County Recorder Office as Instrument #20090710-0002151, Trustee Sale #A9-03-0016 FCL;

WHEREAS, on September 9, 2009 the First Lien Agent caused a Certificate of Postponement to be issued, extending the date of the proposed foreclosure sale to October 21, 2009.

WHEREAS, on October 15, 2009 the First Lien Agent caused a First Amendment to Foreclosure Postponement Agreement to be issued, extending the date of the proposed foreclosure sale to November 18, 2009.

WHEREAS, before the Petition Date (as defined below), FX II and Las Vegas Parent will be merged into the Debtor (such transaction, the "Merger"), with the Debtor being the surviving entity.

WHEREAS, the Parties intend for the Debtor to commence a voluntary prepackaged chapter 11 proceeding (the "Prepackaged Case") on or about November 16, 2009 by filing a petition (the "Petition") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") (the date of that event being the "Petition Date");

WHEREAS, the Borrowers have determined that it would be in the best interests of their creditors and Las Vegas Parent to hold an auction of the Properties (the "Auction") and to require that any Qualified Bids exceed the Minimum Bid Threshold, *provided that*, if no Qualified Bids are received by the bidding deadline, then there shall be no Auction and the Debtor shall proceed to confirmation of the proposed prepackaged chapter 11 plan of liquidation (as amended or supplemented in accordance with the terms hereof and thereof, the "Plan") in accordance with the terms hereof, the terms contained in the plan term sheet attached hereto as Exhibit B-1 (the "Plan Term Sheet"), any Transaction Document (as defined below) and the requirements of the Bankruptcy Code and the Bankruptcy Rules (collectively, the "Transaction");

WHEREAS, the Parties have engaged in good faith negotiations with regard to the Transaction; and

2

WHEREAS, subject to execution of definitive Transaction Documents and appropriate approvals by the Bankruptcy Court thereof, including the Chapter 11 Transaction Documents (as defined below), the following sets forth the agreement between the Parties concerning their respective rights and obligations.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants and agreements set forth herein and for other good and valuable consideration, the Parties agree as follows:

**Section 1.**  **Definitions.**  The following terms shall have the following meanings:

1.1.  "Agreement" shall have the meaning set forth in the Preamble.

1.2.  "Agreement Event of Termination" shall mean the termination of this Agreement in accordance with Section 7 hereof.

1.3.  "Auction" shall have the meaning set forth in the Recitals.

1.4.  "Auction and Bidding Procedures Motion" means a motion, in form and substance reasonably satisfactory to the Parties, providing for, among other things, the sale of the Properties at the Auction for a net cash purchase price of not less than the Minimum Threshold Amount and on terms and conditions set forth in the Purchase and Sale Agreement, which motion shall be in agreed form prior to and filed with the Bankruptcy Court on the Petition Date. The material terms of the Auction and Bidding Procedures Motion are set forth on Exhibit B-3.

1.5.  "Auction and Bidding Procedures Order" means the bidding procedures order and sale order, which shall be consistent in all material respects with the forms attached to the Auction and Bidding Procedures Motion.

1.6.  "Bad Boy Guarantee" shall have the meaning set forth in section 3.6.(b).

1.7.  "Bankruptcy Code" shall have the meaning set forth in the Recitals.

1.8.  "Bankruptcy Court" shall have the meaning set forth in the Recitals.

1.9.  "Bankruptcy Rules" means the federal rules of bankruptcy procedure and official forms, as amended, and the local rules of bankruptcy practice for the district of Nevada, as amended.

1.10.  "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, United States of America, Stuttgart, Munich, Hanover or Mainz, Federal Republic of Germany or London, England are authorized or required by law to close.

1.11.  "Borrowers" shall have the meaning set forth in Section (c) of the Preamble.

1.12.  "Case Margin" shall have the meaning set forth in Exhibit B-4 hereto.

3

**1.13.** "Chapter 11 Transaction Documents" means the Plan, the Disclosure Statement, the Interim Cash Collateral Order, the Final Cash Collateral Order, the Auction and Bidding Procedures Motion, the Auction and Bidding Procedures Order and any other motion and order filed with and entered by, as applicable, the Bankruptcy Court in order to implement and consummate the Transaction contemplated by this Agreement.

**1.14.** "Control", "Controlled" or "Controlled by" means the possession, directly or indirectly, of the power to either (a) vote 51% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of an entity and (b) direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise.

**1.15.** "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan, in form and substance reasonably satisfactory to the First Lien Lenders, the Debtor and New Borrower.

**1.16.** "Cushman & Wakefield" means Commerce CRG of NV, LLC, doing business as CCRG/Cushman & Wakefield.

**1.17.** "Debtor" shall have the meaning set forth in Section (a) of the Preamble and shall refer to FX Luxury Las Vegas I, LLC, both before and after the Merger and both before and after the Petition Date.

**1.18.** "Debtor Parties" shall mean the Borrowers and Las Vegas Parent (and after the Merger shall mean the Debtor).

**1.19.** "Deposit" shall mean the $2,200,000 deposit to be made by the New Borrower.

**1.20.** "Disclosure Statement" means the solicitation and disclosure statement, in form and substance reasonably satisfactory to New Borrower, Debtor and the First Lien Agent, describing, among other things, the Plan, the terms of this Agreement, and the Transaction, and otherwise in compliance with Section 1125 of the Bankruptcy Code and Rules 2002, 3016 and 3017 of the Federal Rules of Bankruptcy Procedure, and will include as exhibits thereto, among other things, the duly executed and delivered Plan Funding Agreement and the agreed form of New Secured Loan Documents.

**1.21.** "Effective Date Amount" means the sum of (x) $16,150,000, *plus* (y) the difference between (A) $650,000 and (B) the Overhead Amount.

**1.22.** "Equity Sponsors" means the individuals listed on Exhibit B-2 hereto.

**1.23.** "Equity Sponsor Commitment" means a firm commitment from each Equity Sponsor, consistent with the term sheet attached as Exhibit B-2 hereto and in form and substance reasonably satisfactory to the First Lien Agent (who shall be a third party beneficiary thereof), committing each such Equity Sponsor to fund its proportionate share of the Deposit by November 11, 2009 and, at closing, of the Effective Date Amount to New Parent and to cause

4

New Parent to fund New Borrower to satisfy New Borrower's obligations under the Plan Funding Agreement and consummate the transactions contemplated hereby and thereby.

