Exhibit A

First Lien Lenders

LANDESBANK BADEN-WÜRTTEMBERG

MÜNCHENER HYPOTHEKENBANK EG

DEUTSCHE HYPOTHEKENBANK (ACTIEN-GESELLSCHAFT)

GREAT LAKES REINSURANCE (UK) PLC

Exhibit B-1

<u>Plan Term Sheet</u>

Plan Term Sheet

| | |
|---|---|
| **Administrative Expense Claims** | "Administrative Expense Claims" shall include (a) Allowed[1] claims for reasonable fees and expenses of professionals retained in the Prepackaged Case with the approval of the Bankruptcy Court, (b) all reasonable fees and expenses incurred by the professional advisors to the First Lien Agent (including, without limitation, Shearman & Sterling LLP and Lionel Sawyer & Collins) and the First Lien Lenders, and (c) Allowed claims under section 503(b) of the Bankruptcy Code. |

The fees and expenses of the Debtor's legal and other professionals (other than their sales agent) (the "Debtor's Advisory Fees") shall be capped in an aggregate amount not to exceed $1.25 million (the "Fee Cap"). The Budget (as defined in the Final Cash Collateral Order) will provide that the Debtor's Advisory Fees may be adjusted downward to the extent necessary in any given month to ensure the availability of funds required to make the Minimum Adequate Protection Payments[2] under the terms of the Cash Collateral Order (it being understood that any such reduced amounts for Debtor's Advisory Fees will be subject to "catch up" payments in subsequent months).

Unless paid in full prior to the Plan Effective Date, New Borrower shall assume or cause to be paid all Allowed Administrative Expense Claims (including any Debtor's Advisory Fees in excess of the Fee Cap): (a) on the Plan Effective Date or as soon thereafter as reasonably practicable, (b) in the ordinary course of the Debtor's business, or (c) as otherwise agreed by the Debtor, the Senior Group and such holder.

New Borrower also will assume and cause to be paid any Permitted Advisory Fees (defined below) which are finally allowed in the cases and which were not satisfied from the reserves established by the Debtor on the Plan Effective Date.

| | |
|---|---|
| **Priority Claims** | Unless paid in full prior to the Plan Effective Date or provided for pursuant to a previously funded Chapter 11 Reserve, New Borrower shall cause to be paid all Allowed claims under sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code, (a) on the Plan Effective Date or as soon thereafter as reasonably practicable, or (b) as otherwise agreed by the Debtor, the Senior Group and such holder. |

| | |
|---|---|
| **First Lien Secured** | All amounts owed under the terms of the First Lien Credit Agreement, |

---

[1]    "*Allowed*" shall mean any claim that is determined to be an allowed claim in accordance with section 502 and/or 506 of the Bankruptcy Code.

[2]    "*Minimum Adequate Protection Payments*" means payments sufficient to satisfy the amounts set forth in the clauses "*first*" and "*second*", in the section entitled Distribution of Debtor's Cash.

B-1-II

**Claims and Distributions**

including, without limitation, post-petition interest (to the extent permissible under the Bankruptcy Code) shall be treated as Allowed secured claims under the Plan.

On the Plan Effective Date, each First Lien Lender shall receive a *pro rata* distribution of (a) interests in the New Secured Loan plus (b) the Effective Date Amount payable pursuant to the Plan Funding Agreement plus (c) the Deposit plus (d) any Cash Distributions (defined below) payable to the First Lien Lenders.

Any adequate protection payments paid to the First Lien Lenders in connection with the Interim Cash Collateral Order or the Final Cash Collateral Order shall be retained by the First Lien Lenders and applied to reduce the interest or fees that otherwise would have been due and payable to the First Lien Lenders on account of their secured claims.

Note B Tranche shall be subordinated in the same manner as it is subordinated with respect to the First Lien Loan Documents.

For the purpose of calculating the interest payable under the First Lien Loan Documents the Plan Effective Date shall be deemed to be a date upon which interest is due and payable. Unless the Plan Effective Date is a date on which an interest payment would be due under the First Lien Loan Documents, the interest rate payable for the month in which the Plan Effective Date occurs shall be a ratable payment calculated as a fraction the numerator of which is the date on which the Plan Effective Date occurs and the denominator of which is the number of days in the month during which the Plan Effective Date occurs (*e.g.*, if the Plan Effective Date occurs on March 10, the interest payable for March would be 10/31 of the payment that would otherwise have been due).

