LEE I. IGLODY. ESQ.
The Law Offices of Paras B. Barnett, P.L.L.C.
9555 South Eastern Avenue, Suite 280
Las Vegas, Nevada 89123
Lee@iglody.com; pbb@pbarnettlaw.com
Tel: (702) 425-5366 / Fax: (702) 446-5148

HERRICK, FEINSTEIN LLP
Joshua J. Angel
Andrew C. Gold
Frederick E. Schmidt, Jr.
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
*Attorneys for The Huff International Fund, L.P. and The Huff Alternative Parallel Fund, L.P.*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| FX LUXURY LAS VEGAS I, LLC | Case No. 10-17015 (BAM) |
| Debtor. | |

------------------------------------------------------x

## MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

The Huff Alternative Fund, L.P. and The Huff Alternative Parallel Fund, L.P. (collectively, "Huff"), minority shareholders in FX Real Estate and Entertainment Inc. ("FXRE"), a publicly-traded company whose sole significant asset is its interest, through its subsidiary, FX Luxury Las Vegas I, LLC (the "Debtor" or, together with FXRE and its affiliates, the "Company"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, in certain real property and improvements thereon located at the southeast corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada (the "Property"), by and through their

2

attorneys, Herrick, Feinstein LLP, as and for their motion seeking entry of an order directing the appointment of a chapter 11 trustee (the "Motion"), respectfully represent as follows:

## INTRODUCTION

1.  It is beyond peradventure that "the conduct of bankruptcy proceedings not only should be right but must seem right." In re Bidermann Industries U.S.A., Inc., 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) citing Knapp v. Seligson (In re Ira Haupt & Co.), 361 F.2d 164, 168 (2d Cir. 1966). Here, nothing about the Debtor's bankruptcy filing is or seems right.

2.  The appointment of a chapter 11 trustee and the attendant termination of the Debtor's exclusivity is necessary in this case in order to protect both creditors and holders of equity interests in the Company whose rights are being extinguished by the blatant self-dealing of three majority shareholders and directors, Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino[1] (the "Controlling Insiders").[2] The Controlling Insiders, in flagrant breach of their fiduciary duties to creditors and other shareholders,[3] have engineered a scheme, manifested in

---

[1] Mr. Torino, while a shareholder who owns and/or controls more than 30% of the outstanding shares of FXRE, is not a director. Prior to May 8, 2009, Mr. Torino was an officer of FXRE with the title of Chairman - Las Vegas Division.

[2] The Debtor is a Nevada limited liability company. Shortly before this chapter 11 filing, the Debtor merged with its affiliate, FX Luxury Las Vegas II, LLC (a Nevada limited liability company) and its corporate parent, FX Luxury Las Vegas Parent, LLC (a Delaware limited liability company). The Debtor is wholly owned by FX Luxury, LLC which itself is wholly-owned by FXRE, a publicly traded Delaware Corporation whose principal place of business is in New York City. The board of directors of FXRE controls the Debtor and operates as a *de facto* board of directors of the Debtor. FXRE was de-listed from the NASDAQ Stock Market on April 24, 2009. FXRE's common stock is currently quoted on the Pink Sheets under the symbol FXRE.PK. The Controlling Insiders collectively own and/or control approximately 73% of the voting shares of FXRE.

[3] Substantially simultaneously herewith, Huff intends to commence a derivative action against each of FXRE's board members, including the Controlling Insiders, in the Supreme Court of the State of New York seeking damages arising from the breach of their fiduciary duties. A copy of the complaint for that action, together with the demand letter to FXRE's board of directors, is annexed hereto as Exhibit "A".

2

the Lock-Up Agreement (hereafter defined) and the pre-packaged plan of liquidation filed on April 21, 2010 (the "Plan"), whereby they alone will retain the benefits and potential upside of the Company's sole significant asset (i.e. the Property),[4] while all other interests will be wiped out. The Debtor, its estate and its other shareholders in no way benefit from the transactions contemplated under the Lock-Up Agreement and Plan.

3. The Lock-Up Agreement and Plan provide that the Property is to be sold to Newco (hereafter defined) a company formed by and controlled solely by the Controlling Insiders for a purchase price of approximately $260 million.[5] None of the other public shareholders of the Company are participants in Newco, nor did the Controlling Insiders structure the transaction using FXRE, rather than Newco. Using FXRE would have inured at least in part to the benefit of all FXRE shareholders.

