BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
HAL L. BAUME, ESQ.
(Admitted Pro Hac Vice)
FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (702) 262-6899; Fax: (702) 597-5503
Email: baxelrod@foxrothschild.com
        hbaume@foxrothschild.com
*Counsel for FX Luxury Las Vegas I, LLC*

| Electronically Filed on June 2, 2010 |
| --- |

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
| --- | --- |
| In re | Case No.  BK-S-10-17015-BAM |
| FX LUXURY LAS VEGAS I, LLC, a Nevada limited liability company, | Chapter 11 |
| | **OBJECTION OF DEBTOR TO MOTION OF THE HUFF ALTERNATIVE FUND L.P. AND THE HUFF ALTERNATIVE PARALLEL FUND, L.P., AND THE JOINDER OF NEXBANK SSB THERETO, TO APPOINT A CHAPTER 11 TRUSTEE** |
| Debtor. | |
| | Hearing Date:    June 11, 2010 |
| | Hearing Time:    9:30 a.m. |

Fox Rothschild LLP, counsel to FX Luxury Las Vegas I, LLC, the debtor and debtor-in-possession (the "Debtor" or "FX") in the above-captioned case (the "Chapter 11 Case"), hereby opposes the Motion of Huff Alternative Fund, L.P. and the Huff Alternative Parallel Fund, L.P. (collectively "Huff") for Appointment of a Trustee, as well as NexBank's and Certain Second Lein Lenders' Joinder in the Huff Alternative Fund, L.P. and the Huff Alternative Parallel Fund, L.P.'s Motion for Appointment of Chapter 11 Trustee (collectively, the "Huff Motion") and files its Opposition to the Huff Motion (the "Opposition").

This Opposition is based upon the following memorandum, the Declaration of Mitchell J. Nelson in Opposition to Motion to Appoint Trustee (the "Nelson Declaration") filed herewith, the papers on file with the Court, and oral argument at the hearing on the Motion.

VG1 40674v1 06/02/10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY OF ARGUMENT

1.    In the infancy of this case, Huff, who is one of the Second Lien Lenders who are "out of the money", has lambasted FX with unsupported allegations of breach of fiduciary duty or bad faith.  Huff offers no factual support for these allegations relying solely on the Lock Up and Plan Support Agreement (and this Chapter 11 case, Plan and Bid Procedures Motion filed by the Debtor pursuant thereto) which were entered and filed by the Debtor to avoid forfeiture of its Property and business to foreclosure by the First Lien Lenders.  Additionally, Huff points to pre-petition allegations made in the First Lien Lenders' action for a rent receiver as proof of pre-petition gross mismanagement despite the fact that these allegations were never admitted by FX or litigated and determined by a court.  A detailed history of the pre-petition foreclosure proceeding by the First Lien Lenders and attempts to effectuate a successful work-out, including the terminated Tri-Party Lock Up Agreement, are set forth at length in the Omnibus Declaration of Mitchell J. Nelson Filed in Support of First Day Motions (the "Omnibus Declaration") as well as in the Nelson Declaration and are incorporated herein by reference.[1]

2.    Although the Debtor respectfully submits that argument as to the propriety of the pending plan (the "Plan") is not germane to the issue as to whether the Court should appoint a trustee, the Huff Motion's reliance on it makes clear that the Huff Motion is not based on a legitimate concern for the Debtor's estate or for alleged misconduct by the Debtor as debtor-in-possession in its administration of the estate pending confirmation of a Plan, but rather is simply a tactic to better its position in this case.

3.    The fact that Huff does not like the anticipated treatment of its claim does not equate to inappropriate behavior or breach of fiduciary duties by the Debtor which would justify or require appointment of a trustee.  When the Bankruptcy Code was drafted, it can only be assumed that the drafters understood that a debtor's application of the provisions of the Bankruptcy Code, whether they be cram-down, sale free and clear of liens, pursuit of avoidance

---

[1] All capitalized terms not defined herein shall have the meaning set forth in the Omnibus Declaration of Mitchell J. Nelson filed on the Petition Date in Support of First Day Motions.

