Rodney M. Jean, NBN 1395
rjean@lionelsawyer.com
Susan L. Myers, NBN 5078
smyers@lionelsawyer.com
LIONEL SAWYER & COLLINS
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-8888 (Telephone)
(702) 383-8845 (Fax)

And

Andrew V. Tenzer (admitted pro hac)
atenzer@shearman.com
Randall L. Martin (admitted pro hac)
Randall.martin@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022
(212) 848-4000 (telephone)
(212) 848-7279 (facsimile)

*Attorneys for Landesbank Baden - Wűrttemberg, New York Branch*

E-filed On June 2, 2010

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:,<br><br>FX LUXURY LAS VEGAS I , LLC, a Nevada limited liability company,<br><br>    Debtor.<br><br>    Defendant | Case No. BK-S-10-17015-BAM<br>Chapter 11<br><br>Date: June 11, 2010<br>Time:  9:30 a.m. |

**OBJECTION OF LANDESBANK BADEN-WÜRTTEMBERG, NEW YORK BRANCH, TO MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Landesbank Baden-Württemberg, New York Branch, as successor administrative and collateral agent (the "**First Lien Agent**") for the first lien lenders (the "**First Lien Lenders**")

/ / /

/ / /

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

under the First Lien Credit Agreement,[1] by and through its undersigned counsel, files this Objection (this "**Objection**") to the *Motion for Appointment of a Chapter 11 Trustee* (the "**Trustee Motion**")[2] [Docket No. 112], filed in the chapter 11 bankruptcy case of the above-captioned debtor (the "**Debtor**") by The Huff Alternative Fund, L.P. and The Huff Alternative Parallel Fund, L.P. (collectively, "**Huff**") and joined by NexBank, SSB as successor administrative agent and collateral agent (the "**Second Lien Agent**") for the second lien lenders (the "**Second Lien Lenders**") under the Second Lien Credit Agreement[3] and certain of the Second Lien Lenders[4] (collectively with Huff and the Second Lien Agent, the "**Second Lien Group**") pursuant to *NexBank's and Certain Second Lien Lenders' Joinder in the Huff Alternative Fund, L.P.'s and the Huff Alternative Parallel Fund, L.P.'s Motion for Appointment of a Chapter 11 Trustee* [Docket No. 256] (the "**Joinder**"). In support of this Objection, the First Lien Agent hereby represents as follows:

## I.    Preliminary Statement

There can be little doubt that the Trustee Motion was filed with three goals in mind, none of which are consistent with the Bankruptcy Code. First and foremost, Huff and the Second Lien

---

[1] The term "**First Lien Credit Agreement**" refers to that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended from time to time), by and among: FX Luxury Las Vegas I, LLC (f/k/a Metroflag BP, LLC); FX Luxury Las Vegas II, LLC (f/k/a Metroflag Cable, LLC); FX Luxury Las Vegas Parent LLC (f/k/a BP Parent, LLC), the First Lien Lenders from time to time party thereto; and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent.

[2] Capitalized terms used in this Objection and not otherwise defined herein shall have the meanings ascribed to such terms in the Trustee Motion.

[3] The term "**Second Lien Credit Agreement**" refers to that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended from time to time), by and among: FX Luxury Las Vegas I, LLC (f/k/a Metroflag BP, LLC); FX Luxury Las Vegas II, LLC (f/k/a Metroflag Cable, LLC); FX Luxury Las Vegas Parent LLC (f/k/a BP Parent, LLC), the Second Lien Lenders from time to time party thereto; and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent.

[4] The Joinder was filed, in addition to the Second Lien Agent, by Five Mile Pooling International LLC; FMC Real Estate CDO 2005-1 Master Trust, Series C; Spectrum Investment Partners, L.P.; and Transamerica Life Insurance Company.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

2

Group seek the appointment of a trustee in order to terminate the Debtor's exclusivity period pursuant to Bankruptcy Code section 1121(c)(1) so they can file a cram down plan – a result that it otherwise cannot achieve under the Bankruptcy Code sections designed to protect a debtor's exclusivity period. Second, the Second Lien Group hopes that a trustee, through surcharging the Debtor's property, would finance a case that the Second Lien Group has showed no interest in financing itself (notwithstanding that it demands that the case must be run for its benefit). Third, the Trustee Motion is designed to oust the Debtor's management as punishment for their unwillingness to engineer a recovery for the out-of-the-money Second Lien Group and for having pursued instead a plan that is more likely to be confirmed.

