## * * § 362 INFORMATION COVER SHEET * *

FX Luxury Las Vegas I, LLC                    10-17015
DEBTOR                                        Case No:              MOTION #:
  Landesbank Baden-Wurttemberg                CHAPTER: 11
MOVANT

| *Certification of Attempt to Resolve the Matter Without Court Action:* |
|---|
| *Moving counsel hereby certifies that pursuant to the requirements of LR 4001(a)(2), an attempt has been made to resolve the matter without court action, but movant has been unable to do so.* |
| *Date:* July 9, 2010          *Signature:* Rodney M Jean |
| *Attorney for Movant* |

PROPERTY INVOLVED IN THIS MOTION: APN Nos. 162-21-301-001, 003, 009, 014, 016
NOTICE SERVED ON:  Debtor(s) [✓] ; Debtor's counsel [✓] ; Trustee [✓] ;
DATE OF SERVICE:

| MOVING PARTY'S CONTENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| The EXTENT and PRIORITY of LIENS: | The EXTENT and PRIORITY of LIENS: |
| 1st $270,752,852.35 | 1st $268,115,868.07 |
| 2nd 220,813,998.97 | 2nd $220,813,998.97 |
| 3rd | 3rd |
| 4th | 4th |
| Other: | Other: |
| Total Encumbrances: $491,566,850 | Total Encumbrances: |
| APPRAISAL of OPINION as to VALUE: | APPRAISAL of OPINION as to VALUE: |
| $183,000,000 | $137,700,000 |

| TERMS of MOVANT'S CONTRACT with the DEBTOR(S):: | DEBTOR'S OFFER of "ADEQUATE PROTECTION" for MOVANT : |
|---|---|
| Amount of Note: $280,000,000 | . |
| Interest Rate:  variable | . |
| Duration:  18 months as extended | . |
| Payment per Month: | . |
| Date of Default: January 7, 2009 | . |
| Amount in Arrears: $270,752,852.35 | . |
| Date of Notice of Default: | . |
| SPECIAL CIRCUMSTANCES: | SPECIAL CIRCUMSTANCES: |
|   Per cash collateral stipulation | |
| SUBMITTED BY: Lionel Sawyer & Collins | SUBMITTED BY: |
|            Rodney M. Jean | SIGNATURE: |

Rodney M. Jean, NBN 1395
rjean@lionelsawyer.com
Susan L. Myers, NBN 5078
smyers@lionelsawyer.com
LIONEL SAWYER & COLLINS
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-8888 (telephone)
(702) 383-8845 (facsimile)

And

Andrew V. Tenzer (admitted pro hac)
atenzer@shearman.com
Randall L. Martin (admitted pro hac)
randall.martin@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000 (telephone)
(212) 848-7279 (facsimile)

*Attorneys for Landesbank Baden-Württemberg, New York Branch*

**E-filed On July 9, 2010**

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re:,<br><br>FX LUXURY LAS VEGAS I , LLC, a Nevada limited liability company,<br><br>    Debtor. | Case No. BK-S-10-17015-BAM<br>Chapter 11<br><br>Date: July 21, 2010<br>Time: 1:30 p.m. |

**AMENDED MOTION OF LANDESBANK BADEN-WÜRTTEMBERG,**

**NEW YORK BRANCH, FOR RELIEF FROM AUTOMATIC STAY**

# Table of Contents

**Page**

**Memorandum of Points and Authorities** ............................................................................ 2

Preliminary Statement and Factual Background ................................................................ 2

I.     The Assertion That the First Lien Lenders "Voluntarily" Invoked This Court's Jurisdiction Are False and Irrelevant ........................................................ 8

II.    The Stay Must be Lifted Because the First Lien Lenders Cannot be Adequately Protected Against Any Actual or Threatened Decline in Their Interest in the Property ...................................................................................... 9

III.   The Stay Must be Lifted Because the Collateral of the First Lien Lenders Is Not Necessary For An "Effective Reorganization" ........................................... 14

     A.    The Stay Must Be Lifted Where A Junior Lender is The Primary Beneficiary Of a Proposed Cram Down Plan ......................................... 15

     B.    The Stay Must Be Lifted Because The Second Lien Lenders' Plan Is Patently Unconfirmable ............................................................... 18

         1.    The Proposed Interest Rate Is Too Low to Compensate for the Risk of the Proposed Loan, and Other Terms Are Insufficient to Protect the First Lien Lenders ................................................... 19

         2.    The Proposed Plan Does Not Provide the Senior Lenders an Opportunity to Credit Bid or to Match the Bid Made by the Second Lien Lenders ................................................................... 22

         3.    The Plan Contemplates a Sale of the Equity in the Debtor That Does Not Satisfy the Requirements of Bankruptcy Code Sections 363 and 1129(b) .............................................................. 24

         4.    The Plan Contemplates Prohibited "Disguised Distributions" ...... 24

         5.    The Plan Cannot Satisfy the Best Interests of Creditors Test ........ 25

         6.    The Plan Contemplates Impermissible "Gifts" To Manufacture A Vote From An Impaired Class ................................................. 26

         7.    The Plan Violates the Absolute Priority Rule and Does Not Satisfy the "New Value" Plan Requirements ................................. 27

         8.    The Plan Is Not Feasible ............................................................. 29

         9.    The Plan Has Not Been Proposed In Good Faith ......................... 31

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

i

10.    The Second Lien Group Will Cast its Votes to Approve a Self-Serving Acquisition and Such Votes Should Be Designated.................................................................................31

C.    The Intercreditor Agreement Prohibits the Second Lien Group Plan....... 33

IV.    Conclusion ............................................................................................. 34

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

## TABLE OF AUTHORITIES

### CASES

*In re 222 Liberty Assocs.*, 108 B.R. 971 (Bankr. E.D. Pa. 1990) .................................................22

*In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650 (9th Cir. 1997) .............................11, 17, 27, 28

*In re Arden Properties, Inc.*, 248 B.R. 164 (Bankr. D. Ariz 2000) .................................................11

*In re Balco Equities Ltd., Inc.*, 312 B.R. 734 (Bankr. S.D.N.Y. 2004) (Bankr. S.D.N.Y. 1994) ...........................................................................................................................10

*Bank of America National Savings Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999)...............................................................................................................27, 29

*In re Bonner Mall P'ship*, 2 F.3d 899 (9th Cir. 1993) .....................................................19, 27, 31

*In re Boulders on the River, Inc.*, 164 B.R. 99 (9th Cir. B.A.P. 1994)...................................16, 20

*In re California Hancock, Inc.*, 88 B.R. 226 (9th Cir. B.A.P. 1988)........................................19, 23

*In re D&F Constr. Co.*, 865 F.2d 673 (5th Cir. 1989)...........................................................18, 22

*In re DeTienne*, 2005 Bankr. LEXIS 3122 (citing *In re Manion*, 127 B.R. 887, 890 (Bankr. N.D. Fla. 1991))...........................................................................................16, 22

*In re Delaney-Morin*, 304 B.R. 365 (9th Cir. B.A.P. 2003) ...........................................................9

*In re Elmira Litho, Inc.*, 174 B.R. 892 (Bankr. S.D.N.Y. 1994).....................................................10

*In re Federal Support Co.*, 859 F.2d 17 (4th Cir. 1988)................................................................32

*In re Figter Ltd.*, 118 F.3d 635 (9th Cir. 1997) ...........................................................................32

*In re Gramercy Twin Assocs.*, 187 B.R. 112 (S.D.N.Y. 1995)......................................................15

*In re Jones*, 189 Bankr. 13, 15 (Bankr. E.D. Okl. 1995) ...............................................................10

*In re Kurth Ranch*, 97 B.R. 33 (Bankr. D. Mont. 1989) ................................................................19

*In re Landing Assocs., Ltd.*, 157 B.R. 791 (Bankr. W.D. Tex. 1993)............................................32

*In re Landry*, 1994 U.S. App. LEXIS 1559 (9th Cir. 1994) .........................................................20

*In re Larson, Inc.*, 300 B.R. 227 (Bankr. D. Del. 2003) ...............................................................25

*In re Las Vegas Monorail Co.*, 2010 WL 1688811 (Bankr. D. Nev. 2010) .................................12

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984).........................................................31

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

*In re Manion*, 127 B.R. 887 (Bankr. N.D. Fla. 1991) ...................................................21

*In the Matter of Holly's Inc.,* 140 B.R. 643 (Bankr W.D. M.I. 1992) ...........................10

*In re Miami Center Associates*, 144 B.R. 937 (Bankr. S.D. Fla. 1992) .................21, 22

*In re Monarch Beach Venture, Ltd.*, 166 B.R. 428 (C.D. Cal. 1993) ......................15, 22

*In re Olick*, 221 B.R. 145 (Bankr. E.D. Pa. 1998) ......................................................17

*In re Orchard Village Invs., LLC.*, 2010 Bankr. LEXIS 48 (Bankr. D. Or. 2010) ...................21, 22

*In re Orchards Village Investments, LLC*, 2010 WL 143706 (Bankr. D. Ore. 2010) ..................17

*In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) ...............................................18

*In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010)................................23

*In re Pinto*, 191 B.R. 610 (Bankr. D.N.J. 1996) ..........................................................10

*In re Pizza of Hawaii, Inc.*, 761 F.2d 1374 (9th Cir. 1985) .........................................29

*Rocco*, 2006 U.S. Dist. LEXIS at 10 (same)............................................................17

*In re Rosen*, 208 B.R. 345 (D.N.J. 1997).................................................................10

*In re Sagewood Manor Associates Limited Partnership*, 233 B.R. 756 (Bankr. D. Nev. 1998) .......................................................................17

*In re Sagewood Manor Assocs., L.P.*, 223 B.R. 756 (Bankr. D. Nev. 1998)...............22

*In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989).................................18

*In re Sterling Development, Inc.*, 2009 WL 196250 (Bankr. D.N.M. 2009) ................10

*Stewart v. Gurley*, 745 F.2d 1194 (9th Cir. 1984) ...................................................15

*In re Sun Valley Ranches, Inc.*, 823 F.2d 1373 (9th Cir. 1987).....................9, 10, 13, 19

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) ........................................................19

*In re Trans Max Tech., Inc.*, 349 B.R. 80 (Bankr. D. Nev. 2006) .............................29

