HAL BAUME, ESQ.
*Admitted Pro Hac Vice*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
MICAELA RUSTIA, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway
Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        aloraditch@foxrothschild.com
        mrustia@foxrothschild.com

*Counsel for FX Luxury Las Vegas I, LLC*

Electronically Filed July 16, 2010

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

In re

FX LUXURY LAS VEGAS I, LLC,
a Nevada limited liability company,

                                    Debtor.

Case No.  BK-S-10-17015-BAM

Chapter 11

Hearing Date:    July 21, 2010
Hearing Time:    1:30 p.m.

## DEBTOR'S OBJECTION TO
## LANDESBANK BADEN-WÜRTTEMBERG, NEW YORK BRANCH'S
## AMENDED MOTION FOR RELIEF FROM AUTOMATIC STAY

VG1 44676v2 07/16/10

FX Luxury Las Vegas I, LLC ("Debtor" or "FX I"), the debtor and debtor-in-possession in the above-captioned case ("Chapter 11 Case"), by and through its counsel, the law firm of Fox Rothschild LLP, hereby objects to Landesbank Baden-Württemberg, New York Branch's ("LBBW") Amended Motion for Relief From Automatic Stay [Docket No. 378] (the "Amended Stay Relief Motion"), which amends and restates the First Lien Agent's request for relief in LBBW's Motion for Relief From Automatic Stay [Docket No. 300] (the "Initial Stay Relief Motion")[1] filed on June 10, 2010, and files its Objection to the Amended Stay Relief Motion (the "Objection").

This Objection is based upon the following memorandum, the Declarations of Anne M. Loraditch (the "Loraditch Declaration"), Gary A. McHenry (the "Second McHenry Declaration"), the Declarations of Edward M. Burr, Jr. (the "Burr Declaration") and Heidi Kent (the "Kent Declaration"); the papers and pleadings on file herein and any oral argument entertained by the Court at the hearing on the Stay Relief Motion.

As set forth in this Objection, Debtor objects to the Amended Stay Relief Motion as LBBW has not established that it is entitled to stay relief under either section 362(d)(1) or (2) of the Bankruptcy Code. LBBW has not established "cause" to terminate the automatic stay under section 362(d)(1) of the Bankruptcy Code because LBBW has not presented credible evidence that the Properties are declining in value and LBBW's interest is being adequately protected. With respect to section 362(d)(2) of the Bankruptcy Code, Debtor needs the Properties to reorganize therefore LBBW is not entitled to stay relief.

## POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

Determination of the Amended Stay Relief Motion is a watershed moment for this case. If the stay is lifted, all the benefit goes to the First Lien Lenders. Such result seems incongruous with the Court's decision to terminate Debtor's exclusive periods to file and solicit a plan, where in the context of its ruling, the Court noted:

---

[1] On June 25, 2010, Debtor filed its Opposition to the Initial Stay Relief Motion [Docket No. 336], along with the supporting Omnibus Declaration of Gary McHenry [Docket No. 338] ("First McHenry Decl."), the Omnibus Declaration of Mitchell J. Nelson [Docket No. 339], and the Declaration of Edward M. Burr, Jr. [Docket No. 340].

1

VG1 44676v2 07/16/10 }|

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

. . . one might fairly well say, well, if the first lien lenders want to do it [reserve the right to credit bid the entire amount of their claim], it's really their ball, let them call the rules.

To that I would respond, well, perhaps, you could have done that were you in a state court receivership where the receiver acts on behalf of the secured party, but once that action dissolves and the debtor commences a bankruptcy case, *bankruptcy code requires me to take into account the interests of the entire estate, **not just the first lienholders***, not to approve processes that unduly favor one party or the other, but to try – to steal the words of the second lienholders – to open up a transparent process.

June 11, 2010 Hr'g Tr. at 153:18-154:4 (emphasis added).  The First Lien Lenders invoked the Bankruptcy Court's jurisdiction and the automatic stay so, as with the consideration of whether to terminate exclusivity, this Court should again take into account the interests of the entire estate and not just the First Lien Lenders, in determining whether there is cause to lift the stay.

In addition to the equities, LBBW has not met its burden to make a *prima face* case that cause exists to lift the automatic stay.  LBBW has not provided sufficient evidence that the Properties are declining in value during the pendency of the bankruptcy or that they lack adequate protection.  LBBW relies, in large part, on the alleged expert opinion of Randall Fine and his declaration [Docket No. 380] ("Fine Declaration") for the proposition that the Properties have declined in value since the Petition Date.  However, Mr. Fine is not a certified real estate appraiser in the State of Nevada and does not appear to have any experience in real estate valuations.  Similarly, Larry Bertsch has testified he is neither a certified real estate appraiser nor an economist thus he is incapable of providing credible real estate valuation testimony.  Keith Harper and Larry Snyder of Snyder Valuation are certified real estate appraisers, but their appraisals are so riddled with misleading assumptions and contradictory statements that the credibility of such reports is highly dubious.  Notwithstanding, the use of the Snyder Valuations to demonstrate an alleged decline in value in the eleven months from July 2009 to June 2010 does not satisfy the Bankruptcy Code requirements that the First Lien Lenders' collateral is declining in value during the pendency of this Chapter 11 Case when this case was filed only three months ago on April 21, 2010.  LBBW has made no credible showing that the alleged decline occurred postpetition.  Indeed, Debtor's postpetition performance, as well as recent economic indicators demonstrating improvement in Las Vegas, suggest that the Properties are not declining in value.

2

1      With respect to section 362(d)(2), the Properties are necessary and integral to an effective

2 reorganization. The Court terminated exclusivity, in part, on the basis of an unexecuted term sheet for a

3 plan of reorganization and now there is a plan on file that shows there is a viable plan in prospect that is

4 not unconfirmable on its face. The viability of such plan should be decided by creditor votes and the

5 confirmation process. Debtor and its estate should be afforded that opportunity. The First Lien Lenders

6 are not entitled to all the benefit. See 11 U.S.C. § 1129(b)(2). Accordingly, the Court should deny the

7 request for termination of the automatic stay.