    **1.24.**   "Existing Property Management Contract" means that certain Exclusive Management Agreement dated as of June 22, 2009 between Cushman & Wakefield and the Receiver.

    **1.25.**   "Fault-Based Termination" shall have the meaning set forth in Section 7.4.

    **1.26.**   "Final Cash Collateral Order" means the final cash collateral order which shall be consistent in all material respects with the form of proposed order to be agreed by the Debtor and the First Lien Agent.

    **1.27.**   "Final Order" means an order or judgment entered by the Bankruptcy Court: (a) that has not been reversed, stayed, modified, amended, revoked, varied or set aside, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought and (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending.

    **1.28.**   "First Lien Agent" shall have the meaning set forth in Section (b) of the Preamble.

    **1.29.**   "First Lien Credit Agreement" shall have the meaning set forth in Section (a) of the Preamble.

    **1.30.**   "First Lien Credit Documents" shall have the meaning set forth in Section 7.4.(a).

    **1.31.**   "First Lien Lenders" shall have the meaning set forth in Section (a) of the Preamble.

    **1.32.**   "First Lien Loan" shall have the meaning set forth in the Recitals.

    **1.33.**   "First Lien Secured Claims" means the Claims (as defined in section 101(5) of the Bankruptcy Code) held by the First Lien Lenders, which Claims are secured by first priority liens and security interests in all of the Debtor's assets.

    **1.34.**   "FX II" shall have the meaning set forth in Section (a) of the Preamble.

    **1.35.**   "FX Entities" means the Debtor Parties, FX LLC and FX Real Estate.

1.36.   "FX LLC" means FX Luxury, LLC, a Delaware limited liability company.

1.37.   "FX Real Estate" means FX Real Estate and Entertainment Inc., a Delaware corporation.

1.38.   "Initial Budgeted Reserve" means funds sufficient to establish a reserve for the first month of the Debtor's operating expenses during the Bankruptcy, as provided under the budget attached to the Interim Cash Collateral Order

1.39.   "Intercreditor Agreement" shall have the meaning set forth in Section 3.2.(iii)(f).

1.40.   "Interim Cash Collateral Order" means the interim cash collateral order, which shall be consistent in all material respects with the form attached as Exhibit D hereto.

1.41.   "Las Vegas Parent" shall have the meaning set forth in Section (a) of the Preamble.

1.42.   "Loans" shall have the meaning set forth in the Recitals.

1.43.   "Merger" shall have the meaning set forth in the Recitals.

1.44.   "Minimum Bid Threshold" means $256 million.

1.45.   "Negotiated Sale Proceeds Amount" means $255,000,000.

1.46.   "New Borrower" shall have the meaning set forth in Section (e) of the Preamble; New Borrower shall be 100% owned by New Parent and Controlled by the Equity Sponsors.

1.47.   "New Entities" shall have the meaning set forth in Section (e) of the Preamble.

1.48.   "New Parent" shall have the meaning set forth in Section (e) of the Preamble; New Parent shall be Controlled by the Equity Sponsors.

1.49.   "New Secured Loan" means a new secured loan, the material terms of which are set forth on Exhibit C (the "New Secured Loan Term Sheet").

1.50.   "New Secured Loan Documents" shall have the meaning set forth in Section 3.10.(a).

1.51.   "Notes" shall have the meaning set forth in the First Lien Credit Documents.

1.52.   "Outside Date" means May 18, 2010 or such other date as the Debtor, the First Lien Lenders and the New Borrower may agree to in a writing executed by all such Parties.

6

**1.53.** "Overhead Amount" means the amount New Borrower advances with respect to salaries and general overhead from the Petition Date until the Plan Effective Date for New Borrower or Debtor Parties' parent or ultimate parent, but not for Debtor Parties, in an amount not to exceed One Hundred Thirty Thousand Dollars ($130,000.00) per month and Six Hundred Fifty Thousand Dollars ($650,000.00) in the aggregate during the Prepackaged Case.

**1.54.** "Parties" and "Party" shall have the meaning set forth in the Preamble.

**1.55.** "Petition" shall have the meaning set forth in the Recitals.

**1.56.** "Petition Date" shall have the meaning set forth in the Recitals.

**1.57.** "Plan" shall have the meaning set forth in the Recitals.

**1.58.** "Plan Effective Date" means the date on which the Plan becomes effective pursuant to the terms thereof.

**1.59.** "Plan Funding Agreement" means an agreement in form and substance reasonably satisfactory to the First Lien Agent and New Borrower, the material terms of which are set forth on Exhibit B-2 (the "PFA Term Sheet").

**1.60.** "Plan Term Sheet" shall have the meaning set forth in the Recitals.

**1.61.** "Prepackaged Case" shall have the meaning set forth in the Recitals.

**1.62.** "Properties" shall have the meaning set forth in the Recitals.

**1.63.** "Purchase and Sale Agreement" means a purchase and sale agreement, which shall be consistent in all material respects with the form attached to the Auction and Bidding Procedures Motion and the Auction and Bidding Procedures Order.

**1.64.** "Qualified Property Manager" means Cushman & Wakefield or such other nationally recognized property management firm as the First Lien Lenders and Debtor shall agree to in writing.

**1.65.** "Receiver" shall have the meaning set forth in the Recitals.

**1.66.** "Receivership Order" shall have the meaning set forth in the Recitals.

**1.67.** "Related Equity Sponsor" means each Equity Sponsor, or any entity which is directly or indirectly controlled by an Equity Sponsor, that owns shares of or interests in or that directly or indirectly controls any of the FX Entities.

**1.68.** "Sale" shall mean the sale of the Properties pursuant to the Purchase and Sale Agreement for an amount not less than the Minimum Bid Threshold.

**1.69.** "Sales Agent" shall have the meaning set forth in Section 3.5.

**1.70.** "Second Lien Holders" shall have the meaning set forth in the Recitals.

NYDOCS03/892580.25C

**1.71.** "Second Lien Loan" shall have the meaning set forth in the Recitals.

**1.72.** "Secured Obligations" shall have the meaning set forth in Section 7.1.(d)(i).

**1.73.** "Senior Group" shall have the meaning set forth in Section (b) of the Preamble.

**1.74.** "Supplemental Budget Request" shall have the meaning set forth in the Interim Cash Collateral Order or the Final Cash Collateral Order as applicable.