**Distribution of Debtor's Cash**

Except to the extent that it has been used to satisfy accrued administrative claims (other than claims of professionals), on the Plan Effective Date, the Debtor's cash including without limitation (x) cash held by any of the First Lien Lenders in any collateral or other bank account (including the Interest Reserve),[3] (y) cash held as Excess Funded Cash,[4] or (z) as Chapter 11 Reserves[5] for amounts which have not accrued and are not reasonably likely to accrue prior to the dismissal

---

[3]    "*Interest Reserve*" shall have the meaning ascribed to such term in the Interim Cash Collateral Order and the Final Cash Collateral Order.

[4]    "*Excess Funded Cash*" shall have the meaning ascribed to such term in the Interim Cash Collateral Order and the Final Cash Collateral Order.

[5]    "*Chapter 11 Reserves*" shall have the meaning ascribed to such term in the Interim Cash Collateral Order and the Final Cash Collateral Order.

of the Prepackaged Case),[6] (any such cash the "Available Funds") shall be applied under the Plan in the following priority (any such payments, the "Cash Distributions"):

- *first*, to fund an advance by the First Lien Lenders to the New Borrower to establish a reserve for operating expenses provided for pursuant to the Budget (as it may be amended in connection with the New Secured Loan) for the remainder of the month in which the Plan Effective Date occurs to the extent such amounts have not been paid pursuant to the Final Cash Collateral Order or the Plan (the "Opex Costs");

- *second*, costs and expenses of the First Lien Agent and the First Lien Lenders (including those of their respective counsel and other advisors) incurred (to the extent not previously paid) in connection with the Prepackaged Case and the Transaction (the "Lenders' Fees");

- *third*, the Debtor's Advisory Fees, or the establishment of a reserve for the payment of same (to the extent they have accrued through the Effective Date, but were not previously paid) upon final allowance, in either case in an amount not to exceed the Fee Cap (the "Permitted Advisory Fees");

- *fourth*, to fund an advance by the First Lien Lenders to the New Borrower to satisfy any costs relating to title insurance (which insurance shall be reasonably acceptable to the First Lien Agent and the New Borrower) and other items relating to the closing of the New Loan Documents including, but not limited to, the legal fees and expenses of the Senior Group and the New Borrower relating solely to the closing of the New Secured Loan, that the Senior Group may agree to in writing in their sole discretion (collectively, the "Closing Transaction Expenses"); *provided, however*, that the First Lien Lenders shall not be required to advance funds in excess of the Aggregate Interest Accrual Cap[7] if there is not sufficient cash to satisfy this priority "*fourth*";

- *fifth*; to the payment of the LIBOR plus Liquidity Spread portion of the interest on the First Lien Loan in an amount not to exceed

---

[6]    The amounts to be held back by the estate on account the amounts reasonably likely to accrue after the Effective Date but prior to the dismissal of the Prepackaged Case shall be determined in a mutually agreeable "wind-down budget" to be agreed by the Debtor and the First Lien Agent (with the consent of the First Lien Lenders).

[7]    "*Aggregate Interest Accrual Cap*" means an aggregate cap of $1.2 million, *less* the amount of any Permitted Advisory Fees which have been funded or reserved for during the Prepackaged Case or on the Plan Effective Date.

that set forth in <u>Exhibit B-4</u> (the "Minimum Interest Payment");

- *sixth*; to the payment of the Case Margin portion of the interest on the First Lien Loan in an amount not to exceed that set forth in <u>Exhibit B-4</u>.

To the extent that Available Funds *are* sufficient to satisfy each of the amounts above, any additional Available Funds shall be transferred to the Holding Account (as defined in the New Secured Loan Documents) on the Plan Effective Date and applied in accordance with the terms and conditions of the New Secured Loan and shall be treated as collateral under that loan for all purposes.

To the extent Available Funds are *not* sufficient to pay the Lenders' Fees, such amounts (the "Unpaid Lenders' Fees") shall be paid by the New Entities on or prior to the Plan Effective Date.

To the extent Available Funds and the advances described above are *not* sufficient to pay the Permitted Advisory Fees and Closing Transaction Expenses, any such deficiency shall, at New Borrowers option, (x) be paid by the New Entities on the Plan Effective Date or (y) be assumed by the New Borrower under the terms of the Plan.

To the extent Available Funds are *not* sufficient to pay the Minimum Interest Payment, such amounts shall, at New Borrowers option, (x) be paid by the New Entities or (y) added to the principal amount of the New Secured Loan in accordance with Section 3 of the New Secured Loan Term Sheet.