4. The reason that the Controlling Insiders diverted this opportunity from FXRE is obvious – by using Newco, the Controlling Insiders do not have to share the investment opportunity with others and they can memorialize their various incentive contracts so that future investors will be more likely to take subject to those contracts.

---

[4] Page 3 of the Company's Form 10-K for the fiscal year ending December 31, 2009 (the "2009 10-K"), a copy of which is annexed hereto as Exhibit "B", describes the Property as "substantially the entire business of the Company."

[5] As window dressing, the Lock-Up Agreement provides that the Property may be sold at auction so long as the successful bid is at least $256 million. The auction component, however, is illusory because the release price for the Property is approximately $118 million more than the $137.7 million value of the Property (i.e. nearly double) as set forth in the Debtor's schedules. Clearly, no rational investor would submit such an overpriced bid at auction. In the face of an insider sale, the chilling effect that such a high release price would have on bidding is fatal to the Debtor's scheme. See In re Bidermann Industries U.S.A., Inc., 203 B.R. at 551-52 (sale motion denied where debtors agreed not to encourage other offers in the face of an insider sale).

5.      The proposed purchase price for the Property greatly exceeds its fair market value (scheduled by the Debtor as $137.7 million)[6] yet is insufficient to pay the Debtor's first lien debt (scheduled by the Debtor as $268,115,868.07) in full. The financing for Newco's purchase of the Property is to be provided by the First Lien Lenders (hereafter defined), on non-market terms to Newco.[7] By agreeing to the sale of the Property to the Controlling Insiders, thereby ensuring a compliant Debtor, the First Lien Lenders have attempted to insulate themselves from any possibility of a cramdown. Once the transaction is completed, the First Lien Lenders will enjoy an inflated performing loan with regard to the Property. It is significant that the Lock-Up Agreement and Plan attempts to circumvent the restructuring protections granted the Second Lien Lenders (hereafter defined) under the Intercreditor Agreement (hereafter defined). Thus, not only would the proposed transaction harm FXRE's shareholders, but it would also harm the Second Lien Lenders.

---

[6] It is unclear how the Debtor came to its $137 million value, given that Exhibits 7 and 8 of *the Errata to Exhibits Filed with Omnibus Declaration of Mitchell J. Nelson in Support of First Day Motions* disclose bids for $160 million and $180 million, respectively. (Docket No. 23.) Coincidentally, the Debtor's $137 million valuation would potentially provide the First Lien Lenders with a blocking position in the Debtor's unsecured creditor class with respect to any competing plan proposed.

[7] Exhibit C (the "Term Sheet for New First Lien Loan") to the Lock-Up Agreement provides that the loan is to have an initial term of 6 years subject to one one-year extension option. The interest rate to be paid by Newco is to be a floating rate on a one or three-month cost of funds (LIBOR plus a liquidity spread). Prior to maturity, repayments are to be interest only.

As described in the 2009 10-K, the First Lien Lenders will provide Newco with financing under the following terms and conditions: (i) it will post a $2.2 million deposit before commencement of the prepackaged chapter 11 bankruptcy proceeding, (ii) it will fund up to $650,000 of expenses during the prepackaged chapter 11 bankruptcy proceeding, (iii) at closing, it will pay approximately $15 million in cash (in addition to the $2.2 million deposit referred to in the preceding clause (i)), while the balance of the purchase price will be payable pursuant to the terms of the new secured loan, and it will prefund a minimum of $3.350 million of reserves (which reserves will be increased on a dollar-for-dollar basis to the extent that it does not fund the entire $650,000 of expenses under the preceding clause (ii)), (iv) during the prepackaged chapter 11 bankruptcy proceeding, it will have to fund or assume other expenses as set forth in the Lock Up Agreement, (v) the Newco Entities Equity Sponsors will have to provide a "bad boy" guarantee of $60 million (decreasing over time to $20 million) in the event of a voluntary or collusive bankruptcy filing and/or misappropriation of funds, and (vi) in the event there is a fault-based termination of the Lock Up Agreement, it will forfeit its $2.2 million deposit to the First Lien Lenders and be obligated to pay the First Lien Lenders an additional $650,000 as liquidated damages.