2

actions, etc., while potentially beneficial to the debtor and some creditor constituencies, would not be looked at favorably by other creditors or creditor constituencies. As such, the drafters of the Bankruptcy Code could not have intended that the use of such provisions by a debtor to the disfavor of creditors would constitute a breach of fiduciary duty or constitute cause for the appointment of a chapter 11 trustee. While neither the Debtor nor its counsel can control the market, to the extent that additional recovery can be realized from the auction of the Debtor's assets so as to provide Huff and the Second Lien Lenders with a distribution on their claims, such will be the case. To the extent such additional recovery is not so realized, such will serve merely as indicia of the economy and certainly not an indictment of the Debtor's actions in connection with the Lock Up and Plan Support Agreement and this case.

4.    The existence of the Lock Up and Plan Support Agreement was not and is not a breach of any fiduciary duties nor cause to divest the Debtor of its business by the appointment of a trustee. The parties to the Lock Up and Plan Support Agreement have negotiated revised bidding procedures, the material elements of a revised plan and a consensual termination of the Lock Up and Plan Support Agreement. Therefore all of Huff's arguments based on the existence of that agreement are not only baseless in the face of reality, but moot and irrelevant.

5.    Finally, the Court should summarily reject allegations that the prepetition appointment of a Receiver somehow establishes mismanagement and/or waste by the Debtor. As set forth at length in the Nelson Declaration and hereinafter, the Debtor acted at all times properly and permitted the appointment of the Receiver without vigorously contesting the allegations made by the First Lien Lenders because it simply could not afford to litigate and dispute such allegations and felt that by virtue of its financial position and default in paying its obligations, the First Lien Lenders were entitled to have a Receiver to collect the rents even though there was no mismanagement by the Debtor. In short, there is not a scintilla of evidence to support the assertion that the Debtor engaged in waste and/or mismanagement prior to the filing of the bankruptcy petition.

6.    Simply, there is neither "cause" for the appointment of a Trustee at the infancy of these proceedings, nor is it in the "interests of the creditors, equity security holders or the

Debtor" at this time.  Therefore, the Huff Motion should be denied.

**II.**    **FACTS**

    **A.**    **Prior To The Bankruptcy** [2]

    7.    As set forth in greater detail in the Omnibus Declaration and Nelson Declaration, beginning in 2007, the Debtor initiated work on the redevelopment of the six parcels of real property located along the strip in Las Vegas, Nevada, known as the Park Central Property. Nelson Decl. at ¶ 6-8.  The plan was to develop a world class entertainment resort including upscale hotels, gaming, resort condominiums and an interactive entertainment theater, all at a cost of approximately $4 billion.  *Id.* at ¶ 8-9.  The redevelopment of the Park Central Property required significant additional resources than the operation of the property with the existing leases; thus, the Debtor began increasing its staff through out 2007 and 2008 to run a large scale development project.  *Id.* at ¶9-10.

    8.    The near worldwide economic collapse in the Fall of 2008 had a major impact on the redevelopment of the Park Central Property.  *Id.* at ¶11.  As a result of, among other things, the down turn in the Las Vegas market as well as the freeze in the credit markets, the Debtor concluded in the Fall of 2008 that the redevelopment of the Park Central Property, as initially planned, was no longer feasible.  *Id.* at ¶ 11.  Thus, beginning in the Fall of 2008, the Debtor began considering alternate plans for the Park Central Property.  *Id.*  at ¶ 11-12.

    9.    When it became clear in the Fall of 2008 that the economic conditions would not permit the project to proceed as scheduled, the Debtor immediately began reducing costs, laying off staff and transitioning the project.  *Id.* At ¶17.  At the time the First Lien Lenders filed for the appointment of a Receiver (in June of 2009), the Debtor had absolutely no funds to even fight the lawsuit and, as a result, with only perfunctory opposition from the Debtor, the draft Order was entered by the state court without a hearing on the merits of the allegations in the receivership complaint.  *Id.* at ¶16.