Most of the arguments advanced by Huff and the Second Lien Group point to an alleged conspiracy between certain of the Debtor's ultimate owners and the First Lien Lenders that resulted in an allegedly "rigged" bidding process for the Debtor's assets.[5] It is also asserted that in constructing such a process, the Debtor has breached its fiduciary duties. These allegations, which the First Lien Lenders dispute, are now moot. The Lockup Agreement,[6] which formed the entire basis for the Trustee Motion, has been terminated. The Debtor has proposed a completely open and unrestricted marketing process – financed by the First Lien Lenders' consent to use of their collateral – that eliminates any purported advantage to any bidder and which does not bestow stalking horse protections on the Debtor's insiders. LIRA has not been presented as a

---

[5] The Second Lien Group declines to explain why they elected not to participate in the allegedly "too good to be true" offer of financing which has been recently offered to them and which was offered to them in the past, on terms more favorable than those which were offered to LIRA (as defined below). See 10-K of FX Real Estate and Entertainment, Inc. ("**FXRE**") for the fiscal year ended December 31, 2009 attached as Exhibit B to the Trustee Motion for a description of a proposed transaction among the Debtor, LIRA, the Second Lien Group and the First Lien Lenders.

[6] The term "**Lockup Agreement**" refers to that certain Lock Up and Plan Support Agreement, dated as of October 27, 2009 (as amended from time to time), by and among the Debtor and certain of its predecessor affiliates, the First Lien Lenders, the First Lien Agent, LIRA Property Owner, LLC ("**LIRA**") and LIRA LLC.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

3

lead bidder and must participate, if it does so at all, on the same terms as any third party interested in the Debtor's assets. The Second Lien Group also urges the Court to appoint a trustee because the Debtor supposedly violated a fiduciary duty to create recovery for out-of-the-money subordinated creditors and equity holders at the expense of undersecured senior creditors. This ridiculous concept of fiduciary duty, for which the movants cite no supporting case law or statute, suggests that a debtor proposing to pay its senior secured creditors first and its junior creditors second should be dispossessed of control of the estate. Finally, the Trustee Motion asks this Court to protect the movants from the results of a state law foreclosure. In their view, a trustee should be appointed so that this case cannot be dismissed to allow the First Lien Lenders to realize the value of their collateral in a state court foreclosure proceeding which could wipe out the Second Lien Group. This makes little sense; there is nothing in the Bankruptcy Code which requires a trustee to oppose (or consent to) a dimissal of a chapter 11 case or relief from the automatic stay. Coupled with their theory regarding the mandatory nature of a cram down plan, the Second Lien Group essentially wants this Court to create a legal landscape in which a secured creditor with perfected first priority liens on all of a debtor's assets cannot realize the full value of its collateral. This Court should decline to rewrite the bankruptcy and foreclosure laws in this unprecedented manner. The Trustee Motion should be denied.

**II.    The Appointment of a Trustee is an Extraordinary Remedy**

The appointment of a trustee is an extraordinary remedy that runs counter to the overarching presumption that a chapter 11 debtor should remain in possession of its assets and operations while it is given the opportunity to reorganize or conduct an orderly wind down. *See, e.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule") (citations omitted); *In re North*, 212 Fed.Appx. 626 (9th Cir. 2006) (noting that "the appointment of a Chapter 11 trustee

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

4

is an extraordinary measure…"); *Schuster v. Dragone (In re Dragone)*, 266 B.R. 268, 271 (D. Conn. 2001) ("the appointment of a trustee under Chapter 11 is the exception rather than the rule and… an extraordinary remedy") (citations omitted); *In re McCorhill Pub.*, 73 B.R. 1013, 1016-1017 (Bankr. S.D.N.Y 1989) ("The appointment of a trustee in a Chapter 11 case is not the usual procedure…. appointment of a trustee is an extraordinary remedy which will cause additoinal expense to the estate").