*In re Tri-Growth Centre City, Ltd.*, 136 B.R. 848 (Bankr. S.D. Cal. 1992) ...........17, 22

*In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (9th Cir. BAP 1994) .........................28

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)....................14

*In re VIP Motor Lodge, Inc.*, 133 B.R. 41 (Bankr. D. Del. 1991) ..............................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

*In re Weinstein*, 227 B.R. 284 (9th Cir. B.A.P. 1998) ...................................................................17

*In re: Worldcom, Inc.*, 2003 WL 22025051 (Bankr. S.D.N.Y. 2003) .........................................10

<u>STATUTES</u>

Bankruptcy Code
        Section 362.................................................................................................3, 4, 9, 14
        Section 506......................................................................................................7, 25
        Section 1111.......................................................................................................6, 21
        Section 1126...........................................................................................................26
        Section 1129..................................................5, 18, 19, 22, 24, 25, 26, 29, 30, 31, 32

Fed. R. Bankr. P. 2002 ..................................................................................................................11

Fed. R. Bankr. P. 4001 ..................................................................................................................11

Fed. R. Bankr. P. 9014 ..................................................................................................................11

11 U.S.C.
        § 105.....................................................................................................................11
        § 361.....................................................................................................................11
        § 362..............................................................................................................9, 11, 14
        § 363.....................................................................................................................11
        § 1129...................................................................................................................17

<u>RULES</u>

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

## AMENDED MOTION OF LANDESBANK BADEN-WÜRTTEMBERG, NEW YORK BRANCH, FOR RELIEF FROM AUTOMATIC STAY

Landesbank Baden-Württemberg, New York Branch, as successor administrative and collateral agent (the **"First Lien Agent"**) for the first lien lenders (the **"First Lien Lenders"**) under the First Lien Credit Agreement,[1] by and through its undersigned counsel, files this amended motion (this **"Liftstay Motion"**)[2] requesting relief from the automatic stay in order to pursue its state court remedies against the Property.  The First Lien Agent bases this Liftstay Motion on the §362 Information Sheet submitted herewith, the following Memorandum of Points and Authorities, the pleadings and papers on file in this case, the declaration of Andrew Manley (the **"Manley Declaration"**), dated as of July 9, 2010, the declaration of Randall A. Fine (the **"Fine Declaration"**), dated as of July 9, 2010,  and the appraisal of Snyder Valuation (the **"Second Snyder Appraisal"**), dated as of June 24, 2010, and attached as Exhibit 2 of the Declaration of Keith Harper, to be filed with concurrently with this pleading, the declaration of Larry Bertsch (the **"Bertsch Declaration"**), and such argument as the Court may hear.[3]

---

[1] Capitalized terms not otherwise defined herein will have the definition ascribed to them in the Original Motion (as hereinafter defined).

[2] This Liftstay Motion amends and restates the First Lien Agent's request for relief in *LBBW's Motion for Relief from Automatic Stay* [Docket No. 300] filed on June 10, 2010, in this chapter 11 case (the **"Original Motion"**). Objections to the Original Motion were filed by (a) the above-captioned debtor (the **"Debtor"**) pursuant to the *Debtor's Opposition to Landesbank Baden-Württemberg, New York Branch's Motion for Relief from Automatic Stay* [Docket No. 336]; (b) NexBank, SSB, as successor administrative and collateral agent (**"NexBank"**) for the Second Lien Lenders and certain of the Second Lien Lenders (Five Mile Capital Pooling International, LLC; FMC Real Estate CDO 2005-1 Master Trust, Series C; Spectrum Investment Partners, L.P.; and Transamerica Life Insurance Company, together with NexBank, the **"Second Lien Group"**) pursuant to *Objection of NexBank, SSB and Certain Second Lien Lenders to LBBW's Motion for Relief from Automatic Stay* [Docket No. 329]; and (c) The Huff Alternative Fund, L.P. and The Huff Alternative Parallel Fund, L.P. (collectively, **"Huff"** and Huff, together with the Debtor and the Second Lien Group, the **"Objecting Parties"**) pursuant to *Objection of Huff Alternative Fund, L.P. and The Huff Alternative Parallel Fund, L.P. to LBBW's Motion for Relief From the Automatic Stay* [Docket No. 334].

[3] Because the Second Lien Group has not yet filed their plan, the First Lien Lenders have analyzed the content of their prior testimony and the term sheet filed with this court on June 9, 2010 [Docket No. 297-1]. The First Lien Lenders reserve all rights to supplement or amend this motion based on any revised term sheet or plan filed by the Second Lien Group.

1

## Memorandum of Points and Authorities

2

*Preliminary Statement and Factual Background*

3

4          This Court observed at the opening of this chapter 11 case that state procedures would be

5   more suitable for disposing of the Property than a bankruptcy court.  The First Lien Lenders have

6   always agreed, and dutifully pursued non judicial foreclosure and appointment of a receiver in

7   Nevada state court.  But foreclosure would have left the Second Lien Lenders and the Debtors'

8   owners with no recovery.  Those stakeholders never intended to permit a foreclosure without

9   threatening and commencing litigation to extract unwarranted recoveries from the First Lien

10   Lenders.  The most obvious threat was to file bankruptcy to invoke the automatic stay, drain

11   value from the First Lien Lenders' collateral, and threaten a cram down.  Both the Debtor and

12

13   Second Lien Lenders made such threats.  These threats were realized when the Second Lien

14   Agent sued the First Lien Lenders, asserting a preposterous claim for breach of the Intercreditor

15   Agreement.

16          Faced with time consuming litigation, an all-but-certain bankruptcy, and the Second Lien

17   Lenders' intention to disregard the Intercreditor Agreement, the First Lien Lenders elected to

18   pursue a consensual debt restructuring with all significant stakeholders.  The First Lien Lenders

19   repeatedly postponed foreclosure to negotiate.  Discussions lasted for months.  The Second Lien

20

21   Group was offered terms more favorable than those offered to LIRA, but they demanded even

22   greater consideration.[4]  They insisted upon a restructuring unreasonably slanted toward junior

23   interests (much like their current term sheet).  Unable to reach a deal with the next party down in

24   the capital structure, the First Lien Lenders agreed to support the Debtor's sale of the Property to

25

26

27

28

---

[4]       *See* 10-K of FX Real Estate and Entertainment, Inc. for the fiscal year ended December 31, 2009, at 9-15, attached as Exhibit B to the Trustee Motion [Docket No. 112-3] for a description of a proposed transaction among the Debtor, LIRA, and the Second Lien Group and the First Lien Lenders.  The relevant portions of the 10-K outlining the terms of the proposed transaction are attached hereto as Exhibit A.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    certain existing equity investors through a prepackaged bankruptcy. That proposed sale was

2    subject to a market test of whether the Property could generate a recovery for the legally and

3    contractually subordinated Second Lien Lenders. The Court determined that the minimum

4    proposed sale price for the Property—which LIRA required—would chill bidding.

5    As a result, the First Lien Lenders refused to support any other proposed sale unless

6    LIRA agreed: (i) to give up its right to a break-up fee and other bid protections; (ii) to

7    termination of the Lock-Up Agreement (thereby freeing the First Lien Lenders to negotiate with

8    all third parties); and (iii) that the First Lien Lenders could offer the Second Lien Lenders the

9    same deal that they had agreed to with LIRA. The Second Lien Group, though, has refused to

10   negotiate and continues to push forward a cram down plan which violates the Intercreditor

11   Agreement, a document the Second Lien Group repeatedly has breached and ignored.[5] These

12   chapter 11 cases promise only further litigation at the sole risk and expense of the First Lien

13   Lenders. State law foreclosure is the best path forward.

14   Grounds for lifting the automatic stay exist under sections 362(d)(1) and 362(d)(2) of the

15   Bankruptcy Code. The Property's continued decline in value justifies lifting the automatic stay

16   under Bankruptcy Code section 362(d)(1). There is little doubt that in the present economic

17   environment generally, and the Las Vegas real estate market particularly, the value of the First

18   Lien Lenders' collateral is declining and at serious risk of further decline. National, state, and

19   local economic conditions that dictate success at the Property, such as unemployment and retail

20   sales, are deteriorating. Numerous retailers have closed locations on "The Strip" in 2010, and

21   vacancy rates at the Property have increased significantly since June of 2009. Fine

---

[5]    Predictably, the Second Lien Group moved this Court for an order delaying determination of their claims for breach of the Intercreditor Agreement immediately after the Court granted their motion to terminate exclusivity. The Second Lien Lenders recognize the weakness of their claims that the First Lien Lenders breached the Intercreditor Agreement, and know that having those claims adjudicated would derail their ability to pursue their plan.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  Declaration, ¶ 16H and Bertsch Declaration, ¶¶ 7D, 12.  City Center's opening has been a major

2  disappointment and has not increased traffic at the Property (and is unlikely to do so in the next

3  decade).  Fine Declaration, ¶¶ 16D, 16G.  The Property has generated declining revenues since

4  mid-2009 and there is substantial deferred maintenance that must be addressed in the near term.

5  Bertsch Declaration, ¶¶ 8, 9.  The Debtor has manipulated the cash flows at the Property in an

6

7  attempt to hide the fact that they are decreasing, not increasing.[6]

8          The actual and threatened decline in value of their collateral entitles the First Lien

9  Lenders to adequate protection.  Without an equity cushion or unencumbered property, the only

10  potential source of adequate protection is cash payments.  But all rents already are the First Lien

11  Lenders' collateral and cannot serve as adequate protection payments.  Even if they could, the

12  First Lien Lenders have not received any payments during this case from the Property (except for

13  legal fees), and turning over all cash the Property generates would not fully compensate the First

14  Lien Lenders for the Property's actual and threatened decline in the value.  On this basis alone,

15

16  the stay must be lifted.

17          It also is undisputed that the Debtor has no equity in the Property.  The First Lien Lenders

18  have submitted an appraisal which values the Property at $183 million.  *See* Second Snyder

19  Appraisal.  The Debtor and Second Lien Group have testified that the Property's value is less

20  than the claims of the First Lien Lenders.[7]  Under these circumstances, section 362(d)(2) of the

21  Bankruptcy Code requires that the stay be lifted if the Property is not necessary to an effective

22  reorganization.  The Supreme Court defines an "effective reorganization" as one reasonably

23  likely to be consummated within a reasonable period of time.