8  **II.     LEGAL AUTHORITY**

9      **A.     The First Lien Lenders Invoked This Court's Jurisdiction and This is Relevant to
          the Determination of Whether There is Cause to Lift the Stay Because it was
10         Unlikely Debtor had the Ability to Support a Chapter 11 Case on its Own.**

11     LBBW asserts that Debtor's allegations LBBW invoked this Court's jurisdiction are false and

12 irrelevant. Am. Mot. at 8:19-9. LBBW alleges that Debtor always threatened and intended to file

13 bankruptcy. Id. at 8:24-9:3. While Debtor considered filing for bankruptcy as one of the many options

14 to prevent foreclosure, it was not viable for Debtor to file for bankruptcy without an arrangement with

15 the First Lien Lenders and/or the Second Lien Lenders in place as Debtor alone did not have the funds

16 to finance a Chapter 11 case. See Rough Deposition Transcript of Mitchell Nelson, taken on July 13,

17 2010 ("Nelson Transcript"), at p. 18. A true and correct copy of the Nelson Transcript is attached to

18 the Loraditch Declaration as Exhibit "1" and incorporated fully herein by this reference. Initially,

19 around November or December 2008, before the loans matured and prior to actual notice of

20 foreclosure, Debtor and LBBW discussed the possibility of a friendly foreclosure. See id. at 18-20, 90-

21 91. However, LBBW did not want to proceed under that option for fear that they would be sued by the

22 junior lenders for conspiracy. See id.

23     Instead of proceeding with its foreclosure sale against the Properties, LBBW chose to proceed

24 under the Bankruptcy Code, with the agreement of Debtor and LIRA, to realize more from the

25 Properties that it could hope to obtain through a foreclosure sale. See id. at 35. LBBW admits this

26 much in its Amended Motion:

27         the First Lien Lenders elected to pursue a consensual debt restructuring with
          all significant stakeholders . . . Unable to reach a deal with the next party

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

3

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

down in the capital structure, the First Lien Lenders agreed to support the Debtor's sale of the Property to certain existing equity investors through a prepackaged bankruptcy. That proposed sale was subject to a market test of whether the Property could generate a recovery for the legally and contractually subordinated Second Lien Lenders.

Am. Mot. at 2:17-19, 2:23-3:3. LBBW thus voluntarily invoked the Bankruptcy Court's jurisdiction and the automatic stay.[2] Moreover, the First Lien Lenders required accelerated deadlines.[3] As the case has not proceeded the way they had intended, the First Lien Lenders changed their strategy by withdrawing support for Debtor remaining in Chapter 11 and seeking to revert back to foreclosure. This is in essence what LBBW argues in the Motion, that the "First Lien Lenders' cash collateral has been used to fund a process that has thus far been fruitless in generating improved value for the estate and has produced instead a wave of litigation." Id. at 8:9-11. However, keeping this case in bankruptcy and exploring the plan currently on file may protect value for the estate that may be otherwise lost in a foreclosure.

Further, as indicated above, contrary to LBBW's assertions, Debtor *did not* always intend to file for bankruptcy due, in large part, to a lack of funds to finance Chapter 11 expenses. Debtor filed this case after negotiating with LBBW, on behalf of the First Lien Lenders, for the use of cash collateral and payment of administrative expenses, including professional fees, during the bankruptcy. The Amended Interim Order Pursuant to 11 U.S.C. Section 105, 361, 362 and 363 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing the Debtors to Use Cash Collateral, and (II) Granting Adequate Protection [Docket No. 83] (the "Amended Interim Cash Collateral Order"), which Debtor submitted for the Court's consideration only after receiving authority and approval to do so from LBBW, on

---

[2] In JP Morgan Chase Bank, NA v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 409 B.R. 649 (Bankr. S.D.N.Y. 2009), JP Morgan filed an adversary for a declaratory judgment that certain technical defaults on the pre-petition credit agreement between Debtors and JP Morgan prevented the credit facility's reinstatement under the Debtors' pre-packaged plan. JP Morgan opposed reinstatement because it wanted leverage to oppose the plan by preventing reinstatement - a key provision in the Debtors' pre-packaged plan. Id. at 651. Despite JP Morgan's position, the court found the matter to be a core proceeding, noting that "JP Morgan is not an unwilling party that has been 'involuntarily subjected' to the [bankruptcy] Court's jurisdiction." Charter, 409 B.R. at 658-59. The court continued, "[i]nstead, JP Morgan has chosen its forum after considering its strategic options. Id. at 659. JP Morgan has actively participated from the outset and remains "intimately involved in the bankruptcy proceedings.'" Id. at 659. Similarly, LBBW chose the Bankruptcy Court as its forum after considering other strategic options so this case should remain in Bankruptcy Court and the stay remain in effect.

[3] This Court noted at the June 11, 2010 hearing: "But, I mean, the point being is your side is the one that has imposed the fast track. Your side is the one that filed the prepackage plan with the accelerated deadlines. Your side is the one that is going forward and saying this has to be heard." June 11, 2010 Hr'g Tr. at 104:7-11.

4

behalf of the First Lien Lenders, NexBank, on behalf of the Second Lien Lenders, the Receiver and the Office of the United States Trustee, states:

> The Debtor has an immediate need to use the Cash Collateral in order to operate the Real Property Collateral.  Without the ability to utilize the Cash Collateral, the value of the Prepetition Collateral will deteriorate substantially.  The First Lien Agent and the Debtor have negotiated at arm's length and in good faith regarding the use of the Cash Collateral to fund the Debtor's business and entry of this Interim Cash Collateral Order is in the best interests of the Debtor, its estate and its creditor and equity holders.  The reliance of the First Lien Agent, the First Lien Lenders and the Debtor on this Interim Cash Collateral Order is in good faith.

Amended Interim Cash Collateral Order, p. 12, ¶ Y.  The Amended Interim Cash Collateral Order also provides (with the following capitalized terms defined therein):

> So long as a Termination Event [ ] has not occurred (or has been waived), and solely to the extent that they are Permitted Expenditures[4] which have been funded by the First Lien Agent, the Debtor shall be permitted to pay (1) the Statutory Fees and (2) [professional fees/expenses] (which in no event shall exceed the Fee Cap [which is $1,250,000] . . . provided that the payment of items described by clauses (1) and (2) of this sentence shall not reduce the Carveout, except with respect to payments under clause (2) which shall always be subject to the Fee Cap.