**1.75.** "Target Dates" shall have the meaning set forth in Section 3.1.

**1.76.** "Transaction Document" and "Transaction Documents" shall have the meaning set forth in Section 3.2.(i)(a).

**1.77.** "Transaction Term Sheets" means, collectively, Exhibits B-1, B-2, B-3 and C.

**1.78.** "Transfer" shall have the meaning set forth in Section 3.7.

**1.79.** "Transaction" shall have the meaning set forth in the Recitals.

**1.80.** "Trustee" shall have the meaning set forth in the Recitals.

**Section 2.    Transaction Term Sheets.**    Each Transaction Term Sheet and any Chapter 11 Transaction Document attached hereto is incorporated herein by reference and made part of this Agreement.

**Section 3.    Covenants.**

**3.1.    Target Dates and Outside Date.**    The Parties hereby agree to the following dates and procedures and for the extension of such dates:

(a)    Each Party shall use commercially reasonable efforts to ensure that the target dates set forth in Exhibit E (the "Target Dates") are met. Without limiting the obligations of the Parties hereunder, if one or more Target Dates cannot be satisfied and neither the Debtor Parties nor the New Entities are in breach of their obligations hereunder beyond applicable notice and cure periods, such Target Dates shall be extended for a reasonable period of time by written notice by one Party to the other Parties setting forth the proposed period of extension; *provided, however,* that no such extension shall occur if, in the First Lien Agent's reasonable judgment, it is reasonably certain that neither a Sale nor the Plan will be capable of consummation on or prior to the Outside Date.

(b)    If the Confirmation Order shall not be a Final Order prior to the Outside Date, the First Lien Agent, the Debtor and the New Borrower shall be entitled to extend the Outside Date if and to the extent (and on such terms as) said Parties shall unanimously agree in writing.

8

**3.2.    Support of the Plan**. (i)    Until the occurrence of the Outside Date, or the First Lien Agent's determination that neither a Sale nor the Plan can be consummated, as set forth in Section 3.1.(a) above, except to the extent that, and for as long as, they shall be prohibited from taking any of the following actions due to any injunction, order, law or other judicial or legal prohibition, the Debtor Parties and the New Entities agree to:

(a)    not object to the Transaction or challenge, or otherwise commence or participate in any proceeding which fails to support the Transaction, this Agreement, the Plan Funding Agreement, the Equity Sponsor Commitment, the New Secured Loan Documents or any Chapter 11 Transaction Document (hereinafter, each a "Transaction Document" and, collectively, the "Transaction Documents").

(b)    not directly or indirectly seek, solicit, support, formulate, prosecute or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Debtor Parties that could reasonably be expected to prevent, delay or impede the consummation of the Transaction or any Transaction Document;

(c)    not take any other action that is inconsistent with, or that would delay or obstruct the proposed solicitation, confirmation or consummation of, the Transaction or any Transaction Document; and

(d)    not (x) direct or encourage any person to take any action that is inconsistent with its obligations under this Agreement or that could impede or delay the implementation and consummation of the Transaction, or (y) support, in any way, any person who may take any action that is inconsistent with or would prevent the implementation and consummation of the Transaction.

(ii)    In addition to the foregoing, the Debtor Parties agree to use commercially reasonable efforts to timely obtain all regulatory, judicial and third party approvals (excluding approvals by any third-party creditor other than a counter-party to a contract to be assigned in connection with the Transaction) that will be required to consummate the Transaction.

(iii)    Each First Lien Lender agrees, for itself only and not on behalf of any other member of the Senior Group and so long as it is the legal owner, beneficial owner and/or the investment adviser or manager of any First Lien Secured Claims, except to the extent that, and for as long as, it shall be prohibited from taking any of the following actions due to any injunction, order, law or other judicial or legal prohibition, to:

(a)    timely (prior to the Petition Date) vote or cause to be voted its First Lien Secured Claims (and not revoke or withdraw its vote) to accept the Plan;

(b)    vote against and shall in no way otherwise, directly or indirectly, support any restructuring, reorganization or liquidation of the Debtor (or any plan or proposal in respect of the same) that is inconsistent with the Transaction and the Transaction Documents;

(c)    not directly or indirectly seek, solicit, support, formulate, prosecute or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation,

9

reorganization, merger or restructuring of the Debtor that could reasonably be expected to prevent, delay or impede the Transaction as contemplated by the Transaction Documents;

(d)    not object to the Transaction or any Transaction Document, or challenge, or otherwise commence or participate in any proceeding which fails to support the Transaction or any Transaction Document (except to the extent that any Transaction Document is inconsistent with the terms of this Agreement);

(e)    not take any other action that is inconsistent with, or that would delay or obstruct the proposed solicitation, confirmation or consummation of, the Transaction, including any Transaction Document;

(f)    exercise all of its rights and powers under the Amended and Restated Intercreditor Agreement, dated July 6, 2007 (the "Intercreditor Agreement"), in all commercially reasonable respects, to cause the Transactions contemplated hereby to be consummated, including, without limitation, enforcing the restrictions and/or prohibitions on the Second Lien Holders to contest (or support any other person in contesting) any aspect of the Transaction; and

(g)    not seek the appointment of a trustee or examiner or to dismiss the Prepackaged Case or to convert the Prepackaged Case to a case under chapter 7 of the Bankruptcy Code.

None of the above described covenants of the Parties shall be deemed to preclude the Parties from discussing appropriate modifications of the Transaction with one another or from approaching third parties (including Second Lien Holders) in order to seek, solicit, support, formulate, prosecute or encourage a plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the FX Entities that is consistent with the terms of the Transaction and the Transaction Documents.

**3.3.    Merger.**    The First Lien Lenders confirm that they have received the proposed documentation for the purpose of effectuating the Merger and that such documents are in form and substance reasonably acceptable. Notwithstanding Section 6.7 of the First Lien Credit Agreement, the First Lien Lenders hereby consent to the Merger on the basis of such documentation. The Debtor Parties agree that the Merger shall occur prior to the Petition Date.