To the extent Available Funds are *not* sufficient to pay the Case Margin Interest set forth in the clause "*fifth*" above, such amounts shall be incorporated into and made part of the New Secured Loan and be payable thereunder pursuant to the terms of the New Secured Loan Term Sheet.

| | |
|---|---|
| **General Unsecured Claims** | The holders of any unsecured claims (including the Second Lien Loan) in the Debtor will receive no distributions under the Plan on account of such claims. |
| **Equity Interests** | The holders of equity interests in the Debtor will receive no distributions under the Plan on account of such interests. All existing equity interests will be cancelled on the Plan Effective Date. |
| **Executory Contracts & Leases** | To be assumed and assigned to New Borrower. |
| **Conveyance of the** | Conveyance of the Properties to the New Borrower to be effectuated |

| | |
|---|---|
| **Properties** | pursuant to the terms of the Plan. |
| **Other** | The Plan shall include customary conditions to effectiveness, including, without limitation, that (i) the Confirmation Order has become a Final Order, (ii) the Lock Up and Plan Support Agreement has not been terminated, (iii) all conditions precedent to the closing of the New Secured Loan Documents, including payment of all costs and expenses of the First Lien Agent and the First Lien Lenders (including those of their respective counsel and other advisors) incurred in connection with the New Secured Loan, have been satisfied or waived in accordance with the terms thereof, and (iv) the Effective Date Amount shall have been funded pursuant to the terms of the Plan Funding Agreement. |
| **Releases** | First Lien Lenders and First Lien Agent to get full releases from the Debtor Parties, the New Entities and the Equity Sponsors in connection with the transactions contemplated hereby. |
| | Equity Sponsors to get full releases from claims arising prior to the Plan Effective Date from the Debtor Parties, the New Entities, the First Lien Lenders and First Lien Agent in connection with the transactions contemplated hereby. |
| **Reconciliation of Funds** | The conditions to the effectiveness of the Plan shall include a condition that the First Lien Agent, the Debtor and the New Borrower shall agree to a closing flow of funds memorandum consistent with the terms of the Plan and the waterfall outlined above. |

Exhibit B-2

PFA and Equity Sponsor Commitment Term Sheet

PFA and Equity Sponsor Commitment Term Sheet

| | |
|---|---|
| **Equity Sponsors** | Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino. |
| | Subject to reasonable diligence by the First Lien Lenders, The Huff Alternative Fund, L.P. (or an affiliate of such entity that is reasonably acceptable to the First Lien Lenders) may become an Equity Sponsor at a later date subject to entry into any appropriate joinder agreements or other appropriate documentation as may be required by the Parties (any such entity a "Huff Sponsor"). |
| **Commitment Amount and Funding** | The sum of (x) $16,150,000, *plus* (y) the difference between (A) $650,000 and (B) the Overhead Amount. |
| | Upon the Plan Effective Date and simultaneously with the acquisition of the Properties from the Debtor, the Effective Date Amount shall be paid directly by New Borrower for the benefit of the First Lien Lenders. |
| **Deposit Upon Execution of Plan Funding Agreement** | $2.2 million |
| | To be deposited with, and held in escrow by, an escrow agent reasonably acceptable to the New Borrower and the First Lien Agent upon execution of the Plan Funding Agreement and until the earlier to occur of (i) the Plan Effective Date; or (ii) the termination of the Lock Up and Plan Support Agreement in accordance with its terms (in which event it shall be returned to the New Borrower, except as otherwise provided below). |
| **Default and Remedies** | Provided that the Plan Funding Agreement has first been executed, upon the occurrence of any Fault-Based Termination under the Lock Up and Plan Support Agreement: |
| | (a) the Deposit shall be paid to the First Lien Agent for the benefit of the First Lien Lenders and shall be applied to the Debtor Parties' obligations under the First Lien Credit Agreement; and |
| | (b) an additional $650,000 shall be paid by New Borrower to the First Lien Agent from contributions to New Parent by the Equity Sponsors (for such purpose) to benefit the First Lien Lenders and shall be applied to the Debtor Parties' obligations under the First Lien Credit Agreement. |
| | The payments referenced above shall be the sole remedy for any Fault-Based Termination under the Lock Up and Plan Support Agreement. |
| **Application of the Commitment Amount** | Upon receipt by the First Lien Agent of the Effective Date Amount and the Deposit on the Plan Effective Date, such amounts shall be applied by the First Lien Agent to principal, interest reserve and capital expenditure reserve in accordance with the provisions of the New Secured Loan Documents. |

| | |
|---|---|
| **Representations and Warranties** | Customary for commitments of this nature. |
| **Assignment** | Any assignment by New Borrower and Equity Sponsors shall not relieve them of responsibility for the funding provided under the PFA and Equity Sponsor Commitment. |
| **Governing Law** | State of New York |

Exhibit B-3

<u>Auction and Bidding Procedures Motion</u>

<u>Auction and Bidding Procedures Motion Term Sheet</u>

The Auction and Bidding Procedures Motion to be filed with the Bankruptcy Court in connection with the Auction shall provide, among other things, for the following:

**Sale Price**                     No less than the Minimum Bid Threshold

**Bidding Deadline**               Seventy-five (75) days after entry of the Bankruptcy Court's order approving the auction and the bidding procedures.