4

6. The Lock-Up Agreement and Plan make a mockery of the bankruptcy process as they prohibit the restructuring of the first lien debt <u>by the Debtor</u> and will result in the sale of the Property only to the Controlling Insiders free and clear of the liens, claims and encumbrances of the Second Lien Lenders and any interest the Company, or any of its shareholders, may have in the Property. It allows the value accompanying the restructure of the Property to inure to the Controlling Insiders in violation of the absolute priority rule and the requirement that the Plan be promulgated in good faith.

7. The scheme is rife with self-dealing, does not allow for Debtor participation, does not allow for participation of any non-Controlling Insiders and tramples the rights of the Second Lien Lenders. The 2009 10-K captures the lack of any benefit to the Debtor, succinctly stating:

> If the auction sale is not completed and the Las Vegas Property is sold under the Old Lock Up Agreement pursuant to the prearranged sale to the Newco Entities, ***the Company will not receive any benefit from any such prearranged sale***.

2009 10-K, page 5 (emphasis added).

8. A chapter 11 trustee is required to thwart the Controlling Insiders' self-dealing and breach of fiduciary duties and to permit the termination of exclusivity so that all stakeholders will be treated fairly.

9. Huff has committed, through its own lock-up agreement with the Second Lien Lenders, to propose or otherwise support a plan of reorganization, either on its own or in conjunction with other creditors, which will allow for meaningful and equitable participation by all claim and equity holders free of the self-dealing of the Controlling Insiders. Huff's previous

5

efforts to propose just such a plan have been rebuked by the First Lien Lenders and Controlling Insiders for obvious reasons.

10. Without the imposition of a chapter 11 trustee, the Controlling Insiders will be free to effectuate their self-dealing scheme virtually unchecked. Huff respectfully requests the Court to appoint a chapter 11 trustee in this case thereby terminating the Debtor's exclusive right to file and solicit acceptances of a plan of reorganization so that the improper transactions contemplated by the Lock-Up Agreement and Plan will not be consummated.

## BACKGROUND

11. On April 21, 2010 (the "Petition Date"), the Debtor filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues in the operation of its business and manages its property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12. The Debtor is engaged in the business of owning and operating the Property which is located at the southeast corner of Las Vegas Boulevard and Harman Avenue in Las Vegas, Nevada. The Property is currently occupied by a motel and several commercial and retail tenants with a mix of short- and long-term leases.

13. Prior to the Petition Date, the Debtor, as a borrower, and certain of the Debtor's affiliates entered into that certain Amended and Restated Credit Agreement dated as of July 6, 2007 (the "First Lien Credit Agreement"), pursuant to which Landesbank Baden-Württemberg, Münchener Hypothekenbank EG, Deutsche Hypothekenbank (Actien-Gesellschaft), Great Lakes Reinsurance (UK) plc (collectively, the "First Lien Lenders") made two-tranche senior secured first priority loans in the aggregate principal amount of $259 million

secured by liens on the Property. The Property is also encumbered by second priority liens securing loans in the principal amount of approximately $195 million made to the Debtor by certain lenders (collectively, the "Second Lien Lenders") under that certain Amended and Restated Credit Agreement dated as of July 6, 2007.

14. On or about July 6, 2007, the First Lien Lenders, the Second Lien Lenders and certain of the Company entities entered into an intercreditor agreement, a copy of which is annexed hereto as Exhibit "C" (the "Intercreditor Agreement").

15. The Debtor failed to pay the loans upon their maturity on January 6, 2009. Thereafter, the First Lien Lenders, through their agent Landesbank Baden-Württemberg, New York Branch (the "First Lien Agent"), exercised their rights and remedies under the First Lien Credit Agreement. On June 5, 2009, the First Lien Agent commenced an action (the "Receiver Action") in the Nevada District Court (Case No. A-09-591831-B, Dept. No.: XIII) and obtained the appointment of a receiver (the "Receiver") pursuant to a court order dated June 22, 2009, as amended by a court order dated August 6, 2009 (the "Receivership Order"). Among other things alleged by the First Lien Agent in support of the Receiver's appointment was mismanagement and waste of cash with respect to the Property by one or more of the Controlling Insiders.

16. Thereafter, a Notice of Trustee's Sale dated July 7, 2009, was issued upon the Debtor informing the Debtor that a trustee would sell the Property at a public auction on September 9, 2009. The First Lien Lenders subsequently agreed to several adjournments of the proposed trustee sale in order to continue discussions with the Debtor and its principals regarding a resolution of the default under the loans.