---

[2] A detailed description of the various loans and the disposition of various pre-bankruptcy negotiations with respect thereto are contained in the Omnibus Declaration of Mitchell J. Nelson, filed with this Court on April 21, 2010, and incorporated herein by reference as if set forth in full herein.

VG1 40674v1 06/02/10

10.     As the maturity date of January 6, 2009 on the First Lien Credit Agreement and Second Lien Credit Agreement approached, the Debtor, the First Lien Lenders and the Second Lien Lenders engaged in significant negotiations pre-petition concerning the First Lien Loan and Second Lien Loans from which, they, along with other parties entered that certain Tri-Party Lock Up Agreement.  Unfortunately, the parties were unable to effectuate that Tri-Party Lock Up Agreement and consensually resolve the resolution of the Loans. *Id.* At ¶12-21.

11.     Therefore, after the negotiations failed, the Debtor was faced with two options: (i) forfeit the Properties to the First Lien Lenders in foreclosure or (ii) proceed to file the Chapter 11 proceeding in conformance with the Lock Up and Plan Support Agreement in an attempt to avoid the forfeiture and retain value for some creditor constituencies other than the First Lien Lenders and save the business.  *Id.*

**B.    The Bankruptcy Filing**

12.     On April 21, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   FX continues in the operation of its business and manages its property as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

13.     The Debtor filed a prepackaged Plan of Liquidation (the "Plan") on the Petition Date which, *inter alia*, provided for the liquidation of the Debtor's business through the sale of substantially all of the Debtor's assets to a new entity formed by three of the Debtor's insiders in the event that an auction sale of those assets (prior to the confirmation hearing) failed to produce a better offer.  Voting on the Plan was solicited from an impaired class entitled to vote, and such class voted in favor of the Plan.  The Plan provided that all other impaired classes would receive nothing under the Plan and were deemed to have rejected the Plan.

14.     The auction prior to confirmation was for the purpose of exposing the assets to the market to attempt to obtain a better offer in order to maximize the potential value of the assets for the benefit of all of Debtor's creditors.  Thus, on the Petition Date, the Debtor filed a Motion for Order Pursuant to 11 U.S.C. §§ 105, 363 and 365(a) Approving Bidding Procedures in Con-nection with the Sale of Substantially All of the Assets of the Bankruptcy Estate, (b) Scheduling

VG1 40674v1 06/02/10

an Auction and (c) Approving the Form and Manner of Notice of the Auction (the "<u>Bidding Procedures Motion</u>").

15.    The Second Lien Lenders objected to the Bidding Procedures on the basis that they did not provide a "level playing field" for competing bidders at an auction for a variety of reasons, including the $256 million minimum cash bid price while LIRA was provided with financing from the First Lien Lenders.   After notice and hearing, the Debtor's motion was denied.

16.    While the initial Lock Up and Plan Support Agreement required that the Debtor file certain motions and documents with the Court that followed a prescribed methodology for Plan confirmation, in fact, once the Debtor was in this chapter 11 proceeding, the parties to that Lock Up and Plan Support Agreement have been flexible and have negotiated several modifications to address the various holdings of this Bankruptcy Court and the objections filed by the various constituencies in Debtor's bankruptcy case, just the way the bankruptcy process is intended to work. *Id.* At ¶24.

17.    The Bankruptcy Code was drafted with certain checks and balances by providing to each of the constituencies that are involved in a bankruptcy case various rights and leverage in order to promote negotiations and consensual resolution of bankruptcy cases.   Faced with the choice of forfeiting the Property to foreclosure or entering the Lock Up and Plan Support Agreement to permit the Debtor to enter these proceedings and avail itself, as well as all creditor constituencies, of these rights and protections, the Debtor chose these proceedings and the checks and balances provided by the Bankruptcy Code are clearly working in this case.   The Second Lien Lenders have been afforded ample opportunity to voice their concerns.   Rather than being bound to an intractable document, the parties to the Lock Up and Plan Support Agreement have proven to be flexible and willing to renegotiate, thus better serving the interests of all parties, including the Debtor, just as envisioned by the Code.