Because appointment of a trustee is disfavored, any party seeking such relief must meet a high evidentiary standard. A movant must show by *clear and convincing evidence* that one of the prongs of section 1104 of the Bankruptcy Code has been satisfied. *See, e.g.*, *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The party moving for appointment of a trustee . . . must prove the need for a trustee under either subsection [of section 1104(a) of the Bankruptcy Code] by clear and convincing evidence") (citations omitted); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502, 507 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. N.J. 2004) ("In every motion to appoint a trustee under section 1104(a), the movant must prove the need for a trustee by clear and convincing evidence") (citations omitted); *In re Adelphia Commc'ns. Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ("A party seeking appointment of a trustee has the burden of showing, by clear and convincing evidence, cause under section 1104(a)(1) or the need for a trustee under section 1104(a)(2)").

In *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261 (1990), the Supreme Court defined the applicable "clear and convincing evidence" standard to require evidence that "'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

5

precise facts in issue.'" *Id.* at 285 n.11 (citation omitted). The Second Lien Group cannot meet this onerous standard and therefore the Trustee Motion must fail.

**III.    The Revised Bidding Procedures and the Termination of the Lockup Agreement Render Moot the Second Lien Group's Arguments Concerning Unfair Treatment of Bidders**

Many of the arguments raised in the Trustee Motion are based on allegations that the Debtor, through the Lockup Agreement and the bidding procedures originally proposed, created a process that unfairly advantaged a group of persons referred to as the "Insiders" (*i.e.*, the principals of LIRA). These allegations, while without merit, are moot because the Lockup Agreement has terminated and the Debtor has submitted for Court approval substantially revised bidding procedures (the "**Revised Bidding Procedures**"). The Revised Bidding Procedures create an open and transparent process in which stakeholders and third parties can bid for the Debtor's assets on an equal footing. These procedures permit all qualified parties to submit bids for the assets, including bids predicated on favorable financing provided by the First Lien Lenders, without any minimum bid threshold.[7] The Insiders, if they choose to bid on the Debtor's assets, will not have their bid accorded special treatment, nor will they receive common protections such as expense reimbursement or a break-up fee. Furthermore, the termination of the Lockup Agreement means that the Debtor and First Lien Lenders owe no contractual obligations to the Insiders that could possibly be construed to favor the LIRA bid. Even if the

---

[7] As described in greater detail in footnote 11 of the *Objection of Landesbank Baden-Württemberg, New York Branch, to Motion of NexBank, SSB and Certain Second Lien Lenders for Order Terminating Exclusivity* (the "**Exclusivity Termination Objection**") filed by the First Lien Agent concurrently with this Objection, the Second Lien Group was invited to prequalify to submit a bid that would be financed on terms being made available to LIRA, but notwithstanding their prior protest at having been prejudiced by the non-availability of such financing, they have taken no steps whatsoever to accept this offer to ensure that they would be eligible to bid.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Revised Bidding Procedures are not approved, the fact that the Debtor has proposed them addresses the concerns of the Second Lien Group and eliminates the need for a trustee.[8]

The Revised Bidding Procedures will draw out the best bids for the Debtor's assets through exposure to the market and test whether any value remains in the estate for the Second Lien Lenders. If the Second Lien Group truly believes the Insiders had previously struck a sweetheart deal, then they (and any other qualified party) are now free to submit a similar bid.[9] Conversely, if the Second Lien Group refuses to take part in the amended bidding process and continues to engage in time consuming and costly litigation, its participation in this chapter 11 case will be exposed for what it really is – an attempt by underwater, contractually subordinated creditors to extract undeserved value through litigation.[10]

---

[8] The Debtor and all of its key stakeholders, other than the Second Lien Group, have shown significant commitment to the case and maximizing the estate's value such that the presumption of the Debtor as debtor-in-possession should not be overcome, even if the Revised Bidding Procedures are not approved. The proposal of the Revised Bidding Procedures is evidence of the Debtor's willingness to negotiate and compromise in good faith which makes a trustee unnecessary in this case. *See*, *Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr. D. Me. 1982) (denying the appointment of a trustee while noting that "[t]here is evidence indicating that if the debtor is able to submit a feasible plan, then the largest secured creditors would be willing to work with current management in its effort to reorganize"). Additionally, as described in greater detail in footnote 7 of the Exclusivity Termination Objection, the termination of the Debtor's exclusivity (which would be attendant with the appointment of a trustee) because of the non-approval of the Revised Bidding Procedures would be premature.