24

25

26  [6]  The Debtor generated projections based on cash flows at the Property for June 2010.  But that month
       includes a one time $40,000 lease termination payment.  Without that $40,000, cash flow declined from the

27     prior month.  Bertsch Declaration, ¶ 7B.

28  [7]  Debtor has just filed amended schedules that value the Property at $137.7 million.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

The Debtor appears to have abandoned any effort to file its own plan, and the only "plan" on the table is based on a term sheet filed by the Second Lien Group.[8] That "plan" is not fair and equitable, discriminates unfairly, and does not satisfy any prong of Bankruptcy Code section 1129(b)(2)(A). Longstanding Ninth Circuit authority requires lifting the automatic stay where a proposed plan primarily benefits a junior creditor to the detriment of an undersecured senior creditor, or where a plan deprives the senior creditor of future profits from its collateral. If the Second Lien Group's plan were feasible—which it likely isn't—its "waterfall" would allow the out-of-the-money Second Lien Group a 20% dividend on its new equity investment— nearly 400% more than the interest rate payable on the First Lien Lenders' restructured loan. The Second Lien Group also will obtain the lion's share of any appreciation in the Property's cash flow or value. So long as interest payments can be made, the Second Lien Group will extract cash to repay their minimal equity investment on a senior basis, after which they will be playing with "house money." If the Property's cash flow increases, then the Second Lien Group keeps most of it. But if the Property's value stagnates or declines, then they lose nothing more; the First Lien Lenders bear all that downside risk. It is entirely plausible that the Second Lien Group could recoup their entire new investment and earn substantial recoveries on their existing debt—some of which they acquired at steep discounts—even if the First Lien Lenders are not repaid. The potential profits that the Second Lien Group see in this litigation-driven investment strategy are so considerable that they are willing to give away a portion of them to non-investing

---

[8]    As of this writing, the Second Lien Group has submitted only a non-binding term sheet for a plan. Even a fully committed plan based on that term sheet cannot be confirmed, a result the Court should reach now, rather than after months of litigation.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

5

stakeholders to buy the voting support needed for their plan. But applicable law prohibits such a plan. Foreclosure would be a faster and more appropriate path to deleverage the Property.[9]

Other confirmation defects are equally glaring. The indebtedness distributed to the First Lien Lenders would not provide them with the value of their collateral or the indubitable equivalent of their claims. That indebtedness would lack either reasonable amortization or interest payments (or both), contemplates an unreasonably long six to nine year term, is not supported by a standard "bad boy" guaranty and does not contain customary covenants. Manley Declaration, ¶14. Such indebtedness would not be worth anywhere near the value of the Property, which is unsurprising for a financing with a loan-to-value ratio that exceeds 90%. Payments at even the ridiculously low rate of 5.5% per year on the First Lien Lenders' claims— which the Second Lien Lenders have underestimated by approximately $11 million—also may not be feasible, especially if the First Lien Lenders elect to treat their entire claim as secured under Bankruptcy Code section 1111(b). Amortizing the loan at a lower rate requires an appreciation in the value of the Property over time that is highly unlikely. Manley Declaration, ¶44. The proposed plan also is structured as a sale of "equity," but in reality is a sale of the Property that deprives the First Lien Lenders of their right to credit bid. Even if the structure were valid, it amounts to a sale of the equity in the Debtor without any proper marketing or auction process to establish the value of that equity.

Other plan defects include the following:

(i)     The proposed interest rate on the debt that the First Lien Lenders would receive is too low and does not adequately compensate them for the risks of default;

---

[9]     The First Lien Lenders have in the past made a commitment to honor all claims of unsecured creditors other than subordinated creditors such as the Second Lien Lenders. The First Lien Lenders are willing to commit to pay or assume, or have assumed in any foreclosure, the liabilities they had previously indicated they would honor in this case (other than the Debtor's professional fees).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

6

(ii)   Repayment of the Second Lien Group's legal fees violates section 506(b) of the Bankruptcy Code;

(iii)  The plan fails the best interests of creditors test because it does not provide the First Lien Lenders with the liquidation value of their collateral;

(iv)   The plan provides *de minimis* "gifts" to otherwise out-of-the-money stakeholders to gerrymander an impaired accepting class;

(v)    The plan violates the absolute priority rule and cannot be justified under the "new value" corollary because the new money is unnecessary, insubstantial, and not reasonably equivalent to the value of the equity to be acquired;

(vi)   The plan has not been proposed in good faith;

(vii)  The votes of the Second Lien Group should be designated because they will be voting in the capacity of a self-dealing plan proponent rather than as a creditor; and

(viii) The proposed plan cannot be confirmed unless and until it has been established that the Intercreditor Agreement is invalid.

The proposed plan does not preserve going concern value, save jobs, or otherwise increase the value available for distribution to stakeholders. Pursuit of confirmation will require the destruction of value and maintain the cloud of uncertainty over the Property that has frustrated meaningful leasing or development activity. All the plan does is divert value to out-of-the-money stakeholders.

Notwithstanding these obstacles, those out-of-the-money stakeholders insist that this case must continue at the sole expense and risk of the only in-the-money creditors. The First Lien Lenders hold an "all-asset" lien and, because they are undersecured, all value, in any form, must be distributed to them. Both the law and Intercreditor Agreement require that result. But the "plan" proponents hope that this Court will allow them to game the system. They hope that the Court will allow them to pursue a plan that would on its face honor the principle that all value must be distributed to the First Lien Lenders, but which in reality shortchanges them at the expense of under-water stakeholders. The basis of their so-called "reorganization" is for the

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

7

Second Lien Group to make a *de minimis* investment. In exchange for creating a razor-thin equity cushion, the Second Lien Group proposes to gain most of the future appreciation in the value of the Property and any profits, while the First Lien Lenders are forced to suffer all future risk of decline. Such a plan is unconfirmable because it shifts the risk of success to the senior secured lenders.

As this Court astutely observed, the Second Lien Group is in essence angling for a lengthy "option" while the First Lien Lenders are the only parties who are "bleeding".[10] The Second Lien Group's plan is both without precedent and contrary to law. The First Lien Lenders' cash collateral has been used to fund a process that has thus far been fruitless in generating any improved value for the estate and has produced instead a wave of litigation. Their collateral is decreasing in value and at risk of further decline. There is no business to reorganize, just value to allocate. Even if cram down were possible, it would still require that all value be allocated to the First Lien Lenders. There is nothing here to be saved for the out-of-the-money stakeholders. Value allocation for this Debtor and this Property is most appropriately handled in a state court foreclosure. Accordingly, the Court should lift the automatic stay.

## I.   The Assertion That the First Lien Lenders "Voluntarily" Invoked This Court's Jurisdiction Are False and Irrelevant

The Objecting Parties assert that the First Lien Lenders "elected" not to foreclose and that they "voluntarily" invoked this Court's jurisdiction. The Debtor, for instance, argues that the First Lien Lenders "chose to proceed under the Bankruptcy Code with the agreement of the Debtor and LIRA, to recognize the highest recovery on the First Lien Loan."[11] The Debtor knows perfectly well the First Lien Lenders chose to pursue the LIRA deal and a prepackaged

---

[10]    June 11 Hr'g Tr. at 13-14.

[11]    Debtor's Opposition to Landesbank Baden-Württemberg, New York Branch's Motion for Relief from Automatic Stay ("Debtor's Lift Stay Opposition") [Docket No. 336] at 5.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

8

bankruptcy on a "lesser-of-two-evils" basis and that the Debtor had always threatened and intended to file for bankruptcy rather than allow foreclosure. In any event, such arguments are irrelevant. There is no statute or case law which supports the principle that a secured creditor "waives" its rights to seek to lift the stay if it initially supports an orderly and controlled chapter 11 process. Such arguments make even less sense where the secured creditor faced the impending prospect of an involuntary or nonconsensual chapter 11 proceeding designed to cram down that creditor.

### II. The Stay Must be Lifted Because the First Lien Lenders Cannot be Adequately Protected Against Any Actual or Threatened Decline in Their Interest in the Property

Section 362(d)(1) of the Bankruptcy Code provides that:

> "….the court shall grant relief from the stay….such as terminating, annulling, modifying, or conditioning such stay….for cause, including lack of adequate protection of an interest in property of such a party in interest."

The burden is on the party opposing a request for stay relief under section 362(d)(1) to prove the absence of cause. 11 U.S.C. § 362(g)(2). That burden includes proving that a creditor's interest in the collateral is adequately protected.[12] *In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1376 (9th Cir. 1987). The First Lien Lenders' entitlement to adequate protection includes protection against the mere threat that the Property's value may decline. *See In re Delaney-Morin*, 304 B.R. 365, 370 n.3 (9th Cir. B.A.P. 2003) (stating that "[a] secured creditor lacks adequate

---

[12]     The Objecting Parties suggest that the First Lien Lenders' prior agreement to accept a more limited package of adequate protection should stay them from pursuing their statutory right to adequate protection. This argument ignores the fundamental distinction in the Bankruptcy Code between consensual and non-consensual use of cash collateral, and the fact that the case which the First Lien Lenders were willing to fund was of a fundamentally different character.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  protection if there is a threat of a decline in the value of the property.").[13]  None of the Objecting

2  Parties can meet this burden.  They cannot prove that the value of the property is not declining or

3  that there is sufficient cash available to protect the First Lien Lenders from any actual or

4  threatened decline in value. *Sun Valley*, 823 F.2d at 1374 (lifting of the stay is appropriate when

5  there is no showing that a secured creditor is "protected against the declining value of the

6  property").  The Second Snyder Appraisal shows a decline in value of $12 million for the

7  Property over the period July 21, 2009, to June 21, 2010, from $195 million to $183 million.

8  Further, the Fine Declaration also establishes that there is a substantial likelihood that the value

9  of the Property has declined since the Petition Date and that it will continue to decline in the near

10 term. Based on Mr. Fine's expert opinion, the most likely scenario is that the Property will have

11 declined by approximately $5 million during the period from the Petition Date through the date

12 this motion is heard.  Fine Declaration, ¶ 12.  Mr. Fine also believes a decline in value thereafter

13 at an annual rate of approximately $10-15 million is likely.  Fine Declaration, ¶ 12.  This actual