Id. at 23-25, ¶ 11.  No Termination Events has occurred yet but a Termination Event may occur at the hearing on July 21, 2010, if the Amended Interim Cash Collateral Order is modified without LBBW's consent.  Id. at 25-27, ¶ 13.  Even if a Termination Event occurs, the Amended Interim Cash Collateral Order provides that "Debtor reserves its rights to seek non-consensual use of Cash Collateral."  Id. at 30, ¶ 21.  The Amended Interim Cash Collateral Order also states that the factual stipulations therein "shall survive any Termination Event."  Id. at p. 30, ¶ 21.  This includes the factual stipulation: "The reliance of the First Lien Agent, the First Lien Lenders and the Debtor on this Interim Cash Collateral Order is in good faith."  Id. at p. 12, ¶ Y.

Further, Courts will "allow payment of administrative expenses from the proceeds of secured collateral when incurred primarily for the benefit of the secured creditor or when the secured creditor

---

[4] Under the Amended Interim Cash Collateral Order, Permitted Expenditures includes the Budget approved in writing by the Debtor and the First Lien Agent (with the consent of the First Lien Lenders), expenses related to the Budget with variances and expenses approved for in writing by the First Lien Agent pursuant to any Supplemental Budget Request. Id. at p. 13, ¶ 1.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

5

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

caused or consented to the expense." <u>Central Bank of Montana v. Cascade Hydraulics and Utility Service, Inc. (In re Cascade Hydraulics and Utility Service, Inc.)</u>, 815 F.2d 546, 548 (9th Cir. 1987). Such is the case here.  This case was initiated by Debtor, LBBW and the First Lien Lenders as a prepackaged bankruptcy, pursuant to the Lock Up and Plan Support Agreement and prepackaged plan. LBBW and the First Lien Lenders put Debtor on a short leash and required Debtor to prepare a multitude of documents, each requiring review and approval of LBBW.  To have LBBW and the First Lien Lenders now disagree to payment of fees and expenses incurred for a consensual prepackaged bankruptcy is unfair and contrary to principals of justice.  Debtor bargained for and have relied on LBBW and the First Lien Lenders' agreement to payment of professional fees and expenses up to the Fee Cap of $1,250,000 and the Carveout up to $250,000.  LBBW and the First Lien Lenders have already agreed to the continued use of cash collateral pursuant to the Amended Cash Collateral Order through July 21, 2010.  Thus, chapter 11 fees and expenses incurred by Debtor through July 21, 2010 for have already been approved and agreed to by LBBW and the First Lien Lenders and relied on by Debtor.  Consequently, LBBW should not be granted stay relief.

**B.    LBBW Has Not Produced Sufficient Evidence to Establish a Prima Facie Case That Cause Exists for Relief Under Bankruptcy Code Section 362(d)(1).**

A creditor seeking relief from the automatic stay has the initial burden of producing evidence sufficient to establish a prima facie case that "cause" exists for relief under § 362(d)(1).  <u>In re Gould</u>, 401 B.R. 415, 426 (B.A.P. 9th Cir. 2009).  Cause for lifting the stay has no clear definition and is determined on a case-by-case basis.  <u>See</u> <u>Christensen v. Tucson Estates. Inc. (In re Tucson Estates. Inc.)</u>, 912 F.2d 1162, 1166 (9th Cir. 1990).  A prima facie case requires the movant to establish both "a factual and legal right to the relief that it seeks." <u>Id.</u> at n. 11 (citations omitted).  Once a prima facie case is established, the burden shifts to the debtor to show that relief from the stay is unwarranted.  <u>Id.</u> (citations omitted).  The decision whether to grant or deny stay relief is within this Court's broad discretion.  <u>Id.</u> at 558 (citation omitted).

**1.    The First Lien Lenders are Undersecured Creditors Not Entitled to Adequate Protection As There Is No Admissible or Credible Evidence of Decline in Their Interest in the Properties.**

Based on its § 362 information sheet and the Stay Relief Motion, LBBW admits the First Lien Lenders are undersecured. Am. Mot. at  4:17-21.  Pursuant to section 506(a) of the Bankruptcy Code,

the First Lien Lenders have a secured claim for the value of its collateral and an unsecured claim for the balance. 11 U.S.C. § 506(a). An undersecured creditor is entitled to stay relief only if the secured portion of its claim is not adequately protected. 11 U.S.C. §§ 362(a), 506(a); see also In re Orlando Trout Creek Ranch, 80 B.R. 190, 191 (Bankr. N.D. Cal. 1987). Section 361 provides that adequate protection of an entity's interest in property may be provided by granting such relief "as will result in the realization by such entity of the indubitable equivalent of its interest." United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 108 S. Ct. 626, 627 (1988). "It should be noted that each case must be approached in light of its individual circumstances." La Jolla Mortg. Fund v. Rancho El Cajon Associates, 18 B.R. 283, 288 (Bankr. S.D. Cal. 1982). The Ninth Circuit Bankruptcy Appellate Panel in In re Weinstein, 227 B.R. 284 (B.A.P. 9th Cir. 1998) explained:

> Adequate protection is provided to safeguard the creditor against depreciation in the value of its collateral during the reorganization process. See Paccom Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.), 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992). If the value of the collateral decreases, the creditor is entitled to cash payments so that the value of its interest in the collateral remains constant. 11 U.S.C. §§ 362(d)(1) and 361(1); see also In re Addison Properties Ltd. Partnership, 185 B.R. 766, 769 (Bankr. N.D. Ill. 1995).

Weinstein, 227 B.R. at 296. The Ninth Circuit Bankruptcy Appellate Panel also held "[w]here there is no depreciation, there is no entitlement to adequate protection payments." Id. (citing Confederation Life Ins. Co. v. Beau Rivage Ltd., 126 B.R. 632, 640 (N.D. Ga. 1991)). Essentially, an undersecured creditor's adequate protection payments are limited to the depreciation of the value of its collateral. In re Marquez, 270 B.R. 761, 768-09 (Bankr. D. Ariz. 2001) (citing Timbers, 484 U.S. 365, 108 S.Ct. 626). Furthermore, if adequate protection is granted, it is granted prospectively from the date a motion for relief from stay or a motion for adequate protection is filed. In re Cook, 205 B.R. 437, 440 (Bankr. N.D. Fla. 1997).