**3.4.    Role of Receiver during the Prepackaged Case.**    Upon the filing of the Prepackaged Case, the First Lien Agent shall not object to or otherwise interfere with the Receiver's obligation to promptly turn over the property of the Debtor and the Parties agree that the Receiver shall no longer continue to serve as a receiver or a custodian and shall no longer be an officer of the court. The Parties agree that subsequent to such turnover the Receiver may be retained by the First Lien Lenders, and that the Receiver (or such other person as may be selected by the First Lien Agent in the event that the Receiver shall resign or is otherwise unavailable), in such capacity shall be permitted to access the Properties and shall be provided reasonable access to all of the books and records of the Debtor for the purpose of monitoring its businesses, operations and finances (on behalf of the First Lien Lenders), and for the purpose of assisting in the implementation of the Transaction. All fees, costs and expenses incurred by the First Lien

Lenders in connection with the retention of the Receiver and/or such other party in such capacity shall be reimbursable by the Debtor pursuant to Section 9.2 of the First Lien Credit Agreement and in accordance with the Interim Cash Collateral Order or the Final Cash Collateral Order, as applicable; *provided, however,* that the Receiver and/or such other party shall be entitled to no more than Thirty Thousand Dollars ($30,000) in the aggregate, payable at a rate of no greater than Five Thousand Dollars ($5,000) per month for its services in accordance with the foregoing.

    **3.5.**    **Sales Agent.** As soon as reasonably practicable after the date hereof, the Borrowers shall engage one or more real estate professionals (a "<u>Sales Agent</u>") acceptable to both the Borrowers and the First Lien Agent, on terms and conditions reasonably satisfactory to said Parties, to market the Properties for sale after the Petition Date, and if applicable, to conduct the Auction in accordance with the terms hereof and the Auction and Bidding Procedures Order. The Debtor shall use commercially reasonable efforts to ensure that the Sales Agent is retained during the Prepackaged Case for purposes of marketing the Properties in accordance with the Auction and Bidding Procedures Order.

    **3.6.**    **Agreement to Forbear.** Each member of the Senior Group, severally and not jointly, agrees that:

        (a)    it shall not (i) take any action or otherwise pursue any right or remedy under applicable law, the First Lien Credit Agreement, the Notes or any documents related thereto, as applicable, or (ii) initiate, or have initiated on its behalf, any lawsuit, cause of action, litigation or proceeding of any kind, if with respect to either of the aforementioned subclauses '(i)' or '(ii)', such action is directly or indirectly related to the Debtor, the First Lien Credit Agreement, the Notes or any other documents related thereto; *provided that* this section shall not prohibit, (i) the enforcement of this Agreement at any time, or (ii) the exercise of rights under the Receivership Order not inconsistent herewith prior to the Petition Date; and

        (b)    it shall waive, solely with respect to the commencement of the Prepackaged Case, the enforcement of that certain First Lien Sponsor Guarantee Agreement dated July 6, 2007 (the "<u>Bad Boy Guarantee</u>").

    **3.7.**    **Transfer of First Lien Secured Claims and Other Rights.** Each First Lien Lender hereby severally and not jointly agrees after the date hereof not to sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "<u>Transfer</u>"), all or any of its First Lien Secured Claims (or any right related thereto, including any voting rights associated with such First Lien Secured Claims) or any rights and obligation as the First Lien Agent (including, all rights and obligations under this Agreement), unless, with respect the First Lien Secured Claims, the Transfer is in compliance with the terms of the First Lien Credit Agreement and the transferee thereof agrees in writing to assume and be bound by this Agreement, and to assume the obligations of a First Lien Lender under this Agreement and delivers such writing to each of the Debtor and the First Lien Agent (in form and substance satisfactory to the First Lien Agent) within five (5) Business Days of the relevant Transfer (each such transferee becoming, upon the Transfer, a First Lien Lender hereunder). The Debtor Parties shall promptly (but in no event longer than two (2) Business Days) acknowledge any such Transfer in writing, and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Debtor Parties shall be deemed to have

11

acknowledged that their obligations to the First Lien Lenders hereunder shall be deemed to constitute obligations in favor of the relevant transferee as a First Lien Lender hereunder. Any Transfer of any First Lien Secured Claims that does not comply with the procedure set forth in the first sentence of this Section 3.7. shall be deemed void *ab initio*.

      **3.8.**    **Postponement of Foreclosure.**    Unless and until there has been an Agreement Event of Termination, the Senior Group agrees to postpone the foreclosure sale proceedings.

      **3.9.**    **Compliance with First Lien Credit Agreement.**    Subject to the availability of required funds pursuant to the Budget (as defined in the Interim Cash Collateral Order or the Final Cash Collateral Order, as the case may be), from and after the Petition Date, the Debtor will use reasonable efforts to comply with, or to direct its property manager to comply with, the provisions of Sections 5.6(A) and 5.6(B) (except for the use of proceeds clause) 5.8 (with respect only to compliance with material applicable laws), 5.9 (to the extent applicable during the case), 5.10, and 6.15 of the First Lien Credit Agreement.

      **3.10.**    **Good Faith Negotiation of Documents**.    The Parties agree to negotiate all documents in good faith, and further covenant as follows:

      (a)    the definitive loan documents (the "New Secured Loan Documents") evidencing the New Secured Loan will be finalized prior to the solicitation of votes to accept or reject the Plan, and will be consistent in all material respects with the New Secured Loan Term Sheet and shall otherwise be in form and substance reasonably acceptable to the First Lien Agent and the New Borrower;

      (b)    the Disclosure Statement will be finalized prior to the commencement of solicitation of votes to accept or reject the Plan and will be in form and substance reasonably acceptable to the Parties;

      (c)    the Plan will be finalized (and duly voted upon by the First Lien Lenders) prior to the filing of the Petition, will be consistent in all material respects with the terms of the Plan Term Sheet and shall otherwise be in form and substance reasonably acceptable to the Parties;

      (d)    the Auction and Bidding Procedures Motion, with the proposed Auction and Bidding Procedures Order, and the proposed Purchase and Sale Agreement will be finalized prior to the filing of the Petition and will be consistent in all material respects with the term sheet attached as Exhibit B-3 hereto and be in form and substance reasonably acceptable to the Parties; and

      (e)    all other filings, documents, pleadings or other materials required in connection with the consummation of the Transactions contemplated hereby or the Prepackaged Case shall be in form and substance reasonably acceptable to all Parties affected in any material regard by such documents, pleadings or other materials.