**Qualified Bid – Certain**        A bid will be deemed a Qualified Bid if:
**Terms and Conditions of**
**the Sale**

   (a)   it is submitted by the Bidding Deadline

   (b)   it is a cash only/cash with a firm financing commitment, with a 10% escrow and balance to be paid at closing

   (c)   it is in an amount not less than the Minimum Bid Threshold

   (d)   it provides that the buyer will pay all transfer taxes and title insurance incurred in connection with the sale

   (e)   it provides for a purchase as-is, where-is with no substantial representations or warranties from the seller

   (f)   it is accompanied by:

- a purchase and sale agreement executed by the bidder
- evidence of a deposit in escrow, by the bidding deadline, of an amount equal to 10% of purchase price
- proof of the bidder's ability to close escrow within 30 days after entry of the Bankruptcy Court's order approving the sale

**Non Disclosure and**             To be drafted on usual and customary terms and conditions and to be
**Confidentiality**                executed by prospective bidders in order to receive access to the due
**Agreement**                      diligence room

**Mutual Due Diligence**           Parties will establish a mutual due diligence room and will cooperate
**Data Room**                      to gather non-privileged documents within their possession and control, for the purpose of the Plan and the Auction, including:

- Lease rent roll and tenant litigation
- Existing title policies with updated title reports and exceptions
- Unexpired leases and executory contracts
- Parking agreements and other existing approvals - with explanatory memoranda

B-3-II

- Most recent environmental reports for the Properties
- Unaudited financials for the Properties for the years 2008 and 2009
- Receiver's report and cash flow projections
- REA and amendments – with explanatory memoranda
- FAA approvals
- Marriot settlement agreement regarding future development
- Other usual and customary "due diligence" materials

**Auction Date**    An auction pursuant to section 363 of the Bankruptcy Code will take place if more than one Qualified Bid acceptable to the Debtor and the First Lien Agent is submitted.

**Sale Date**    If only one Qualified Bid acceptable to the Debtor and the First Lien Agent is submitted, a sale pursuant to section 363 of the Bankruptcy Code will take place *not later than* thirty (30) days after entry of the Bankruptcy Court's order approving the sale.

**Proceeds of Sale**    Order confirming sale shall provide for immediate payment and application of proceeds to satisfy the claims of the Senior Group. Any amounts in excess of the amount required to satisfy the claims of the Senior Group shall be distributed or applied in accordance with the Bankruptcy Code.

**Plan *in lieu* of the Sale**    If no acceptable Qualified Bids are timely received, Debtor shall proceed to confirmation of the Plan

Exhibit B-4

<u>Interest Rate on First Lien Loan</u>

<u>Interest Rate on First Lien Loan</u>

**Interest Rate on First Lien Loan.** Subject to the occurrence of the Plan Effective Date, and notwithstanding anything to the contrary contained in the First Lien Credit Agreement, solely for the purposes of determining (i) the application of the adequate protection payments payable during the Prepackaged Case and (ii) the aggregate amounts due under the New Secured Loan upon consummation of the Transaction, the interest rate under the First Lien Credit Agreement shall be deemed to be and shall be calculated as if such rate were as follows:

- from and after the Maturity Date (as defined in the First Lien Credit Agreement), through the Petition Date, the otherwise applicable rate of interest under the First Lien Credit Agreement less the amount of any default interest that would otherwise have been due and payable thereunder; and

- from and after the Petition Date, through the Plan Effective Date, a rate equal to 1-month LIBOR plus the Liquidity Spread (as defined in the New Secured Loan Term Sheet)[1], plus the Case Margin. For purposes of this Agreement, "<u>Case Margin</u>" shall mean 150 basis points per annum calculated on a per diem basis.

For the sake of greater certainty, neither of the above interest rates shall be effective if the Transaction is not consummated consistent with this Agreement, and, if this Agreement is terminated prior to the Plan Effective Date, this provision shall be null and void and of no further force or effect and the otherwise applicable rates of interest (including, without limitation, default interest) due under the First Lien Credit Agreement shall become due and payable immediately and shall be otherwise reinstated and remain in full force and effect.