17. On October 30, 2009, despite the Controlling Insiders' prior mismanagement of the Property which caused the appointment of the Receiver, the Debtor and certain affiliates of the Debtor, all of whom were represented by Greenberg Traurig, LLP, entered into a Lock Up and Plan Support Agreement (the "Lock-Up Agreement")[8] with the First Lien Lenders, and LIRA Property Owner, LLC and LIRA LLC (collectively, "Newco"). A copy of the Lock-Up Agreement is annexed hereto as Exhibit "D". Newco was formed for the benefit of and is controlled by the Controlling Insiders who are directors, executive officers and, collectively, own and/or control approximately 73% of the equity of FXRE.

18. Under the terms of the Lock-Up Agreement, the Debtor is to conduct an auction sale under section 363 of the Bankruptcy Code of the Property for at least $256 million, which is nearly double its value as scheduled by the Debtor. Once the Debtor fails to procure any qualified bids (which is a foregone conclusion), the Property is to be sold to Newco in a prearranged sale (the "Insider Sale") under a proposed plan of reorganization (the "Plan"). The parties to the Lock-Up Agreement all agree to support the Plan. The provisions of the Lock-Up Agreement were incorporated in the Plan, a copy of which is annexed hereto as Exhibit "E".

19. The Lock-Up Agreement provides that Newco will acquire the Property for approximately $260 million through the Insider Sale, and that the First Lien Lenders will finance (the "Insider Financing") the Insider Sale. The Plan also provides that the existing equity interests in the Debtor will be cancelled, and the holder of equity interests in the Debtor will receive no distribution. Other than the Controlling Insiders, none of the other Company shareholders have any interest in Newco or otherwise receive any benefit from the Plan..

---

[8] A subsequent lock up agreement, which included as an additional party certain of the Second Lien Lenders, was entered into on or about December 23, 2009. That agreement was terminated. Upon information and belief, the termination of the agreement revived the material terms of the Lock-Up Agreement.

20. Under the Lock-Up Agreement, (i) the First Lien Indebtedness will either be satisfied or reinstated at par, (ii) the Insiders that own Newco will end up owning and managing the Property, and (iii) the interests of all other creditors (except for the First Lien Lenders) and equity holders (except for the Controlling Insiders) will be extinguished. The proposed sale, which the Controlling Insiders and First Lien Lenders have sought to quickly push through this Court via the pre-packaged Plan, is not subject to meaningful bidding and provides no value or potential upside to the Debtor's constituencies, other than the Controlling Insiders and First Lien Lenders.

## **RELIEF REQUESTED**

21. Huff seeks the appointment of a chapter 11 trustee to operate the Debtor's business and manage its estate. The Controlling Insiders, along with the First Lien Lenders, control every step of the Debtor and have caused the Debtor to engage in inappropriate self-dealing transactions detrimental to the Debtor's estate, which necessitates the appointment of a chapter 11 trustee in this case. Accordingly, cause exists for the appointment of a chapter 11 trustee. The Debtor also has established that it cannot be expected to discharge its fiduciary duties in this bankruptcy case. Accordingly, it is in the interest of creditors to appoint a chapter 11 trustee under section 1104(a)(2), rather than to rely on the perpetrators of the misconduct to administer the bankruptcy estate.

22. Section 1104(a) of the Bankruptcy Code governs the appointment of chapter 11 trustees and provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

9

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after commencement of the case, or similar cause . . .;

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . .; or

(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of the creditors and the estate.

11 U.S.C. § 1104(a).

23. The grounds set forth in section 1104(a) are each independent separate grounds to justify the appointment of a trustee. See In re Lowenschuss, 171 F.3d 673, 685 (9th Cir. 1999). On a showing of cause, the Court *must* order the appointment of a trustee. In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988). Section 1104(a)(2) also permits the Court to order the appointment of a trustee when it is in the best interests of creditors and others, even when no "cause" exists. In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

**Cause Exists for the Appointment of a Chapter 11 Trustee**

24. Cause exists for the appointment of a trustee where the controlling interests of a debtor in possession breach their fiduciary duties. In re Ridgemour Meyer Props., LLC, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008) (finding cause existed for appointment of a trustee where manager breached his fiduciary duties); In re Russell, 60 B.R. 42, 44 (Bankr. W.D. Ark. 1985).