18.    In the very short period since the Petition Date, the Debtor has negotiated new terms with the parties to the Lock Up and Plan Support Agreement for both the Bidding Procedures and the Plan.   FX anticipates filing its revised Bidding Procedures Motion with the Court

VG1 40674v1 06/02/10

1   shortly.  FX has succeeded in negotiating revised terms for the bidding procedures that will (i)

2   allow any potential purchaser, who is financially qualified, to bid on the assets on the same terms

3   (including First Lien Lenders provided financing) as LIRA was previously offered, (ii) eliminate

4   the $256 million dollar cash bid and (iii) provide for the sale of the Properties through a

5   confirmed plan.  LIRA while permitted to make a bid, will not even receive a break up fee as

6   "stalking horse" despite the cost it incurred in connection with this case which, if the court so

7   approves, will have resulted in a fair auction process.  The revised plan will provide for the

8   payment of all non-subordinated unsecured claims in addition to priority and administrative

9   expense claims.  *Id.* at ¶25

10          19.     Although the Lock Up and Plan Support Agreement was a permissible and legal

11  means to avoid forfeiture of the Properties and to set forth the terms of a plan and other

12  procedures and motions to be filed with the Court, because both NexBank and Huff have based

13  their requests to terminate exclusivity and to appoint a chapter 11 trustee on the existence of the

14  Lock Up and Plan Support Agreement and its perceived, albeit non-existent, control over the

15  Debtor's actions in this case, the termination of that agreement, in conjunction with the

16  substantially modified proposed bid procedures, demonstrates that all alleged concerns raised by

17  Huff and NexBank were baseless and in any event, no longer exist.

18  **III.   ARGUMENT**

19          **A.      A Strong Presumption Exists Against Appointment of a Chapter 11 Trustee**

20          20.     Most Courts have held that the party seeking appointment of a trustee has the

21  burden of establishing the need for such appointment by clear and convincing evidence.  *See In*

22  *re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3rd Cir. 1989); *In re PRS Insurance Group, Inc.,*

23  274 B.R. 381,384 (Bankr. D. Del. 2001); 7 *Collier On Bankruptcy* § 11.04[2][b] (15th ed. Rev.

24  2007).  The appointment of a Chapter 11 trustee is an "extraordinary remedy".  *In re Ionosphere*

25  *Clubs, Inc.,* 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990).  The appointment of a trustee "should be

26  the exception, rather than the rule." *Sharon Steel* at 1226 (citations omitted).  Although section

27  1104(a)(1) requires appointment of a trustee if the court finds cause, such a determination is

28  within the court's discretion.  *Id.*  Moreover, this determination must overcome the strong pre-

sumption that a debtor is entitled to remain in possession during the chapter 11 case:

> It is the debtor, presumably, who knows his own business. Consequently, the appointment of a trustee will generally necessitate the replacement of the current experienced management with those probably less familiar with the field at a time when the enterprise itself is usually tottering on the brink of financial collapse. In addition, the trustee will usually need to hire an attorney both of whom will be entitled to compensation from the estate. Accordingly, the appointment of a trustee is considered an extraordinary remedy to be awarded judiciously.

*In re Bonded Mailings, Inc.,* 20 B.R. 781, 785-86 (Bankr. E.D.N.Y. 1982) (citations omitted).

As a result, the decision regarding whether or not to appoint a trustee is one that must be made in consideration of the totality of the circumstances, on a case by case basis. *Sharon Steel* at 1225-26. Under too rigid and literal of an approach, "the court would be forced to appoint a trustee in most chapter 11 cases." *In re General Oil Distrib., Inc.,* 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984). However:

> A determination of whether sufficient 'cause' exists to appoint a trustee compels the court to eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interest.