[9] The process is now completely open to participation from FXRE and all of its shareholders, countering Huff's argument that non-Insider shareholders have been shut out of the process.

[10] Huff also asserts its claims as a minority shareholder of FXRE, an entity several levels upstream from the Debtor. Leaving aside the fact that there may not be, by Huff's own admission, enough value in the Debtor's estate to satisfy even *creditors* let alone equityholders (Trustee Motion at ¶ 5), it is not clear what standing Huff has as an equityholder in FXRE to complain about this chapter 11 case. Equity in FXRE is not equity in the Debtor. Thus, Huff cannot properly raise the arguments in the Trustee Motion in its capacity as an FXRE equityholder. The correct vehicle for any such complaint is not this chapter 11 case, but a derivative action against the management or directors of FXRE, which Huff has already commenced in the Supreme Court of the State of New York, County of New York. *Huff Alternative Fund et al v. Kanavos et al*, Index No. 10/650338 (filed April 28, 2010).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

7

**IV. The Trustee Motion was Filed with the Improper Aim of Terminating the Debtor's Exclusive Period to File and Confirm a Plan**

There can be no doubt that one of the chief aims of the Trustee Motion is to allow the Second Lien Group, whose members are party to their own lockup agreement, to terminate exclusivity pursuant to section 1121(c)(1) and to allow the filing of a cram down plan. The Trustee Motion alludes to this goal:

> "A chapter 11 trustee is required to thwart the Controlling Insiders' self-dealing and breach of fiduciary duties and to permit the termination of exclusivity so that all stakeholders will be treated fairly.
>
> Huff has committed, through its own lock-up agreement with the Second Lien Lenders, to propose or otherwise support a plan of reorganization…" Trustee Motion at ¶¶ 8-9.

For the reasons discussed in the Exclusivity Termination Objection, the termination of exclusivity under section 1121(d) in order to allow a junior creditor, who has contractually subordinated itself, to file a cram down plan (that is seemingly yet to be formulated) is unsupportable as a matter of law. To allow the same result to be achieved via appointment of a trustee would frustrate the purpose of the Debtor's exclusivity period. This is all the more true given that the factual bases for the requested relief are identical to the factual bases which fall short of the standard required to show "cause" to terminate exclusivity under Section 1121(d) of the Bankruptcy Code. This type of statutory "end around" should not be countenanced. *See In re Eagle-Picher Indus., Inc.*, 176 B.R. 143, 148 (Bankr. S.D. Ohio 1994) (where a motion under an alternative legal theory would have the same result as a motion to terminate exclusivity, the considerations disfavoring termination of exclusivity are "equally applicable" to any motion that would have the effect of terminating exclusivity).

/ / /

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

8

**V.     The Requirements of Section 1104(a) Have Not Been Shown by Clear and Convincing Evidence**

Under section 1104(a) of the Bankruptcy Code, only if a party in interest can satisfy, after notice and a hearing, one of three tests by a showing of *clear and convincing evidence*, is the appointment of a trustee justified. The Second Lien Group fails to fulfill this high burden of proof under each of the three tests.

*1. There Are No Clear and Convincing Grounds Under 1104(a)(1) to Appoint a Trustee*

Section 1104(a)(1) provides for the appointment of a trustee "for cause." The Second Lien Group argues that the Lockup Agreement and original bidding procedures constitute a breach of fiduciary duty by the Debtor's management sufficient to constitute "cause". This argument fails for at least two reasons.