14

15

16

17

18  [13]  *See also In re Rosen*, 208 B.R. 345, 356 (D.N.J. 1997) (noting that "[o]ne basis for cause may be where a
secured creditor lacks adequate protection because there is a threat the value of the property may decline.);
19  *In re Sterling Development, Inc.*, 2009 WL 196250, *3 (Bankr. D.N.M. 2009) (noting that "[a] creditor
seeking relief from the automatic stay for cause based on a lack of adequate protection must demonstrate
20  that its collateral is declining in value, or that there is a threat of a decline in value, in order to establish a
prima facie case."); *In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 751 (Bankr. S.D.N.Y. 2004) (stating that
21  a secured creditor must "prove [the] decline in value—or threat of a decline—in order to establish a prima
facie case. Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with
22  evidence, and ultimately, prove that the collateral is not declining in value . . ." (citing *In re Elmira Litho,
Inc.*, 174 B.R. 892, 902) (Bankr. S.D.N.Y. 1994)); *In re: Worldcom, Inc.*, 2003 WL 22025051, *6 (Bankr.
23  S.D.N.Y. 2003) (noting that "[a]s part of the prima facie case, secured creditors must prove a decline in
value – or a threat of a decline – during the term of the automatic stay.  A secured creditor can prove this
24  decline in value – or the threat of a decline – by either quantitative or qualitative methods.") (internal
citations omitted); *In re Pinto*, 191 B.R. 610, 612 (Bankr. D.N.J. 1996) (stating that "[a] secured creditor
25  lacks adequate protection if there is a threat that the value of the property may decline.") (citing *In re Jones*,
189 Bankr. 13, 15 (Bankr. E.D.Okl. 1995); *In the Matter of Holly's, Inc.*, 140 B.R. 643, 696 (Bankr.
26  W.D.M.I. 1992) (noting that "[secured creditor] is entitled to be protected or compensated with regard to
any diminution of property interest occasioned by the automatic stay.  Failure to protect [secured creditor],
27  or compensate [secured creditor], for possible diminution of its property rights constitutes a lack of
adequate protection and expressly requires modification of the automatic stay.") (internal citations
28  omitted).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  and threatened decline is related to the continued recession and poor performance of the national,

2  state, and local economies.  Fine Declaration, ¶ 16.  This amount of the decline exceeds any cash

3  available to the estate to make adequate protection payments to the First Lien Lenders.  In fact,

4  available cash generated from the Petition Date is only a small fraction of the $5 million

5  probable decline in the Property's value.  The Debtor's own budget, filed at the beginning of this

6  case, suggested that available cash would amount to $1.89 million over the much longer period

7  of April 20 to August 11 (and in fact this number probably overestimates free cash due to the

8  unanticipated levels of litigation in this case).[14]  The Debtor likely could fall short in future

9  months as well.  The Debtor estimates it will have annualized net operating income of

10  $9.3-9.5 million post-bankruptcy.  This is less than the annual predicted decline in value even

11  before considering chapter 11 expenses.

12  

13  In any event, the Debtor's cash is *not* available for adequate protection payments.  The

14  "law in this Circuit is clear that when a creditor is secured by income producing property, when

15  its lien extends to the rents or other income generated by the property, and when the value of the

16  real property alone is less than the amount of the claim, then the amount of the secured claim

17  pursuant to § 506(a) includes both the value of the real property and the amount of the

18  accumulated cash collateral."  *In re Arden Properties, Inc.*, 248 B.R. 164, 168 (Bankr. D. Ariz.

19  2000, citing *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650 (9th Cir. 1997) (holding that

20  unapplied post-petition rents of $300,000 increased undersecured creditor's claim by that

21  amount, from $4.3 million to $4.6 million).  Accordingly, the Debtor's free cash flow does *not*

22  provide a source of adequate protection because it must be paid or reserved for the benefit of the

---

[14]    *See* Debtor's Operating Budget attached as Exhibit 1 to the Amended Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing the Debtors to Use Cash Collateral and (II) Granting Adequate Protection [Docket No. 83].

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

First Lien Lenders on a dollar-for-dollar basis. Every dollar the Debtor generates represents an increased allowed secured claim of one dollar, meaning profits are not available as adequate protection. Because its collateral is deteriorating in value at a rate greater than can be offset by available adequate protection payments, the automatic stay must be lifted.

The Debtor argues that the value of the Property is not declining because there have been marginal improvements to cash flow since the petition date. This assertion is of questionable veracity and appears to be based on misleading figures and improper accounting practices rather than improved performance. The alleged improvement is illusory, generated by mathematical errors and the improper annualization of a lease termination payment in June.[15] Bertsch Declaration, ¶ 7. Nonetheless, such income represents only part of the value of the Property. The primary driver of value is the Property's potential future use as a site for a casino-hotel development. The value of the First Lien Lender's collateral is not merely a function of phantom improvements in rental income, but of the downward trending market for casino-hotel property in Las Vegas. Fine Declaration, ¶¶ 16A-D. The actual and potential decline in these markets exposes the First Lien Lenders' collateral to unreasonable and uncompensated levels of risk while this case continues. For this reason, the stay must be lifted.

For the same reason, the Debtor's focus on the protection of rents is misplaced. The First Lien Lenders do not contest that rents applied to productive maintenance benefit the Property, as do payments of rent which produce replacement property. *In re Las Vegas Monorail Co.*, 2010 WL 1688811 (Bankr. D. Nev. 2010). But diverting cash collateral to pay professional fees and other chapter 11 expenses does not protect or compensate the First Lien Lenders, especially in a

---

[15]    *See* Bertsch Declaration, ¶¶ 7A-B, detailing the $40,000 termination payment which the debtor has used to claim $480,000 in annualized revenues that will never materialize, as well as the understatement of prepetition revenues.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

case that has nothing to do with preserving the value of the Property and everything to do with reallocating value to out-of-the-money stakeholders. The Second Lien Group should pay the professional expenses and other costs of the chapter 11 proceeding because the case is being run for its benefit. If the Second Lien Group does not fund this case (with any loan to the Debtor junior to the First Lien Lenders' claims), then the First Lien Lenders are being deprived of rents to which they otherwise would be entitled. If they could foreclose now, then the First Lien Lenders would realize the full value of their collateral (including future rents). If forced to wait, they will receive the value of their collateral *less* the amount of any chapter 11 expenses.

The Objecting Parties have the burden of proving that there is no decline or risk of decline in value of the Property during this chapter 11 case. *Sun Valley Ranches*, 823 F.2d at 1376. This will be an all but impossible burden to meet because it requires proof that the Las Vegas real estate and gaming markets are significantly less distressed and unstable than experts believe. Fine Declaration, ¶ 15. Thirty thousand Las Vegas hotel rooms are vacant each night and six vacant sites are available for development on the Strip (and five more may become vacant). Fine Declaration, ¶¶ 16A, 16C. The economics of the market no longer support "green field" development and, even if they did, five of the vacant sites are larger and easier to develop than the Property. Fine Declaration, ¶¶ 16B, 16D. Similarly, there is no objective evidence that the precipitous decline in value of this Property over the past two years has all of a sudden halted. In short, to avoid lifting of the stay, the Objecting Parties must not only "call" the bottom of the market but must prove it to this Court. Given the Objecting Parties' evidentiary burden, any doubts on this issue must be resolved in favor of the First Lien Lenders.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

**III. The Stay Must be Lifted Because the Collateral of the First Lien Lenders Is Not Necessary For An "Effective Reorganization"**

Section 362(d)(2) of the Bankruptcy Code provides that the Court must grant relief from the automatic stay with respect to any property in which "the debtor does not have any equity" if "such property is not necessary to an effective reorganization." Section 362(g)(1) of the Bankruptcy Code imposes on the First Lien Lenders the burden of establishing that there is no equity in the Property. Not only does the Second Snyder Appraisal satisfy this burden, but every party in interest in this case concedes that the value of the Property is less than the First Lien Lenders' debt. *See* Debtor's Lift Stay Opposition at 9; Huff's Motion for Appointment of a Chapter 11 Trustee [Docket No. 112] at 5; June 11 Hr'g Tr. at 72.

The burden on all other issues is on the party opposing a lift stay motion. 11 U.S.C. § 362(g)(2). The Supreme Court has stated that to meet this burden, an objecting party must demonstrate that the property is essential to a legitimate reorganization effort. This requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (italics in original). This means that there must be a "reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 376.

There is nothing "necessary" or "effective" about the proposed reorganization outlined by the Second Lien Group. Their proposed plan does nothing more than provide themselves with the exclusive opportunity to invest a small sum from which they hope to reap a huge return. Their investment has no productive value and is not necessary to "reorganize" the Debtor. Consummation of their proposal will have no beneficial impact on the estate, and, if anything, will result in a highly leveraged Property that will be managed in identical fashion as would be

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  the case after a foreclosure. The Property is not being preserved because it is essential to a

2  reorganization nor has the plan been proposed to broaden the assets available for distribution to

3  other creditors. The plan is intended only to allow the Second Lien Group to make a buck. The

4  cram down provisions of the Bankruptcy Code were never intended to give out-of-the-money

5  creditors long-dated "options" on future appreciation at the expense of senior secured lenders.

6

7      A.  The Stay Must Be Lifted Where A Junior Lender is The Primary Beneficiary Of a
           Proposed Cram Down Plan

8      The automatic stay must be lifted when the debtor has no remaining economic stake in

9

10  the property and where the real beneficiary of maintaining the stay would be a junior lender. The

11  Court of Appeals for this Circuit clarified this over twenty years ago in a ruling that disposes of

12  any opposition to the First Lien Lenders' motion:

13      "[u]nless the debtor can demonstrate that the property is necessary to an effective
        reorganization, the property is of no value to him. *Refusing to grant relief from the*
14      *automatic stay under those circumstances would only promote the junior lienholders'*
        *interests over those of the senior lienholder.*"[16]

15

16  *Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir. 1984) (emphasis added). This case cannot be

17  continued for the benefit of the junior Second Lien Lenders over the objection of a senior

18  secured lender who desires to foreclose. Cram down plans that shift the risk of success of the

19  plan to a secured lender also should not be confirmed. *In re Gramercy Twin Assocs.*, 187 B.R.