Further, LBBW misunderstands that, for purposes of determining whether its collateral is adequately protected, the Court will look at whether the Properties are declining in value *during* the pendency of the bankruptcy. Timbers, 484 U.S. at 370-71, 108 S. Ct. at 630 ("It is common ground that the 'interest in property' referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest

7

F O X  ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

is not adequately protected if the security is depreciating during the term of the stay."). LBBW does not provide admissible or credible evidence demonstrating a decline in the value of the Properties during the period that the stay has been in effect thus it has not established its prima facie case. Accordingly, the Amended Stay Relief Motion should be denied on that basis.

**a.    The Allegations in the Bertsch Declaration are False and Misplaced and Mr. Bertsch is not Qualified to Provide an Opinion on Decline in Value.**

LBBW and Mr. Bertsch make several accusations of improper accounting practices by Debtor to rebut Debtor's assertion that its cash flows demonstrate improvement during the bankruptcy. Am. Mot. at 12:5-12; see generally Bertsch Decl. [Docket No. 379]. The difference in the figures derived by Mr. Bertsch and Mr. McHenry are due to the method of accounting. Mr. McHenry utilized the accrual basis, which is the method of accounting required for filling out Monthly Operating Reports in this District.[5] See Second McHenry Decl. Mr. Bertsch testified at his deposition held July 13, 2010,[6] that he used the cash basis of accounting as that was what was required under the lockbox arrangement with LBBW. Mr. Bertsch also alleges that Mr. McHenry improperly annualized a lease termination payment in June. Bertsch Decl., ¶ 7B. However, the one-time payment did not artificially inflate Debtor's revenues for June 2010. See Second McHenry Decl. FX Luxury billed $1,288,148.37 for the month of June 2010 and the increase was the result of adding one new tenant and billing for annual increases in existing leases. Id. Mr. Bertsch alleges Mr. McHenry's calculation for the annualized number for June 2010 is erroneous. Bertsch Decl., ¶7C. Mr. McHenry discovered an input error causing the annualized number to be overstated. See Second McHenry Decl. However, the corrected numbers still demonstrate an increase in annualized revenue in June 2010 over March 2010 of $298,445.48. See id. A chart providing Mr. Bertsch's allegations side-by-side with Mr. McHenry's responses, as reflected in the Second McHenry Declaration, is attached hereto as Exhibit A. The corrected figures still reflect improvement in Debtor's cash flows during the pendency of the bankruptcy.

---

[5] The first paragraph of the Monthly Operating Report forms provided by the Office of the United States Trustee state: "Debtor in possession (or trustee) hereby submits this Monthly Operating Report on the Accrual Basis of accounting (or if checked here the Office of the U.S. Trustee or the Court has approved the Cash Basis of Accounting for the Debtor)."

[6] Debtor's counsel was in attendance at the deposition; however, a transcript of those proceedings has not yet been made available. Debtor will supplement this Objection when it obtains a copy of the transcript.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

VG1 44676v2 07/16/10

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Mr. Bertsch also states in his declaration that he reviewed the appraisals by Snyder Valuation dated June 23, 2009 and June 24, 2010 and applied a linear drop of $12 million over the 11 month between the two appraisals period to show that there is insufficient protection for the First Lien Lenders. Yet, Mr. Bertsch testified that he is not an economist and not an appraiser. Mr. Bertsch testified that he did not recall if the $12 million decline was a straight decline and that he assumed a monthly decline. However, the real estate market is not linear. If, in fact, a decline occurred, it is difficult to determine when, in fact, the decline in value actually occurred. Mr. Bertsch's testimony regarding a decline in value should not be afforded any weight. The appropriate technique to determine whether an income producing property is declining in value is to evaluate the cash flows and whether they are declining. See Burr Decl.; In re 2712 Mission Partners, L.P., 2010 WL 431738, *5 (Bankr. N.D. Cal. 2010) ("The value of all income-producing real property is determined by discounting to present value the expected cash flow from the property."). As set forth in the First and Second McHenry Declarations, tenant revenue is in fact increasing. See McHenry Decls. LBBW has not sufficiently established its case in chief via Mr. Bertsch's testimony.

**b.    The Snyder Appraisals are Flawed and Misleading.**

LBBW relies on two appraisals by Snyder Valuation, one performed on July 23, 2009 ("2009 Snyder Appraisal") and the other on June 24, 2010 ("2010 Snyder Appraisal") attached as Exhibits 1 and 2 to the Declaration of Keith Harper [Docket No. 382]. Debtor asked its real estate appraiser, Kent Appraisal Services ("Kent") to review the 2009 Snyder Appraisal and the 2010 Snyder Appraisal and determine the completeness, consistency and coherency of each Exhibit and a comparison of the two. Kent's analysis and conclusions from its technical review of the Snyder Appraisals are detailed in the memorandum correspondence ("Kent Report") attached as Exhibit "B" to the Kent Declaration. The analysis and conclusions in the Kent Report indicate the Snyder Appraisals are plagued with numerous misleading assumptions and contradictory findings.

Debtor's financial advisor, Sierra Consulting Group ("Sierra") also reviewed the appraisals by Snyder Valuation. Sierra focused on the key drivers of the valuation of the Properties instead of the extensive narrative included in both reports. The narrative, which describes many different economic indicators, metrics, and activity levels, seems to be the basis for the reduction in the land valuation from

9

VG1 44676v2 07/16/10 }|

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1   $10 million per acre to $8 million per acre.  See Burr Decl.  There is very little data included in the

2   report to substantiate the land value reduction.  In fact, the comparable sales included in the 2009 report

3   ($10 million per acre) and the 2010 report ($8 million per acre) are identical, except for one additional

4   sale in the 2010 report which Mr. Harper and Mr. Snyder believe was priced above market.  A summary

5   of the of the notable differences is attached to the Burr Declaration as Exhibit 1.

6          Aside from the fact that the Snyder Appraisals do not prove that there has been a decline in the

7   value of the Properties during the pendency of the bankruptcy, the observations in the Kent Declaration

8   and Burr Declaration raise doubt as to the credibility of the Snyder Appraisals and whether the alleged

9   decline in value between the two appraisals is actually supported.

10                  **c.        The Fine Declaration is a Red Herring and is Irrelevant**

11          LBBW relies heavily on the alleged expert testimony of Randall Fine for support that the value

12   of the Properties is declining.  Am. Mot. at 3:24-4:4, 10:9-11:13, 12:12-19, 13:12-20.  It is confounding

13   what the foundation and qualifications are for Mr. Fine being an alleged expert on the decline in the

14   value of the Properties.  To perform a real estate appraisal, Mr. Fine needs a certificate as a general

15   appraiser.  N.R.S. § 645C.280(1)(c).  Mr. Fine does not state that he is a certified real estate appraiser.