      **3.11.**    **Leases**. Without the written consent of the First Lien Agent, the Debtor Parties shall not enter into any leases with respect to the Properties that are greater than three (3)

months in duration unless such leases shall be terminable at the election of the lessor, without any penalty, fee, or payment of any kind, upon not more than three months notice.

**3.12.  No Removal of Property Manager.**  The Debtor Parties shall continue to employ a Qualified Property Manager, as the property manager of the Properties until the Transaction has been consummated and the New Secured Loan has been extended to the New Borrower.  The Debtor Parties and the Senior Group shall use their commercially reasonable best efforts to ensure the continued retention of Cushman & Wakefield by the Debtor and shall do such other things as are reasonably necessary to ensure such continued retention, including, without limitation, entering into a contract by and between Cushman & Wakefield and the Debtor upon terms and conditions substantially similar to the terms and conditions of the Existing Property Management Contract and reasonably acceptable to the First Lien Agent and the Debtor, *provided, however*, that such contract shall not provide that Cushman & Wakefield will be the exclusive leasing agent for the Properties, or entitled to any commissions unless it procures post-Petition a new (not renewal) tenant, with which the Debtor executes a lease.

**3.13.  Payments Prior to Filing.**  Immediately prior to the Petition Date, the First Lien Agent shall: (y) fund the Initial Budgeted Reserve into a bank account in the name of the Debtor that shall be subject to a security interest in favor of the First Lien Lenders, and, after (y) is satisfied, (z) be entitled to collect and retain from the existing agent cash management account held by First Lien Agent for the benefit of the First Lien Lenders, all fees and expenses incurred by the First Lien Agent and the First Lien Lenders in connection with the First Lien Loan prior to the Petition Date (including a reasonable estimate of such fees and expenses as of such date).  In addition, unless the Petition Date is a date on which an interest payment would be due under the First Lien Loan Documents, the interest rate payable for the month in which the Petition Date occurs for the pre-petition period shall be a ratable payment due and payable immediately prior to the Petition Date and calculated as a fraction the numerator of which is the date on which the Petition Date occurs and the denominator of which is the number of days in the month during which the Petition Date occurs (*e.g.*, if the Petition Date occurs on November 15, the interest payable for November would be 15/30 of the payment that would otherwise have been due), it being understood that interest shall continue to accrue and be payable during the pendency of the Prepackaged Case at the rate proscribed herein and in the Interim Cash Collateral Order and the Final Cash Collateral Order.  If there shall be insufficient funds to pay the amounts owed under this paragraph prior to the Petition Date, such amounts will be due and payable as additional principal under the New Secured Loan.

**Section 4.    Representations.**

**4.1.    Representations of First Lien Lenders and Agent.**

(a)    Each First Lien Lender, severally and not jointly, represents and warrants that the following statements are true and complete, in all material respects, as of the date hereof:

(i)    it is the sole legal or beneficial owner of, or the investment advisor or manager for the beneficial owner of, such legal or beneficial owner's First Lien Secured Claims set forth below its name on the signature page hereof (including the Notes

13

evidencing such First Lien Secured Claims), in each case free and clear of all claims, liens and encumbrances, and, to the best of its knowledge, there are no First Lien Secured Claims of which it is the legal or beneficial owner, or investment advisor or manager for such legal or beneficial owner, which are not part of its First Lien Secured Claims;

(ii)    it has full power to vote on and consent to such matters concerning its First Lien Secured Claims and to exchange, assign, transfer and dispose of such First Lien Secured Claims; and

(iii)    the execution, delivery and performance of this Agreement does not and shall not: (x) violate the provision of law, rule or regulations applicable to it or any of its subsidiaries; (y) violate its articles of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (z) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(b)    Agent hereby represents and warrants that as of the date hereof, to the best of its knowledge there are no holders of First Lien Secured Claims except as set forth on Exhibit A.

4.2.    **Representations of the Debtor Parties and the New Entities.**  Each Debtor Party and each New Entity, severally and not jointly, represents and warrants that the following statements are true and complete, in all material respects, as of the date hereof:

(a)    it is not aware of any event, circumstance or provision hereof that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement or any Transaction Document, and it has consulted counsel with respect to such matters to affirm the foregoing; and

(b)    the execution, delivery and performance of this Agreement does not and shall not: (i) violate the provision of law, rule or regulations applicable to it or any of its subsidiaries; (ii) violate its articles of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (iii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

4.3.    **Mutual Representations and Warranties.**  Each Party, severally and not jointly, represents and warrants to each other Party, that the following statements, are, in all material respects, true, correct and complete as of the date hereof:

(a)    **Due Organization.**  It is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)    **Power and Authority.**  Such Party has all requisite personal capacity or corporate, partnership, limited-liability company or similar power and authority to enter into this Agreement and any applicable Transaction Document and carry out the Transaction and perform its obligations contemplated hereunder.

14

(c)    **Authorization**.  The execution, delivery and performance by such Party of this Agreement have been duly authorized by all necessary corporate, limited-liability company, partnership or similar action on its part (if any).

(d)    **Third Party Consents**.  Except as expressly provided in this Agreement, no consent or approval is required to be obtained by any other person or entity in order for such Party to carry out the provisions of this Agreement.

(e)    **Governmental Consents**.  The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state or other non-judicial governmental authority or regulatory body, except such filings as (i) are identified in this Agreement, (ii) may be necessary and/or required under the antitrust laws or the federal securities laws, or (iii) may be necessary and/or required in connection with any matters concerning the Transaction which require Bankruptcy Court approval.

(f)    **Binding Obligation**.  Subject to the provisions of the Bankruptcy Code and any such Bankruptcy Court approval as may be required, this Agreement is a legally valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws, or by equitable principles relating to or limiting creditors' rights generally.

(g)    **No Other Agreement**.  It has no agreements, written or oral, with any third party (including any Second Lien Holder) the purpose or terms of which are inconsistent with the purpose and/or terms of this Agreement, of any documents contemplated by this Agreement and/or of any New Secured Loan Document.