---

[1]   During the pendency of the Debtor's chapter 11 case the LIBOR plus Liquidity Spread rate shall be deemed to be one-month LIBOR plus 150 basis points, subject to a final adjustment and true-up at the conclusion of the case based on a good faith calculation by the First Lien Agent of the LIBOR plus Liquidity Spread rate applicable during the pendency of the case if such rate would be higher than one-month LIBOR plus 150 basis points.   Pursuant to this true-up, the First Lien Lenders shall either receive cash payment the amount by which the actual Liquidity Spread differed from the deemed rate or such amount shall be added to the total balance of the New Secured Loan.

Exhibit C

New Secured Loan Term Sheet

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408**
**& ANY SIMILAR APPLICABLE STATE OR FEDERAL RULE OR LAW**

**MAY NOT BE USED IN ANY JUDICIAL, ARBITRATION, MEDIATION OR**
**ADMINISTRATIVE FORUM FOR ANY PURPOSE WHATSOEVER**

<u>**TERM SHEET FOR NEW FIRST LIEN LOAN**</u>

October 23, 2009

Summary of terms of new loan to be made by Landesbank Baden-Württemberg, New York Branch, as administrative agent and collateral agent (in such capacity, "***Agent***") on behalf of certain lenders ("***Lenders***") to a newly formed single purpose entity ("***New Borrower***").

For reference purposes only, the existing first lien mortgage loan (the "***Existing Loan***") was made pursuant to that certain Amended and Restated Credit Agreement ("***First Lien Credit Agreement***"), dated as of July 6, 2007 among FX Luxury Las Vegas Parent, LLC (f/k/a BP Parent, LLC), FX Luxury Las Vegas I, LLC (f/k/a Metroflag BP, LLC) and FX Luxury Las Vegas II, LLC (f/k/a Metroflag Cable, LLC) (collectively, "***Existing Borrower***"), Lenders party thereto ("***Lenders***") and Agent, as successor in interest to Credit Suisse, Cayman Islands Branch, as Administrative Agent and Collateral Agent (in such capacity, "***Agent***"). Capitalized terms used herein without being defined herein shall have the meaning set forth in the First Lien Credit Agreement.

New Borrower, Agent and Lenders hereby agree to consummate a new first lien mortgage loan (the "***New Loan***") containing the following terms:

1.    <u>**Intentionally Omitted**</u>.

2.    <u>**Effective Date of New Loan**</u>.  The New Loan would be made effective upon the transfer of the property to New Borrower in accordance with the provisions of the Plan (the "***Effective Date***").

3.    <u>**Principal Amount of Loan**</u>.  The amount of the New Loan as of the Effective Date shall be the sum of (i) $244,000,000.00, plus (ii) all accrued interest incurred (and unpaid) prior to the filing of the bankruptcy of Existing Borrower, plus (iii) all accrued and unpaid fees of Agent incurred prior to the bankruptcy of the Existing Borrower, plus (iv) all accrued and unpaid interest incurred (and unpaid) during the bankruptcy of the Existing Borrower, plus (v) all accrued and unpaid fees of Agent incurred during the bankruptcy of the Existing Borrower, plus (vi) any other amounts to be included as principal of the New Loan as set forth in the Lockup Agreement, each of the foregoing as more specifically described and calculated as set forth in the Lock-Up Agreement.

4.    <u>**Repayment of Existing Loan**</u>.  The Existing Loan shall be repaid on the Effective Date from (a) the proceeds of the New Loan, plus (b) a payment by or on behalf of New Borrower of $15,000,000.00.

5.    <u>**Initial Maturity Date of the New Loan**</u>.  Six (6) years from the Effective Date (such term, the "***Initial Term***" and such date, the "***Initial Maturity Date***").

6.    <u>**Extension Option**</u>.  There shall be one (1) one-year (the "***Extension Term***") extension option (the "***Extension Option***") subject to the following conditions to be satisfied upon the exercise of

NYDOCS03/879348.17

the Extension Option: (i) New Borrower has provided to Agent not less than ninety (90) days prior written notice of its intention to exercise the Extension Option; (ii) on the date such notice is received by Agent and on the commencement date of the Extension Term, no Event of Default shall exist and be continuing; (iii) on or before the commencement date of the Extension Term, New Borrower shall have paid to Agent the Exit Fee in full; (iv) on or before the commencement date of the Extension Term, New Borrower shall have paid to Agent an extension fee equal to thirty-five (35) basis points on the then outstanding principal balance of the New Loan; (v) the DSCR shall be no less than 1.2:1.0 (based on a forward looking 12-month basis on the then applicable interest rate for the Extension Term, which will assume a new Liquidity Spread and Margin method as set forth below); (vi) the Liquidity Spread shall be adjusted as per below to the First Lien Lenders' cost of funds as of the commencement of the Extension Term; and (vii) the Margin shall be increased to the greater of (a) 170 basis points and (b) the current market margin, such margin to be paid currently and not accrued).