25. Here, the Controlling Insiders' breach of their fiduciary duties constitutes "cause" for the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1).

10

26. It is well established that the fiduciary duties of officers and directors to shareholders of a company continue in bankruptcy. See In re Bush Industries, Inc., 315 B.R. 292, 295 (Bankr. W.D.N.Y. 2004) (officers and directors' fiduciary obligations to shareholders continue in bankruptcy). Similarly, self-dealing by officers and directors remains prohibited even in the chapter 11 context. In re Bush Industries, Inc., 315 B.R. at 295 ("The bankruptcy process allows no room for self-dealing by officers and directors of a publicly traded enterprise.").

27. Here, the self-dealing of the Controlling Insiders is manifested in the Lock-Up Agreement and Plan.[9] The Lock-Up Agreement and Plan require the sale of the Debtor's sole significant asset, the Property, to the Controlling Insiders. The Controlling Insiders have negotiated a deal with the First Lien Lenders that is guaranteed not to benefit the Debtor or FXRE's other shareholders and creditors. Although sales to fiduciaries may be approved in certain circumstances, they are subject to heightened scrutiny by bankruptcy courts. See In re Bidermann Industries U.S.A. Inc., 203 B.R. at 551 ("[s]ales to fiduciaries in chapter 11 cases are not *per se* prohibited, 'but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse.'") (quoting In re Wingspread Corp., 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)). Here, the need for such heightened scrutiny is obvious.

28. By causing the Debtor to enter into the Lock-Up Agreement, the Controlling Insiders have ceded the Debtor's ability to exercise its fiduciary duties to its creditors and ultimate shareholders. This alone constitutes "cause" for the appointment of a chapter 11

---

[9] In addition to the self-dealing captured in the Lock-Up Agreement and Plan, upon information and belief, in or about February 2010, Messrs. Kanavos and Torino purchased approximately two (2) acres of vacant land contiguous to the Property and financed the purchase though the credit of the drugstore chain, The Walgreen Company ("Walgreens"). Walgreens is a current tenant of the Property. Upon information and belief, neither Mr. Kanavos nor Mr. Torino presented this opportunity to the Board of Directors of FXRE for its consideration, despite the fact that FXRE was in the business of owning and operating real estate in Las Vegas.

11

trustee. See In re Bellevue Place Assocs., 171 B.R. 615, 624-25 (Bankr. N.D. Ill. 1994) (appointing a trustee for cause where pre-petition debtor entered into an agreement which "deprived [it] of the ability to discharge duties, particularly its fiduciary duties, to all creditors and equity security holders as a debtor-in-possession.").

29. The Bush Industries case, which also involved a debtor's breach of its fiduciary duties, is particularly instructive here. There, the bankruptcy court, citing the insider's breach of fiduciary duties to shareholders, refused to confirm a plan of reorganization that was predicated on a lock-up and voting agreement. At issue was a provision in the lock-up agreement that provided a "golden parachute" for one of the debtor's insiders in the form of an extended employment agreement. The court found the self-dealing on the part of an insider to constitute bad faith and denied confirmation as follows:

> Although a debtor may in good faith negotiate a lock up agreement, the particular terms of any resulting plan must themselves be proposed in good faith and not by any means forbidden by law. I agree with the contention of the Equity Committee that the debtor violated this requirement when it negotiated to include into the Lock Up and Voting Agreement a revised contract for employment of Paul S. Bush.

In re Bush Industries, Inc., 315 B.R. at 304.

30. The Bush Industries Court further described the insider's breach of fiduciary duties to shareholders:

> Prior to the approval of the Lock Up and Voting Agreement, Paul S. Bush held a controlling interest in the stock of the debtor and served as its Chief Executive Officer and as Chairman of its Board of Directors. In these capacities, Mr. Bush held the position of a fiduciary with respect both to the corporation and to its stockholders. See HARRY G. HENN, LAW OF CORPORATIONS, § 235 AT 457 (2nd ed.1970). As a fiduciary, he owed a duty to act in good faith and without self dealing.