*Id.* at 408 (quotations omitted). In deciding a motion to appoint a Trustee, the Court stated:

> Beside the dislocation caused by the appointment of a trustee, the Court must also consider the cost of the trustee and balance the harm of such an appointment against the benefits of a trustee's appointment. The Court must weigh all of the factors and interests carefully because the appointment of a trustee is an extraordinary remedy which will cause additional expense to the estate.

*Schuster v. Dragone*, 266 B.R. 268, 271 (D. Conn. 2001) (*citing General Oil*, 42 B.R. at 409; *In re North Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991)).

### B.    A Trustee Cannot Be Appointed as Huff Failed to Meet its Burden of Proof Under 11 U.S.C. § 1104(a)(1)

21.    The Bankruptcy Code provides for the court's appointment of a trustee for the following reasons:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after commencement of the case,

8

or similar cause . . .;

(2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, . . . ; or

(3)  if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or examiner is in the best interests of the creditors and the estate.

11 U.S.C. §1104(a).  The party moving for the appointment of a trustee must prove its grounds by clear and convincing evidence.  See *In re Sharon Steel Corp.*, 871 F.2d 1212, 1226 (3rd Cir. 1989).  *Adams v. Marwil (In re Bayou Group LLC)*, 564 F.3d 541, 546 (2nd Cir. 2009) (burden of proof is clear and convincing evidence).

22.  Huff does not and can not assert any of the "bad acts" for which most courts assert  a trustee is necessary.  *In re Real Estate Partners, Inc.*, 2009 U.S. Dist. LEXIS 97064 *3 (C. D. Cal. October 5, 2009) (Appellant did not prove fraud, dishonesty, incompetence or mismanagement so as to warrant appointment of a trustee); *In re BIBO, Inc.*, 76 F.3d 256, 257 (9th Cir. 1995) (Trustee appropriate when determined that insider was siphoning money out of the debtor by means of a kickback scheme); *In re Russell*, 60 B.R. 42 (Bankr. W.D. Ark. 1985) (sale immediately before the filing of the bankruptcy structured to avoid claims of creditors raised inference of fraud justifying appointment of trustee).

23.  Huff seems to imply that a trustee should be appointed due to gross mismanagement of the Debtor relying on the First Lien Lenders' pre-petition motion for appointment of a rent receiver.  *Huff Motion* at ¶ 15.  However, the Order allowing the appointment of a receiver was entered without an actual finding of mismanagement of any kind by the state court.  Had the factual allegations necessary for the appointment of the receiver been litigated, Debtor would have vigorously disputed any allegations of mismanagement or excessive fees.  *See also Nelson Declaration at* ¶16-19.  Moreover, the Debtor's Properties have been managed by Cushman & Wakefield, and not the Debtor, for the nine (9) months preceding the Petition Date.  *See Nelson Declaration,* ¶¶ 18-20.  By Order of this Court on May 13, 2010 at Docket No. 217, FX was authorized to continue to employ Cushman & Wakefield as its property manager.  Although

9

1    Debtor maintains there was no mismanagement at all, simple mismanagement or disagreement

2    with the Debtor-in-Possession's business judgment will not, per se, constitute grounds for the

3    appointment of a trustee.  *See In re Anchorage Boat Sales, Inc.*, 4 BR 635, 645 (Bankr. E.D.N.Y.

4    1980); *In re Eichorn*, 5 BR 755, 758 (Bankr. E.D. Mass. 1986).

5         24.    Nowhere does Huff assert facts that are sufficient for the appointment of a chapter

6    11 trustee under 1104(a)(1).  The only allegation that Huff asserts as a "cause" for appointment

7    of a trustee is the existence of the Lock Up and Plan Support Agreement.[3]  *Huff Motion at ¶2-7.*

8    Because the Lock Up and Plan Support Agreement has been terminated, even the specious basis

9    for Huff's Motion to Appoint a Trustee no longer exists.   Also <u>see</u> *In re Cumberland Investment*

10   *Corp.*, 118 BR 3, 7 (Bankr. D.R.I. 1986) ( broad and pervasive course of debtor post petition

11   misconduct, in contravention and disregard of numerous court orders, requires the appointment

12   of a trustee.).