*First*, the Lockup Agreement and original bidding procedures no longer exist, having been replaced by a process that cannot in any way be construed to favor LIRA. Because the Second Lien Group argues "cause" based almost exclusively on the allegedly preferential treatment afforded to LIRA by the old bidding process, its arguments are now moot because the Revised Bidding Procedures have completely obviated any need for a Trustee on this basis. The Second Lien Group has not offered any other significant arguments or evidence as to why the presumption against removing the Debtor from control of its operations should be overturned "for cause." In fact, there is nothing in the record or otherwise to suggest that the Debtor is

/ / /

/ / /

/ / /

/ / /

/ / /

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

exhibiting any of the statutory badges of "cause" under section 1104(a) (*i.e.*, "fraud, dishonesty, incompetence, or gross mismanagement.")[11]

*Second*, the Second Lien Group's fiduciary duty arguments appear to be based solely on the fact that the Debtor's subordinated creditors and the equityholders of FXRE stood to be wiped out under the Debtor's original plan. Stating this concern, the Second Lien Group complains that: "[i]nsiders have negotiated a deal with the First Lien Lenders that is *guaranteed* not to benefit the Debtor or FXRE's other shareholders and creditors." Trustee Motion at ¶ 27. This statement is false. The Debtor's sale could have generated a recovery for the Second Lien Group if a valuable bid was received.[12] But if no such bid was received, it shows merely that shareholders and junior creditors have nothing to complain of. Although it is true that fiduciary duties are owed to creditors in circumstances of insolvency, there is no rule of law which suggests that fiduciary duties compel a debtor or its officers and directors to pursue recoveries for subordinated creditors at the expense of secured creditors. To argue, as the members of the

---

[11] The Second Lien Group hints, but does not expressly argue under 1104(a), that the prepetition appointment of a receiver is a sign that the Debtor at one point was guilty of mismanagement. But any such argument, fails to account for the different treatment of prepetition receivers and post-petition trustees under the Bankruptcy Code, or for the presumption in favor of a debtor-in-possession. Section 542 explicitly requires the turnover by a prepetition receiver of estate property to the debtor, whereas section 1104(a) and related case law create a very high standard for the appointment of a post-petition trustee. Read together, and along with the general presumption that estates should be managed by debtors-in-possession, these sections do not suggest that the presence of a prepetition receiver implicates the appointment of a chapter 11 trustee. Indeed, section 542 would make little sense if prepetition appointment of a receiver constituted "cause" for appointment of a chapter 11 trustee.

Furthermore, section 1104(e) of the Bankruptcy Code provides that the United States Trustee "*shall* move for the appointment of a trustee under subsection (a) [of section 1104] if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in *actual fraud, dishonesty or criminal conduct* in the management of the debtor or the debtor's public reporting." That the United States trustee, who is obligated to move for appointment of a trustee in such circumstances, has not done so here is a telling indication that the Debtor and its management have not engaged in inappropriate behavior.

[12] The new bidding procedures also allow all such stakeholders the opportunity to submit a bid to acquire the Debtor's assets with generous financing to be provided by the First Lien Lender.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

10

Second Lien Group essentially do, that it may be a breach of fiduciary duty for a chapter 11 debtor to decline to pursue a recovery for its subordinated creditors and equity holders (even when they are out of the money), implicates fiduciary issues in all but "full payment" bankruptcies. And to suggest that a debtor must do so even when its assets are completely encumbered by the liens of a creditor which it cannot repay would require debtors to wage war against their secured lenders and the absolute priority rule. Indeed, if the Second Lien Group's theories on the nature of fiduciary duties are correct, then the filing of a chapter 11 plan that proposes to sell assets and distribute the proceeds in accordance with creditors' priorities must always be rejected in favor of a plan that crams down secured lenders and makes distributions to out-of-the-money constituencies. Similarly, management of any corporation that had allowed an undersecured creditor to foreclose would have done so in abdication of its fiduciary duties to file a bankruptcy and to seek to distribute equity to underwater stakeholders. This notion of fiduciary duty is absurd, and implies that courts have sanctioned decades of corporate wrongdoing by allowing debtors to sell assets to satisfy their creditors.