20  112 (S.D.N.Y. 1995) (high loan-to-value ratio shifts risk to secured creditor and makes plan

21  unconfirmable); *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 428 (C.D. Cal. 1993)(shifting

22

23

24  _____

[16]  The Objecting Parties cannot avoid the binding nature and import of this established precedent merely by
25    offering up to the Debtor's former equity holders a token "hope note" which they themselves have testified
      will likely never be in-the-money. June 11 Hr'g Tr. at 76 (Mr. Glasgow notes that the former equity
26    holders of the Debtor are "being offered warrants which are way out of the money but understand that
      they're intended to be hope notes in the sense that if the value of this property six years from now is worth
27    more than anyone could ever imagine, you know, then they'll be -- they'll be able to exercise those
      warrants and actually recoup some of their investment."). Nor does providing the Debtor the opportunity to
28    invest in their scheme to divert value from the First Lien Lenders save their plan.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

of risk to secured creditor makes plan unfair and inequitable); *In re DeTienne*, 2005 Bankr. LEXIS 3122, at *20 (citing *In re Manion*, 127 B.R. 887, 890 (Bankr. N.D. Fla. 1991)) (cram down plan is inappropriate when it shifts the risk to the creditor such that the proposed plan "essentially speculat[es] with the lender's interest in the assets."). But this is precisely what the Second Lien Group is attempting.

The structure proposed by the Second Lien Group is not permitted. In *In re California Hancock, Inc.*, 88 B.R. 226 (9th Cir. B.A.P. 1988), the Bankruptcy Appellate Panel of the Ninth Circuit affirmed stay relief after consideration of a preliminary plan proposal from an out-of-the-money debtor who was attempting to prevent foreclosure. The debtor had proposed a transaction that was designed to ensure it would enjoy the benefits of any sale or future appreciation in value of an apartment complex. *Id.* at 227. The debtor proposed to provided its secured creditor with only a secured claim pegged to the appraised value of the property. The B.A.P. rejected the plan and affirmed lifting of the stay, holding that the secured lender was "**entitled to *all* the consideration from the transfer of the property which included any interest in 'future profits'**" *Id.* at 227 (italics in original).

The First Lien Lenders have an undersecured claim and a lien on all assets of this estate, so they must receive the entire value of all estate property. The First Lien Lenders are aware of no case in this Circuit in which an undersecured senior lender holding a lien on all of the debtor's property has been crammed down if the creditor had a preference to foreclose upon, purchase, or acquire the equity in the property.[17] Even if a cram down plan was theoretically possible, the

---

[17] The majority of the relatively few published cases in this Circuit confirming a cram down pursuant to 1129(b)(2)(A)(i) involve ***oversecured*** creditors who retain secured notes in principal amounts equal to their prepetition debt and who are thus protected from any valuation errors with respect to their collateral. This is a radically different situation than the present case where the Second Lien Group's plan proposes to cram down an *undersecured* senior lender by saddling the First Lien Lenders with a note valued far below the amount of their prepetition debt. *See, e.g., In re Boulders on the River, Inc.*, 164 B.R. 99 (9th Cir. B.A.P.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    secured lenders still must receive either the sale proceeds, the indubitable equivalent of their

2    claim, or cash and liens of a value equal to their claim.  11 U.S.C. § 1129(b)(2)(A)(i-iii).  In each

3    case, that is the entire value of the estate.  *See In re Ambanc*. 115 F.3d at 653 (holding that each

4    of the three cram down prongs under 1129(b)(2)(A) prevented a secured creditor from being

5    crammed down unless it received the entire present value of the collateral securing its claim).

6    The possibility of cram down does not create a right for stakeholders with no economic interest

7    in the Debtor's property to receive a distribution under a plan where no value remains for them.

8

9        It is puzzling how the Objecting Parties can argue that there is value to be "preserved" for

10   other constituents in this case.  *See* Debtor's Lift Stay Opposition at 30-31.  Even a cram down

11   plan cannot preserve value for out-of-the-money constituents.  They cannot strip a secured

12   lender's collateral of future appreciation in value unless the undersecured creditor is paid in full

13   or unless the secured creditor recovers equal consideration for what has been taken from them.

14   Otherwise, a secured lender is not receiving the full value of its collateral.[18]  The fact that the

15

16   _____

17        1994) (Oversecured senior creditor received under a cram down plan a secured note with face value equal
     to its prepetition indebtedness, bearing 9% interest and which required periodic amortizations); *In re
18   Sagewood Manor Associates Limited Partnership*, 233 B.R. 756 (Bankr. D. Nev. 1998) (cram down
     permitted where prepetition senior debt was approximately 80% of collateral value); *See also In re
19   Orchards Village Investments, LLC*, 2010 WL 143706 (Bankr. D. Ore. 2010) (cram down plan found not
     "fair and equitable" because restructured loan required secured lenders to bear the risk that the debtor's
20   operations would improve in the future or that refinancing would be available in the future; court
     acknowledged that if it were to overrule the cram down objections "I would be permitting the TIC Investors
21   to speculate on an uncertain future lending environment not only with their funds, but with [the secured
     lenders'] money as well"); *In re Tri-Growth Centre City, Ltd.*, 136 B.R. 848 (Bankr. S.D. Cal. 1992) (stay
22   lifted where debtor's proposed cram down plan was "defective on its face" because it attempted to
     restructure a loan to have an initial loan to value ratio of 100% and which "shift[ed] the risks associated
23   with a declining motel business on a secured creditor who did not bargain for those risks when it initially
     lent the funds"); . The only case providing any apparent support for the Objecting Parties' view is *In re
24   Weinstein*, 227 B.R. 284 (9th Cir. B.A.P. 1998).  In that case individual chapter 11 debtors successfully
     crammed down an undersecured mortgage lender with a restructured note secured by the debtors' home.
25   Such modifications of residential mortgages were subsequently prohibited by amendments to section
     1123(b)(5).  Leaving aside the legislative nullification of this option, this case is an outlier, inconsistent
     with other cases, and was decided on facts radically different than those here.

26   [18]  Courts considering whether to lift the stay are called on to consider "the balance of the hardships between
     the parties and whether the creditor's property interest is being unduly jeopardized" *Rocco*, 2006 U.S. Dist.
27   LEXIS at *10; *In re Olick*, 221 B.R. 145, 161 (Bankr. E.D. Pa. 1998) (same).  Here, the balancing is easy.

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

17

1    Second Lien Group openly admits that its plan is designed to "preserve" value for out-of-the-

2    money investors is an admission that they hope to game the system and benefit from a new

3    capital structure forced upon the First Lien Lenders.  The Court should lift the stay to prevent the

4    Second Lien Group from pursuing such a windfall.

5           The requirements of section 1129(b)(2)(A) are not a cram down plan's only prerequisites.

6    Such a plan must also be "fair and equitable" in the literal sense of those words.  *In re Pacific*

7    *Lumber Co.*, 584 F.3d 229, 245-256 (5th Cir. 2009) ("[e]ven a plan compliant with these

8    alternative minimum standards is not necessarily fair and equitable."); *In re Sandy Ridge Dev.*

9    *Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989) ("the bankruptcy court 'must consider the particular

10   plan in the context of . . . the particular facts and circumstances [of the case]' . . . simple

11   technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is

12   fair and equitable) (quoting *In re D&F Constr. Co.*, 865 F.2d 673, 676 (5th Cir. 1989)).  To

13   allow the out-of-the-money Second Lien Group to invert the capital structure after having

14   bargained for exactly the opposite result under an Intercreditor Agreement, and to acquire all of

15   the Debtor's equity for a minimal cash payment and a note of dubious value, would not be fair

16   and equitable under any circumstances.  This is all the more true where the senior secured

17   creditor prefers to retain the collateral and where no reorganization purpose would be furthered

18   by allowing cram down.

19          B.   The Stay Must Be Lifted Because The Second Lien Lenders' Plan Is Patently
                 Unconfirmable

20          The Second Lien Group's plan proposal suffers from other glaring confirmation defects.

21   While courts recognize that a plan proponent need not establish each and every confirmation

---

If the stay is not lifted, the First Lien Lenders bear serious risk of an imperfect valuation or that the plan
will fail. But the only interest to be protected if the stay is left in place is the opportunity for the Second
Lien Group to make an investment that will *net them $0*.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

standard to the same level they would at a confirmation hearing, deficiencies or purely legal

issues which render confirmation impossible or improbable provide a basis for lifting the stay.

*California Hancock*, 88 B.R. 226, 231 (stay lifted where cram down proposal provided

out-of-the-money investor with all rights to future appreciation in a manner that violated

section 1129(b) and denied the creditor the right to credit bid); *Sun Valley Ranches*, 823 F.2d at

1376 (the stay is properly lifted in cases where declining value of real property provides reason

to believe that a reorganization cannot be achieved, even where parties "understandably

disagree" over whether a reasonable possibility of reorganization exists).  The Ninth Circuit

requires a plan proponent, to avoid lifting of the stay, to demonstrate "feasibility of

confirmation" before the trial court and to "produce some evidence that its plan could be

confirmed by a reasonable bankruptcy judge").  *In re Bonner Mall P'ship*, 2 F.3d 899, 902 n.4

(9th Cir. 1993).  In that case the Ninth Circuit instructed the trial court to evaluate confirmation

objections when considering whether to lift the stay.  *Id.* at 905.  The Objecting Parties must

provide clear proposals and evidence regarding their purported plans of reorganization.  *In re

Kurth Ranch*, 97 B.R. 33, 36 (Bankr. D. Mont. 1989) (lifting the stay where no plan had been

proposed and where the absence of testimony on a confirmable plan provided no grounds for

finding an effective reorganization in prospect "on the basis of the present record").  The

Objecting Parties cannot meet this burden.

       1.   *The Proposed Interest Rate Is Too Low to Compensate for the Risk of the
Proposed Loan, and Other Terms Are Insufficient to Protect the First Lien
Lenders*

In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court determined that in a

chapter 13 case, the cram down interest rate is the national prime rate plus a risk factor based on

the creditworthiness of the debtor.  *Till* left open the possibility that a market rate might be more

appropriate in a chapter 11 context, *id.* at 477 n.14, and the Ninth Circuit has not ruled on that

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

19

issue. But there is no reason to believe that the 5.5% interest rate the Second Lien Group has

offered would pass muster under any method for the calculation of a cram down interest rate.