16   The State of Nevada regulates appraisals[7] of real estate.[8]  N.R.S. § 645C.170.  The Properties are

17   improved commercial real estate and Mr. Fine's analysis, opinions and conclusions on the nature,

18   quality, value or use of the Properties, for which he is receiving compensation, constitutes an appraisal.

19   N.R.S. § 645C.030.  Since Mr. Fine is not authorized under the laws of the State of Nevada to appraise

20   Debtor's real estate, he does not satisfy the Fed. R. Evid. 702 requirements to qualify as an expert on

21   real estate appraisal.  In fact, N.R.S. § 645C.260 makes his conduct of opining on the purported decline

22   in the value of the Properties as a misdemeanor in the State of Nevada.  His declaration does not

23   indicate whether he has any experience on real estate valuations and is devoid of any qualifications

24

25          [7] N.R.S. § 645C.030:  "Appraisal" means an analysis, opinion or conclusion, whether written or oral, relating to the
26   nature, quality, value or use of a specified interest in, or aspect of, identified real estate for or with the expectation of
receiving compensation.

27          [8] N.R.S. § 645C.110:  "Real estate" defined.  "Real estate" includes land, any improvements and fixtures permanently
affixed thereon, and every right, interest or estate therein, whether legal or equitable, whether corporeal or incorporeal, and
whether the property is situated in this state or elsewhere, including without limitation freeholds, leaseholds and interests in
28   condominiums, townhouses and planned unit developments.

VG1 44676v2 07/16/10 ᠍}|

allowing him to perform valuations of improved commercial real estate. The website of his company, Fine Point Group, does not include real property valuations as one of its practices.[9] As there is no evidence that Mr. Fine is an expert on real estate valuation, he cannot rely on the hearsay testimony, which serves as the basis for his opinion, throughout his declaration. Fed. R. Evid. 703.

Instead, Mr. Fine's declaration and background indicates he specializes in gaming consulting and marketing. However, the Properties are not currently gaming properties. Mr. Fine does not indicate if he has ever been qualified as an expert in a court proceeding and his only bankruptcy experience was in connection with the Greektown Casino (08-53104-wsd E.D. Mich) although he states "it was not in the capacity as an expert witness." Fine Decl. [Docket No. 380], ¶ 6. He stated in an interview with the Las Vegas media that, through Greektown Casino, he "got a great education in how bankruptcy works." See March 5, 2010 Las Vegas Sun article, "Q&A: Randall Fine, Managing Director, Fine Point Group," attached to the Loraditch Declaration as Exhibit "2." Notably, Mr. Fine's admitted recent education in bankruptcy was cut short in December 2009 when his contract with the Greektown Casino was terminated by the tribemembers. See id. Thus, any expertise held by Mr. Fine is irrelevant and unreliable for this case.

Mr. Fine demonstrates his incapacity with his prediction that a "decline or stagnation in the value of the Property will extend through 2020 based on existing and projected economic conditions in the Las Vegas real estate and gaming markets." Fine Decl., ¶11. This prediction does not correspond with the June 23, 2010 Snyder Valuation[10] submitted by LBBW, which estimates that "in 2-3 years, the projects that have been put on hold could resurface and add to the gaming inventory." See Harper Decl. Ex. 2, p. 55. Mr. Fine also estimates that the Properties have declined in value by $2.1-6.4 million from the Petition Date and believes the Properties will decline by $5 million through July 21, 2010 and continue to decline at an annual rate of $10-15 million. Fine Decl., ¶12. At that rate and taking into account his prediction of a decline through 2020, the Properties will be worth nothing by 2020! This is

---

[9] The website is located at http://www.thefinepointgroup.com/ and lists the Fine Point Group's practices as: record at optimizing property performance, casino turnaround, operations consulting, marketing consulting, training programs for employees, gaming analytics for other industries

[10] Mr. Fine only reviewed the Snyder Valuation dated as of June 24, 2010. Fine Decl., ¶ 8.

VG1 44676v2 07/16/10

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1  simply not credible. Mr. Fine also opines that the "existing use of the Propert[ies] as a site for retail,

2  entertainment and hospitality tenants subjects to the Propert[ies] to considerable risk of declining

3  revenues in the near and mid term." Id., ¶ 16(H). Mr. Fine's opinions are incongruous to his own

4  statements to the Las Vegas Sun, which were published on March 5, 2010. When asked "Where do you

5  see Las Vegas moving in terms of visitor volume, hotel room rates, retail sales associated with casinos

6  and gaming win in the next few years?," Mr Fine answered, "I don't see this year as being better than

7  last year. *This year may be the same as last year.*" See Loraditch Decl., Ex. 2. (emphasis added). This

8  undercuts his statements regarding a precipitous decline in the Las Vegas real estate and gaming

9  markets. Later on in the interview, when asked "Do you agree with the common thought that nothing

10 else will be built in Las Vegas for several years?," Mr. Fine responded, "*I actually think lots of things*

11 *are going to be built in Las Vegas, they're just not going to be new buildings. You're going to see new*

12 *restaurants and new retail shops and the large structures we have get redesigned to appeal to this new*

13 *market. So there aren't going to be billion-dollar construction projects, but lots of million-dollar*

14 *construction projects as people reorient their facilities to this new market*." See id. (emphasis added).

15 This statement, made just prior to the Petition Date, also does not conform to Mr. Fine's assertion that

16 the Properties' existing use for retail subjects it to considerable risk of decline.

17      Mr. Fine also concludes in his declaration that "[n]egative local economic performance and

18 indicators suggest that the Las Vegas real estate and gaming markets likely will continue to decline."