**Section 5.    No Waiver of Participation and Reservation of Rights**.  Subject to any forbearance of remedies required in order to effectuate the terms hereof prior to an Agreement Event of Termination, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict the ability of any First Lien Lender to protect and preserve its rights, remedies and interests, including without limitation, its claims against the Debtor Parties, any Liens or security interests in assets of any of the Debtor Parties, or its full participation in the Prepackaged Case.  Nothing herein shall be deemed an admission of any kind.  If the Transactions contemplated herein are not consummated, or there has been an Agreement Event of Termination, the Parties fully reserve any and all of their rights and defenses, including, but not limited to, those rights and defenses set forth in this Agreement, the First Lien Credit Agreement and any other First Lien Credit Document, except to the extent that such rights and defenses have been waived or modified under Sections 7.3. or 7.4. hereof.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  The Parties shall cooperate and do all other things reasonably necessary to protect or assert a joint interest privilege with respect to their communications in the event a third party shall seek discovery of such communications.

NYDOCS03/892580.25C

**Section 6.**    **Compromise Amounts Payable.**

(a)    Solely for purposes of implementing the Transactions contemplated hereby, including the Sale, the Senior Group will accept in full satisfaction of the First Lien Secured Claims the Negotiated Sale Proceeds Amount payable from the proceeds of Sale (without being required to credit any sums paid to the Senior Group by way of adequate protection prior to the Sale date) and the Senior Group will waive any other claims that they may otherwise have under any of the Cash Collateral Order, the Lock-Up Agreement, or any of the First Lien Credit Documents upon receipt of such funds.

(b)    The Debtor and the Senior Group agree that solely for the purposes of determining (i) the application of the adequate protection payments payable during the Prepackaged Case as may be provided in the Interim Cash Collateral Order or in the Final Cash Collateral Order and (ii) the aggregate amounts due under the New Secured Loan upon consummation of the Plan, it being understood that such rates shall not otherwise be applicable at any time or for any reason, the interest rate on the First Lien Loan shall be calculated as indicated in Exhibit B-4.

(c)    If neither the Sale nor the Plan is consummated, then Debtor shall not be deemed to have waived any right to claim that payments made during the case to or for the benefit of the Senior Group as adequate protection should be applied to reduce the secured principal portion of the First Lien Loan.

**Section 7.**    **Termination.**

**7.1.**    **Termination by the First Lien Lender.**    So long as the First Lien Lenders are not in breach of this Agreement, this Agreement shall terminate and be of no further force or effect:

(a)    upon the occurrence of a Termination Event (as defined in the Interim Cash Collateral Order or in the Final Cash Collateral Order, as applicable);

(b)    if (i) the Petition Date has not occurred by November 16, 2009; (ii) the Interim Cash Collateral Order has not been entered within ten (10) Business Days of the Petition Date or the Final Cash Collateral Order has not become a final order within fifty-five (55) days of the Petition Date; (iii) the Plan Funding Agreement has not been executed and delivered by November 11, 2009; (iv) the Equity Sponsor Commitment has not been duly executed and delivered by the parties thereto and copies thereof have not been delivered to the First Lien Agent by November 11, 2009; (v) a default, beyond applicable notice and cure, has occurred under the Plan Funding Agreement; (vi) the Equity Sponsor Commitment is terminated, rescinded or a default, beyond applicable notice and cure, has occurred thereunder; or (vii) the form of the Final Cash Collateral Order has not been agreed by the First Lien Agent and the Debtor by November 11, 2009;

(c)    if the First Lien Agent reasonably determines that it is reasonably certain that neither a Sale nor the Plan Effective Date is capable of occurring before the Outside Date;

16

(d)    in case of either (i) a filing or commencement by any FX Entity of (x) any motion, application, adversary proceeding or cause of action challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the First Lien Credit Documents (collectively, the "Secured Obligations") or (y) any other motion, application, adversary proceeding or cause of action against and/or with respect to the Secured Obligations that seeks to challenge the validity, enforceability, perfection or priority of or seeking avoidance of the Secured Obligations, or against and/or with respect to the First Lien Agent or any First Lien Lender (or if the Debtor Parties support any such motion, application or adversary proceeding commenced by any third party or consent to the standing of any such third party), or (ii) the entry of an order of the Bankruptcy Court providing relief against the interests of any First Lien Lender with respect to any of the foregoing causes of action or proceedings;

(e)    if any FX Entity or any Related Equity Sponsor files any motion, application or adversary proceeding seeking to invalidate or disallow in any respect the claims in respect of the First Lien Loan (it being understood that no motion or application seeking to enforce Debtor's rights hereunder or with respect to the Transaction shall be prohibited by the foregoing sentence, nor shall Debtor or New Borrower be prohibited from challenging the mathematical computation of interest (as opposed to the applicable rate of interest hereunder), the reasonableness of fees and expenses of the First Lien Agent and the First Lien Lenders and computations of amounts due or reasonableness of any response to any Supplemental Budget Request);

(f)    if the Debtor Parties, without the consent of the First Lien Agent, (i) withdraw from or take any action materially inconsistent with the Plan or the Transaction (which withdrawal or action, if capable of being reversed, has not been reversed within fifteen (15) days of the giving of written notice by the First Lien Agent to the Debtor Parties and New Borrower), (ii) without the consent of the First Lien Agent, support any plan of reorganization or any plan of liquidation other than the Plan or support any sale process with respect to the Properties, other than as contemplated hereby, (iii) move to dismiss the Prepackaged Case, (iv) move for conversion of the Prepackaged Case to a case under chapter 7 of the Bankruptcy Code, (v) move for appointment of a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Prepackaged Case, or (vi) move or otherwise seeks to reject or otherwise invalidate, in whole or in part, this Agreement;

(g)    if (i) a trustee or an examiner with expanded powers is appointed in the Prepackaged Case, (ii) the Prepackaged Case is converted to a case under chapter 7 of the Bankruptcy Code prior to completion of the Transaction or (iii) the Prepackaged Case is dismissed prior to completion of the Transaction;

(h)    if any of the Debtor Parties or the New Entities has breached any representation, warranty, covenant or agreement contained in any Transaction Document, which breach (if capable of being cured) has not been cured within fifteen (15) days (or such longer period as may be allowed thereunder, if any) after the giving of written notice by the First Lien Agent to the Debtor Parties of such breach;

17

(i)    in the event that a Final Order has not been entered confirming the Plan and allowing the Plan Effective Date to occur on or before the Outside Date;