7.  **Interest Rate**:  Floating rate on one (1) or three (3) month cost of funds ($-LIBOR plus Liquidity Spread (as defined below)) plus Margin. Borrower has the option to choose a one (1) or three (3) month period at the end of each interest period, but there may be no more than two (2) LIBOR tranches at any one time. The monthly payment during the Initial Term shall be equal to LIBOR plus Liquidity Spread.

8.  **Interest Rate Hedge Requirement**.  No interest rate hedging agreement or other arrangement shall be required.

9.  **Liquidity Spread**: The Liquidity Spread shall mean Lenders' costs for providing liquidity throughout the term of the New Loan; the highest cost among Lenders' rates shall apply. The final spread will be settled two (2) Business Days prior to closing and will then be fixed and payable throughout Initial Term. For the Extension Term a new Liquidity Spread will be settled two (2) days prior to the commencement of the Extension Term and will then be fixed and payable throughout the Extension Term. If the then applicable Liquidity Spread is greater than the immediately preceding Liquidity Spread, the greater Liquidity Spread shall apply. As of October 22, 2009, the Liquidity Spread is equal to 150 bps per annum for a 6-year term.

10. **Margin**. During the Initial Term, the Interest Rate Margin on the New Loan shall be 150 bps per annum, but shall accrue and be paid as an Exit Fee (see below).

11. **Prepayment**. Prepayment in amounts of at least $1,000,000.00 shall be possible subject to (a) 10 business days prior notice, (b) payment of any breakage costs (including, without limitation, with respect to LIBOR breakage and Liquidity Spread breakage), which costs shall be calculated by Lenders and binding on New Borrower and (c) payment of the Currency Breakage Prepayment Premium with respect to the portion of the New Loan being prepaid to MHB; *provided, however*, the Currency Breakage Prepayment Premium shall not be payable in connection with partial prepayments of the New Loan made pursuant to the waterfall set forth in paragraph 21. The parties will reasonably cooperate to minimize any breakage fees in connection with any prepayment as a result of any payments made under the waterfall set forth in paragraph 21, including application at the end of an applicable LIBOR period. For purposes hereof, "*Currency Breakage Prepayment Premium*" shall mean: (i) 250 bps in year 1 of the Initial Term, (ii) 200 bps in year 2 of the Initial Term; (iii) 150 bps in year 3 of the Initial Term; (iv) 100 bps in year 4 of the Initial Term; (v) 50 bps in year 5 of the Initial Term; and (vi) 0 bps in year 6 of the Initial Term.

12. **Amortization**. Interest only to be paid during the Initial Term and the Extension Term, to be paid from the Net Operating Income and/or the Interest Reserve Account, if necessary. Any amortization payments shall be made pursuant to the waterfall set forth in paragraph 21 below.

13. **Exit Fee & Case Margin**. Upon the earlier of the Initial Maturity Date or repayment of the New Loan, New Borrower shall pay to Lenders a fee equal to 150 basis points per annum calculated on a per diem basis (the "***Exit Fee***") less any amounts paid to Lenders pursuant to the waterfall set forth in paragraph 21, subparagraph "*eleventh*", below. Upon the earlier of the Initial Maturity Date or repayment of the New Loan, New Borrower shall pay to Lenders any unpaid "Case Margin", as set forth in the Lock-Up Agreement (the "***Case Margin***") less any amounts paid to Lenders pursuant to the waterfall set forth in paragraph 21, subparagraph "*ninth*" below.

14. **Limited Non-Recourse Carve-Out Guaranty**. Limited Non-Recourse Carve-Out Guaranty from Guarantor (defined below), in the amount of $60,000,000.00, which provides that the Loan shall immediately become full recourse to Guarantor in the event of the following: (a) a voluntary (or colluded) bankruptcy of New Borrower, (b) misappropriation of funds, but only to the extent of actual loss, and (c) if upon a Monetary Event of Default (after all notice and cure periods), New Borrower attempts to hinder, delay or cancel a trustee's sale through legal proceedings. Such Guaranty shall burn down pro rata each year of the Initial Term to a floor of $20,000,000.00 (i.e., 1/6 of $40M per each year of the Initial Term).

15. **Interest Reserve**. Borrower will deposit into the Interest Reserve Account on or before the Effective Date, $2,000,000.00.

16. **Interest Reserve Replenishment**. Interest Reserve to be replenished pursuant to the waterfall set forth in paragraph 21 below, up to an amount equal to six (6) months of interest payments (LIBOR plus Liquidity Spread, but not including the Margin).

17. **Interest Payment Guaranty**. Interest Payment Guaranty from Guarantor (defined below), guaranteeing three (3) months of interest payments (LIBOR plus Liquidity Spread).