> Accordingly, corporate directors are obligated "to shareholders in general and to individual shareholders in particular to treat all shareholders fairly and evenly." *Schwartz v. Marien*, 37 N.Y.2d 487, 491, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975). These fiduciary duties arise "from the fact that shareholders are owners of the corporation and they expect to share in its profits, and ***when a director or other officer benefits himself at the expense of the corporation, he breaches his duty to the shareholders by preventing them from realizing their expectations to share fairly in the corporate fortunes.***" 14A N.Y. JUR. 2D *Business Relationships,* § 683 (1996).
>
> In bankruptcy, officers and directors owe a primary duty to maximize the return to creditors. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). ***Nonetheless, this responsibility to creditors does not eliminate the fiduciary obligation to provide an equality of treatment among shareholders.*** Typically, when unsecured creditors are to receive less than full payment, shareholders are uniformly distressed by a loss of all equity. Indeed, section 1129(b)(2)(B) of the Bankruptcy Code provides generally that a plan is fair and equitable to an impaired class of unsecured creditors only when shareholders receive no distribution. Of course, with the acquiescence of creditors, shareholders may retain some interest or benefit. ***In negotiating such provisions, however, officers and directors must still satisfy their underlying fiduciary obligations.***

Id. at 306 (emphasis added).

31. Critical to the Bush Industries decision was the fact that the favorable treatment of the directors and officers under the lock-up agreement *was not made available* to all shareholders. Thus, the plan could not meet the requirement that it be proposed in good faith and not by any means forbidden by law. In this regard, the Bush Industries court found:

> While Paul Bush was still an officer and director of the debtor, the secured creditors and Mr. Bush's personal counsel directly negotiated the terms of a revised employment agreement. With Paul Bush as its chair, the Board then accepted that revised employment agreement as a component of the Lock Up and Voting Agreement. ***Despite the preferred treatment that the agreement gave to Paul Bush, the board chose not to propose an alternative of equal cost for the benefit of all shareholders.*** By reason of the renegotiated contract, the secured creditors paid value in excess of

> a fair consideration for the business. ***Due to his controlling stock position, Mr. Bush was able to secure a promise for what is essentially a bonus that would be distributed to himself and without concern for minority stock interests. In this way, he violated a fiduciary obligation.*** By reason of this violation, the plan has been proposed by means forbidden by law and in contradiction of the requirement of good faith.

Id. at 307 (emphasis added).

33. The parallels between the behavior of the officers and directors in <u>Bush Industries</u> and those of the Controlling Insiders are unmistakable. Here, the Controlling Insiders' scheme to wrest ownership of the Property from the Debtor for themselves (through Newco), at the expense of the Debtor and FXRE's other shareholders, represents the same type of self-dealing and breach of fiduciary duties that was present in <u>Bush Industries</u>. Significantly, they have refused to invite all of FXRE's other shareholders to participate in Newco.[10] More significantly, the same transaction entered into by Newco could be entered into by FXRE. Of course, that structure would require sharing the opportunity with all shareholders, something the Controlling Insiders are unwilling to do. Put simply, the only shareholders that stand to gain from the transactions contemplated by the Lock-Up Agreement are the Controlling Insiders. Accordingly, due to the Controlling Insiders' breach of fiduciary duties, a chapter 11 trustee must be appointed.

**<u>It is in the Interest of Creditors and the Estate to Appoint a Chapter 11 Trustee</u>**

33. It is also in the best interest of both the Debtor's creditors (except for the First Lien Lenders) and the Debtor's estate that a chapter 11 trustee be appointed. Although the best interests of creditors will be found where certain factors, such as trustworthiness of the debtor, the lack of confidence of the business community and of creditors in current

---

[10] The Controlling Insiders invited Huff to participate in Newco. That invitation, however, was not extended to the remainder of FXRE's public shareholders to which Huff objected and, thus, declined the invitation to participate.

management, and the benefits derived by the appointment of a trustee versus the cost of the appointment, are present, the standard for the appointment of a trustee under section 1104(a)(2) is a flexible one. In re Ridgemour Meyer Props., LLC at *9. ("The court has broad discretion, and at bottom, it seems that § 1104(a)(2) reflects the practical reality that a trustee is needed."); In re Bellevue Place Assocs., 171 B.R. at 623 ("[s]ection 1104(a)(2) sets forth a flexible standard for appointment of a trustee even when no cause exists.").

34. The Controlling Insiders have directed and/or manipulated the rest of FXRE's board of directors to sell the Property to Newco with no benefit whatsoever to the Debtor, its creditors (other than the First Lien Lenders) or its estate. Moreover, the Controlling Insiders have obligated the Debtors to fast-track a prepackaged liquidating plan which, due to the Controlling Insiders' self-dealing and bad faith, is patently unconfirmable.