### C.    Appointment of a Chapter 11 Trustee Is Not in the Interests of the Creditors, Equity Security Holders or the Estate Under 1104(a)(2)

15        25.    Huff cites to 1104(a)(2) and incorrectly argues that the appointment of a trustee in

16   this chapter 11 case is in the interests of creditors, any equity security holders, and other interests

17   of the estate.

18        26.    Huff asserts that the Debtor has breached its fiduciary duties to the creditors and

19   the shareholders, citing solely to the Lock Up and Plan Support Agreement, *Huff Motion* at ¶25-

20   27, and asserts that directors Torino, Kanavos an Sillerman "directed and/or manipulated the rest

21   of FXRE's board of directors to sell the Properties to Newco . . .".  Id. at ¶34.  However, they

22   present no evidence of such manipulation or any other support for their allegations.

23        27.    In the present case, the board members who have a controlling interest in LIRA,

24   did not participate in the voting concerning the Lock Up and Plan Support Agreement or the

25   approval of the Debtor to sell the Properties to LIRA.  Nelson Declaration at ¶ 21.  In fact, the

26   filing of the bankruptcy case and approval of the Lock Up and Plan Support Agreement were

---

[3] And yet, Huff admits that it has entered into its own lock up agreement with the Second Lien Lenders to propose or support a plan of reorganization. *Huff Motion at ¶9.*

VG1 40674v1 06/02/10

both approved by the independent directors of FXRE. *Id.* at ¶21. Therefore, the decision by the independent board directors to enter into the Lock Up and Plan Support Agreement was within the sound business judgment of the independent board of directors and was not a breach of the Debtor's fiduciary duties. See *In re Dwight's Piano Company,* 424 B.R. 260 (S.D. Ohio 2009). Moreover, since the Lock Up and Plan Support Agreement has been terminated, Huff's specious allegations regarding the Debtor's breach of its fiduciary duties can not stand.

28.    The cases cited by Huff in support of their request are inapposite. The *Bush Industries* case, upon which Huff relies most heavily, arose in the context of confirmation of a plan of reorganization that was predicated on a lock up agreement, not on a motion for the appointment of a trustee. More importantly, confirmation was denied **not** because of the lock up agreement *per se*, but because the lock up agreement contained an extended employment agreement for an insider director that was impermissible and evidenced self-dealing, in contravention of the debtors fiduciary duties. *In re Bush Industries, Inc.,* 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004).

29.    Specifically, Mr. Bush, the insider who directly benefited by his revised and greatly enlarged employment agreement, directly negotiated the employment agreement with the board members of the debtor and then, as the chairman of the board, voted to accept the lock up agreement which contained his employment agreement. Thereafter, he resigned, but continued to receive his compensation at the rate of approximately $630,000 per year, in addition to other benefits. In addition, other officers and directors of the board secured personal bonuses as part of the lock up agreement. *Id.* At 306.

30.    The Court's discussion of the lock up agreement in *Bush* is instructive.

> The Lock Up and Voting Agreement established the terms of the debtor's plan and obligated its signatories to promote and support confirmation. Noting that the agreement precluded consideration of any alternative plan, the Equity Committee contends that the debtor effectively limited its ability to seek a greater return for shareholders. In the committee's view, this limitation represents a lack of good faith. I disagree. Life is not a computer simulation, through which one can test how variations of action will affect outcome. Perhaps shareholders might have enjoyed a greater

recovery without the limiting impact of the Lock Up and Voting Agreement.  On the other hand, this agreement also provided assurances of post-petition financing and of support for the plan by the only class of impaired creditors.  Without the Lock Up and Voting Agreement, the debtor might have been unable to effect any distribution to general unsecured creditors.  Nothing in the Bankruptcy Code requires a debtor to seek a distribution to the shareholders of a company that lacks equity value in excess of outstanding debt. . . . A lock up agreement does not *per se* indicate a lack of good faith.  In light of the risks attendant to the present case, **the debtor did not violate any duty of good faith by accepting a lock up agreement that would effectively limit competing options**.