### *2. There Are No Clear and Convincing Grounds Under 1104(a)(2) to Appoint a Trustee*

Section 1104(a)(2) of the Bankruptcy Code permits a court to order the appointment of a trustee in chapter 11 case if – but only if – such appointment is in the best interests of the debtor's estate, its creditors and its equityholders. *In re Slettedland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001). This test looks not only to the best interests of the most junior creditors and equityholders, but also to the interests of more senior creditors and the Debtor itself. 7 Collier on BANKRUPTCY ¶1104.02[3][d], at 1104-14 (16th ED. REV. 2010) ("the 'interests' standard requires a finding that the appointment of a trustee would be in the interest of essentially all interested constituences… creditors cannot on their own obtain the appointment of a trustee under this provision in order to disenfranchise equity security holders or other interests…"). The analysis

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

under section 1104(a)(2) requires balancing of the benefits that an independent trustee might bring against the necessary expense and "learning-curve" that it also would entail. *See, In re Stein & Day, Inc.*, 87 B.R. 290, 295 (Banrk. S.D.N.Y.). The arguments put forth in the Trustee Motion fail to show by clear and convincing evidence that the section 1104(a)(2) test is met.

The Second Lien Group, in support of its section 1104(a)(2) arguments, again point to the now extinct Lockup Agreement and Original Bidding Procedures as signs that the Debtor has mismanaged its business to the point that a trustee is in *the Second Lien Lenders' best interests*. These are essentially the same arguments the Second Lien Group cites as "cause" under section 1104(a)(1). The best interests test, however, is *not* a "catch-all" provision for the appointment of a trustee when "cause" cannot be established. 7 Collier on BANKRUPTCY ¶1104.02[3][d], at 1104-15 (16th ED. REV. 2010) ("Few situations come to mind in which grounds will exist for the appointment of a trustee under subsection (a)(2) although 'cause' for such appointment does not exist under subsection (a)(1)").

Further, the Second Lien Group examines only the perceived benefits that the appointment of a trustee would accord *its members*, without analyzing the benefits and costs to other constituents or to the estate as a whole. Had they done so, they would have reached the inevitable conclusion that any negligible benefits a trustee might bring are outweighed by very substantial costs, which include (but are not limited to): (i) the actual costs to the estate of the trustee and its professionals' fees and expenses; (ii) the necessary loss of time as the trustee gets up to speed with the chapter 11 case; (iii) potential disruption and displacement of tenants (the estate's sole current source of income) as the trustee replaces current management; and (iv) increased litigation costs as the Debtor's exclusivity would be terminated and multiple contested plans would be filed. *See*, *Crescent Beach Inn*, 22 B.R. at 160 (refusing to appoint a trustee,

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

noting that "a trustee would impose a substantial financial burden on an already hard pressed debtor, and could preclude an effective reorganization due to resulting administrative expenses").

Moreover, the First Lien Lenders are funding this case through their consent to the use of their collateral. The First Lien Lenders are unwilling to finance a bankruptcy process where subordinated creditors and equityholders are permitted to propose an unconfirmable cramdown that would strain the estate's limited resources.[13] The loss of consensual use of cash collateral resulting from the appointment of a trustee would have adverse results on the estate. At a minimum, it would plunge the estate into a contested cash collateral battle and would result in the First Lien Lenders prosecuting their lift stay and dismissal motions.[14] The Second Lien Group is indifferent to these risks because they are effectively playing with other peoples' money, and perceive that they have nothing to lose. This is further proof that the appointment of a trustee is not in the best interests of the Debtor's estate.

Finally, there is no reason to believe that a trustee would do anything that the Second Lien Lenders cannot do themselves. If the Debtor is pursuing an "illegal" plan, this can surely be shown at confirmation. If a trustee was appointed, there is little reason to believe it would act differently than the Debtor is acting now. The notion that an independent trustee would choose the novel and aggressive approach to these cases that the Second Lien Group would prefer is speculative at best. More likely, the trustee would spend estate money and take considerable time, only to arrive at the same orthodox conclusion reached by the Debtor in this case: that the

---

[13]   The cash collateral order currently affords the First Lien Lenders the right to terminate the Debtor's use of cash collateral upon the appointment of a trustee. *Amended Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection* at ¶14 [Docket No. 83].