There is an efficient market for large commercial real estate loans in this country, but no

bank would ever extend the loan being proposed by the Second Lien Group at a 5.5% rate (or a

rate even close to this amount). Manley Declaration, ¶¶ 17-18. The reorganized borrower would

be highly leveraged and have no commitments for future equity infusions; instead, it would have

to pay high equity returns. With only the most marginal of equity cushions and cash flows which

are barely sufficient (at best) to service the debt, the restructured loan exposes the First Lien

Lenders to severe risk of loss of principal and would demand a high interest rate in return.

Manley Declaration, ¶¶26-29. A plan predicated on an unstable rental income stream in a

volatile real estate market has dubious confirmation prospects. *In re Landry*, 1994 U.S. App.

LEXIS 1559, *13 n.5 (9th Cir. 1994) (stay lifted in case where "property values and rents were

declining in the area" making debtor's income "subject to fluctuation" such that a proposed cram

down plan was too uncertain to be confirmable). The commercial real estate loan market also

would never value at par a loan at the debt-to-value ratio proposed by the Second Lien Group,

especially one without standard lender protections such as limits on returns to equity holders, bad

boy guaranties, and a reasonable package of financial and restrictive covenants. Manley

Declaration, ¶ 14. The Ninth Circuit B.A.P. has approved a plan that provided for a loan-to-

value ratio higher than prevailing market ratios (as is the case here), only where an above-market

interest rate was paid in return. *In re Boulders on the River*, 164 B.R. 99, 104-06 (B.A.P. 9th

Cir. 1994).

The Second Lien Group's plan is a classic "heads-we-win, tails-you-lose" proposal. If

the Property appreciates, then they keep everything (having paid almost nothing); if the Property

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

20

1  declines, or does not appreciate quickly enough, then the plan fails, and the First Lien Lenders

2  will not receive even the depressed value of their collateral.  In the meantime, the Second Lien

3  Group will hope that they have recouped their own investment with a handsome return of 20%

4  prior to any such default.  This is precisely the type of risk shifting that applicable case law

5  forbids.  *See In re Manion*, 127 B.R. 887, 890 (Bankr. N.D. Fla. 1991) (plan was not fair and

6  equitable because it was unclear whether the property would be able to maintain its current value

7  and proponent was speculating with the creditors' money).[19]

8

9      The availability of a section 1111(b) election does not cure this defect.  A lender is not

10  compelled to make a section 1111(b) election.  More importantly, even if a section 1111(b)

11  election was made, the First Lien Lenders would still be at risk because the amortization

12  payments that the Property can support would not reduce the principal amount of the loan

13  quickly enough to ensure repayment of the principal and the exit fees at maturity.  Manley

14  Declaration, ¶44.  The First Lien Lenders would be forced to bear considerable risk that the

15  Property may not appreciate.  Fine Declaration, ¶ 14.

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[19]  *In re Orchard Village Invs., LLC.*, 2010 Bankr. LEXIS 48 (Bankr. D. Or. 2010) is also instructive.  There the court declined to confirm a plan that would pay a secured claim at below market interest over seven years with a substantial balloon payment due at the end of seven years.  Drawing on expert evidence, the court concluded that it was unclear the debtor would be able to refinance at the end of seven years. *Id.* at *52-53.  In making its decision, the court weighed expert testimony which indicated that the market for obtaining financing at an affordable rate was tight, and that even the lowest rate at which refinancing could be available was higher than the 5% interest the secured creditor would be paid under the cram down plan. *Id.* at *55-56.  Plans that do not provide for amortization require balloon payments at the end and may be held unconfirmable for this reason. *Miami Center Associates,* 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992) (market conditions and contingent nature of the plan shifted the risk to the creditor making it "questionable" whether the creditor would receive the value of its total secured claim).  This defect in the Second Lien Group's proposal is only made more offensive when one considers the amount of free cash flow they propose to divert from the Property irrespective of whether the value of the Property is likely to support repayment at maturity and irrespective of whether the loan is in default.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

21

In addition, loans with lengthy maturities at odds with industry standards are routinely rejected under Bankruptcy Code section 1129(b).[20] The existing loan has already matured, but the Second Lien lenders want to force the First Lien Lenders to wait another nine years to see if they can recover even the now depressed value of their loan. This does not satisfy Bankruptcy Code section 1129(b)(2)(A). An appropriate term for a loan such as this would be 1-3 years. Manley Declaration, ¶33.

       2.  *The Proposed Plan Does Not Provide the Senior Lenders an Opportunity to Credit Bid or to Match the Bid Made by the Second Lien Lenders*

A secured creditor cannot have its property sold without being provided a right to credit bid. In *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428 (D. C.D. Cal. 1993), the District Court for the Central District of California noted the discretion granted to a bankruptcy court to decline to allow credit bidding under section 363(k). The court surveyed case law in this Circuit and concluded that "each of the six decisions that has addressed this issue held that the secured creditor had a right to credit bid his entire claim." *Monarch Beach*, 166 B.R. at 433. The Court thus concluded that "at least in this Circuit, the right to credit bid may not be taken from the creditor." *Id.* Here, the only "cause" which the Second Lien Group is able to point to is their own desire to effectuate a cram down plan over the objection of the First Lien Lenders or the

---

[20]   See, e.g., *In re Miami Center Associates, Ltd.*, 144 B.R. 937, 940-41 (Bankr. S.D. Fla. 1992) (ten year term of cram down note not fair and equitable because loans in the debtor's industry usually were three to four years in duration); *In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 45 (Bankr. D. Del. 1991) (finding a hotel loan for a thirty year term at ten percent interest rate too long because few hotel loans were being made and such loans typically were available only with shorter terms"); *In re D&F Constr., Inc.*, 865 F.2d 673, 676 (5th Cir. 1989) (holding that a fifteen year deferred payment period was too long); *In re 222 Liberty Assocs.*, 108 B.R. 971, 993-996 (Bankr. E.D. Pa. 1990) (determining that a ten year deferred payment period to be too long)); *In re DeTienne Assocs. L.P.*, 2005 Bankr. LEXIS 3122 (Bankr. D. Mon. July 29, 2005) (lengthy extension of loan term was not fair and equitable and "smacked of inequity"). Although lengthier cram downs are not unknown, they are subject to heightened scrutiny and typically occur in contexts of residential mortgages or where a substantial equity cushion provides more genuine security of eventual repayment. *See also In re Orchard Village Invs., LLC.*, 2010 Bankr. LEXIS 48, at *57-59 (Bankr. D. Or. Jan. 8, 2010) (proposal to extend a matured, short-term loan over a substantially longer term is subject to particularly close scrutiny (citing In re Tri-Growth Centre City, Ltd., 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992)); *In re Sagewood Manor Assocs., L.P.*, 223 B.R. 756, 770-71 (Bankr. D. Nev. 1998) (allowing cram down plan, which extended the repayment time period but finding existence of an equity cushion).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  alleged "conspiracy" pursuant to which the First Lien Lenders attempted to sell their collateral to

2  the highest available bidder.

3      Perhaps most importantly, a plan designed to circumvent credit bidding by a secured

4  lender would be unconfirmable in this Circuit. *California Hancock* makes clear that credit bid

5  rights extend even to plan proposals that are not technically structured as sales, including plans

6  proposed under sections 1129(b)(2)(A)(i) and 1129(b)(2)(A)(iii). *California Hancock*, 88 B.R.

7  at 230-31. It is not surprising that the Second Lien Group attempts to direct this Court toward

8  cases from other jurisdictions. But it is surprising that they cite *In re Philadelphia Newspapers,*

9  *LLC*, 599 F.3d 298 (3d Cir. 2010) time after time. In that case, well known at first for the

10  unsettling shadow it cast over the rights of secured lenders, the Third Circuit ultimately decided

11  that there could be circumstances in which a sale pursuant to a plan could be structured without

12  allowing secured creditors the right to credit bid. *Id.* at 304-10. But even as they did so, they

13  called into serious question whether a secured creditor would, as a matter of fact, receive the full

14  value of its collateral if denied the right to credit bid to prevent the disposition of its collateral at

15  an unreasonably low price. *Id.* at 312. Furthermore, *Philadelphia Newspapers* only delayed the

16  inevitable because the secured lenders in that case ultimately decided to bid cash at an auction

17  for their collateral and thereby achieved the same result as a credit bid. *In re Philadelphia*

18  *Newspapers, LLC*, Case No. 09-11204 (Bankr. E.D. Pa. 2010) [Docket No. 2253] (plan

19  providing for acquisition by a group of secured lenders who had been denied the right to credit

20  bid confirmed by order entered on June 29, 2010) (appeal by employee pension benefit plan on

21  other grounds currently pending).

22

23

24

25

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

3. *The Plan Contemplates a Sale of the Equity in the Debtor That Does Not Satisfy the Requirements of Bankruptcy Code Sections 363 and 1129(b)*

The Second Lien Group's plan is effectively a sale of the equity to the Second Lien Group for $10 million and certain other value (*e.g.*, the value of certain reserves). But the Second Lien Group aims to immunize this sale from the strictures of any market testing. The mere fact that the Second Lien Group's plan is being presented in a case where exclusivity has been terminated does not mean that they can avoid proving that the price paid for any property of the estate is fair, reasonable, and on market terms. Only an auction could show this. The Second Lien Group, or the Debtor, must market test their proposal. Otherwise there is no reason to believe the proposed price they are paying is the best available price, especially when they see that investment earning 20%.

Plan voting and confirmation requirements might normally provide some protection to ensure that a below-market sale could not be approved. But that would not happen here because the voting will be determined by the Second Lien Group who will, of course, vote their claims in favor of the below-market sale. They also will curry favor with junior classes by offering them a share of the misappropriated value for blessing the deal with their votes. With the voting rigged, only a robust market test can provide any assurance that section 1129(b)(2)(A)(i) or 1129(b)(2)(A)(iii) has been satisfied. Absent such a test, there will be no evidence that the First Lien Lenders have received the full value of their collateral. Manley Declaration, ¶ 49.