19 ¶14. However, the Las Vegas Convention and Visitors Authority (the "LVCVA") recently reported,

20 among others, improvement in Las Vegas visitation, room rates, convention attendance and auto traffic

21 in recent months. See LVCVA May 2010 Reports, attached to the Loraditch Declaration as Exhibit

22 "3." The new numbers from the LVCVA was highlighted in an article in the Las Vegas Review Journal

23 ("LVRJ"), in which the LVCVA's vice-president of finance is quoted as saying "We're certainly not

24 recovering, but a parachute has opened. *We're no longer plummeting down to Earth and crashing. It's*

25 *great that we're not seeing the continual spiraling-down*, but we certainly haven't begun to see

26 recovery." See July 14, 2010 LVRJ Article, "Revenue from room taxes shows signs of improvement;

27 Official: No recovery yet but continual spiraling down has abated" (emphasis added), attached to the

28 Loraditch Declaration as Exhibit "4." The LVCVA appears to be the authority on Las Vegas gaming

VG1 44676v2 07/16/10 }

and tourism indicators and the June 24, 2010 Snyder Valuation relies on figures published by the LVCVA for 2009. See Harper Decl. Ex. 2, pp. 21-24. The LVCVA reports and the statement by one of its officials is objective evidence. Thus, the LVCVA's recent reports casts doubt on both conclusions of Mr. Fine and Mr. Harper of a continuing decline.

Mr. Fine's analysis also does not include a discounted cash flow technique, which is the appropriate technique to determine whether an income producing property is declining. See Burr Decl. In re 2712 Mission Partners, L.P., 2010 WL 431738, *5 (Bankr. N.D. Cal. 2010) ("The value of all income-producing real property is determined by discounting to present value the expected cash flow from the property."). As set forth in the McHenry Declaration, tenant revenue is in fact increasing. See McHenry Decl.

Accordingly, the Court should not give any credence to Mr. Fine's testimony because Mr. Fine does not have the requisite qualifications to provide his opinions, which opinions are unsupported by credible evidence.

### d.    Debtor Does not Believe the Properties are Declining in Value.

While under the protections of bankruptcy, Debtor has steadily worked on improving its cash flow and restoring its business after the difficulties it encountered prepetition. McHenry Decls. In addition, Debtor has worked on improving the quality and reliability of this cash flow. Id. Debtor contends that, based on the increase in cash flows and tenants described in the McHenry Declaration, the Properties are not declining in value. 11 U.S.C. § 502(b); see In re Flagler-at-First Associates, Ltd., 114 B.R. 297, 302 (Bankr. S.D. Fla. 1990) (rents would "have to be taken into account and added to the value of the secured claim which is otherwise determined by the value of its remaining collateral as of the commencement of the case (i.e., the Building, including the future projected income therefrom)"); In re Executive House Associates, 99 B.R. 266, 278-82 n. 25 (Bankr. E.D. Pa. 1989) (anticipated rental income always considered in determining value). Since LBBW has not offered any credible evidence on this subject and Debtor has demonstrated evidence of increased cash flows for the Properties, the Court should find that the Properties are not declining in value and that LBBW is adequately protected. See id.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

13

VG1 44676v2 07/16/10 }|

### e.    LBBW's Assertion that it is Entitled to Adequate Protection Against the Mere Threat of Decline is Misplaced

LBBW cites to a footnote in In re Delaney-Morin, 304 B.R. 365 (B.A.P. 9th Cir. 2003), for the proposition that "the First Lien Lenders' entitlement to adequate protection includes protection against the mere threat that the Property's value may decline." Am. Mot. at 9:18-10:1. However, LBBW takes the footnote in Delaney-Morin out of context. The debtor in Delaney-Morin filed a Chapter 13 petition to stay foreclosure against her mobile home and the creditor filed a motion for relief from the automatic stay asserting that the debtor had failed to make post-petition property tax payments, owed pre-petition property taxes that were not provided for under the Chapter 13 plan, had not paid the sewer assessments and had no equity in the property. 304 B.R. at 367. The creditor further asserted at the hearing that the debtor had allowed the fire insurance to lapse and was two months in arrears on post-petition obligations to the creditor. Id. at 368. The bankruptcy court granted relief from the stay because there had been post-petition defaults that had not been cured and no real defense on the merits. Id. The court noted that the additional allegations made at the hearing, including as to the lapse of the fire insurance, while potentially serious concerns, were not, for several reasons, an adequate basis for relief. Id. at 370. It is in the context of addressing these allegations, in particular the issue as to the lapse in fire insurance, that the Court inserted the footnote cited to and relied upon by LBBW. Id. at n. 3. The footnote, and other comments from cases cited therein, focus on the issue of adequate protection as it pertains to the maintenance of insurance. Id. (citing In re Elmira Litho, Inc., 174 B.R. 892, 902 n. 9 (Bankr. S.D.N.Y. 1994) ("Such 'threats' [of decline] include the failure to maintain property insurance or the failure to keep the property in a good state of repair."). The string of cases LBBW cites in footnote 13 of its Amended Stay Relief Motion are also distinguishable on this basis and in the context of failure to pay property taxes.[11] Here, Debtor continues to maintain its property insurance which names LBBW as the loss payee, and Debtor current on its property taxes; therefore, there is no "threat" of decline. See McHenry Decl. ¶ 7. There may be a "threat" of decline to the

---

[11] The court in In re Rosen, 208 B.R. 345 (D.N.J. 1997) addressed the granting of relief from the automatic stay and the issue of adequate protection in the context of lack of insurance or the failure to pay property taxes; In re Balco Equities Ltd., Inc., 312 B.R. 734 (Bankr. S.D.N.Y. 2004) cites to Elmira Litho, which, as previously noted, provides examples of threats of decline; In re Pinto, 191 B.R. 610 (Bankr. D.N.J. 1996) and In the Matter of Holly's, Inc., 140 B.R. 643 (Bankr. W.D. Mich. 1992) also focus on the issue of insurance and property taxes.

VG1 44676v2 07/16/10 }|

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1    extent Debtor is prohibited from using its revenues to continue to pay such expenses.

2        **2.**    **LBBW Is Not Entitled to Stay Relief Under Section 362(d)(1) of the**
3               **Bankruptcy Code Because the First Lien Lenders Have Received Payments.**

4        Post-petition and under the Amended Interim Cash Collateral Order, the First Lien Lenders

5    received $161,663.07 for legal fees on May 24, 2010. Undersecured creditors are not entitled to fees

6    and interest; thus, the First Lien Lenders have received more than they are entitled to under the

7    Bankruptcy Code. See 11 U.S.C. § 506(b); Timbers, 484 U.S. at 382, 108 S.Ct. at 636; In re Arden

8    Properties, Inc., 248 B.R. 164, 170 (Bankr. D. Ariz. 2000).

9        Such payments should constitute adequate protection under section 361 of the Bankruptcy Code.

10    The concept of adequate protection was not designed or intended to place an undersecured or minimally

11    secured creditor in a better post-filing position than it was in before the stay. In re Smithfield Estates,

12    Inc., 48 B.R. 910 (Bankr. D. R.I. 1985). As a result, LBBW has received $161,663.07 more because of

13    the bankruptcy filing. "This type of creditor enhancement was neither intended nor articulated by the

14    drafters." In re Kalian, 169 B.R. 503, 506-07 (Bankr. D.R.I. 1994). Therefore, cause does not exist to

15    grant the relief requested by LBBW under section 362(d)(1) of the Bankruptcy Code.