(j)    if revenue generated from the Properties shall be insufficient to ensure the payment of the operating expenses contemplated under the Budget at any given point in time and more than $250,000 of such budgeted expenses have accrued and are due and payable and cannot be extended and then satisfied by the Debtor because there are insufficient funds available to the Debtor and additional sufficient funds will not be subsequently available in the ordinary course of operating the Properties (notwithstanding that the First Lien Agent has complied with its obligations under the Interim Cash Collateral Order or the Final Cash Collateral Order, as the case may be, to transfer revenues of the Properties to the Debtor to satisfy budgeted amounts);

(k)    if any FX Entity or any Related Equity Sponsor (i) objects to, challenges or otherwise commences or participates in any proceeding opposing the Transaction or any Transaction Document, or takes any other action that is inconsistent with, or that would delay or obstruct, the solicitation, confirmation or consummation of the Transaction or any Transaction Document; (ii) directly or indirectly seeks, solicits, supports, formulates, or prosecutes any plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Debtor Parties that could reasonably be expected to prevent, delay or impede the consummation of the Transaction or any Transaction Document; or (iii) directs or supports in any way any person to take (or who may take) any action that is inconsistent with its obligations under this Agreement, or that could impede or delay the implementation or consummation of the Transaction;

(l)    if the Petition Date has not occurred within one day of the funding of the Initial Budgeted Reserve or if the amounts so funded are used or transferred without the written approval of the First Lien Agent prior to the entry of the Interim Cash Collateral Order; or

(m)    if New Borrower or New Parent shall no longer be Controlled by the Equity Sponsors.

Notwithstanding the foregoing, the automatic termination of this Agreement may be waived by the First Lien Agent, in its sole and absolute discretion, within three (3) Business Days of the occurrence of any event described above.

### 7.2.    Termination by the Debtor or the New Borrower.

(a)    So long as the Debtor Parties and the New Entities are not in breach of this Agreement, this Agreement may be terminated by the Debtor if any member of the Senior Group breaches any of its obligations under this Agreement, which breach (if capable of being cured) has not been cured within fifteen (15) days after the giving of written notice by the Debtor to the First Lien Agent of such breach.

(b)    In the event that a Final Order has not been entered confirming the Plan and allowing the Plan Effective Date to occur on or before the Outside Date, this

18

Agreement may be terminated by the Debtor or New Borrower upon notice given to the First Lien Agent.

**7.3.    Effect of Termination.**  If this Agreement is validly terminated in accordance with any of the provisions above, there will be no continuing liability or obligation on the part of any of the Parties hereunder as of the effective date of such termination; *provided, however,* that the obligations of the Parties under Sections 6(c), 7.4. (provided Section 7.4 shall only survive in the case of a Fault-Based Termination), 8.1., 8.6., 8.9. and 8.15. of this Agreement shall survive any such termination and continue to be binding upon the Parties. Following such termination, each Party shall have all rights and remedies available to it in the absence of this Agreement, including, but not limited to, all rights and remedies set forth in the First Lien Credit Agreement, the Bad Boy Guarantee and any other First Lien Credit Document; provided, however, that the Bad Boy Guarantee shall not be enforceable with respect to the filing of the Prepackaged Case.

**7.4.    Fault-Based Terminations.**  In the event that this Agreement is terminated in accordance with any of Sections 7.1.(a) (except if the reason for such Termination Event is not within the control of the Debtor Parties), (b)(i) (except if the petition is not filed because the Parties cannot agree on documents or for other reasons outside of the control of the Debtor Parties or the Equity Sponsors), (b)(v), (b)(vi), (d)(i), (e), (f), (g)(ii), g(iii), (h), (k), (l) or (m) (any such termination a "Fault-Based Termination"), each of the Parties hereby agree (it being understood that each of the remedies and agreements below shall be available independently of one another and at the sole discretion of the First Lien Agent):

(a)    to stipulate to and not object to the exercise of any remedies available to the First Lien Agent and the Senior Group under the First Lien Credit Agreement and the "Loan Documents" as defined in the First Lien Credit Agreement (collectively, the "First Lien Credit Documents"), except to the extent expressly modified herein;

(b)    to stipulate to, and not object to, the lifting, vacation or modification of the automatic stay under section 362 of the Bankruptcy Code to permit the First Lien Lenders to complete the foreclosure on the Properties or such other action as they shall be deemed appropriate in the sole discretion of the First Lien Agent; and

(c)    to consent to, and not object to, the completion of any foreclosure proceedings on the Properties that are initiated by the First Lien Agent or with the consent of the First Lien Agent.

**Section 8.    Miscellaneous Terms.**

**8.1.    No Third-Party Beneficiaries.**  This Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

**8.2.    Assignment.**  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.7. hereof.

19

**8.3.** **Consultation and Cooperation.** The Debtor and the First Lien Agent agree to consult and cooperate with each other in connection with any analyses, appearances, presentations, briefs, filings, arguments or proposals made or submitted by any such party to the Bankruptcy Court, other creditor constituents or other parties with an interest in the Transaction. Each Party, severally and not jointly, agrees to use commercially reasonable efforts to provide each other Party with copies of any of the following within two Business Days of receipt of any such document or communication: (i) any written offer, expression of interest or similar document in connection with the direct or indirect acquisition of all or any material part of the Properties, or (ii) any written communication regarding the Sale or the Transaction or any alternative proposal, material modification or abandonment of the Sale or the Transaction from any Person.

**8.4.** **Further Assurances.** The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

**8.5.** **Headings.** The headings of all sections of this Agreement are inserted solely for the convenience of reference and shall not affect the interpretation hereof.

**8.6.** **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Prepackaged Case is commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement unless and until the Prepackaged Case has been dismissed, the automatic stay has been lifted, or this Agreement has been terminated, in which case all disputes will be adjudicated in the Southern District of New York.

**8.7.** **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between or among the Parties with respect thereto, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Debtor and each First Lien Lender shall continue in full force and effect.

NYDOCS03/892580.25C

**8.8.    Amendments.**

(a)    This Agreement, including the attachments hereto, may not be modified, altered, amended, waived or supplemented except by an agreement in writing by the Parties hereto.

(b)    No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

**8.9.    Specific Performance.**  The Parties understand and agree that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and further understand and agree that each non-breaching Party shall be entitled to the remedy of specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a non-exclusive remedy of any such breach; *provided, however,* that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such a remedy.