18. **Guarantor**. Guarantor to be a credit-worthy person(s) and/or entity(ies) acceptable to the First Lien Lenders. Guarantors shall initially be Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino and initially or later, possibly The Huff Alternative Fund, L.P. and The Huff Alternative Parallel Fund, L.P., or others, subject to Agent's review and approval of financial statements to be provided by or on behalf of the proposed Guarantors.

19. **Capital Expenditures**. In the event New Borrower desires to undertake any capital expenditures and/or any tenant improvements, New Borrower shall first provide to Agent a capital expenditure/tenant improvement budget, which shall be subject to the reasonable approval of Agent. In the event that there is not sufficient cash flow to pay for such approved capital expenditures and/or tenant improvements (after taking into account any amounts on reserve in the Capital Expenditure/Tenant Improvement Reserve), and New Borrower desires to undertake such approved capital expenditures/tenant improvements, such shortfall shall be at the sole cost and expense of New Borrower, subject to reimbursement of such shortfall amounts expended pursuant to "*sixth*" and "*seventh*" of paragraph 21 below.

20. **Capital Expenditure/Tenant Improvement Reserve**. Borrower shall deposit into the Capital Expenditure/Tenant Improvement Reserve on or before the Effective Date, $2,000,000.00 less an Overhead Allowance. "***Overhead Allowance***" shall mean the amount New Borrower advances with respect to salaries and general overhead from the Petition Date until the Effective Date for

New Borrower, or Existing Borrower's parent or ultimate parent (but not Existing Borrower), but in no event more than $650,000.00.

21.  **Cash Management**.  All revenue from Property shall be deposited into a lockbox account established by New Borrower and pledged to Agent on behalf of Lenders.  All funds on deposit shall be disbursed as follows: *first*, to fund operating expenses (pursuant to an operating budget reasonably approved by Agent); *second*, to fund a tax reserve account; *third*, to fund an insurance reserve account; *fourth*, to fund current interest due and payable; *fifth*, to replenish the interest reserve account (up to an amount equal to 6-months of interest); *sixth*, to replenish the capital expenditure/tenant improvement reserve account (up to $2M); *seventh*, provided no Monetary Event of Default or Triggering Event of Default (to be defined and agreed to by New Borrower and Lenders) has occurred and is continuing, to New Borrower to the extent New Borrower has incurred any costs, pursuant to an approved budget, in respect of any new lease agreement or capital improvement; *eighth*, to Agent, to the extent that any costs, expenses and/or accrued (but unpaid) interest becomes part of the New Loan as set forth in the Lock-Up Agreement (*see* paragraph 3), which amounts shall applied to prepay the New Loan; *provided, however*, in the event that any such prepayment shall result in breakage costs, at New Borrower's option, such amounts that would otherwise cause such breakage costs shall be deposited in a segregated, interest bearing account pledged to Agent on behalf of Lenders as additional collateral for the New Loan; *ninth*, to Agent, to be applied to the payment of the Case Margin; *tenth*, provided no Monetary Event of Default or Triggering Event of Default has occurred and is continuing, to New Borrower in an amount equal to (x) taxable income attributed to the Property ownership times (y) the maximum Federal, State and City tax rate applicable to a taxable individual beneficial owner of New Borrower (a "pass-through" entity) resident in New York City (as verified by an independent accountant acceptable to Agent and Lenders); and *eleventh*, to be disbursed in equal parts as follows: (a) to Lenders, with any such amounts disbursed to Lenders to be applied to the payment of the Exit Fee; it being understood that upon payment of the Exit Fee in full (whether by crediting amounts disbursed in accordance with the above waterfall or otherwise), all excess amounts being distributed to Lenders in accordance with the above waterfall shall thereafter be applied to prepay the New Loan; *provided, however*, in the event that any such prepayment shall result in breakage costs, at New Borrower's option, such amounts that would otherwise cause such breakage costs shall be deposited into a segregated, interest bearing account pledged to Agent on behalf of Lenders as additional collateral for the New Loan, and (b) provided no Monetary Event of Default or Triggering Event of Default has occurred and is continuing, to New Borrower.  Any interest earned in the account(s) described in the preceding clauses "*eighth*" and "*eleventh*" (the "***Prepayment Accounts***") shall be credited to each respective account.  Agent shall have the right to apply the funds on account in any Prepayment Account if such application shall not result in any breakage costs or upon the occurrence of an Event of Default or Triggering Event of Default.  For the avoidance of doubt, any amounts deposited into any Prepayment Account shall not be deemed to be a prepayment or repayment or reduction of the outstanding principal amount of the New Loan and such amounts shall continue to bear interest until such amounts are actually applied to reduce the outstanding principal amount of the New Loan.