35. By causing the Debtors to enter into the Lock-Up Agreement and Plan, the Controlling Insiders have conclusively demonstrated that they are in it for themselves and cannot be trusted to act in the best interests of the Debtor, its creditors (other than the First Lien Lenders) or FXRE's other shareholders. The Controlling Insiders have demonstrated that neither they, nor their hand-picked officers,[11] can be counted on to manage the chapter 11 case free of material conflicts of interest and self-dealing. See In re Bidermann Industries U.S.A., Inc., 203 B.R. at 551 (conflict of interest found where insider sought to sell debtor's business to company in which he and his firm had an interest)[12]; In re Hawaiian Airlines, Inc., 2003 WL 22945906,

---

[11] The Controlling Insiders have caused FXRE's Executive Vice President and General Counsel, Mitchell J. Nelson, to become the Debtor's President.

[12] The Bidermann Court was so concerned with the self-dealing in that case that it ordered the debtor to show cause why an examiner should not be appointed. The court explained:

15

No. 03-00817 (Bankr. D. Haw: May 16, 2003) (trustee appointment under section 1104(a)(2) appropriate where debtor's management had a disabling conflict of interest). Clearly, the Controlling Insiders are motivated by personal gain and are not interested in discharging their fiduciary duties to the Debtor, its estate and FXRE's shareholders. Accordingly, it is in the best interest of the Debtor's creditors that a chapter 11 trustee be appointed.

## The Appointment of a Chapter 11 Trustee is Preferable to Dismissal of the Debtor's Chapter 11 Case.

36. Section 1104(a)(3) of the Bankruptcy Code provides for the appointment of a trustee if grounds exist to convert or dismiss a case under 11 U.S.C. § 1112, and the court determines that the appointment of a trustee or an examiner is in the best interests of the creditors and the estate. In re Products Int'l Co., 395 B.R. 101, 111 (Bankr. D. Ariz. 2008). A debtor's breach of fiduciary duty and self-dealing are grounds for conversion or dismissal of a chapter 11 case under 11 U.S.C. § 1112(b). In re Products Int'l Co., 395 B.R. at 111.

37. Here, the Controlling Insiders' self-dealing and breach of their fiduciary duties could form the basis for dismissal or conversion under 11 U.S.C. § 1112(b). However, dismissal or conversion of this case would effectively accomplish the goals of the Controlling Insiders and First Lien Lenders, to wit, the disenfranchisement of all other creditors and shareholders and the complete extinguishment of their interests through a foreclosure or other

---

> In addition, because my confidence in management and the debtors' counsel has been sorely shaken by the manner in which they sought to pursue this transaction, I am ordering the parties to show cause why an examiner with expanded powers ought not be appointed to assess the desirability of proceeding along the mapped route and to assess the fairness of any offers which may be made to the debtors for their purchase, including a Vestar offer.

In re Bidermann Industries U.S.A., Inc., 203 B.R. at 554. Here, Huff respectfully submits that a chapter 11 trustee should be appointed. However, if the Court deems that an examiner with expanded powers should instead be appointed, Huff would have no objection.

16

liquidation proceeding. Accordingly, the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(3) is warranted.

## NOTICE

38. Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) counsel to the Debtor, (iii) all of the scheduled creditors of the Debtor, (iv) counsel to the First Lien Lenders; (v) counsel to the Second Lien Lenders; and (vi) all other parties that have filed notices of appearance in the Debtors' bankruptcy cases. In light of the nature of the relief requested, Huff submits that no further notice need be given.

## CONCLUSION

39. For all the reasons set forth herein, Huff respectfully requests that the Court enter an order, substantially in the form annexed hereto as Exhibit "F", directing the appointment of a chapter 11 trustee and to grant Huff such other and further relief as the Court deems just and proper.

Date: May 4, 2010

Respectfully submitted,

_____
LEE I. IGLODY, ESQ.
Nevada Bar #: 7757
The Law Offices of Paras B. Barnett, P.L.L.C.
9555 South Eastern Avenue, Suite 280
Las Vegas, Nevada 89123
Lee@iglody.com; pbb@pbarnettlaw.com
Tel: (702) 425-5366 / Fax: (702) 446-5148