*Id.* at 303-304 (emphasis added).

31.    Like the *Bush Industries* case, the Lock Up and Plan Support Agreement entered into by the Debtor was the result of, in part, limited options.  The Lock Up and Plan Support Agreement provided the Debtor the funding and opportunity to avoid forfeiture of its assets and engage in a process to sell its assets for the best price possible under the circumstances.  As drafted and effectuated, it does not violate any duty of good faith by the Debtor nor does it violate any fiduciary duty the Debtor has to its creditors and shareholders.

32.    Moreover, the *Bush Industries* case states that, with regard to fiduciary duties, "when a director or other officer benefits himself at the expense of the corporation, he breaches his duty to the shareholders by preventing them from realizing their expectations to share fairly in the corporate fortunes."  *Id*. At 306 (emphasis added).  In the present case, there was no benefit to LIRA or the individual owners of LIRA at the expense of the Debtor.  In *Bush,* the  insiders were not providing any value to the debtor for what they were receiving as Bush was receiving additional expanded compensation to provide the services he had been providing prepetition.  Here, LIRA was paying valuable consideration in excess of nineteen million dollars cash (plus a restructured $244 million mortgage loan) for the Debtor's assets which they were purchasing pursuant to the plan if a better offer was not received.  They were paying in excess of the value of the Property.  Moreover, pursuant to the anticipated revised bidding procedures, all potential bidders, will bid on a "level playing field".  Thus, all of the proceeds of the bidding process will

inure to the benefit of the Debtor and its creditors.  Unlike in *Bush Industries* where the insiders were "getting something for nothing", in this case LIRA is basically "getting nothing for something" if it is outbid for the assets after having incurred substantial expense to produce such a sale.

33.    Huff urges this court to decide that "the Controlling Insiders' scheme to wrest ownership of the Property from the Debtor for themselves (through Newco), at the expense of the Debtor and FXRE's other shareholders, represents the same type of self-dealing and breach of fiduciary duties that was present in <u>Bush Industries</u>." *Huff Motion* at ¶32.  However, for the reasons discussed *supra,* and as this Court noted at the hearings on May 10, 2010, in order to have a breach of fiduciary duty with regard to a corporate opportunity, the Debtor must have had the financial wherewithal to exercise the corporate opportunity in the first place.  *Transcript of Hearing Before Judge Markell on May 10, 2010*, page 153, lines 19-20.  The Debtor did not have any resources to exercise this opportunity.

34.    The bankruptcy process of checks and balances, in fact, provided the protection that it was intended to provide as demonstrated by the revised bid procedures which provide a "level playing field", elimination of any perceived purchase advantage to the "insiders" who own LIRA and the peaceful termination of the Lock Up and Plan Support Agreement.  All concerns which led to the denial of the first proposed bid procedures have now been addressed.

35.    The other cases cited by Huff in support of its argument are also inapposite.  The court in *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008) appointed a trustee because the principal of the debtor and its lawyers secretly transferred real properties, and then misled the opposing parties and the court as to the existence of that transaction.  *Id.*  It was the secret transfers in the *Ridgemour* case that were evidence of the breach of fiduciary duty on behalf of the debtor that constituted cause for the appointment of the Trustee.  *Id.*  There have been no secret transactions or transfers of estate property by the Debtor in this case and none have been alleged.

36.    *In re Bellevue Place Assoc*. concerned the appointment of a chapter 11 trustee as the Court had found that the debtor had signed away all of its rights as a debtor in possession and

VG1 40674v1 06/02/10

handed over the bankruptcy case decisions to the hotel management company.  171 B.R. 615, (Bankr. N.D.Ill. 1994).  As set forth hereinabove, the Lock-up and Plan Support Agreement does not abdicate the duties of FX to the First Lien Lenders, and, in any event, has been terminated.  In the *Hawaiian Airlines* case, the court appointed a chapter 11 trustee for cause in response to a prepetition tender offer and large fraudulent transfer that had taken place.  2003 WL 22945906 (Bankr. D. Hawaii May 16, 2003).  There are no actions that have been taken by FX, either prepetition or post petition, which warrant the appointment of a chapter 11 trustee.