[14]   The First Lien Agent intends to file a motion (the "**Lift Stay Motion**") shortly after the filing of this Objection to lift the stay to permit foreclosure if exclusivity is terminated or if the Debtor's Revised Bidding Procedures are not approved.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

13

sale process supported by the First Lien Lenders is the best available strategy for maximizing and distributing value in this case.

### 3. There Are No Clear and Convincing Grounds Under 1104(a)(3) to Appoint a Trustee

Section 1104(a)(3) provides for the appointment of a trustee if "grounds exist to convert or dismiss the case under section 1112, but the court determines the appointment of a trustee or an examiner is in the best interest of creditors and the estate." The Trustee Motion urges that the Court could find grounds for dismissal under section 1112 because of the Insiders' alleged breach of fiduciary duty and self-dealing. For the many reasons discussed previously, these concerns have been alleviated by the open and fair bidding procedures that the Debtor is now proposing and by the termination of the Lockup Agreement. Moreover, this argument is premature since the Court has not yet heard arguments on whether dismissal is warranted in this case. "[S]ection 1104(a)(3) applies only when the court has already determined that the case should be dismissed or converted…" 7 Collier on BANKRUPTCY ¶1104.02[4][a], at 1104-17 (16th ED. REV. 2010). To permit the appointment of a trustee under Section 1104(a)(3) at this juncture in the case serves to rob parties of the ability to fully respond to the merits of a dismissal request.[15]

Further, the Second Lien Group's arguments in favor of a trustee appointment under section 1104(a)(3) are telling of its true intentions in this chapter 11 case. The Second Lien Group asserts that a trustee is a more appropriate remedy than a dismissal under Section 1112(b) because a dismissal would permit the "extinguishment of [junior creditors' and equityholders'] interests through a foreclosure…" Here, by admitting that it would receive nothing in a

---

[15] The First Lien Lenders reserve all arguments with respect to any potential dismissal of this chapter 11 case including those raised or to be raised in the Lift Stay Motion. The First Lien Lenders only argue at this time that the Second Lien Group's dismissal arguments under Section 1104(a)(3) are not yet ripe because no dismissal motion had been noticed or briefed in respect of the dismissal of this case when the arguments were raised.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

14

foreclosure proceeding, the Second Lien Group acknowledges that its members' interests are completely out-of-the-money. Nonetheless, they continue to wage a litigation battle against the Debtor and the First Lien Lenders in an attempt to extract value for themselves, while ignoring a legitimate opportunity to do so via the Revised Bidding Procedures. Furthermore, this argument depends upon yet another variant of the Second Lien Group's theory that a cram down plan must always be pursued in favor of any alternative which would allow a secured lender to realize the full value of its collateral (which is, in fact, the appropriate result whether under the Bankruptcy Code or applicable state law). If the Second Lien Group is correct that a case cannot be dismissed when it would result in a foreclosure that would wipe out equity, then a secured creditor would never be able to foreclose over the objection of an owner who has not satisfied its debts. Once again, Huff and the Second Lien Group have the law *backwards*: the lack of equity in property is an expressly sanctioned basis for a lifting of the stay under Section 362(d)(2) to allow foreclosure and dismissal of a case.

**VI.    Conclusion**

For all of the above reasons, the First Lien Agent respectfully requests that this Court sustain this Objection and deny the relief requested in the Trustee Motion.

/ / /

/ / /

/ //

/ / /

/ / /

/ / /

/ / /

/ / /

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

15

WHEREFORE, the First Lien Agent respectfully requests that this Court (i) enter an order denying the Trustee Motion, and (ii) grant such other and further relief as is just and proper.

Dated: June 2, 2010.

                          LIONEL SAWYER & COLLINS

                          By:   /s/   Rodney M. Jean
                                Rodney M. Jean, NBN 1395
                                Susan L. Myers, NBN 5078
                                1700 Bank of America Plaza
                                300 South Fourth Street
                                Las Vegas, Nevada 89101

                          Attorneys for Landesbank Baden- Württemberg, New York Branch

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888