4. *The Plan Contemplates Prohibited "Disguised Distributions"*

The plan proposed by the Second Lien Lenders contains a "waterfall" intended to govern the distribution of cash flow generated by the Property postpetition. The Second Lien Group has included in this waterfall a number of cash payments for their exclusive benefit. These payments are nothing more than *de facto* deferred distributions under the plan. The distributions in

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

24

question run afoul of the requirements that a plan not "discriminate unfairly," that it be fair and equitable, and that any new value provided be of reasonably equivalent value to that which is taken in exchange. The proposed distributions include the repayment of a $20 million proposed investment with a 20% return. This amount is payable regardless of whether the loan is in default. *See* Debtor's term sheet, [Docket No. 297-1] at 4 (prong 10 of proposed "waterfall" does not terminate payments upon default). The Second Lien Group also proposes to receive distributions reimbursing them for their prepetition and postpetition legal fees. Because the payment of fees of an unsecured creditor is prohibited under section 506(b) of the Bankruptcy Code, the inclusion of such a provision violates section 1129(a)(1) and make the plan unconfirmable.

5.   *The Plan Cannot Satisfy the Best Interests of Creditors Test*

The Second Lien Lenders plan cannot satisfy the "best interests of creditors" test under Bankruptcy Code section 1129(a)(7) because the proposed distribution to the First Lien Lenders does not exceed what they would receive in a chapter 7 liquidation. Where assets can be sold quickly in a chapter 7 case on a going concern basis a hypothetical "fire sale" valuation is not the proper metric for judging whether the "best interests" standard is satisfied, and the court must instead look to the value that could be available from a going concern sale of the collateral. *In re Larson, Inc.*, 300 B.R. 227, 232-33 (Bankr. D. Del. 2003) (court noted that while "best interests of creditors" required a hypothetical chapter 7 liquidation analysis, chapter 7 authorizes trustee to operate the debtor's business for a limited period for the purposes of realizing greater returns by selling the debtor's business as a going concern).[21]  Offers of not less than $180 have been received for the Property, and interested parties continue to contact the First Lien Lenders.

---

[21]    This reasoning is difficult to reject in a case where the debtor would almost certainly sell the entire Property at once and to a single buyer.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Bertsch Declaration, ¶ 16.  If a buyer would pay $180 million for the Property in liquidation, and the First Lien Lenders were to receive a $10 million cash paydown under the plan, they must also receive a restructured debt obligation that is *worth* $170 million.  Thus, any debt obligation which the First Lien Lenders could be forced to accept must trade at par and otherwise be on market terms for the "best interests of creditors" test to be satisfied.  As demonstrated in the Manley Declaration, the value of the note on offer from the Second Lien Lenders comes nowhere near par.  Manley Declaration, ¶15.

Finally, the First Lien Lenders themselves likely are willing and able to purchase the Property in a liquidation for a cash price in excess of the value being offered by the Second Lien Group's plan.  On this basis alone the Second Lien Group's plan is unconfirmable.

> 6.  *The Plan Contemplates Impermissible "Gifts" To Manufacture A Vote From An Impaired Class*

The Second Lien Group's plan requires an accepting impaired class under section 1129(a)(10) of the Bankruptcy Code.  There is no value in this estate other than for the First Lien Lenders, so nothing can be distributed under a plan to junior classes.  Accordingly, all such classes should be deemed to reject the plan under Bankruptcy Code section 1126(g).  If the First Lien Lenders vote against the plan, then there would be no accepting impaired class and the plan could not be confirmed.

The plan proposes distributions to out-of-the-money stakeholders in order to gerrymander an accepting impaired class.  In addition to improperly classifying any First Lien Lender deficiency claim separately from unsecured creditors that would be paid in full, the Second Lien Group proposes to make a *de minimis* gift to the unsecured creditors (*i.e.*, primarily to themselves) and to have such a gift treated as if it were a "distribution" of the Debtor's property (where in fact it is a distribution of a portion of the equity which the Second Lien Group

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

26

proposes to purchase from the estate).  This gimmick is intended to avoid a deemed rejection by such class and allow the Second Lien Group to vote their worthless prepetition claim in favor of their own self-serving plan.

This is a clear effort to eviscerate the protections afforded by Bankruptcy Code sections 1129(a)(10) and 1126(g).  Those sections combine to ensure that the hardships of a cram down are justified only where the cram down is needed to preserve value for a junior class that is *not* out-of-the-money.  Treating what is in fact a "gift" as a "distribution" for the purpose of class voting would end run these Bankruptcy Code provisions and should not be permitted.  *See In re Ambanc*, 115 F.3d at 656 (classification schemes which are designed "for the purpose of securing an impaired consenting class" have been found to be "improper.").  The creation of a separate convenience class is also a clear attempt at gerrymandering in this case.

> 7.   *The Plan Violates the Absolute Priority Rule and Does Not Satisfy the "New Value" Plan Requirements*

The Second Lien Group's plan, including its classification scheme, violates the absolute priority rule because junior creditors and equity holders receive value under the plan despite the fact that impaired, senior creditors will vote to reject the plan.[22]  Furthermore, the Second Lien Group's plan does not satisfy the so-called "new value corollary" to the absolute priority rule, as detailed by this Circuit in *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir. 1993) and as described by the Supreme Court in *Bank of America National Savings Assoc. v. 203 N. LaSalle*

---

[22]    The First Lien Lenders will vote to reject the Second Lien Lenders' plan.  If they do not make a §1111(b) election they must be separately classified and will vote to reject in their capacity as unsecured creditors, triggering a violation of the absolute priority rule.  In fact, the structure of the Second Lien Group's plan is so similar to the type of manipulative new value plan that motivated the Supreme Court to endorse the heightened level of scrutiny required under the *LaSalle* factors, that the *LaSalle* factors should be applied by this Court to the proposed Second Lien Group plan irrespective of whether the First Lien Lenders make a § 1111(b) election or whether the Court holds that the absolute priority rule applies in the case of a secured creditor who will  not be paid in full.  The factors should be applied as part of the Court's "fair and equitable" analysis.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   *St. Partnership*, 526 U.S. 434 (1999).  At the outset, it should be noted that the Debtor's equity

2   holders are receiving a distribution without making any corresponding contribution.  This is a

3   *per se* violation of the absolute priority rule.

4          The Second Lien Group offers to provide the estate with $10 million to fund

5   distributions.  This amount represents a mere 2% or so of the outstanding claims.  The Ninth

6   Circuit has noted that contributions constituting 3.8%, 2.2%,  and 1.56% have been found to be

7   insubstantial.  *In re Ambanc*, 115 F.3d at 655-56.  The contribution offered by the Second Lien

8   Group clearly falls within this range of *de minimis* contributions and does not constitute

9   sufficient new value.

10         More importantly, the "value" proposed in the Second Lien Lender Plan is not necessary

11  for a successful reorganization.  The use of "new value" to pay additional senior claims is not

12  sufficient to prove necessity.  *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 873 (9th Cir. BAP

13  1994).  The value provided to the bankruptcy estate through the Second Lien Group's plan does

14  not assist in the successful reorganization of the debtor because no new money is needed.  The

15  cash flow of the Property is positive and no funding needs have gone unsatisfied.  In fact, the

16  money to be provided is required under the plan only because the plan itself creates such a highly

17  leveraged property.  Foreclosure accomplishes greater deleveraging without the need for

18  additional funds.  The necessity test is designed to prevent precisely the type of plan proposed by

19  the Second Lien Group:  one which provides new money, where none is needed, in the hope of

20  subverting a debtor's capital structure even though there is an impaired senior creditor who

21  should receive the equity in the debtor because their claim cannot be satisfied.

22         It is also clear that the value provided by the Second Lien Group's Plan is not

23  "reasonably equivalent" to the interest that the investing Second Lien Group will receive.  While

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

the Second Lien Group's plan provides only $10-20 million in new value, it allows the investing

Second Lien Group and the Debtor's equity holders to enjoy nearly the entire amount of any

"future profits" from the property. They also benefit from any appreciation in the Property's

value over time. The proposed waterfall allows them to repay their own investment from free

cash flow, meaning that they could in effect be acquiring an option on all future profit or

appreciation for free. If the Second Lien Lenders were to attempt to purchase the entire rights to

the future profits and appreciation of similarly situated property in return for a paydown of a

mere $10 million, they likely would not be able to find a seller.

Finally, the Second Lien Group also cannot satisfy the requirement that their plan be

market tested. *See Bank of America National Savings Assoc. v. 203 N. LaSalle St. Partnership*,

526 U.S. 434, 458 (1999) (stating that "plans providing junior interest holders with exclusive

opportunities free from competition and without benefit of market valuation fall within the

prohibition of §1129(b)(2)(B)(ii)."). Here, both the Debtor and the Second Lien Group have

failed to test the market to determine the sufficiency of their terms and they appear to have no

plan to do so. Exclusivity has been terminated to allow competing plans, but the Second Lien

Group argues that the First Lien Lenders cannot bid in this process. To be confirmable, the

Objecting Parties must either market test *their* proposed structure (*i.e.*, market test what someone

would pay for the equity they propose to acquire) or the First Lien Lenders must be permitted to

buy the equity themselves in any such process (for cash or credit).

8. *The Plan Is Not Feasible*

The Second Lien Group's plan is not feasible, as section 1129(a)(11) of the Bankruptcy

Code requires, because it is likely to require further reorganization or liquidation in the future.

*See In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985); *see also In re Trans Max*

*Tech., Inc.*, 349 B.R. 80, 91 (Bankr. D. Nev. 2006). The Debtor, who opposes the Liftstay

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Motion, has nonetheless noted that the cash flow from the Property likely is not sufficient to satisfy the proposed interest payments on the new loan but argues that the $8 million interest reserve will be sufficient to make the plan feasible. The term sheet for the Second Lien Lender's plan, though, states that the First Lien Lenders would receive 5.5% in amortization payments should they make an 1111(b) election. Even at the misstated claim amount of $259 million, and after giving effect to the proposed $10 million paydown, these amortization payments would exceed $28 million in the first two years. Manley Declaration, ¶ 44.[23] That would use up substantially all of the cash flow from the Property and eat up the entire interest reserve with a default triggered within the second year of the loan. While that alone creates a high probability of default, the Debtor's analysis also ignores the additional risks of declining revenues in an unstable market in which tenants of the Property have been demanding rent concessions. Fine Declaration, ¶ 16H and Bertsch Declaration, ¶ 10. The feasibility of the plan cannot be saved merely by reducing the amortization payments to be received by the First Lien Lenders because that, in turn, would create the risk that the Property would not appreciate quickly enough to support repayment of the restructured loan and any applicable exit fees. Manley Declaration, ¶44. Further, even if the First Lien Lenders do not make a § 1111(b) election, feasibility cannot be established unless the Court approves a cram down interest rate of 5.5% or less, which is far below a market rate of interest or a rate reasonable to compensate the First Lien Lenders for risk assumed. Manley Declaration, ¶ 17. Even then, there must be no decline in revenues. The plan simply will not satisfy section 1129(a)(10) of the Bankruptcy Code.