16        **3.**    **The First Lien Lenders Are Adequately Protected Under 11 U.S.C. §**
17               **362(d)(1).**

18        Adequate protection is made available to protect creditors from the diminution of collateral

19    during the pendency of the bankruptcy petition; not to compensate creditors for delay in being able to

20    foreclose on collateral. See Timbers, 484 U.S. at 377, 108 S.Ct. 626. The principle that adequate

21    protection under 11 U.S.C. § 363 is intended to compensate lenders for diminution of their collateral

22    was reaffirmed by the Bankruptcy Appellate Panel of the Ninth Circuit. Weinstein, 227 B.R. at 296.

23    One court explained:

24            To determine whether an entity is entitled to adequate protection and the type
        and the amount required, a court must evaluate the value of the collateral, the
25            creditor's interest in the collateral, and the extent to which that value will
        decrease during the course of the bankruptcy case. In re Megan-Racine
26            Associates Inc., 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996). With regards to
        rents, a court must look to the stream of future rents to determine whether
27            adequate protection is required. Id. This is because the lien on each month's
        rents replaces the lien on the prior month's rents, so there is a replacement
28            lien of equal value under Section 363 of the Bankruptcy Code. Id. Therefore,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1

> as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral. In re Megan-Racine Associates Inc., 202 B.R. at 663. The rationale is that the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced. In re Mullen, 172 B.R. at 477-78. Accordingly, if the underlying collateral is not declining in value, the additional cash collateral may be used by the debtor to pay administrative expenses as well as to maintain and improve the underlying collateral. In re Addison Properties Limited Partnership, 185 B.R. at 784.

In re Wrecclesham Grange, Inc., 221 B.R. 978, 981-82 (Bankr. M.D. Fla. 1997).

LBBW contends "Debtor's cash is not available for adequate protection payments" and cites to In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650 (9th Cir. 1997) and In re Arden Properties, Inc., 248 B.R. 164 (Bankr. D. Ariz. 2000) for the proposition that the rents collected increase the secured claim and cannot be used to fund adequate protection payments. In Ambanc, the secured creditor objected to confirmation of a Chapter 11 plan, arguing that the value of its secured claim should include the value of the real property and the rents collected post-petition. Ambanc, 115 F.3d at 652. The Court held for purposes of confirmation, that the value of the secured claim is the market value of the real property plus the net amount of the rents collected post-petition and pre-confirmation subject to a deed of trust and assignment of rents. Id. at 654. In Arden, the secured creditor sought a reconsideration of a confirmation order seeking, in part, a determination by the Court that the value of its secured claim at confirmation should have included the debtor's cash collateral. 248 B.R. at 167. The Court agreed and determined that the cash collateral on hand in the debtor's bank account at the date of confirmation should be included in the amount of the secured claim. Id. at 169. While both cases addressed the inclusion of post-petition rent for valuation purposes at confirmation, neither case prohibited the use of such rents to make adequate protection payments. In fact, in Arden, the debtor sought to argue that adequate protection payments made to the secured creditor should be used to reduce principal, but the Court held that as the source of the adequate protection payments came from the net rent, and as the net rents had been paid to the secured creditor during the case, the effect on the amount of the undersecured claim was a wash. Id. at 169-170. Contrary to LBBW's argument, the net Cash Collateral arguably can be paid to the First Lien Lenders as adequate protection payments.

This Court's ruling in In re Las Vegas Monorail Co., 429 B.R. 317 (Bankr. D. Nev. 2010) addressed an unsecured creditor's motion for adequate protection. In that case, the debtor generated

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

more than $5 million in annual profits, before debt service and the creditor argued that it was entitled to adequate protection of all of debtor's revenues. Id. at 323. Similarly, LBBW argues that:

> the Debtor's free cash flow does not provide a source of adequate protection because it must be paid or reserved for the benefit of the First Lien Lenders on a dollar-for-dollar basis. Every dollar the Debtor generates represents an increased allowed secured claim of one dollar, meaning profits are not available as adequate protection. Because its collateral is deteriorating in value at a rate greater than can be offset by available adequate protection payments, the automatic stay must be lifted.

Am. Mot. at 11:23-12:5. This Court addressed this "starkly maximalist view of [a secured creditor's] rights" in Las Vegas Monorail and stated that adoption of that position "would lead to an almost impossible adequate protection burden if [debtor] has to give dollar-for-dollar adequate protection payments" and that debtor "would have to have a profit margin of at least 100% just to break even. Neither it nor any other bankruptcy debtor could meet that requirement; debtors with 100% profit margins rarely need bankruptcy protection." Id. at 329. This Court did not require dollar-for-dollar adequate protection payments in Las Vegas Monorail and held that the secured creditor was adequately protected in part because cash generated and used by a debtor "is itself a form of adequate protection" because the debtor's "continued investment in, and operation of, the [collateral] will increase, or at least maintain, the collateral's value." Id. at 341. The Court also found "that a debtor's use of cash collateral to maintain properties for which rents are being generated is a sufficient form of adequate protection," even in situations "without [an] equity cushion." Id. at 341-42 (citing McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.), 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988).

The facts in this Chapter 11 Case are much like those in the Las Vegas Monorail case in terms of debtor's use of cash generated by its assets. Debtor's operations are comprised solely of the operation, maintenance and collection of Rents (as defined in the Initial Stay Relief Motion) being generated by the Properties. As set forth in the Emergency Cash Collateral Motion, Debtor proposes to continue to invest the Rents in, and to operate, the Properties on an ongoing basis thereby increasing, or at least maintaining, the First Lien Lenders' collateral.