**8.10.    Counterparts.**  This Agreement may be executed (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

**8.11.    Independent Due Diligence and Decision-Making.**  Each of the Parties hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospect of the Debtor and the other Parties hereto.  Each of the Parties acknowledges that any materials or information furnished to it by any other Party has been provided for informational purposes only, without any representation or warranty by the Debtor or any other Party except to the extent expressly stated herein. Notwithstanding the foregoing, the Debtor Parties acknowledge that the Senior Group intends to rely on the statements included in the Disclosure Statement.

**8.12.    Actions Inconsistent with Intercreditor Agreement.**  Notwithstanding anything to the contrary contained herein, the First Lien Agent and the First Lien Lenders shall not be required to take any action or refrain from taking any action to the extent that any such action would violate the terms and conditions of the Intercreditor Agreement.

**8.13.    Consents.**  Unless set forth to the contrary herein, any consent or approval required by any Party hereunder shall be in the sole and absolute discretion of such Party.

**8.14.    Waiver of Jury Trial.**  Each of the Parties hereto hereby waives trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement, any Transaction Documents, or the actions of the Parties in the negotiation, administration, performance or enforcement thereof.

**8.15.    Notices.**  All notices and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed to have been duly given when delivered in person, or upon confirmation of receipt when transmitted by electronic mail or by facsimile transmission during standard business hours (from 8:00 a.m. to 6:00 p.m.),

NYDOCS03/892580.25C

of the next Business Day if transmitted by national overnight courier, addressed in each case as follows (or at such other address or facsimile number as shall be specified by like notice):

(a)    If to the Debtor, FX II, or Las Vegas Parent, to:

c/o FX Real Estate and Entertainment Inc.
650 Madison Avenue
New York, New York 10022
Attention: Mitchell Nelson
Email:      mitchell.nelson@flagluxury.com
Facsimile: (212) 750-3034

with copies to:

Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Attention: Brett Axelrod
Email:      axelrodb@gtlaw.com
Facsimile: (702) 792-9002

(b)    If to the First Lien Agent, to:

Landesbank Baden-Württemberg, New York Branch
280 Park Avenue, 31st Floor – West Building
New York, New York 10017
Attention: Robert Dowling
Email:      robert.dowling@lbbwus.com
Facsimile: (212) 584-1759

with copies to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention: Robert W. Fagiola
             Michael H. Torkin
Email:      rfagiola@shearman.com
             mtorkin@shearman.com
Facsimile: (646) 848-7606
             (646) 848-8283

(c)    If to a First Lien Lender or a transferee thereof, to the addresses or facsimile number set forth below following the First Lien Lender's signature (or as directed by any transferee thereof), as the case may be;

22

NYDOCS03/892580.25C

(d)    If to the New Borrower or the New Parent:

c/o Bryan Cave
1290 Avenue of the Americas
New York, New York  10104-3300
Attention:    Bradford B. Lavender
Email:        bblavender@bryancave.com
Facsimile:    (212) 541 1471


[SIGNATURES ON THE NEXT PAGE]

NYDOCS03/892580.25C

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

FX LUXURY LAS VEGAS I, LLC
(f/k/a Metroflag BP, LLC),
a Nevada limited liability company

By:    FX Luxury Las Vegas Parent, LLC
(f/k/a BP Parent, LLC), a Delaware limited
liability company, its sole member

   By:  FX Luxury, LLC (f/k/a FX Luxury
   Realty, LLC), a Delaware limited liability
   company, its sole member

      By:      FX Real Estate and
      Entertainment Inc., a Delaware
      corporation, its managing member

By: _____    10/30/09
Name: Mitchell J. Nelson
Title: Exec. VP

FX LUXURY LAS VEGAS II, LLC
(f/k/a Metroflag Cable, LLC),
a Nevada limited liability company

By:    FX Luxury Las Vegas Parent, LLC
(f/k/a BP Parent, LLC), a Delaware limited
liability company, its sole member

   By:  FX Luxury, LLC (f/k/a FX Luxury
   Realty, LLC), a Delaware limited liability
   company, its sole member

      By:      FX Real Estate and
      Entertainment Inc., a Delaware
      corporation, its managing member

By: _____    10/30/09
Name: Mitchell J. Nelson
Title: Exec. VP

NYDOCS03/892580.25

FX Luxury Las Vegas Parent, LLC

By: FX Luxury, LLC (f/k/a FX Luxury
Realty, LLC), a Delaware limited liability
company, its sole member

By:     FX Real Estate and
Entertainment Inc., a Delaware
corporation, its managing member

By: _____          10/30/09
Name: _____
Title: _____

LIRA Property Owner, LLC

By _____
Name: _____Paul C. Karavos_____
Title: _____Authorized Signing_____

LIRA LLC

By: _____
Name: _____Paul C. Karavos_____
Title: _____Authorized Signing_____

Landesbank Baden-Württemberg,
New York Branch, as First Lien Agent

By: _____
Name: _____Leonard J. Crann_____
Title: _____Head of Real Estate
            Finance Department_____

By: _____
Name: _____
Title: _____
       Robert Dowling
        Vice President
  Sr. Marketing Officer

25

**FIRST LIEN LENDERS**

LANDESBANK BADEN-WÜRTTEMBERG,
as a Lender

By:

Name:  Nicole Schumacher
Title:  Assistant Vice President

By:

Name:  HARIE-ANTOINETTE PAQUES
Title:  AVP

Aggregate principal amount of First Lien
Secured Claims held as of the date
above:

First Lien Secured Claim:                USD  121,523,543.97

NYDOCS01/892580.25

MÜNCHENER HYPOTHEKENBANK EG,
as a Lender

By:   _____
      Name:
      Title:

By:   _____
      Name:
      Title:

Aggregate principal amount of First Lien
Secured Claims held as of the date
above:

First Lien Secured Claim:              USD $55,424,111.46

27

DEUTSCHE HYPOTHEKENBANK
(ACTIEN-GESELLSCHAFT), as a Lender

By:
Name:    DENNIS BAASELAAR
Title:    AUTHORIZED OFFICER

By:
Name:    Dirk Wilke
Title:    authorized officer

Aggregate principal amount of First Lien
Secured Claims held as of the date
above:

First Lien Secured Claim:                    US $ 42,065,842.14

NYDOCS03/892580.25

GREAT LAKES REINSURANCE (UK) PLC,
as a Lender

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: DIRECTOR

Aggregate principal amount of First Lien
Secured Claims held as of the date
above:

First Lien Secured Claim:                    US $ 46,739,824.60

29