22.  **Property Manager**.  New Borrower shall be permitted to select the property manager and leasing agent, if any, and any replacement property manager or leasing agent subject to the reasonable approval of Agent.  Any property management agreement or leasing commission agreement shall be subject to the prior approval of Agent.  It is contemplated that these will be affiliates of New Borrower.

23.  **Operating Budget**.  New Borrower shall provide to Agent on or before the Effective Date and each January 1st following the Effective Date a proposed annual operating budget which shall be

subject to the reasonable approval of Agent (the "*Operating Budget*"). The Operating Budget shall contain, but not be limited to, real property Taxes, insurance premiums, and any other reasonable cost or expense related to the Property as approved by Agent (the "*Approved Expenses*"). In the event that there is not sufficient cash flow to pay the Approved Expenses, such shortfall shall be at the sole cost and expense of New Borrower. Note, the Cushman & Wakefield report of February 2009 (attached to the Receiver motion) states that the Property with a Total Rental Area of 194,171 sft could be managed at a cost of approx. $30.00 USD psf per annum. Notwithstanding the forgoing, the initial Operating Budget shall be based on the budget relating to the property operations during bankruptcy.

24.     **Leasing**. Borrower shall be permitted to enter into Qualified Leases without Agent's consent. A "*Qualified Lease*" means a lease or amendment, renewal or extension thereof that (a) provides for rental rates and term, which, in New Borrower's reasonable judgment (supported by applicable evidence in Agent's reasonable discretion), are comparable to existing local market rates and terms, (b) is an arms-length transaction, (c) is for a term of not more than six (6) years, but not exceeding the Initial Maturity Date of the New Loan; *provided, however,* the term of such lease may be more than six (6) years or exceed the Initial Maturity Date if such lease is cancelable after the earlier of six (6) years or the Initial Maturity Date by the landlord thereunder (or successor thereto) on not less than ninety (90) days notice, (d) provides that such lease is subordinate to the First Lien Mortgage and that the tenant under such lease shall attorn to Agent and (e) is on New Borrower's standard form lease (which shall be previously approved by Agent). Any lease which is not a Qualified Lease shall be permitted only with Agent's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. In the event that Agent fails to notify Borrower within ten (10) Business Days after receipt of Borrower's written request for consent, such consent shall be deemed to be given. While New Borrower would expect that short-term leases where extensive tenant installation work is not required will generally not require a non-disturbance agreement (and New Borrower shall not offer one in those circumstances), if and to the extent that New Borrower believes it is appropriate to seek a non-disturbance agreement, whether due to the lease term, credit of the tenant or expense of required tenant installation, Agent will not unreasonably withhold, condition or delay its consent thereto. Upon the second anniversary of the Effective Date, New Borrower and Agent shall cooperate in all reasonable respects to reevaluate the terms and provisions of the definition of "Qualified Lease".

25.     **Loan Documents**. Loan Documents to reflect a "retail loan" (not a "development loan") and are to include covenants and conditions for such a loan to be negotiated by the parties.

26.     **Title Insurance**. New Borrower shall, at its sole cost and expense, deliver to Agent a new title insurance policy for the amount of the New Loan.

27.     **Opinions**. New Borrower shall, at its sole cost and expense, deliver to Agent legal opinions, as reasonably requested by Agent with respect to New York Law and Nevada Law, and the law of the jurisdiction of New Borrower, the member(s) of New Borrower and Guarantor (collectively, the "*New Borrower Parties*"), with respect to the due authorization, execution, delivery, enforceability and any other matters reasonably requested by Agent with respect to any and all documents executed and delivered by any New Borrower Party and any Affiliate of any New Borrower Party, such opinions to be in form and substance satisfactory to Agent.

28.     **Costs & Expenses**: New Borrower shall pay for all costs and expenses of Agent, Lenders and their respective counsel in connection with the consummation of the New Loan.

29.  **Transfer Taxes**.  Any transfer tax incurred in connection with the New Loan and/or the transfer of the ownership of the property from Existing Borrower to New Borrower shall be at New Borrower's sole cost and expense.

The foregoing terms are a statement of the parties' general intent only and do not set forth all of the terms and conditions which are required for the transaction or required in the Loan Documents which the parties are to negotiate and agree upon in their sole discretion.  Nothing contained in this term sheet, nor the execution or delivery of this letter by any person or entity, shall be deemed an offer, an acceptance or binding upon any person or entity.  Except as set forth in the below, none of the parties hereto will have any legal obligation to any other party hereunder unless and until definitive documentation shall have been executed and delivered by all parties thereto.