37.    *In re Bidermann Industries U.S.A. Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) also does not advance the case for the appointment of a trustee.  In fact, *Bidermann*, relying on *In re Wingspread Corporation*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988), specifically states that sales to fiduciaries in chapter 11 are not *per se* prohibited, only that they are subject to heightened scrutiny.[4]  In the present case, there is no cause for a trustee.

**D.    The Harm Caused by the Disruption of the Appointment of a Trustee Will Exceed any Perceived Benefit**

38.    It is unclear from the Huff Motion or otherwise what a chapter 11 trustee could bring to this case, or what protection a trustee could provide to the interests of either creditors or equity holders, that is not already being provided or protected by the Bankruptcy process itself.  Appointment of a trustee at this juncture, especially without cause, will result in a significant cost to the estates with no reciprocal or demonstrable benefit.  See *In re L & S Goods & Co.*, 8 BR 312, 314 (Bankr. N.D. W. Va. 1980 (Court to engage in a cost-benefit analysis in order to determine whether appointment of trustee would be in interests of creditors, equity security holders and other interests of the estate); *In re Eichorn*, 5 BR 755, 758 (Bankr. D. Mass 1980) (Costs and benefits of appointment of a chapter 11 trustee must be analyzed.

39.    Given the financial facts of this case-- a debt due the First Lien Lenders of over

---

[4]  In *Bidermann*, the proposed purchaser of the business, Marsal, was the person that was hired for the specific purpose of enhancing the value of the business, and it was his obligation to ensure that the debtors received the highest and best offer available for the business.  *Id.* at 551.  Nonetheless, the debtor decided to sell the assets to Marsal, but they made that decision without any test of the marketplace for other expressions of interest.  *Id.*    As the *Bidermann* court stated, the proposed sale should have followed an intensive effort to find the best price obtainable.  Therefore, the court determined that the sale, and the excessive break up fee, could not be approved.  The court, however, did not appoint a chapter 11 trustee.

VG1 40674v1 06/02/10

$268 million, total debt of over $460 million, and Properties worth between $137 and $236 million-- a trustee is likely to perceive abandonment of the Properties as its most rational and logical choice—which would not inure to the benefit of any constituency other than the First Lien Lenders.

40.     Considering that this case has been filed for a mere forty-two (42) days, and there is no fraud, misconduct, gross mismanagement or any other type of "bad" action alleged against the Debtor, it is in the best interests of all of the bankruptcy estate constituencies to deny Huff's request for the appointment of a chapter 11 trustee and allow the balancing of the various competing interests that exist in a bankruptcy proceeding, by statutory design, to work.

**IV.     RESERVATION OF RIGHTS**

41.     The Debtor expressly reserves all of its respective rights to supplement, amend, or augment its Opposition.

**V.     CONCLUSION**

WHEREFORE, for the foregoing reasons, the Debtor submits that Huff has failed to establish cause for the appointment of a chapter 11 trustee and has failed to establish the appointment of a chapter 11 trustee is in the interests of the creditors, equity holders and the Debtor under 1104(a), and respectfully requests that the Court deny the Motion in its entirety and grant such other relief as this Court deems just and proper.

DATED this 2nd day of June, 2010.

**FOX ROTHSCHILD LLP**

By:    */s/Brett Axelrod*
      BRETT A. AXELROD, ESQ.
      Nevada Bar No. 5859
      HAL L. BAUME, ESQ.
      (Admitted Pro Hac Vice)
      3800 Howard Hughes Parkway, Suite 500
      Las Vegas, Nevada 89169
      Telephone: (702) 262-6899
      *Counsel for FX Luxury Las Vegas I, LLC*

VG1 40674v1 06/02/10