---

[23] Manley Declaration actually provides amortization amounts for an 1111(b) note of face value of $260 million.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

30

9.   *The Plan Has Not Been Proposed In Good Faith*

Section 1129(a)(3) of the Bankruptcy Code requires that "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Assocs.*, 749 F.2d 410, 415 (7th Cir. 1984); *see also Bonner Mall*, 2 F.3d 899. The Second Lien Group's plan fails this test. In *Bonner Mall* the Ninth Circuit noted that the two objectives of the Bankruptcy Code were:  (i) to permit successful rehabilitation of debtors and (ii) to maximize the value of the estate. *Bonner Mall*, 2 F.3d at 915.  The Second Lien Group plan has been proposed not to preserve value that would otherwise be lost or to enhance value for creditors.  Nor does the plan do anything to rehabilitate the Debtor.  The Court has queried whether there *is* a Debtor to speak of in this case.[24]  The Second Lien Group's plan has been proposed in the hopes of diverting value from the First Lien Lenders and preserving it for out-of-the-money stakeholders, who while arguing that they are providing fair and full value to the estate's only in-the-money creditors, are in fact gambling that they can siphon back their original investment and enjoy all future appreciation in value for themselves while requiring the First Lien Lenders to bear all losses.  To achieve this effect, the proposed plan leaves the property leveraged at close to 100% of its value, ensuring a subsequent bankruptcy if the gaming and real estate markets do not rebound.  All of this directly contradicts the Intercreditor Agreement.  Such a plan cannot be said to have been proposed in good faith under the applicable legal standard in this jurisdiction.

10. *The Second Lien Group Will Cast its Votes to Approve a Self-Serving Acquisition and Such Votes Should Be Designated*

The votes of the Second Lien Group should be designated rather than being counted toward the acceptance of their own self-dealing plan.  It is clear that on their own plan proposal

---

[24]     June 11 Hr'g Tr. at 140-41.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

the Second Lien Group will be wearing "two hats". They will be treated as both "Investing Second Lien Lenders", in which capacity they propose to acquire a substantial majority of the equity in the Property, and they will be an unsecured creditor as well, purportedly voting their claim as an independent and objective creditor. But when they vote to approve the plan in their capacity as an "unsecured creditor" they will in fact be voting to accept their own plan because it serves their interests in their capacity as acquirer of equity in the Property. There will be no objectivity or independence to any such vote and the situation falls well within the scope of cases in which a creditor's vote should be "designated" in order to protect the integrity of the chapter 11 plan approval process. *See In re Figter Ltd.*, 118 F.3d 635, 639 (9th Cir. 1997) (noting that in determining whether votes were not made in good faith "[i]t is always necessary to keep in mind the difference between a creditor's self interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest."); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) (noting that "[t]he mere pursuit of economic gain does not, of itself, indicate bad faith, so long as the interest being served is that of the creditor *as creditor*, as opposed to the creditor in some other capacity.") (emphasis in original); *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988) (stating that "[o]ne who casts his vote with a purpose of coercing payment to him of more than he might reasonably perceive as his fair share of the debtor's estate, does not cast his vote in good faith.").

Section 1129(a)(10) of the Bankruptcy Code expressly provides that the votes of insiders are not to be counted. This reflects a choice on the part of Congress to not allow the votes of plan proponents when considering whether an impaired class has voted to accept the plan. With exclusivity having been terminated, the Second Lien Group stands in the shoes of the "Debtor"

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    for purposes of their own plan, and their own, self-serving votes should be treated as those of an

2    "insider" and not be counted.

3        C.  The Intercreditor Agreement Prohibits the Second Lien Group Plan

4        Last but not least, the Second Lien Group cannot confirm their plan unless and until they

5    prevail in the adversary proceeding regarding the Intercreditor Agreement. To do so, the Second

6    Lien Group must establish, *inter alia*, that: (i) the previously proposed LIRA transaction was a

7    prohibited refinancing within the meaning of the Intercreditor Agreement; (ii) such prohibition

8    on refinancings applied even after maturity of the original loan; (iii) such prohibition on

9    refinancings were not overridden by the clear terms of the contract which allowed the First Lien

10    Lenders full discretion in the disposition of the Property after any default; (iv) that the Second

11    Lien Group did not breach the Intercreditor Agreement prior to any alleged breach by the First

12    Lien Lenders; (v) that the mere contemplation and pursuit of the LIRA transaction constituted a

13    breach of the Intercreditor Agreement even though such transaction was never actually

14    consummated; and (vi) that the remedy of treating the contract as terminated was available and

15    appropriate under the circumstances and that the Second Lien Group was not required to elect an

16    alternative remedy under applicable law or the terms of the contract itself. Absent successfully

17    establishing each of the above points (in addition to rebutting any other arguments raised by the

18    First Lien Lenders), the Second Lien Group plan cannot be confirmed.

19        As detailed above, the Second Lien Group's Plan suffers from at least a dozen separate

20    sets of confirmation problems. Most of these defects violate settled case law in this Circuit.

21    Thus, to succeed in confirming their plan, the Second Lien Group must persuade both this Court,

22    and any appellate courts, that *each* of the above described deficiencies should not prohibit

23    confirmation. If they fail to rebut even a single argument, then their plan cannot be confirmed.

24    Against these odds, there is no reasonable basis for concluding that there is a "reasonable

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

33

1   likelihood" of confirming a plan within a reasonable period of time.  Accordingly, there is no

2   reason that this case should continue over the objection of the secured lenders, who stand ready

3   and able to achieve a substantially identical or superior reorganization of the property that will

4   return it to a more productive use on a quicker timeframe and with greater certainty and less

5   expense.

6

7   **IV.    Conclusion**

8        The Objecting Parties are asking for a radical reorientation of the rights and priorities of

9   secured lenders vis-à-vis out-of-the-money stakeholders.  On the Second Lien Group's novel

10  theory of the law, a secured lender could always be prevented from realizing the full value of its

11  collateral if a handful of creditors can force a bankruptcy and then assert that they desire to

12  purchase the equity or assets of the debtor for minimal consideration.  The Objecting Parties

13  insist a secured lender must fund such a process with its own cash collateral and can be forced to

14  endure actual and threatened deterioration in the value of their collateral in a highly volatile and

15  unsettled real estate market.

16

17       An undersecured lender's "forced lending obligations" do not end here according to the

18  Objecting Parties.  They extend beyond bankruptcy as well.  The Second Lien Group insists that

19  even where a secured lender is the only entity with any economic interest in the property, such a

20  lender can be compelled to sell its collateral to an out-of-the-money stakeholder and to finance

21  such a purchase with a loan of almost a decade (even after a prior loan has matured and gone

22  unpaid).  Under this theory of the law, the First Lien Lenders could have over one-

23  hundred million dollars of their investment eliminated while the dissenting creditors keep for

24  themselves the value of any future recovery in the real estate market.  The dissenting creditor is

25  allegedly entitled to this value for a price of its own choosing because the Objecting Parties

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

34

argue that the secured lender cannot block such a proposal with their own bid, be it a bid of cash or credit.  In fact, no other party will be permitted to bid.

The Second Lien Group will, no doubt, argue that the confirmation and voting requirements of the Bankruptcy Code provide sufficient protection for the senior lenders.  But here, the only votes other than the self-serving votes of the Second Lien Group members will be the votes that they "buy" by sharing the value that they plan to divert from the senior lenders.  The Second Lien Group argues that the subordinated junior lenders (who enjoyed greater returns in exchange for willingly accepting greater risk) must have the right to trump the preferences of the senior lenders (who accepted lower returns but bargained for greater protection).  This would flip the comparative rights of the two groups on their head.  Such a disturbing new precedent could make worthless shares and loans the new "fulcrum security" and investment of choice for distressed investors.  This would have jarring effects in any case involving a proposed foreclosure.  Even a small stake of worthless equity or credit, acquired for pennies on the dollar, could allow distressed investors to halt foreclosures and engage in opportunistic bankruptcy cases with the aim of realizing outsized returns based on nothing other than the inevitability of errors in valuation and the hope of a future appreciation in the real estate market.  Such cases would be encouraged notwithstanding the absence of any legitimate reorganizational purpose or economic value and would upset long held investor expectations that are underpinned by the protections of the Bankruptcy Code and settled appellate level authority in this Circuit.

Against this novel and legally unsupported new theory, the First Lien Lenders ask this Court to honor a centuries old legal principle and to find that a secured mortgagee who has not been repaid at the maturity of its loan be allowed to foreclose.  In a case where the property securing the loan has no role to play in a larger reorganization and where no value remains for out-of-the-money creditors a cram down plan is not viable.  There is no reason foreclosure

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

35

1    should be prohibited.  On the facts of this case, both equity and the Bankruptcy Code demand

2    that the stay be lifted.

3            For all of the above reasons, the First Lien Agent respectfully requests that this Court

4    grant this Liftstay Motion and enter an order for the relief requested herein.

5            WHEREFORE, the First Lien Agent respectfully requests that this Court (i) enter an

6    order granting the Liftstay Motion and (ii) grant such other and further relief as is just and

7

8    proper.

9

     Dated this 9th day of July, 2010

10

11                                              Lionel Sawyer & Collins

12                                      By:    /s/ Rodney M. Jean
13                                              Rodney M. Jean
                                                Susan L. Myers
14

15                                              and

16                                              Shearman & Sterling, LLP

17                                              Randall L. Martin
                                                Andrew V. Tenzer
18
                                                Attorneys for *Landesbank Baden-*
                                                *Württemberg, New York Branch*
19

20

21

22

23

24

25

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

36