As in Las Vegas Monorail, this Court should reject LBBW's reasoning that dollar-for-dollar adequate protection is required in this Chapter 11 Case. Instead, since Debtor's revenues are being used

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

17

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1  to increase, or at least maintain, the value of the First Lien Lenders' collateral, this Court should find

2  that the First Lien Lenders are adequately protected and deny the Amended Stay Relief Motion.

3  LBBW additionally states that the "First Lien Lenders do not contest that rents applied to

4  productive maintenance benefit the Property, as do payment of rent which produce replacement

5  property" but takes issue with payment of Debtor's professional fees and other chapter 11 expenses.

6  Am. Mot. at 12:19-13:2.  As noted in Section II.A herein, Debtor filed this case after negotiating with

7  LBBW, acting on behalf of the First Lien Lenders, for the use of cash collateral and payment of

8  administrative expenses, including professional fees, during the bankruptcy.  Accordingly, in addition to

9  the arguments in Section II.A,  Debtor should be authorized to continue to use its revenues for payment

10  of professional fees and other chapter 11 expenses "based on the equities of the case." 11 U.S.C. § 552.

11  The last clause of section 552(b) of the Bankruptcy Code states that even if a security interest in

12  proceeds survives, it may be limited to the "extent that the court, after notice and a hearing and based

13  upon the equities of the case, orders otherwise." Las Vegas Monorail, 429 B.R. at 344.  "This provision

14  provides bankruptcy courts considerable latitude in establishing the appropriate balance between the

15  rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code."  Everett Home

16  Town Ltd. Partnership, 146 B.R. 453, 458 (Bankr. D. Ariz. 1992).  The purpose behind the "equities of

17  the case" rule of section 552(b) of the Bankruptcy Code is "to enable those who contribute to the

18  production of proceeds during chapter 11 to share jointly with pre-petition creditors secured by

19  proceeds."  In re Crouch, 51 B.R. 331, 332 (Bankr. Or. 1985).  This Court previously noted that

20  "revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if

21  such revenue represents compensation for goods and services rendered by the debtor in its everyday

22  business performance . . . Revenue generated post-petition solely as a result of a debtor's labor is [also]

23  not subject to a creditor's pre-petition interest." Las Vegas Monorail, 429 B.R. at 345.

24  The facts in this Chapter 11 Case warrant the same finding made by the Court in the Monorail

25  case.  Here, there has been a substantial increase in the Debtor's cash flows from the time it was back

26  in possession of the Properties as compared to the time the Properties were under state court

27  receivership.  See First McHenry Decl., Second McHenry Decl.  Moreover, section 552(b) of the

28  Bankruptcy Code authorizes the use of the proceeds of collateral to pay administrative expenses "based

18

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1  on the equities of the case." In re Pizza of Hawaii, Inc., 69 B.R. 60, 61 (Bankr. D. Hawaii 1986).

2  Thus, the Court should find that the Debtor should retain its revenues based on the equities of the case.

3      Thus, while the First Lien Lenders are already adequately protected, Debtor is proposing

4  additional adequate protection to the First Lien Lenders, as set forth in Debtor's Emergency Cash

5  Collateral Motion.  Such payments are in addition to the adequate protection already afforded the First

6  Lien Lenders by virtue of Debtor's continued investment in, and operation of, the Properties on an

7  ongoing basis, which  thereby increases or at least maintains, the First Lien Lenders' collateral.

8  Furthermore, the Properties are insured with named LBBW as a loss payee. See First McHenry Decl.

9  Accordingly, LBBW is adequately protected.

10      **C.    LBBW Is Not Entitled to Stay Relief Under Code Section 362(d)(2).**

11      Under section 362(d)(2) of the Bankruptcy Code, the automatic stay may be lifted if a debtor

12  does not (1) have equity in the property, and (2) such property is not necessary to an effective

13  reorganization.

14          **1.    There Is No Equity in the Properties.**

15      Debtor admits that there is no equity in the Properties for purposes of 11 U.S.C. § 362(d)(2)(1).

16  See Stewart v. Gurley, 745 F.2d 1194 (9th Cir. 1984).  However, there is no requirement that equity

17  exist in the Properties for an effective reorganization.

18          **2.    The Properties Are Necessary for an Effective Reorganization.**

19      The Supreme Court in Timbers, stated that in order to establish that the property is necessary to

20  an effective reorganization, the debtor must show that the property is essential to the reorganization

21  effort.  Timbers, 484 U.S. 372, supra.  "What this requires is not merely a showing that if there is

22  conceivably to be an effective reorganization, this property will be needed for it; but that the property

23  is essential for an effective reorganization that is in prospect." Id. at 375-76.  As many lower courts

24  have properly held, this means that there must be a "reasonable possibility of a successful

25  reorganization within a reasonable time." Id. at 376.

26      The Properties comprise Debtor's only assets and are necessary and integral for an effective

27  reorganization.  The only business conducted by the Debtor is the ownership, maintenance and

28  operation of the Properties.  The Properties are currently cash flow positive on an operating basis,

VG1 44676v2 07/16/10 }|

before debt service.  This Court terminated exclusivity and the Backstop Investors have filed a disclosure statement and plan of reorganization, which should satisfy the requirement that an effective reorganization is in prospect.  Debtor joins in the Objection of NexBank, SSB and the Backstop Investors to Amended Motion of LBBW for Relief from the Automatic Stay [Docket No. 426] with respect to the arguments under section 362(d)(2) of the Bankruptcy Code.

## III.    RESERVATION OF RIGHTS

At the time of filing this Objection, discovery in connection with the Amended Stay Relief Motion was ongoing with depositions continuing, possibly, through Monday, July 19, 2010, and with several deposition transcripts not yet available.  Accordingly, Debtor expressly reserves its rights to supplement and amend this Objection and raise additional objections with respect to the Amended Lift Stay Motion after discovery with respect to the Amended Stay Relief Motion and this Objection has been concluded and to introduce evidence at any hearing relating to the Objection.

## IV.    CONCLUSION

WHEREFORE, for all of the foregoing reasons, Debtor respectfully requests that the Court deny the Amended Stay Relief Motion in its entirety, and grant such other and further relief as is just and proper.

DATED this 16th day of July 2010.

**FOX ROTHSCHILD LLP**

By   /s/ Micaela Rustia
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
MICAELA RUSTIA, ESQ.
Nevada Bar No. 9676
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone:  (702) 262-6899
*Counsel for FX Luxury Las Vegas I, LLC*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

20

VG1 44676v2 07/16/10