NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No.: (702) 362-7800
Facsimile No.: (702) 362-9472
E-Mail: nleatham@klnevada.com
ncox@klnevada.com

Attorneys for
**FIVE MILE CAPITAL POOLING INTERNATIONAL LLC; SPECTRUM INVESTMENT PARTNERS, L.P.; & TRANSAMERICA LIFE INSURANCE COMPANY**

LENARD M. PARKINS, ESQ. (*PRO HAC VICE*)
HENRY FLORES, ESQ. (*PRO HAC VICE*)
TREVOR R. HOFFMANN, ESQ. (*PRO HAC VICE*)
JONATHAN HOOK, ESQ. (*PRO HAC VICE*)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Telephone No.: (212) 659-7300
Facsimile No.: (212) 884-8226
E-Mail: lenard.parkins@haynesboone.com
henry.flores@haynesboone.com
trevor.hoffmann@haynesboone.com
jonathan.hook@haynesboone.com

Attorneys for
**FIVE MILE CAPITAL POOLING INTERNATIONAL LLC; SPECTRUM INVESTMENT PARTNERS, L.P.; & TRANSAMERICA LIFE INSURANCE COMPANY**

LEE I. IGLODY, ESQ.
Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT, P.L.L.C.**
9555 S. Eastern Avenue, Suite 280
Las Vegas, Nevada 89123
Telephone No.: (702) 425-5366
Facsimile No.: (702) 446-5148
E-Mail: lee@iglody.com
pbb@pbarnettlaw.com

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P. AND THE HUFF ALTERNATIVE PARALLEL FUND, L.P.**

JOSHUA J. ANGEL, ESQ. (*PRO HAC VICE*)
ANDREW C. GOLD, ESQ. (*PRO HAC VICE*)
FREDERICK E. SCHMIDT, JR., ESQ. (*PRO HAC VICE*)
**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, New York 10016
Telephone No.: (212) 592-1400
Facsimile No.: (212) 592-1500
E-Mail: jangel@herrick.com
agold@herrick.com
eschmidt@herrick.com

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P. AND THE HUFF ALTERNATIVE PARALLEL FUND, L.P.**

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

FX LUXURY LAS VEGAS I, LLC, a Nevada limited liability company,

Debtor.

Case No. BK-S-10-17015-bam

Chapter 11

**FIRST AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 30, 2010**

Hearing Date: August 27, 2010
Hearing Time: 9:30 a.m. (PST)

# TABLE OF CONTENTS

Page

ARTICLE I.    INTRODUCTION ..................................................................................................1

    A.   Preliminary Statement. ......................................................................................1

    B.   Securities Law Matters. .....................................................................................4

    C.   Forward-Looking Statements. ...........................................................................5

ARTICLE II.    SUMMARY OF TRANSACTIONS AND TREATMENT OF CLAIMS AND
                  INTERESTS UNDER THE PLAN ................................................................5

    A.   Summary of Transactions Contemplated Under the Plan....................................5

    B.   Summary of Treatment of Claims and Interests Under the Plan. ........................6

ARTICLE III.    THE DEBTOR, THE CURRENT DEBT STRUCTURE AND PLAN
                 OBJECTIVES ...............................................................................................7

    A.   Debtor's Capital Structure. ................................................................................7

    B.   The Debtor's Business Operations. ....................................................................8

          1.   *The Property.* ..........................................................................................8

          2.   *Tenants, Rental Income and Expenses.* ....................................................9

          3.   *Motel Operations.* ................................................................................10

    C.   The Loans Against the Property. ......................................................................10

    D.   Events Leading Up to Bankruptcy.....................................................................12

          1.   *Economic Crisis.* ..................................................................................12

          2.   *The Default.* ........................................................................................13

          3.   *Appointment of the Receiver.* ...............................................................13

          4.   *The Lock-Up Agreement, LBBW/Insider Plan and Related Events.* ..........14

    E.   The Chapter 11 Case and the Backstop Investors' Objectives in Filing the Plan. ...........15

          1.   *The Chapter 11 Case.* ..........................................................................15

               a.   Bid Procedures. ...........................................................................16

              b.   Cash Collateral. ..........................................................................16

               c.   Stipulation for Turnover by Receiver. ..........................................18

               d.   Cash Management.........................................................................19

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

i

e.  Motion Not to Convene Meeting of Creditors Pursuant to 11 U.S.C. § 341(a) and to Set Claim Bar Dates and the 341 Notice. ...................................19

f.  Employment and Retention of Property Manager ................................20

g.  Retention Applications ...........................................................21

h.  Other Motions. .....................................................................21

2.  *The Backstop Investors' Actions* ...............................................21

a.  Motion to Terminate Exclusivity and Filing of Plan Documents. ...............21

b.  Trustee Motion. ....................................................................22

c.  Intercreditor Adversary Proceeding. ..............................................23

3.  *The First Lien Agent's Position on the Plan* ....................................23

F.  The Debtor's Assets and Liabilities. .................................................25

1.  *Assets.* .............................................................................26

a.  The Real Property. .................................................................26

b.  Cash and Accounts Receivable. ....................................................26

c.  Other Personal Property. ..........................................................27

2.  *Liabilities.* ........................................................................27

ARTICLE IV.   DESCRIPTION OF CHAPTER 11 REORGANIZATION PLAN ....................27

A.  Overall Structure of the Plan. .......................................................27

B.  Classification and Treatment of Claims and Interests Under the Plan. .............27

1.  *Unclassified Claims.* ..............................................................28

a.  Administrative Claims. ............................................................28

b.  Priority Tax Claims. ...............................................................29

2.  *Classified Claims.* ................................................................30

a.  Class 1 − Priority Claims. .........................................................30

b.  Class 2 − Other Secured Claims. ...................................................30

c.  Class 3 − First Lien Secured Claims. ..............................................31

(i)   General ...........................................................................31

(ii)  The 1111(b) Election ............................................................32

d.  Class 4 − Trade Unsecured Claims. ................................................33

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

  e. Class 5 − Non-Trade Unsecured Claims. ................................................33

  f. Class 6 − Interests. ................................................34

C. Means of Implementation of Plan. ................................................34

 1. *Plan Implementation.* ................................................34

 2. *Merger.* ................................................35

 3. *Assumption of Liabilities.* ................................................36

 4. *Cancellation of Interests.* ................................................37

  a. Discharge and Injunction. ................................................37

   (i) Discharge of the Debtor ................................................37

   (ii) Injunction ................................................38

 5. *Exemption From Certain Transfer Taxes and Further Transactions.* ................38

 6. *Final Decree.* ................................................39

 7. *Effectuating Documents, Further Transactions.* ................................................39

 8. *Adequate Protection Liens.* ................................................39

D. Provisions Concerning Plan Distributions. ................................................40

 1. *Distributions on Account of Claims Allowed as of the Effective Date.* ..............40

 2. *Distributions on Account of Claims Allowed After the Effective Date.* ............40

  a. Payments and Distributions on Disputed Claims. ................................40

  b. Special Rules for Distributions to Holders of Disputed Claims. ................40

 3. *Manner of Payment Under the Plan.* ................................................40

 4. *Whole Dollars.* ................................................40

 5. *Escheat.* ................................................41

 6. *Delivery of Distributions.* ................................................41

  a. Record Date for Distributions. ................................................41

  b. Distribution Agent. ................................................41

  c. Delivery of Distributions in General. ................................................41

 7. *Returned Distributions.* ................................................42

 8. *Disputed Distributions.* ................................................42

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9. *Setoffs.* ..........................................................................................................43

10. *Withholding Taxes.* ......................................................................................43

11. *Allocation of Distributions.* ........................................................................43

E. Certain Terminations and Releases. ....................................................................43

    1. *Certain Terminations.* ................................................................................43

    2. *Rights If Plan Not Confirmed.* ..................................................................43

    3. *Term of Bankruptcy Injunction or Stays.* ..................................................44

    4. *Exculpation.* ..............................................................................................44

    5. *Releases.* ...................................................................................................45

    6. *Injunctions.* ...............................................................................................45

        a. Injunction Against Releasors. ...........................................................45

        b. Injunction Protecting Exculpation of Releasees. ..............................46

        c. Injunction Against Interference With Plan. .......................................46

F. Executory Contracts and Unexpired Leases. .......................................................46

    1. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.* ...........47

    2. *Rejection Claims.* ......................................................................................48

    3. *Filing of Rejection Claims.* ........................................................................48

    4. *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* ......48

    5. *Reservation of Rights.* ...............................................................................49

G. Procedures for Resolving Disputed Claims. ........................................................49

    1. *Time Limit for Objections to Claims.* .........................................................49

    2. *Payments.* ..................................................................................................49

    3. *Personal Injury Claims.* .............................................................................50

    4. *Estimation of Claims.* ................................................................................50

H. Retention of Jurisdiction. ....................................................................................50

    1. *Retention of Jurisdiction.* ...........................................................................50

    2. *Jurisdiction Unaffected.* .............................................................................52

I. Certain Obligations of the Debtor ........................................................................52

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

J.    Conditions to Effective Date. ..................................................................53

    1.    *Conditions to Occurrence of Effective Date.* ................................53

    2.    *Nonconsensual Confirmation/Reservation of Right to Effectuate Confirmation of the Plan Using Cramdown under Bankruptcy Code Section 1129(b).* ..................54

K.    Miscellaneous Provisions. ......................................................................55

    1.    *Modification of the Plan.* ...............................................................55

    2.    *Notices.* ..........................................................................................55

    3.    *Limitation of Notice.* .....................................................................57

        a.    Notice of Entry of Confirmation Order ...............................58

        b.    Post-Confirmation Date Service List — Additional Persons Entitled to Notice. ..................................................58

    4.    *Requisite First Lien Lenders' Approval.* ........................................58

    5.    *Headings.* .......................................................................................58

    6.    *Exhibits.* .........................................................................................58

    7.    *Nonseverability of Plan Provisions.* ..............................................59

    8.    *Waiver or Estoppel.* .......................................................................59

    9.    *Conflicts.* ........................................................................................59

    10.    *Computation of Time.* ....................................................................60

    11.    *Governing Law.* .............................................................................60

    12.    *Successors and Assigns.* .................................................................60

    13.    *Withdrawal or Modification of Plan and Plan Documents.* ...........60

    14.    *Other Agreements.* .........................................................................61

ARTICLE V.   CERTAIN RISK FACTORS TO BE CONSIDERED .............................61

A.    Failure to Confirm the Plan. ....................................................................61

B.    Potential Adverse Effects of Chapter 11. .................................................61

C.    Risks Associated. .....................................................................................61

ARTICLE VI.   CONFIRMATION OF THE PLAN ....................................................62

A.    Voting Requirements. ...............................................................................63

B.    Voting on the Plan. ...................................................................................65

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

v

C.  Confirmation Requirements.................................................................66

1.  *Acceptance by Impaired Classes.* ..........................................66

2.  *Best Interests Test.* ..............................................................67

3.  *Feasibility of the Plan.* ........................................................69

4.  *Classification.* ....................................................................69

a.  No Unfair Discrimination. ........................................70

b.  Fair and Equitable Test. ..........................................70

(i)  Secured Creditors....................................70

(ii)  Unsecured Creditors ...............................71

(iii)  Equity Interest Holders ............................71

5.  *Confirmation Hearing.*........................................................72

ARTICLE VII.  ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...............................................................................72

ARTICLE VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN ...........................................73

A.  Introduction...................................................................................73

B.  Certain U.S. Federal Income Tax Consequences to the Debtor. ..............75

C.  Tax Consequences to Creditors. ...................................................75

1.  *General.* ............................................................................75

2.  *Original Issue Discount.* ......................................................77

3.  *Backup Withholding.*...........................................................78

4.  *Importance of Obtaining Professional Tax Assistance.*.................78

ARTICLE IX.  FURTHER INFORMATION ...............................................79

ARTICLE X.  RECOMMENDATION AND CONCLUSION ........................79

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1                          LIST OF EXHIBITS

2   EXHIBIT A  —   The Plan

3   EXHIBIT B  —   FX I Ownership Structure Chart

4   EXHIBIT C  —   FXRE's 10-K

5   EXHIBIT D  —   McHenry Declaration

6   EXHIBIT E  —   May 3, 2010 Receiver Report

7   EXHIBIT F  —   Debtor's Schedules and Statement of Financial Affairs

8   EXHIBIT G  —   Form of Refinanced Secured Note

9   EXHIBIT H  —   Form of Interest Payment Guaranty

10  EXHIBIT I  —   Form of Contribution and Indemnity Agreement

11  EXHIBIT J  —   Form of New Borrower LLC Agreement

12  EXHIBIT K  —   Form of New Borrower Parent LLC Agreement

13  EXHIBIT L  —   Form of Private Offering Memorandum

14  EXHIBIT M  —   Form of Subscription Agreement

15  EXHIBIT N  —   Form of New Borrower Parent UPA

16  EXHIBIT O  —   Form of Class 5 Rights Agreement

17  EXHIBIT P  —   Form of Class 6 Rights Agreement

18  EXHIBIT Q  —   Liquidation Analysis

19  EXHIBIT R  —   Form of Mortgage

20

21

22

23

24

25

26

27

28

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

THIS DISCLOSURE STATEMENT (AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED, THE "DISCLOSURE STATEMENT") IS SUBMITTED IN CONNECTION WITH THE SOLICITATION OF VOTES ON A CHAPTER 11 PLAN OF REORGANIZATION (AS AMENDED, MODIFIED OR OTHERWISE SUPPLEMENTED) PROPOSED BY FIVE MILE CAPITAL POOLING INTERNATIONAL LLC, SPECTRUM INVESTMENT PARTNERS, L.P., TRANSAMERICA LIFE INSURANCE COMPANY, THE HUFF ALTERNATIVE FUND, L.P., AND THE HUFF ALTERNATIVE PARALLEL FUND, L.P.[1] AND CERTAIN OF THEIR RESPECTIVE AFFILIATES (COLLECTIVELY "BACKSTOP INVESTORS").  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), OR ANY OTHER REGULATORY AUTHORITY.

## ARTICLE I.

## INTRODUCTION

**A.    Preliminary Statement.**

FX LUXURY LAS VEGAS I, LLC ("DEBTOR" OR "FX I") IS A DEBTOR AND DEBTOR-IN-POSSESSION IN THE ABOVE-CAPTIONED CASE UNDER TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").  THIS DISCLOSURE STATEMENT IS BEING FILED IN CONNECTION WITH THE PLAN, WITH RESPECT TO WHICH THE BACKSTOP INVESTORS SEEK TO SOLICIT VOTES.  A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT "A"** AND IS INCORPORATED HEREIN BY THIS REFERENCE.  THE PLAN CONTEMPLATES THE REORGANIZATION OF THE DEBTOR.

. . .

. . .

. . .

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[1] For purposes of this Disclosure Statement, the Huff parties will be collectively referred to as "Huff."

1

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

THE BACKSTOP INVESTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS SUBMIT BALLOTS ACCEPTING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.  IF THE REQUISITE ACCEPTANCES ARE RECEIVED, AND THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND IS CONSUMMATED, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR (WHETHER OR NOT SUCH HOLDERS SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TREATMENT AFFORDED SUCH HOLDERS THEREUNDER.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rules 3016 and 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of a Chapter 11 bankruptcy case.  This Disclosure Statement has been neither approved nor disapproved by the SEC, nor has the SEC passed judgment upon the accuracy or adequacy of the statements contained herein.

This Disclosure Statement is being provided to Holders of Impaired Claims and Interests entitled to vote on the Plan (*i.e.*, (i) Class 3 (First Lien Secured Claims), (ii) Class 4 (Trade Unsecured Claims), (iii) Class 5 (Non-Trade Unsecured Claims), and (iv) Class 6 (Old Membership Interests)) in connection with the solicitation of their votes on the Plan.[2]  The Disclosure Statement is designed to provide information deemed by the Backstop Investors to be material and necessary to enable such creditors and interest holders to make a reasonably informed decision in the exercise of their rights to vote on the Plan.  In making a decision in connection with the Plan, Holders of Claims and Interests must rely on their own examination of the Debtor and the terms of the Plan, including the merits and risks involved.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW ALL OF THE TERMS AND CONDITIONS OF THE PLAN

---

[2] The specific procedures set forth for voting on the Plan, including copies of the ballots that will be provided to creditors entitled to vote on the Plan (the "Ballots") and other solicitation information, are annexed to the Motion of the Backstop Investors for Entry of an Order (A) Approving Disclosure Statement; (B) Approving Solicitation Procedures; (C) Approving Forms of Ballots and Noticing Procedures; and (D) Scheduling Certain Dates With Respect Thereto (the "Motion to Approve Disclosure Statement and Solicitation Procedures").  The Motion to Approve Disclosure Statement and Solicitation Procedures was filed with the Court on July 9, 2010 (Docket No. 376).

CAREFULLY, NOT RELY SOLELY ON THE SUMMARY IN THIS DISCLOSURE STATEMENT AND CAREFULLY REVIEW THE VOTING INSTRUCTIONS SET FORTH IN ARTICLE VI HEREIN AND THE MOTION TO APPROVE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES, ASSUMING SUCH MOTION IS APPROVED BY THE BANKRUPTCY COURT.

Capitalized terms in this Disclosure Statement not defined herein shall have the meaning ascribed to them in the Plan, the Bankruptcy Code or the Bankruptcy Rules, as applicable, unless the context hereof requires a different meaning.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON FINANCIAL AND OTHER INFORMATION DEVELOPED BY THE DEBTOR AND/OR THE BACKSTOP INVESTORS.  WHILE THE BACKSTOP INVESTORS HAVE REASONABLY ENDEAVORED TO OBTAIN AND SUPPLY ALL MATERIAL INFORMATION, THE INFORMATION CONTAINED HEREIN (SOME OF WHICH IS INCORPORATED HEREIN BY REFERENCE), HAS BEEN GLEANED FROM (I) THE SEC FILINGS OF THE DEBTOR'S ULTIMATE PARENT FX REAL ESTATE AND ENTERTAINMENT, INC. ("FXRE"), AND (II) THE BANKRUPTCY FILINGS OF THE DEBTOR AND ESTATE PROFESSIONALS.  SUCH INFORMATION HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT OR INDEPENDENT REVIEW BY THE BACKSTOP INVESTORS EXCEPT WHERE EXPRESSLY INDICATED.  ACCORDINGLY, THE BACKSTOP INVESTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY OR IS COMPLETE, AND RESERVE ALL RIGHTS WITH RESPECT THERETO.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

The Ballots will not be used for any purpose other than (x) to determine votes for acceptance or rejection of the Plan (and any permitted modified version thereof) under the Bankruptcy Code and (y) with respect to (i) Class 5 creditors voting to accept the Plan, the election of the Equity Option or Cash Option, and (ii) the Class 6 Interest Holder, assuming it votes in favor of the Plan, whether it will elect to exercise the Class 6 Purchase Option, all as provided in the Plan.

**B.**     **Securities Law Matters.**

Pursuant to the Plan, New Borrower, a Delaware limited liability company, will issue 100% of its equity (*i.e.,* the New Borrower Interest) to New Borrower Parent in exchange for an investment by New Borrower Parent that will fund the Total Capital Contribution which will be used for, among other things, Distributions to Creditors and the funding of the Refinanced Secured Loan Reserves.  Class A Units of New Borrower Parent, a Delaware limited liability company (the "New Borrower Parent Units"), will be issued to the (x) Backstop Investors and the New Property Manager (in an amount determined by the Backstop Investors), and (y) assuming their respective Classes vote in favor of the Plan (i) Class 5 creditors that, among other requirements, elect the Equity Option and are Accredited Investors and (ii) the Class 6 creditor if it, among other requirements, is an Accredited Investor and exercises the Class 6 Purchase Option.  The Class 5 Rights will be issued to Class 5 creditors that elect the Equity Option and are Accredited Investors, assuming Class 5 votes in favor of the Plan.  The Class 6 Rights will be issued to the Class 6 Holder.  The offering and sale of the New Borrower Parent Units and the Rights is intended to be exempt from registration under the Securities Act of 1933 (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder and applicable exemptions under state securities laws.  The New Borrower Parent Units and the Rights will be issued only to Accredited Investors.  New Borrower Parent will file a Form D with the SEC with respect to the issuance and will make required filings under state securities laws.  The New Borrower Parent Units will be "restricted securities" and cannot be resold absent registration or pursuant to an applicable exemption from registration.  There are additional contractual restrictions on transferability provided in the New Borrower Parent LLC Agreement.  The Rights will not be transferable or assignable except to affiliates of the Holders thereof or other members of New

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

4

Borrower Parent.

**C.      Forward-Looking Statements.**

The information presented in this Disclosure Statement includes forward-looking statements as well as historical information.  These statements involve known and unknown risks and relate to future events, future financial performance or projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although the Backstop Investors believe that the expectations reflected in the forward-looking statements are reasonable, they cannot guarantee future results, events, levels of activity, performance or achievements and they expressly disclaim a duty to update any of the forward-looking statements.

<div align="center">

**ARTICLE II.**

**SUMMARY OF TRANSACTIONS AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

</div>

**A.      Summary of Transactions Contemplated Under the Plan.**

The Plan contemplates the Debtor's restructuring, the salient terms of which include:

1.  New Borrower will merge with and be the successor by merger to the Debtor;

2.  New Borrower will be owned 100% by New Borrower Parent and the Property will be managed by the New Property Manager;

3.  New Borrower Parent will be owned by the (i) Backstop Investors and the New Property Manager, in exchange for the Total Capital Contribution, (ii) Holders of Allowed Class 5 Claims that properly elect the Equity Option, in the event Class 5 votes to accept the Plan, and (iii) Class 6 Interest Holder, in the event it elects to be the Class 6 Investor and it votes to accept the Plan;

4.  The Holders of First Lien Loan Claims will receive:  (a) their *Pro Rata* share of (i) a $10 million paydown, and (ii) the Refinanced Secured Note; and, (b) if the First Lien Lenders do not make an election under Bankruptcy Code section 1111(b), Distributions on account of the Deficiency Claim.  An $8 million Interest/TI Reserve and a $2 million CapEx Reserve will be established in connection with the Refinanced Secured Loan;

<div align="center">

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

</div>

5.  Administrative Claims, Priority Claims (including Priority Tax Claims) and Other Secured Claims will not be Impaired under the Plan and will either be paid in cash in full on the Effective Date, paid in the ordinary course, or treated as agreed by the respective Holders and New Borrower;

6.  Executory Contracts, except for limited Excluded Contracts, will be assumed; and

7.  Trade Unsecured Creditors will be paid in full in cash without interest.

The Total Capital Contribution will be used to fund Distributions to Creditors holding Allowed Claims and to fund the Refinanced Secured Loan Reserves in accordance with the terms and conditions of the Plan.  The Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 1 Priority Claims will be paid in full in cash or the obligations will be assumed by the New Borrower.  Holders of Allowed Class 2 Other Secured Claims shall have such Claims reinstated pursuant to section 1124(2) of the Bankruptcy Code and/or assumed by New Borrower such that the Claim is rendered unimpaired, except to the extent that the Holder agrees to less favorable treatment thereof.  Class 3 (First Lien Loan Claims), Class 4 (Trade Unsecured Claims), Class 5 (Non-Trade Unsecured Claims) and Class 6 (Old Membership Interests) will also receive Distributions under the Plan, to be approved by the Bankruptcy Court.

**B.**    **Summary of Treatment of Claims and Interests Under the Plan.**

The following summary of the Plan is qualified in its entirety by reference to the detailed explanations set forth in this Disclosure Statement and the Plan itself.  For a more detailed description of the Plan, see Article IV hereof and the Plan.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Allowed Priority Tax Claims are not designated as Classes under the Plan.  The Holders of such unclassified Claims will be paid in full under the Plan or assumed by New Borrower, consistent with the requirements of section 1129(a)(9)(A) of the Bankruptcy Code, and they are not entitled to vote on the Plan.  The Plan classifies all other Claims against and Interests in the Debtor that existed on July 30, 2010, into six (6) separate Classes.  Set forth below is a chart summarizing the classification and treatment of Claims and Interests under the Plan.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

| Class | Description | Treatment | Estimated Amount of Claims[3] |
|---|---|---|---|
| Class 1: | Priority Claims | Not Impaired.  Paid in full in cash or assumed by New Borrower.  *See* Section IV.B.2.a. | $1,731.23 |
| Class 2: | Other Secured Claims | Not Impaired.  Reinstated or assumed by New Borrower.  *See* Section IV.B.2.b. | $23,831.32 |
| Class 3: | First Lien Secured Claims | Impaired.  *Pro Rata* share of (i) a $10 million paydown, (ii) the Refinanced Secured Note.  *See* Section IV.B.2.c. | $270,752,852.35[4] |
| Class 4: | Trade Unsecured Claims | Impaired.  Paid in full in cash without interest or assumed by New Borrower.  *See* Section IV.B.2.d. | $347,459.46 |
| Class 5 | Non-Trade Unsecured Claims | Impaired.  Assuming Class 5 votes in favor of the Plan, Holders of Allowed Claims can elect either the (i) Cash Option or (ii) Equity Option, provided such electing Holder is an Accredited Investor.  If Class 5 does not vote in favor of the Plan, the Holders of Allowed Claims in Class 5 will receive their *Pro Rata* share of the Cash Option.  *See* Section IV.B.2.e. | (a) if the First Lien Lenders make the 1111(b) Election, $233,155,094.16;[5] (b) if the First Lien Lenders do not make the 1111(b) Election, $233,155,094.16 plus the Deficiency Claim of $82,752,852.35, for a total of $315,907,946.51. |
| Class 6 | Old Membership Interests | Impaired.  (a) If Class 6 votes in favor of the Plan, (i) the Class 6 Rights, and (ii) the Class 6 Purchase Option; or (b) if Class 6 does not vote in favor of the Plan, the Class 6 Rights.  *See* Section IV.B.2.f | N/A |

For a more detailed description of the treatment of the foregoing Classes of Claims and Interests, see Section IV.B.2. below.

## ARTICLE III.

## THE DEBTOR, THE CURRENT DEBT STRUCTURE AND PLAN OBJECTIVES

A.    **Debtor's Capital Structure.**

As disclosed in the *Omnibus Declaration of Mitchell J. Nelson Filed in Support of First Day Motions* (the "Nelson First Day Dec."),[6] FX I[7] is a limited liability company formed under the laws

---

[3] Unless specified otherwise, these amounts were compiled by combining the list of undisputed Claims listed on the Debtor's bankruptcy schedules and accounting for payments made or to be made during the Bankruptcy Case.  As such, these amounts may change as Proofs of Claims are filed and the adjudication or other resolution of pending contingent, unliquidated and/or Disputed Claims occurs.

[4] As asserted by the First Lien Agent in the Lift Stay Motion (defined below).  The Backstop Investors reserve the right to contest these amounts.

[5] This amount represents the Second Lien Loan Claims, including principal and accrued interest until the Petition Date.

[6] Docket No. 21.

[7] In August 2008, FX I changed its name from Metroflag BP, LLC, to FX Luxury Las Vegas I, LLC.  At the same time, affiliated entities BP Parent, LLC, and Metroflag Cable, LLC, changed their names to FX Luxury Las Vegas Parent, LLC ("Las Vegas Parent"), and FX Luxury Las Vegas II, LLC ("FX II"), respectively.  On November 5, 2009, FX II merged its assets and operations into FX I.  Subsequently, also on November 5, 2009, Las Vegas Parent merged its

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

7

1  of the state of Nevada on December 26, 2001.  FX I is wholly-owned by FX Luxury, LLC ("FX

2  LLC"), a non-debtor limited liability company formed under the laws of the state of Delaware on

3  April 13, 2007.

4      FX, LLC is, in turn, owned by (i) FXL, Inc., a non-debtor corporation incorporated under

5  the laws of the State of Delaware on December 21, 2009, which is wholly owned by FXRE, a non-

6  debtor publicly traded C-corporation incorporated under the laws of the State of Delaware on June

7  15, 2007, and (ii) FXL Priority Corp., a non-debtor corporation formed under the laws of the state

8  of Delaware on December 21, 2009.  A chart outlining the ownership structure of FX I and its

9  affiliates is attached hereto as **Exhibit "B"** and is incorporated herein by reference.  A history of the

10  Debtor's business operations and its non-debtor affiliates is detailed in FXRE's 10-K annexed to the

11  Nelson First Day Dec., which is attached hereto as **Exhibit "C"** and is incorporated herein by

12  reference.

13  **B.**      **The Debtor's Business Operations.**

14       **1.**      *The Property.*

15      As disclosed in the Nelson First Day Dec., the Debtor owns and operates real property

16  consisting of nine contiguous tax parcels,[8] comprised of six leasable parcels, covering

17  approximately 17.89 contiguous acres of land (collectively, the "Property") located at the southeast

18  corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada and extending south

19  almost to Tropicana Avenue.  The Property is currently comprised of a motel operation and several

20  commercial and retail tenants with a mix of short and long-term leases, including well-known

21  establishments such as Smith & Wollensky, McDonald's, Fatburger, Walgreen's, and Sunglass Hut.

22  Prepetition, the Debtor and its affiliates had commenced design and planning for the Property's

23  redevelopment plan that included a hotel, casino, entertainment, retail, commercial and residential

24  development project.  As a result of the disruption of the capital markets and the economic

25  downturn in the U.S. in general, and Las Vegas in particular, the Debtor decided not to proceed with

26  assets and operations into FX I.  The merger of FX II and Las Vegas Parent into FX I accomplished a more accurate
reflection of the actual business operations of the entities, which the Debtor states have always been consolidated and
27  effectively operated as a single enterprise.

[8] The Assessor's Office for Clark County, Nevada identifies the tax parcels by Assessor Parcel Numbers 162-21-301-
28  001, 162-21-301-003, 162-21-301-009, 162-21-301-014, 162-21-301-016, 162-21-301-017, 162-21-301-018, 162-21-
301-019 and 162-21-301-020.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

its originally proposed redevelopment plan.

The Property consists of six parcels described as follows:

a) Parcel 1 – is comprised of 0.996 acres.  One tenant currently occupies parcel 1.  The lease is terminable at any time by either party upon one hundred twenty (120) days' prior written notice and without the payment of a termination fee.

b) Parcel 2 – is comprised of 5.135 acres.  The land is occupied by a Travelodge motel, which FX I owns in fee, as well as several retail, billboard and parking lot tenants.  The Travelodge motel is being operated by WW Lodging Limited, LLC ("WW Lodging"), pursuant to a management agreement (the "WW Agreement").  The WW Agreement is terminable upon thirty (30) days' prior notice and a termination fee equal to 4% of the trailing twelve (12) months room revenue multiplied by 200%.  The property's retail, billboard and parking lot leases are month-to-month.

c) Parcel 3 – is comprised of 2.356 acres.  This parcel currently hosts the Hawaiian Marketplace, which consists of multiple retail tenants.  All but six of the leases on this property are terminable at any time upon thirty (30) days' (in one instance one hundred eighty (180) days') advance written notice and without payment of a termination fee.  The six leases not terminable with notice are terminable by FX I at any time upon the exercise of options to either repurchase, recapture or relocate the premises.

d) Parcel 4 – is comprised of 4.49 acres.  It is currently occupied by several tenants.  The leases are month-to-month, except for a lease with a single tenant whose lease term expires in July 2014.

e) Parcel 5 – is comprised of 3.008 acres.  The property accommodates 51,414 square feet of retail space and is currently occupied by several restaurant and retail tenants.  One lease term expires in January 2012, but is terminable earlier upon one hundred twenty (120) days' advance written notice and requires payment of an early termination fee of $200,000.  A second lease term expires in August 2012, with the tenant holding an option to extend the lease for an additional five years.  A third lease term expires in May 2059.

f) Parcel 6 - is comprised of 1.765 acres.  The property accommodates 2,094 square feet of retail space and is currently occupied by a restaurant and several retail tenants.  One lease term expires in December 2013, another lease term expires in April 2011 and a third lease term expires in February 2014, with the tenant holding an option to extend the lease term for an additional five years.  A fourth lease term expires in May 2045.

**2.    _Tenants, Rental Income and Expenses._**

As disclosed by the Debtor,[9] as of March 2010, there are a total of ninety (90) leasable

spaces with sixty-three (63) occupied spaces and twenty-seven (27) vacant spaces, and the Property

---

[9] _See Omnibus Declaration of Gary McHenry Filed in Support of (1) Emergency Motion for Entry of Second Amended Interim Order (I) Authorizing and Approving Debtor's Use of Cash Collateral and (II) Scheduling a Hearing for Entry of a Final Order Authorizing and Approving Such Use; and (2) Landesbank Bade-Württemberg, New York Branch's Motion for Relief from Automatic Stay_ (the "McHenry Dec.") (Docket No. 338).  The McHenry Dec. is annexed hereto as **Exhibit "D."**

was generating approximately $1,263,569.58 in monthly revenues from rents, billboards, parking, common area maintenance charges and other sources (collectively, the "Rents). *See also* Rent Roll Dated March 2010 annexed to the McHenry Dec. as Exhibit 1. Since March 2010, the monthly revenues from Rents have increased and the Debtor anticipated its June monthly revenues from rents will be $1,288,148.37. McHenry Dec. at ¶¶ 6-9; *see also* Appraisal Report of Kent Appraisal Services dated March 4, 2010, p.27 (FX Luxury Las Vegas Property Net Operating Income) (the "Kent Report")[10] and Report from Receiver dated May 3, 2010 (the "May 3 Receiver Report"),[11] at Exhibit A. A true and correct copy of the May 3 Receiver Report is attached hereto as **Exhibit "E."**

        **3.**    *Motel Operations.*

As disclosed in the Nelson First Day Dec., the motel situated on the Property, branded as a Travelodge, is a 125-room limited service motel wholly-owned by the Debtor and managed by WW Lodging, pursuant to the WW Agreement. Pursuant to the WW Agreement, all Travelodge employees are employed directly by WW Lodging. As of the Petition Date, WW Lodging controlled all revenues and paid the expenses of, and FX I was receiving no revenues from, the Travelodge operation. Revenues available for distribution, if any, would have been sent directly to a lockbox account (the "Lockbox Account") controlled by Landesbank Baden-Württemberg, New York Branch ("LBBW"), as administrative agent and as collateral agent ("First Lien Agent") for the senior secured lenders ("First Lien Lenders," and together with First Lien Agent, the "First Lien Parties") holding a first priority Lien against the Property.

**C.**    **The Loans Against the Property.**

As disclosed in the Nelson First Day Dec., the Property is encumbered by Liens securing loans having an aggregate principal balance of approximately $475 million as of December 31, 2008, including (i) two-tranche senior secured first priority loans (the "First Lien Loan") in the initial principal amounts of approximately $250 million (the "Note A Tranche") and $30 million (the "Note B Tranche") made by the First Lien Lenders, pursuant to that certain Amended and

---

[10] The Kent Report was annexed to the *Declaration of Mitchell J. Nelson in Support of Debtor's Motion for Entry of Order Establishing Bid Procedures and Deadlines in Connection with the Sale of Substantially All of the Assets of the Bankruptcy Estate* as Exhibit 1 (Docket No. 277-1) as is incorporated herein by reference. The Backstop Investors do not concede the accuracy of the Kent Report's conclusions and reserve all of their rights with respect thereto.
[11] Docket No. 88.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Restated Credit Agreement, dated as of July 6, 2007 (as amended, modified or supplemented from time to time, the "First Lien Credit Agreement," and together with the Loan Documents (as defined in the First Lien Credit Agreement), the ("First Lien Loan Documents") and that certain Co-Lender Agreement, dated as of July 6, 2007, by and between Column Financial, Inc., Münchener Hypothekenbank eG ("MHB") and Deutsche Hypothekenbank (Actien-Gesellschaft) ("Deutsche Hypo"), with the Note B Tranche to at all times be junior, subject and subordinate to the Note A Tranche, Deutsche Hypo's interest in the Note A Tranche in an amount equal to $125 million and MHB's interests in the Note A Tranche in an amount equal to $125 million and in the Note B Tranche in an amount equal to $30 million; and (ii) secured second priority loans in the initial principal amount of approximately $195 million (the "Second Lien Loan," and together with the First Lien Loan, the "Loans") made by and among the lenders thereof (the "Second Lien Lenders"), the Debtor Parties and Nexbank SSB, as successor-in-interest to Credit Suisse, Cayman Islands Branch ("CS"), as second lien administrative agent and collateral agent (the "Second Lien Agent" and together with the Second Lien Lenders, the "Second Lien Parties"), pursuant to that certain Amended and Restated Credit Agreement, dated as of July 6, 2007 (as amended, the "Second Lien Credit Agreement").

On May 11, 2007, the First Lien Lenders recorded a First Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the "First Lien Deed of Trust") against the Property, as Book No. 20070511, Instrument 0004533, in the Official Records of the Office of the County Recorder, Clark County, Nevada (the "Official Records").  In connection with the First Lien Deed of Trust, the First Lien Agent recorded the following financing statements in the Official Records on May 11, 2007: Book No. 20070511, Instrument 0004534; Book No. 20070511, Instrument 0004535; Book No. 20070511, Instrument 0004537; and Book No. 20070511, Instrument 0004538.

Also on May 11, 2007, the Second Lien Agent recorded a Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing against the Property as Book No. 20070511, Instrument 0004536, in the Official Records, as amended by that certain First Amendment to Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases

11

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

and Fixture Filing, dated as of July 6, 2007, and recorded on July 6, 2007, in Book 20070706 as Instrument 0004185 in the Official Records (as amended, amended and restated, modified or supplemented from time to time, the "Second Lien Deed of Trust").

Pursuant to the terms of that certain Assignment Agreement, dated as of December 17, 2007, (i) Deutsche Hypo assigned a portion of its interest in the Note A Tranche in an amount of $80 million to LBBW and (ii) MHB assigned a portion of its interest in the Note A Tranche in an amount of $50 million to LBBW and LBBW acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

Pursuant to the terms of that certain Assignment Agreement, dated as of June 25, 2009, MHB assigned a portion of its interest in the Note A Tranche in an amount of $50 million to Great Lakes Reinsurance (UK) PLC ("Great Lakes") and Great Lakes acquired its interest as a First Lien Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

The Debtor Parties subsequently entered into that certain Amended and Restated Intercreditor Agreement dated July 6, 2007, with CS, as collateral agent for the First Lien Lenders and the Second Lien Lenders (the "Intercreditor Agreement"). The Intercreditor Agreement was intended to establish the rights and obligations between the First Lien Parties and the Second Lien Parties, including lien priorities and the enforcement of remedies with respect to the collateral securing the Loans. The beneficial interests under the First Lien Deed of Trust were subsequently assigned to the First Lien Agent by recordation on March 23, 2009, of an Assignment of Deed of Trust dated March 20, 2009, as Book No. 20090323, Instrument 0004872, in the Official Records.

**D.    Events Leading Up to Bankruptcy.**

    **1.    *Economic Crisis.***

As disclosed in the Nelson First Day Dec., the current global financial crisis has had a particularly grave impact on the Las Vegas real estate market, including a substantial reduction in the number of visitors and per visitor spending, the abandonment of, and/or loan defaults related to, several major new hotel and casino development projects, as well as publicly expressed concerns regarding the financial viability of several of the largest hotel and casino operators in the Las Vegas market. The economic climate adversely affected the Property's commercial leasing activities and,

as a result, the Debtor failed to maintain its previously high tenant occupancy rates amid these market conditions.  In addition, market forecasts indicate Las Vegas may experience a prolonged decline in developing new hotels and other entertainment venues, which could adversely affect any potential redevelopment of the Property for the immediate future.

### 2.     The Default.

As disclosed in the Nelson First Day Dec., FX I, as the surviving Entity following the merger of the Debtor Parties, is currently in default on the Loans as a result of the Debtor Parties' failure to repay the full amounts due and owing at maturity on January 6, 2009.

On January 30, 2009, the First Lien Agent seized the cash collateral reserve accounts from which the Debtor Parties had been drawing working capital funds to meet ordinary operational expenses at the Property.  At that time, the First Lien Lenders applied $21 million of the cash collateral reserve to the outstanding principal of the First Lien Loan, leaving, as of March 27, 2009, an outstanding principal balance of approximately $259 million under the First Lien Loan.  The principal amount of $195 million under the Second Lien Loan remained outstanding.  In addition, the First Lien Parties directed the Property's existing tenants to make all monthly lease payments directly to them.  In addition, the First Lien Agent revoked the Debtor's license to collect, receive, use and enjoy the Rents, and instructed the Debtor to deposit any rents it might receive into the Lockbox, which practice continued through the Petition Date

Subsequent to the default on the First Lien Loan, the First Lien Agent issued a Notice of Breach and Election to Sell, which was recorded April 9, 2009, in the Official Records as Book No. 20090409, Instrument 0003049, Foreclosure Proceeding #A9-03-0016 FCL.

On or about May 12, 2009, the Debtor Parties, as borrowers on the Loans, and FX LLC, as guarantor, entered into that certain Pre-Negotiation Agreement with the First Lien Parties and Second Lien Parties, in order to explore negotiations for a consensual resolution to the issues surrounding the existing default on the Loans.

### 3.     Appointment of the Receiver.

As disclosed in the Nelson First Day Dec., the First Lien Agent later commenced an action in the Eighth Judicial District Court, Clark County, Nevada ("<u>Nevada District Court</u>"), as case no.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

A-09-591831-B, Dept. No.: XIII, and obtained the appointment of a receiver (the "Receiver"),

pursuant to Nevada District Court order dated June 22, 2009, as amended by an order dated August

6, 2009 (the "Receivership Order").  Among other things alleged by the First Lien Agent in support

of the Receiver's appointment was mismanagement and excessive management charges by the

Debtor's managers (i.e., Paul C. Kanavos ("Kanavos")) and, upon information and belief, Brett

Torino ("Torino") with respect to the Property.  The Receiver took possession of the Property on or

about June 23, 2009.

In the meantime, as a result of the Lockbox arrangement instituted by the First Lien Agent

on January 30, 2009, the First Lien Agent exercised de facto control over all decisions related to the

Property (including as to budgeting and payments to the Receiver and the Debtor) through the

Petition Date by virtue of its control over the Debtor's cash flows.

Nevada Title Company, as duly substituted trustee under and pursuant to the First Lien

Credit Agreement and the First Deed of Trust, issued a Notice of Trustee's Sale, dated July 7, 2009,

and recorded July 10, 2009, in the Official Records as Book No. 20090710, Instrument 0002151,

Trustee Sale #A9-03-0016 FCL.

On September 9, 2009 (and on numerous occasions thereafter), the First Lien Agent caused

a Certificate of Postponement to be issued, extending the date of the foreclosure sale of the

Property.

While the Property is generating revenues in excess of First Lien Loan debt service

obligations, the ongoing Las Vegas tourism and real estate market financial crises have resulted in

the Property's depressed leasing capacity which, in turn, has severely impacted the Debtor's ability

to re-negotiate or repay the past-due amounts currently due and owing on the Loans.  As a whole,

these factors necessitated the Debtor's filing the Chapter 11 Case.

**4.      *The Lock-Up Agreement, LBBW/Insider Plan and Related Events.***

Following the First Lien Agent's noticing of the foreclosure sale, on October 27, 2009, a

Lock Up and Plan Support Agreement (the "Lock-Up Agreement") was executed among:  (i) the

Debtor Parties; (ii) the First Lien Parties, and (iii) the LIRA Entities, entities created by Robert F.X.

Sillerman, Kanavos and Torino (collectively, the "Insiders"), who are directors, executive officers

14

and/or greater than 10% stockholders and collectively own and control at least 73% of FXRE.[12]

The Lock-Up Agreement contemplated the Debtor filing for bankruptcy, and implementing a two-step disposition transaction for the sole benefit of the First Lien Parties and the Insiders, as follows:  (1) at the outset of the Chapter 11 Case, the Debtor sought to conduct an auction of the Property; and (2) if the auction did not yield a cash bid equal to or greater than $256 million, the Debtor would have sought to effectuate a prearranged sale of the Assets to the LIRA entities via a pre-packaged liquidation plan (the "LBBW/Insider Plan") whereby other parties were to be precluded from submitting higher or better offers for the Assets.

On November 12, 2009, in response to the Lock-Up Agreement, the Second Lien Agent filed a complaint in the Southern District of New York for, among other things, breach of fiduciary duty against, among others, the Debtor and its Insiders.

Thereafter, certain of the Second Lien Parties entered into settlement negotiations with, among others, the Debtor, the Insiders and the First Lien Parties.  In connection with such settlement negotiations, the Second Lien Agent and the Lock-Up parties entered into a lock-up agreement and a stipulation pursuant to which the Second Lien Agent agreed to (and did) voluntarily dismiss the complaint, without prejudice.  Ultimately, however, settlement negotiations failed.

On April 8, 2010, certain of the Second Lien Lenders entered into a lock-up agreement with Huff to propose or otherwise support an alternative restructuring, including a competing plan of reorganization, which would allow for meaningful and equitable participation by all claim and equity holders free of the self-dealing of the Insiders and the First Lien Lenders.  The Plan is the product of that agreement.

**E.    The Chapter 11 Case and the Backstop Investors' Objectives in Filing the Plan.**

    **1.    *The Chapter 11 Case.***

On the Petition Date, the Debtor sought entry of several "first day orders" and filed applications or motions, and supporting pleadings with the Bankruptcy Court.  First day orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business

---

[12] The Lock-Up Agreement, as amended, is annexed to the Nelson First Day Dec.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.  The following summary details many of the first day orders that were sought and the disposition of such orders after presentation to the Bankruptcy Court.

### a.    Bid Procedures.

On the Petition Date, in addition to filing the LBBW/Insider Plan, the Debtor filed a Motion for an Order (i) approving bidding procedures in connection with the sale of the Property, (ii) scheduling an auction in connection thereto, and (iii) approving the form and manner of notice of the auction (the "Original Bid Procedure Motion").  By the Original Bid Procedure Motion, the Debtor sought authorization to sell substantially all of the Assets via an auction that would have required, among other things, a minimum cash bid of $256 million (the "Minimum Bid Threshold"). The Original Bid Procedure Motion provided that if no bids satisfying the Minimum Bid Threshold were received, the Lock-Up Agreement parties would have proceeded to effectuate the prearranged sale of the Property to the Insiders under the LBBW/Insider Plan.

Certain objectors, including certain of the Second Lien Parties, filed objections to the Original Bid Procedure Motion on several grounds, including that the procedures chilled, rather than encouraged bidding.[13]  On May 26, 2010, the Bankruptcy Court entered an Order denying the Original Bid Procedures Motion.[14]  On June 2, 2010, the Debtor filed a motion seeking approval of, among other things, amended bid procedures (the "Amended Bid Procedures Motion").[15]  On June 25, 2010, the Debtor withdrew the Amended Bid Procedures Motion.[16]

### b.    Cash Collateral.

On the Petition Date, the Debtor filed a motion for interim and final orders authorizing the Debtor's use of cash collateral and granting adequate protection in connection thereto (the "Cash Collateral Motion").[17]  According to the Debtor, it needed the ability to use cash collateral so that it could operate as a debtor and debtor in possession.  As of the Petition Date, the First Lien Lenders

---

[13] *See, e.g.,* Docket No. 96.
[14] Docket No. 253.
[15] Docket No. 276.
[16] Docket No. 333.
[17] Docket No. 13.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  had enforceable Liens on all or substantially all of the Assets, including the Debtor's Cash on hand

2  as of the Petition Date, and all Cash received by the Debtor during the Chapter 11 Case, which Cash

3  constitutes "cash collateral" of the First Lien Lenders (the "<u>Cash Collateral</u>").  Under the

4  Bankruptcy Code, the Debtor is prohibited from using, selling, or leasing cash collateral unless

5  either the appropriate Creditors consent to such use of cash collateral, or the Bankruptcy Court

6  approves the use of the cash collateral after notice and a hearing.  The Debtor negotiated with the

7  First Lien Agent, on behalf of the First Lien Lenders, a stipulated consensual use of the Cash

8  Collateral.

9       By the Cash Collateral Motion, the Debtor sought to grant adequate protection to the First

10  Lien Agent on behalf of the First Lien Lenders for and equal in amount to the aggregate diminution

11  in value of the Prepetition Collateral, including, among other things, replacement liens in post-

12  petition collateral, payment of interest, professional fees and expenses and accrual of interest not

13  otherwise paid.  The Debtor also sought to grant adequate protection replacement liens to the

14  Second Lien Agent on behalf of the Second Lien Lenders.

15       On April 30, 2010, the Bankruptcy Court approved the Cash Collateral Motion on an interim

16  basis, subject to objection and a final order.[18]  On May 4 and 5, 2010, responses were filed,

17  including by certain of the Second Lien Parties, to the Cash Collateral Motion including on the

18  grounds that, as an undersecured creditor (*i.e.*, the First Lien Loan Claims significantly exceeded

19  the collateral securing such claims), the First Lien Lenders could not receive payment and accrual

20  of interest and payment of fees and expenses.  The Cash Collateral Motion was scheduled to be

21  heard by the Bankruptcy Court on May 10, 2010, but after the Bid Procedures Motion was denied,

22  the Debtor and the First Lien Parties adjourned the hearing to consider the Cash Collateral Motion

23  to June 11, 2010.  On June 11, 2010, after the Court granted the Exclusivity Motion (defined

24  below), the Debtor and the First Lien Parties again adjourned the hearing to consider the Cash

25  Collateral Motion, this time to July 7, 2010.

26       On June 10, 2010, the First Lien Agent filed a motion for relief from the automatic stay (the

27

28  _____

[18] Docket No. 83.

"Lift Stay Motion")[19] to enable it to foreclose on the Property in the event the Bankruptcy Court, among other things, granted the Exclusivity Motion (defined below). Upon the Bankruptcy Court's entry of the Exclusivity Order (defined below), the Lift Stay Motion was "triggered."

Thereafter, on June 25, 2010, the Debtor filed its (i) opposition to the Lift Stay Motion, asking the Bankruptcy Court to allow the Plan to proceed to confirmation and (ii) emergency motion for, among other things, the authority and approval to use cash collateral (the "Emergency Cash Collateral Motion").[20]

On July 9, 2010, the First Lien Agent filed (i) an amended motion for relief from the automatic stay (the "Amended Lift Stay Motion"),[21] and (ii) an objection to the Emergency Cash Collateral Motion (the "Cash Collateral Objection"),[22] both of which were scheduled for hearing on July 21, 2010 (the "July 21 Hearing"). On July 16, 2010, (i) the Second Lien Agent and the Backstop Investors, and (ii) the Debtor, each filed objections to the Amended Lift Stay Motion (together, the "Amended Lift Stay Objections").[23] On July 19, 2010, the First Lien Agent filed an omnibus response to the Amended Lift Stay Objections,[24] and on July 20, 2010, the Second Lien Agent and the Backstop Investors filed their surreply to the First Lien Agent's omnibus response (the "Surreply").[25]

At the July 21 Hearing, the Court explained the legal burdens the First Lien Agent would have to satisfy in order to prevail on its Amended Lift Stay Motion. Consequently, the parties agreed to continue the Amended Lift Stay Motion to the hearing to consider the Disclosure Statement. In addition, the parties resolved the Cash Collateral Objection and agreed on a stipulated consensual use of cash collateral.

### c.   Stipulation for Turnover by Receiver.

By stipulation filed on April 23, 2010 (the "Turnover Stipulation"), the Debtor, First Lien

---

[19] Docket No. 300.
[20] The Debtor has been operating under consensual cash collateral stipulations agreed to by and between the Debtor, the First Lien Agent and the Second Lien Agent until the hearing to consider the Cash Collateral Motion on a final basis is conducted.
[21] Docket No. 378.
[22] Docket No. 373. On July 19, 2010, the Debtor filed a reply to the Cash Collateral Objection (Docket No. 447).
[23] Docket Nos. 426 and 429.
[24] Docket No. 450.
[25] Docket No. 463.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Agent and Receiver agreed, pursuant to Bankruptcy Code Section 543(a), that the Receiver's authority terminated and he was not to make any disbursement from, or take any action, in the administration of the Debtor's property.

Pursuant to Bankruptcy Code Section 543(b)(2) and the Turnover Stipulation, the May 3 Receiver's Report contained a preliminary accounting detailing all property of the Debtor, including the Property, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody or control of Receiver was filed.

On April 26, the Bankruptcy Court "So-Ordered" the Turnover Stipulation.[26]

### d.    Cash Management.

On the Petition Date, the Debtor filed a motion[27] seeking a Bankruptcy Court order approving continuation of its pre-petition cash management procedures and pre-petition bank accounts (the "Cash Management System"),[28] which Order was entered on April 30, 2010.[29]

### e.    Motion Not to Convene Meeting of Creditors Pursuant to 11 U.S.C. § 341(a) and to Set Claim Bar Dates and the 341 Notice.

On the Petition Date, the Debtor filed a motion requesting entry of an Order that the United States Trustee not convene a meeting of the Debtor's Creditors or Interest Holders pursuant to Bankruptcy Code Section 341(a) or (b) and setting bar dates for the respective Proofs of Claims to be filed (the "341 Motion").[30]  In the 341 Motion, the Debtor argued there was no need or basis for convening a meeting of Creditors or Interest Holders because (i) prior to commencing the Chapter 11 Case, the Debtor solicited acceptance of the Plan from the First Lien Lenders, the only Impaired Class entitled to vote to accept or reject the LBBW/Insider Plan and (ii) the Second Lien Lenders would serve as a significant safeguard for the interests of the Holders of unsecured claims.

In addition, the 341 Motion sought to establish the following claim bar dates:  (i) a Priority Claims Bar Date, no later than 25 days prior to the date of the Confirmation Hearing, for the filing

---

[26] Docket No. 60.
[27] Docket No. 9.
[28] According to the Debtor, prior to the Petition Date, the Debtor implemented the Cash Management System to provide an efficient means of moving funds through its corporate structure to cover its expenses and debts, as well as provide funds on an as-needed basis.
[29] Docket No. 84.
[30] Docket No. 12.

of Priority Claims or Priority Tax Claims; (ii) a deadline of thirty (30) days after the Effective Date of the Plan, for Filing requests for payment of Administrative Claims incurred after the Petition Date through the Effective Date, except Professional Fees; and (iii) a deadline of no later than twenty (20) days after the Effective Date of the Plan for Filing all final applications for compensation for Professional Fees.  Under the 341 Motion, failure to file a Proof of Claim by the applicable deadlines by any Holder of a Claim or Interest, whose Claim or Interest is not scheduled or scheduled as disputed, contingent, or unliquidated will result in disallowance of the Claim or Interest and no Distribution to the Claim Holder.  The 341 Motion did not seek to establish a bar date for general unsecured claims because the LBBW/Insider Plan proposed to wipe out all general unsecured claims.  The 341 Motion also sought to obviate the need for the Holders of First Lien Loan Claims and Second Lien Loan Claims to file proofs of claim (the "Deemed Filed Request").

At the hearing to consider the 341 Motion, the Debtor withdrew its request to not convene a 341 meeting of creditors, and on May 7, 2010, the Bankruptcy Court entered an order granting the 341 Motion as it pertained to Priority (June 30, 2010) and Administrative Claim Bar Dates and the Deemed Filed Request.[31]

Separately, in the Notice of Meeting of Creditors,[32] August 27, 2010 was set as the deadline for all creditors, including General Unsecured Creditors, to file proofs of claim against the Debtor, other than for governmental units who have a deadline of November 27, 2010.

### f.    Employment and Retention of Property Manager

On the Petition Date, the Debtor filed an application for an Order authorizing the employment of Commerce CRG of NV, LLC, doing business as CCRG/Cushman & Wakefield Alliance ("C&W"), as property manager other than for the real property upon which the Travelodge motel is situated (the "C&WApplication").[33]  Prior to the Petition Date, at the Receiver's discretion and pursuant to the Receivership Order, the Receiver executed a property management agreement with C&W to manage the Property.  In the C&W Application, the Debtor opined that in its business judgment, (i) a property manager is essential to the Debtor's ability to

---

[31] Docket No. 146.
[32] Docket No. 3.
[33] Docket No. 10.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

realize the value of the Property for the benefit of all Creditors and Interest Holders in the Chapter 11 Case, (ii) retention of C&W was necessary because the Debtor did not possess the requisite licensing or expertise to manage the Property independently, and (iii) such services were necessary to maintain the Debtor's shopping center facility, pending further action in the Chapter 11 Case.

On May 7, 2010, the Bankruptcy Court entered an interim Order,[34] and on May 13, 2010, the Bankruptcy Court entered a final Order, granting the C&W Application.[35]

### g.    **Retention Applications**

The Court also ruled on the following motions/applications filed by the Debtor, as follows:

    i.   <u>Fox Rothschild LLP as the Debtor's general bankruptcy counsel</u>-granted;[36]

    ii.   <u>Greenberg Traurig, LLP as the Debtor's special real estate counsel</u>-granted;[37]

    iii.   <u>Sierra Consulting, LLC as the Debtor's financial advisor</u>-granted;[38]

    iv.   <u>Kent Appraisal Services as the Debtor's appraiser ("Kent")</u>-granted;[39]

    v.   <u>Employment/compensation of ordinary course professionals</u>-denied.[40]

### h.    **Other Motions.**

On the Petition Date, the Debtor filed motions for entry of Orders with respect to the payment of certain employee claims and treatment of utility providers.  On May 7, 2010 and May 10, 2010, the Court entered Orders granting those respective motions.[41]

### 2.    *The Backstop Investors' Actions*

### a.    **Motion to Terminate Exclusivity and Filing of Plan Documents.**

The Second Lien Agent and certain of the Second Lien Lenders filed a motion for an order terminating the Debtor's exclusive periods to file, and solicit acceptances for, a plan (the "<u>Exclusivity Motion</u>").[42]  At the June 11 hearing to consider the Exclusivity Motion, the Court granted the Exclusivity Motion.  Thereafter on June 14, 2010, the Debtor withdrew the

---

[34] Docket No. 145.
[35] Docket No. 217.
[36] Docket No. 242.
[37] Docket No. 264 (as amended).
[38] Docket No. 216.
[39] Docket No. 215.
[40] Docket No. 190.
[41] Docket Nos. 144 and 191.
[42] Docket No. 118.

LBBW/Insider Plan.[43]  On June 22, 2010, the Bankruptcy Court entered an Order granting the Exclusivity Motion (the "Exclusivity Order").[44]

On July 9, 2010, the Backstop Investors filed their first Plan,[45] Disclosure Statement[46] and the Motion to Approve Disclosure Statement and Solicitation Procedures,[47] along with their respective exhibits.

On July 13, 2010, the Backstop Investors filed an application seeking, among other things, a determination (i) that the Property Value as of the Effective Date is $188 million, (ii) that, subject to an 1111(b) Election, the First Lien Loan Claims are secured in the amount of $188 million as of the Effective Date, and (iii) of the amount of the First Lien Loan Claims (the "506 Application").[48]  On July 14, 2010, the Backstop Investors filed their first amended Plan.  The Backstop Investors' second amended Plan, filed contemporaneously herewith, is annexed hereto as **Exhibit "A."**

At the July 21 Hearing, the Court set the hearing to consider the Disclosure Statement, the Motion to Approve Disclosure Statement and Solicitation Procedures and the 506 Application for August 27, 2010 at 9:30 a.m. (PST) (the "August 27 Hearing").  In the event the Court does not approve the Disclosure Statement at the August 27 Hearing, the Court will also consider the Amended Lift Stay Motion at the August 27 Hearing.  If the Court approves the Disclosure Statement at the August 27 Hearing, the Amended Lift Stay Motion will be continued to the hearing to consider confirmation of the Plan, which is scheduled for October 7, 15 and 18, 2010.

### b.    Trustee Motion.

On May 4, 2010, Huff filed a motion seeking the appointment of a chapter 11 trustee based on, among other things, the Insiders' alleged complete control of the Debtor, their alleged breach of

---

[43] Docket No. 318.
[44] Docket No. 324.
[45] Docket No. 374.
[46] Docket No. 375.
[47] Docket No. 376.
[48] Docket No. 395.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

fiduciary duties and their alleged self-dealing (the "Trustee Motion").[49] On June 2, 2010, the Debtor[50] and the First Lien Agent[51] filed objections to the Trustee Motion. The hearing to consider the Trustee Motion was later continued to July 19, 2010. On June 28, 2010, the parties entered into, and submitted to the Bankruptcy Court, a stipulation seeking to continue the hearing on the Trustee Motion to a date after September 1, 2010.

### c.    Intercreditor Adversary Proceeding.

On April 30, 2010, the Second Lien Agent commenced an adversary proceeding (No. 10-01157-bam) (the "Adversary Proceeding") by filing a complaint against the First Lien Agent alleging that the First Lien Parties breached the Intercreditor Agreement, and therefore, the Second Lien Parties should not be bound by the Intercreditor Agreement.[52]

On June 7, 2010, the First Lien Agent filed an answer in the Adversary Proceeding,[53] and on June 28, 2010, the First Lien Agent filed an amended answer in the Adversary Proceeding and asserted certain counterclaims therein (the "Amended Answer").[54] On July 19, 2010, the Second Lien Agent filed a motion to dismiss the counterclaims in the Amended Answer (the "Motion to Dismiss").[55] A pre-trial conference is set for November 29, 2010 at 9:00 a.m. (PST) and the trial is set for December 1-3, 2010, beginning each day at 9:30 a.m. (PST) other than December 2, 2010, which will begin at 1:30 p.m. (PST).[56]

### 3.    *The First Lien Agent's Position on the Plan*

In the Amended Lift Stay Motion, the First Lien Agent argues, among other things, that the automatic stay should be lifted because the Plan is unconfirmable, because:

(1) The terms of the Refinanced Secured Note do not satisfy the Bankruptcy Code's

---

[49] Docket No. 112.
[50] Docket No. 265.
[51] Docket No. 267.
[52] Docket No. 82.
[53] Docket No. 17.
[54] Docket No. 28.
[55] Docket No. 36. The hearing to consider the Motion to Dismiss is currently scheduled for August 27, 2010.
[56] *See Stipulation and Order Modifying Schedule in Adversary Proceeding* (Docket No. 33).

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

"fair and equitable" requirement (*i.e.,* the proposed interest rate is too low, the term is too long, the loan-to-value ratio is too high, and the Refinanced Secured Note does not contain standard lender protections such as limits on returns to equity holders, bad boy guaranties, and other financial and restrictive covenants).[57]  Amended Lift Stay Motion at pp. 19-21.

(2)  The Plan, which the First Lien Agent asserts is really a sale, does not comply with Bankruptcy Code sections 363 and 1129(b).  Specifically, the First Lien Agent argues that the Plan improperly does not (a) provide them with the opportunity to credit bid their debt pursuant to Bankruptcy Code section 363(k), and (b) demonstrate that the price being paid for the Property is fair, reasonable, and on market terms, which the First Lien Agent argues could only be shown by exposing the "sale" to the market through an auction.  *Id.* at pp. 22-23.

(3)  The Plan contemplates payments to the Backstop Investors under the Plan, such as the post-petition repayment of the Initial Capital Contribution and reimbursement of legal fees that are violative of Bankruptcy Code section 1129(a)(1).  *Id.* at pp. 24-25.

(4)  The Plan could not satisfy the "best interests of creditors" test because the First Lien Parties would receive ***as much*** under the Plan as they would in a chapter 7 liquidation, which is violative of Bankruptcy Code section 1129(a)(7).  *Id.* at pp. 25-26.

(5)  The Plan contemplates giving value to stakeholders other than the First Lien Parties, who should receive 100% of any value up to the full amount of their claims, which constitutes an impermissible gift designed to create an impaired consenting class.  *Id.* at pp. 26-27.

(6)  The Plan creates a separate convenience class (*i.e.,* Class 4-Trade Unsecured Claims) for the purpose of gerrymandering an impaired consenting class.  *Id.* at p.27.

(7)  The Plan violates the "absolute priority rule" and could not satisfy the "new value plan" requirements because junior creditors and equity holders would receive value under the

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[57] *See also Declaration of Andrew A. Manley* (the "Manley Dec.") (Docket No. 381).

24

Plan despite the fact that impaired, senior creditors (*i.e.*, the First Lien Parties) would vote to reject the Plan.  *Id.* at p. 27-29.

(8)  The Plan is not feasible given that the income from the Property and the Refinanced Secured Loan Reserves described in the Plan would not be sufficient to service the Refinanced Secured Note obligations over its term.[58]  *Id.* at pp. 29-30.

(9)  The Plan was not proposed in good faith because the Backstop Investors proposed the Plan in the hopes of diverting value from the First Lien Lenders and preserving it for out-of-the-money stakeholders.  *Id.* at p. 31.

(10)  Given that the Intercreditor Agreement prohibits confirmation of the Plan, the Backstop Investors would first have to prevail in the Adversary Proceeding before the Plan can be confirmed.  *Id.* at pp. 33-34.

As set forth in the Backstop Parties papers filed in connection with the Amended Lift Stay Motion, ***the Backstop Investors do not believe the First Lien Parties' arguments have merit and believe the Plan can, and likely will be confirmed.***  As (i) set forth in the Surreply, (ii) provided in the Plan and in the amended Refinanced Secured Note annexed hereto as **Exhibit "G,"** and (iii) described herein, the First Lien Parties will be receiving treatment under the Plan that satisfies all of the Bankruptcy Code's confirmation requirements.  In addition, contemporaneously herewith, the Backstop Investors have filed modified Refinanced Secured Documents providing the First Lien Parties with additional provisions regarding the treatment of their claim.

F.    **The Debtor's Assets and Liabilities.**

On the Petition Date, the Debtor filed its Schedules and Statements of Financial Affairs (as amended, the "<u>Schedules</u>").  On July 8, 2010, the Debtor filed amended Schedules.  Copies of the Schedules are attached hereto as **Exhibit "F."**  The Schedules, which may be amended from time to time, identify the Debtor's known assets and liabilities as of the Petition Date.  Pursuant to the

---

[58] See *Declaration of Larry Bertsch* (Docket No. 379) at ¶10, Fine Dec. at ¶16H and the Manley Dec. at ¶¶17 and 44.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Schedules, the Debtor's Assets are valued at approximately $137,700,000 and the Debtor has scheduled approximately sixty (60) creditors with Claims totaling approximately $502,600,000. Among the more significant assets and liabilities listed in the Schedules are the following:

    **1.**    *Assets.*

        **a.**    <u>**The Real Property**</u>.

The Debtor owns the Property described above. On June 2, 2010, the Debtor filed the Kent Report valuing the Property as follows: (1) assuming a number of factors including the Debtor's net operating income doubling to $14,970,676, a fair value of $235,095,000; and (2) a liquidation value of $137,700,000. On July 9, 2010, the First Lien Agent filed the (i) *Declaration of Keith Harper*, which attached an appraisal of Snyder Valuation, the First Lien Agent's retained appraiser, who valued the Property at $183 million,[59] and (ii) *Declaration of Randall A. Fine* ("<u>Fine Dec.</u>"), in which Mr. Fine opined that the Property Value declined by approximately $5 million since the Petition Date.[60] Nevertheless, under the Plan, the Backstop Investors have stipulated that the value of the Property as of the Effective Date is $188 million. In addition, the Backstop Investors have agreed to facilitate the Debtor's reorganization and take title to the Property for capital contributions in excess of $20 million and a refinanced first lien loan with a present value equal to $188 million, the value ascribed by the First Lien Agent's experts[61] as of the Petition Date.[62]

        **b.**    <u>**Cash and Accounts Receivable**</u>.

According to the Debtor: (1) as of March 29, 2010, the Debtor had approximately: $1,500.00 in cash in its Travelodge Daily Opening Cash Drawer, $205,313.98 in the Travelodge Account, and $4,839.27 in the Debtor's Operating Account; and (2) as of February 28, 2010, there was $767,133.47 in the Security Deposit Account. The Schedules list approximately $521,816.83

---

[59] Docket No. 382.

[60] *See* Docket No. 380. The Backstop Investors do not believe or concede that the Property Value has decreased in any respect since the Petition Date.

[61] The Backstop Investors do not concede in any respect that any person presented by the First Lien Agent as an expert in this Case qualifies or should be qualified as such.

[62] *See* 506 Application.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

26

in accounts receivable as of February 28, 2010, the collectible amount of which is unknown.

### c.    Other Personal Property.

According to the Debtor, all of its other assets such as office equipment, furnishing, and supplies are *de minimis* in value.  Other personal property such as prepaid expenses will be in the approximate amount of $545,302, as of March 29, 2010.

### 2.    *Liabilities.*

According to the Debtor, it has two primary liabilities:  the First Lien Loan Claims in the approximate amount of $270,752,852.35 and the Second Lien Loan Claims in the approximate amount of $233,155,094.16.  In addition, the Debtor owes approximately $347,459.46 to Holders of Trade Unsecured Claims.

### ARTICLE IV.

### DESCRIPTION OF CHAPTER 11 REORGANIZATION PLAN

### A.    Overall Structure of the Plan.

Under the Plan, Claims against, and Interests in, the Debtor are divided into Classes according to their relative seniority and other criteria.  If the Bankruptcy Court confirms the Plan and it is consummated, the Holders of Allowed Administrative, Allowed Priority Tax, Allowed Priority Claims and Trade Unsecured Claims will receive Distributions in Cash equal to the full amount of their Claims.  The First Lien Loan Claims, the Second Lien Loan Claims and the Old Membership Interests are Impaired and will receive Distributions as described herein and in the Plan.

### B.    Classification and Treatment of Claims and Interests Under the Plan.

Section 1123 of the Bankruptcy Code provides that a plan must classify the Claims and Interests of a debtor's Creditors and Interest Holders.  Therefore, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

and Priority Tax Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Backstop Investors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes which contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest in that Class is Allowed and has not been paid, released or otherwise settled prior to the Effective Date.

**1.**   *Unclassified Claims.*

     **a.**   <u>**Administrative Claims**</u>.

Administrative Claims are unpaid Claims for costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses, including but not limited to, Professional Fees, Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estate pursuant to chapter 123 of the Judicial Code and 28 U.S.C. § 1930; and (d) all Bankruptcy Court-approved requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

As set forth in <u>Section 2.2(a)</u> of the Plan, subject to sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Claim shall either: (i) be paid in Cash

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

in the Allowed amount of any such Claim on, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date upon which such Administrative Claim becomes Allowed, or (c) such date as is otherwise agreed by New Borrower and the Holder of such Claim; or (ii) have such Claim assumed by New Borrower, to be paid in Cash in the Allowed amount of any such Claim on, or as soon as reasonably practicable after, the later of (a) the date upon which such Administrative Claim becomes Allowed, (b) the date on which such Administrative Claim becomes due in the ordinary course of business, or (c) such date as is otherwise agreed by the Debtor, New Borrower and the Holder of such Claim.  Notwithstanding the foregoing or anything to the contrary in the Plan:  (1) Debtor shall pay, or cause to be paid, all accrued fees payable under 28 U.S.C. § 1930 on or before the Effective Date of the Plan; (2) all final applications for Fee Claims constituting amounts due for services rendered on or before the Effective Date shall be Filed no later than twenty (20) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; and (3) following the Effective Date, the Debtor shall be responsible for timely payment of all United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Final Decree closing the Chapter 11 Case is entered and all quarterly fees due as of the Confirmation Date are paid in full.  Notwithstanding anything to the contrary in the Plan, the Debtor shall File with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the Chapter 11 Case remains open in such format as reasonably may be required by the United States Trustee.

       **b.**       **Priority Tax Claims.**

Priority Tax Claims are any Claims that are entitled to priority under section 502(i) or section 507(a)(8) of the Bankruptcy Code.  Priority Tax Claims do not include *ad valorem* tax Claims if such Claims under applicable state law are Secured by a Lien on the Assets.  The legal and equitable rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan.  Each Holder of an Allowed Priority Tax Claim shall, subject to <u>Section 2.2(b)</u> of the Plan, either:  (i) be paid the Allowed amount of such Claim in Cash on the Effective Date, (ii) have such Claim assumed by New Borrower, to be paid by New Borrower in Cash in the Allowed amount of any such Claim on the date on which such Claim is payable under applicable law or any agreement relating thereto;

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

or (iii) receive such other treatment as is agreed by the Holder of the Allowed Priority Tax Claim, the Debtor, the Investors and New Borrower.

### 2. *Classified Claims.*

#### a. <u>Class 1 − Priority Claims</u>.

Class 1 consists of Priority Claims against the Debtor which are Allowed Claims entitled to priority under sections 502(a)(2) through (7) of the Bankruptcy Code. The legal and equitable rights of the Holders of Allowed Priority Claims are unaltered by the Plan. As set forth in <u>Section 2.3(a)</u> of the Plan, each Holder of an Allowed Priority Claim shall, either: (i) be paid the Allowed amount of such Claim in Cash on the Effective Date, (ii) have such Claim assumed by New Borrower, to be paid by New Borrower in Cash in the Allowed amount of any such Claim on the date on which such Claim is payable under applicable law or any agreement relating thereto; or (iii) receive such other treatment as is agreed by the Holder of the Allowed Priority Claim, the Debtor, and New Borrower.

Class 1 is not Impaired and the Holders of Allowed Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 are not entitled to vote to accept or reject the Plan.

#### b. <u>Class 2 − Other Secured Claims</u>.

Class 2 consists of Other Secured Claims against the Debtor. As set forth in <u>Section 2.3(b)</u> of the Plan, Holders of Allowed Other Secured Claims shall have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code and/or assumed by New Borrower such that the Claim is rendered unimpaired, except to the extent that the Holder agrees to less favorable treatment. The failure of the Debtor or any other party-in-interest (including New Borrower) to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan shall be without prejudice to the rights of New Borrower or any other party-in-interest (including New Borrower Parent) to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable) when and if such Claim is sought to be enforced. Any Cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder, New Borrower and the Debtor.

Class 2 is not Impaired and the Holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 are not entitled to vote to accept or reject the Plan.

### c.    Class 3 − First Lien Secured Claims.

#### (i)    General

Class 3 consists of the First Lien Secured Claims against the Debtor which are held by the First Lien Lenders, and which are Secured by first priority Liens and security interests in all of the Assets.  As set forth in Section 2.3(c) of the Plan, on the Effective Date, each First Lien Lender shall, in full satisfaction, settlement, release and exchange for Allowed First Lien Secured Claims, receive:  a *Pro Rata* Distribution of (a) Cash in an amount equal to the Paydown Amount, and (b) interests in the Refinanced Secured Loan evidenced by the Refinanced Secured Note.

The Refinanced Secured Note will be secured by the Property, and will take one of the following two forms, in accordance with Bankruptcy Code section 1129(b), depending on whether the First Lien Lenders elect under Bankruptcy Code section 1111(b):

(a) The First Lien Lenders elect under Bankruptcy Code section 1111(b) - a note with a (i) face amount equal to the First Lien Loan Claims (*i.e.* $270,752,852.35) *minus* the Refinanced Secured Note Deduction, and (ii) net present value equal to the Property Value (*i.e.,* $188 million), *minus* the Refinanced Secured Note Deduction; or

(b) The First Lien Lenders do not elect under Bankruptcy Code section 1111(b) - a note with a face amount and with a net present value equal to the Property Value (*i.e.,* $188 million) *minus* the Refinanced Secured Note Deduction.

The form of the Refinanced Secured Note, as amended, is annexed hereto as **"Exhibit "G."**  In addition, the Investors will enter into, on a joint and several basis, an Interest Payment Guaranty in connection with the Refinanced Secured Note substantially in the form annexed hereto as **Exhibit "H."**  A form of the Contribution and Indemnity Agreement that will be executed and delivered by the Investors in connection with the Interest Payment Guaranty is annexed hereto as **Exhibit "I."**

In the event the First Lien Lenders make an election under Bankruptcy Code section

31

1111(b), the Refinanced Secured Note, which will have a net present value as described above, will provide the First Lien Lenders with a stream of payments equal to the face amount of the Refinanced Secured Note.  Interest payments made on the Refinanced Secured Note will be credited against the face amount of the Refinanced Secured Note (*i.e.,* will retire principal amounts).  Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

Notwithstanding anything else contained in the Plan, all Distributions to be made to Holders of Allowed Class 3 Claims shall be subject to the terms and conditions of the Co-Lender Agreement, which agreement shall remain in full force and effect and shall be unaltered by the Plan.

### (ii)   The 1111(b) Election

Pursuant to section 1111(b) of the Bankruptcy Code, a class of undersecured creditors may elect to have its entire claim, both the secured and unsecured portion, treated as a secured claim (the "Election").  The purpose of the Election is to prevent an undersecured creditor from being deprived of any appreciation of its collateral after emergence from chapter 11.  Thus, Bankruptcy Code section 1111(b) provides undersecured creditors with an option of protecting against a judicial and/or cyclical undervaluation of their collateral by having their entire claim treated as secured.

When a claim is secured by a lien on property, the present value of which is less than the amount of the claim, the claim is undersecured.  Bankruptcy Code section 506(a) bifurcates an undersecured claim into two components:  (i) a secured claim, equal to the value of the property; and (ii) an unsecured claim or unsecured deficiency claim for the remainder.  Section 1111(b) provides undersecured creditors with two choices:  (i) keep the bifurcated claims (secured and unsecured deficiency); or (ii) elect to have the entire claim treated as secured under section 1111(b)(2), thus waiving the unsecured deficiency component of its claim.

If a creditor class makes an Election, its entire claim, even the unsecured portion, is treated as secured and the creditor waives the unsecured deficiency portion of its claim and loses the right to vote its unsecured claim.  Assuming a reorganized debtor intends to keep the collateral, in order to cramdown a secured claim, the plan must provide for the following:

- the creditor's liens on the property remain for the full amount of the claim, whether the property is retained by the debtor or sold (post-confirmation);

- a stream of payments to the creditor, adding up to the full claim amount, the present value of which must be equal to the value of the collateral as of the effective date of the plan; and

- the creditor's liens attach to the sale proceeds if the property is sold post-confirmation (due on sale for the entire claim amount).

Pursuant to Bankruptcy Rule 3014, the Election must be made by the conclusion of the disclosure statement hearing, or within such later time as prescribed by the court. At least two-thirds in dollar amount and more than half in number of claims of the entire class must vote to make an Election. Once the Election is made, it is binding, usually irrevocably, upon all class members.

### d.    Class 4 − Trade Unsecured Claims.

Class 4 consists of General Unsecured Claims against the Debtor that are not Second Lien Loan Claims or the First Lien Deficiency Claims. Each Holder of an Allowed Trade Unsecured Claim shall, in full satisfaction, settlement, release and exchange for Allowed Trade Unsecured Claims, be paid the Allowed amount of such Claim in Cash without interest on the Effective Date. Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

### e.    Class 5 − Non-Trade Unsecured Claims.

Class 5 consists of Non-Trade Unsecured Claims and are comprised of the Second Lien Loan Claims and, if applicable, the Deficiency Claim. As set forth in Section 2.3(e) of the Plan, assuming Class 5 votes to accept the Plan, each Holder of a Non-Trade Unsecured Claim shall, in full satisfaction, settlement, release and exchange for such Allowed Non-Trade Unsecured Claim be entitled to elect to receive one of the following two treatments: (A) assuming such Holder is an Accredited Investor, the Equity Option consisting of (i) a *Pro Rata* right to participate in the Class 5 Purchase Option, (ii) a *pro rata* Distribution of the Equity Grant based on the amount of Allowed Class 5 Claims that elect the Equity Option and (iii) *a Pro Rata* Distribution of the Class 5 Rights; or (B) a *pro rata* sharing of the Cash Option (*i.e.,* $250,000) based on the amount of Allowed Claims that elect the Cash Option. The Backstop Investors, in their capacity as Second Lien Lenders, shall be deemed to have elected the Equity Option and waived their respective rights to

33

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

elect to participate in the Cash Option.  Notwithstanding, in the event Class 5 does not vote for the Plan, each Holder of a Non-Trade Unsecured Claim shall, in full satisfaction, settlement, release and exchange for such Allowed Non-Trade Unsecured Claim, be deemed to have elected and shall receive its *Pro Rata* share of the Cash Option.  Class 5 is Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

### f.    Class 6 − Interests.

Class 6 consists of all Interests held in the Debtor, which class includes any:  (a) equity security, including all membership interests together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company or similar interest.  As set forth in Section 2.3(f)(ii) of the Plan, the treatment of the Allowed Interests in Class 6 depends on whether Class 6 votes in favor of the Plan, as follows:

(a) If Class 6 votes to accept the Plan, the Holder of the Old Membership Interests, in full satisfaction, settlement, cancellation, release and exchange for the Old Membership Interests, shall receive (i) the Class 6 Rights, and (ii) the Class 6 Purchase Option.

(b) If Class 6 does not vote to accept the Plan, the Holder of the Old Membership Interests, in full satisfaction, settlement, cancellation, release and exchange for the Old Membership Interest, shall receive the Class 6 Rights.

Whether treated under Section 2.3(f)(ii)(A) or (B) of the Plan, upon the Effective Date, the Old Membership Interests shall be extinguished and cancelled without further action by the Debtor or notice to such Holder being necessary.  Class 6 is Impaired and Holders of Class 6 Interests are entitled to vote to accept or reject the Plan.

### C.    Means of Implementation of Plan.

#### 1.    *Plan Implementation.*

The Plan shall be implemented in all respects in a manner that is consistent with the terms and conditions of the Operative Documents, including the LLC agreements governing New Borrower and New Borrower Parent and as described in the Plan and this Disclosure Statement. Forms of the New Borrower LLC Agreement and the New Borrower Parent LLC Agreement are

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

annexed hereto as **Exhibits "J" and "K,"** respectively.  In order to implement the Plan, the Investors will invest the Initial Capital Contribution of $20 million in New Borrower Parent to be paid to New Borrower in exchange for the New Borrower Interest.  The Initial Capital Contribution will be used for the (i) Paydown Amount ($10 million), (ii) Interest/TI Reserve ($8 million) and (iii) CapEx Reserve ($2 million).

The New Borrower Parent Units will be owned 88% by the Backstop Investors and the New Property Manager (in an amount determined by the Backstop Investors), and 12% by the Non-Trade Unsecured Creditors subject to the following:  (1) 10% of the New Borrower Parent Units will be offered for sale to the Holder of the Old Membership Interests in the form of the Class 6 Purchase Option; and (2) 78% of the New Borrower Parent Units will be offered for sale to the Non-Trade Unsecured Creditors in the form of the Class 5 Purchase Option.  The Private Offering Memorandum, Subscription Agreement and the New Borrower Parent UPA, substantially in the forms that will describe and be used to implement the sale and allocation of the New Borrower Parent Units are annexed hereto as **Exhibits "L," "M"** and **"N,"** respectively.  In addition the Rights will be issued (a) assuming Class 5 votes to accept the Plan, to the Holders of Allowed Claims in Class 5 that are Accredited Investors that elect the Equity Option and (b) to the Holder of the Old Membership Interests in Class 6, to the extent the Holder is an Accredited Investor.  The Class 5 Rights Agreement and the Class 6 Rights Agreement, substantially in the form that will be used to issue and allocate the Rights, are annexed hereto as **Exhibits "O" and "P,"** respectively.

The Backstop Investors are in the process of selecting the New Property Manager from two (2) nationally recognized property managers and have begun setting a framework for the New Property Manager Agreement, under which the New Property Manager will manage the Property after the Effective Date.  The Backstop Investors will be filing a form of the New Property Management Agreement as an exhibit to the Plan Supplement.

       **2.**     *Merger.*

On the Effective Date, New Borrower shall merge with and be the successor by merger to the Debtor, and the Certificate of Merger shall be filed in Nevada (including, to the extent necessary, the real property records of Clark County, Nevada) and Delaware on the Effective Date.

Simultaneously therewith, the Mortgage, as amended and restated, shall be recorded in Clark County, Nevada. The form of Mortgage is annexed hereto as **Exhibit "R."** The Debtor and New Borrower shall have all the power to take all actions necessary to effectuate and consummate the transaction contemplated by the Plan under applicable state laws in addition to all the rights, powers and responsibilities conferred by the Bankruptcy Code, the Plan and any Final Orders of the Bankruptcy Court. Except as expressly agreed to otherwise by the Debtor and New Borrower or as provided in the Plan or the New Secured Loan Documents, the Assets will vest in New Borrower free and clear of all Liens (except for the Mortgage and any Liens for *ad valorem* taxes not yet due and payable and Permitted Encumbrances) and Claims (other than Claims which have been assumed by New Borrower), but subject to easements, restrictions, conditions and limitations of record that affect the title to the Property as of the Petition Date, any Liens securing Other Secured Claims that are reinstated or assumed by New Borrower, and any such matters arising after the Petition Date which have been approved by First Lien Agent and New Borrower. The Confirmation Order shall, among other things, constitute an Order authorizing the Debtor to execute and deliver the Operative Documents (to the extent they have not already been executed and delivered) and the vesting of all of the Estate's interests in the Assets in New Borrower without requiring any further corporate authorizations and notwithstanding the requirements otherwise applicable under any applicable non-bankruptcy law. The Confirmation Order shall, among other things, provide that: (i) New Borrower and the Investors have acted in good faith in consummation of the Plan and the Debtor's reorganization; and (ii) the Mortgage constitutes a valid first priority Lien, subject only to any Permitted Encumbrances.

　　　　　**3.**　　*Assumption of Liabilities.*

　　　　　On the Effective Date, unless such Claims shall be paid on or prior to such date, New Borrower shall be deemed to have assumed any Claim that is an Administrative Claim, a Priority Tax Claim or a Priority Claim (including any such Claims that are Disputed Claims or with respect to which any applicable period for asserting a Claim has not expired), and all Other Secured Claims will be reinstated and assumed by New Borrower pursuant to and in accordance with the terms of the Plan. New Borrower shall be obligated to honor and satisfy all such assumed or reinstated

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Claims solely if and to the extent such Claims are Allowed Claims or become Allowed Claims.  The failure of the Debtor, New Borrower or any other party-in-interest (including New Borrower Parent) to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan or with respect to any Claims that are assumed by New Borrower under the Plan, shall be without prejudice to the rights of New Borrower or any other party-in-interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable) when and if such Claim is sought to be enforced.  Except as set forth in the Operative Documents and the Plan, New Borrower shall have no liability for Claims against or Interests in the Debtor (whether or not currently known) stemming from the Debtor's reorganization or its merger with New Borrower, unless such Claims have expressly been assumed pursuant to the terms of the Plan.

**4.    *Cancellation of Interests.***

On the Effective Date, the Debtor's membership interests (the Old Membership Interests) shall be cancelled and be of no further force or effect, without any further action being required to effect such cancellation.  Following the cancellation of the Old Membership Interests, the Holder of such Interests shall have no rights arising from or relating to such Interests or the cancellation thereof unless as otherwise set forth in the Plan.

**a.    Discharge and Injunction.**

(i)    Discharge of the Debtor

Except as provided in the Plan or Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims and Interests.  Except as provided in the Confirmation Order, Confirmation discharges the Debtor and/or New Borrower from all Claims or Interests, or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:  (a) a proof of claim based on such debt is filed or deemed to be filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim based on such debt has accepted the Plan.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

      (ii) <u>Injunction</u>

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all Entities and Persons that have held, currently hold or may hold a debt, Claim, other liability or Interest against or in the Debtor that would be discharged upon Confirmation of this Plan on the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code are permanently enjoined from taking any of the following actions on account of such debt, Claim, liability, Interest or right:  (i) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, liability, Interest or right against Assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a Distribution with respect to such Assets or the proceeds thereof as provided under the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any Assets retained by New Borrower or distributed to Holders of Claims under the Plan, other than as permitted under subparagraph (i) above; and (iii) creating, perfecting or enforcing any Lien or encumbrance against any Assets retained by New Borrower or distributed under this Plan, other than as permitted by the Plan.

On and after the Effective Date, each Holder of any Claim against or Interest in the Debtor is permanently enjoined from taking or participating in *any* action that would interfere or otherwise hinder the Debtor from implementing the Plan, the Confirmation Order or any Operative Documents in accordance with the terms thereof.

  **5.**  ***Exemption From Certain Transfer Taxes and Further Transactions.***

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance or exchange of any security, or the making or delivery of any instrument of transfer under, in furtherance, or in connection with the Plan, including, but not limited to, any deeds, bills of sale, assignments or other instruments of transfer (including those with respect to the Property), shall not be subject to any stamp tax, real estate transfer tax or similar tax.  As such, the New Borrower Interests and the New Borrower Parent Units issued in connection with the Plan are exempt under section 1146(a) of the Bankruptcy Code.

6. **Final Decree.**

Notwithstanding otherwise applicable law, the Debtor shall not request entry of the Final Decree, unless such provision(s) are waived by the Backstop Investors in their sole and exclusive discretion, until:

(a) All adversary proceedings and contested matters pending before the Bankruptcy Court have been resolved by a Final Order;

(b) All Claims have either: (i) become Allowed Claims and have been paid in accordance with the treatment to be given such Allowed Claim pursuant to the Plan; (ii) been disallowed by a Final Order or deemed to be a Disallowed Claim in accordance with the terms of the Plan; or (iii) been assumed by New Borrower or reinstated;

(c) All Distributions to be made by the Debtor to Holders of Allowed Claims shall have been made by the Distribution Agent in accordance with the requirements of the Plan; and

(d) The Total Capital Contribution has been disbursed to New Borrower to be distributed in accordance with the Plan and the New Borrower Interests, the New Borrower Parent Units and the Rights have been issued.

7. **Effectuating Documents, Further Transactions.**

On and after the Effective Date, New Borrower, New Borrower Parent, the Investors and the Debtor and their respective officers, members agents and professionals, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtor, as applicable, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

8. **Adequate Protection Liens.**

As of the Effective Date, any adequate protection replacement liens granted pursuant to the terms of Cash Collateral Orders (or associated stipulations) shall be deemed to be eliminated and of no further force and effect.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

**D.**     **Provisions Concerning Plan Distributions.**

    **1.**     *Distributions on Account of Claims Allowed as of the Effective Date.*

Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Effective Date.

    **2.**     *Distributions on Account of Claims Allowed After the Effective Date.*

    **a.**     **Payments and Distributions on Disputed Claims.**

In the event that there are Disputed Administrative Claims, Disputed Priority Claims or Disputed General Unsecured Claims requiring adjudication and resolution and such Claims have not become Allowed or Disallowed prior to the Effective Date, the obligation to satisfy such Claims will be assumed by New Borrower, subject to Allowance or Disallowance by the Bankruptcy Court. Except as otherwise provided in the Plan, a Final Order, or as agreed to by New Borrower Parent, any Disputed Administrative Claim or Disputed Priority Claim that becomes Allowed after the Effective Date shall be satisfied or performed by New Borrower in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

    **b.**     **Special Rules for Distributions to Holders of Disputed Claims.**

Notwithstanding any provision to the contrary in the Plan and except as otherwise agreed by the relevant parties:  (i) partial payments/Distributions shall not be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

    **3.**     *Manner of Payment Under the Plan.*

Distributions of Cash to be made by the Distribution Agent pursuant to the Plan shall be made, at the discretion of the Distribution Agent, by check drawn on the Distribution Agent's bank account or by wire transfer from a domestic bank.

    **4.**     *Whole Dollars.*

Any other provision of the Plan to the contrary notwithstanding, no payments of cents will

1  be made.  Whenever any payment of cents would otherwise be called for, the actual payment may

2  reflect a rounding of such fraction to the nearest whole dollar (up or down).

3  **5.**    *Escheat.*

4  Holders of Allowed Claims shall have three (3) months from the check date to negotiate

5  Distribution checks issued by the Distribution Agent under the terms of the Plan, otherwise payment

6  on such checks may at the Distribution Agent's sole discretion be stopped and the funds shall

7  escheat to the Distribution Agent and shall be promptly distributed to New Borrower, in accordance

8  with section 347 of the Bankruptcy Code.

9  **6.**    *Delivery of Distributions.*

10  **a.**    **Record Date for Distributions.**

11  On the Distribution Record Date, the Claims Register shall be closed and any party

12  responsible for making Distributions shall be authorized and entitled to recognize only those record

13  Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

14  Notwithstanding the foregoing, if a Claim is transferred twenty (20) or fewer days before the

15  Distribution Record Date, the Distribution Agent shall make Distributions to the transferee only to

16  the extent practical and in any event only if the relevant transfer form contains an unconditional and

17  explicit certification and waiver of any objection to the transfer by the transferor.

18  **b.**    **Distribution Agent.**

19  The Distribution Agent shall make all Distributions required under the Plan.

20  **c.**    **Delivery of Distributions in General.**

21  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary,

22  Distributions to all Holders of Allowed Claims shall be made to Holders of record as of the

23  Distribution Record Date by the Distribution Agent:  (a) in accordance with Federal Rule of Civil

24  Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set

25  forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein

26  (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtor has

27  been notified in writing of a change of address); (c) at the addresses set forth in any written notices

28  of address changes delivered to the Distribution Agent after the date of any related Proof of Claim;

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1   (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the

2   Distribution Agent has not received a written notice of a change of address; or (e) on any counsel

3   that has appeared in the Chapter 11 Case on the Holder's behalf, *provided, however*, that

4   Distributions to First Lien Lenders shall be made to First Lien Agent for the benefit of First Lien

5   Lenders.  Except as otherwise provided in the Plan, Distributions under the Plan on account of

6   Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that

7   each Holder of an Allowed Claim shall have and receive the benefit of the Distributions in the

8   manner set forth in the Plan.  Absent willful misconduct or gross negligence, the Debtor, New

9   Borrower, New Borrower Parent, the Investors, the Distribution Agent, and their respective

10   members, officers, agents and professionals, as applicable, shall not incur any liability on account of

11   any Distributions made under the Plan.

12        **7.**     ***Returned Distributions.***

13       In the case of Distributions to the Holders of Allowed Claims that are returned to the

14   Distribution Agent due to an incorrect or incomplete address, the Distribution Agent shall retain any

15   such returned Distribution in a segregated account established by the Distribution Agent to keep

16   track of any returned Distributions.  Unless the Holder of the Allowed Claim relating to any such

17   returned Distribution contacts the Distribution Agent (or its designee) within three (3) months from

18   the date on which such Distribution was returned and provides the Distribution Agent (or its

19   designee) with acceptable proof of identity and an accurate address, such Holder shall forfeit all

20   rights thereto, and to any and all future Distributions or rights under the Plan. In such event, the

21   Claim for which such Distributions was issued shall be treated as a Disallowed Claim and the

22   Distribution on account of such Disallowed Claim shall promptly be distributed to New Borrower.

23        **8.**     ***Disputed Distributions.***

24       Subject to <u>Section 6.9</u> of the Plan, in the event of any dispute between or among Holders of

25   Claims as to the right to any Holder of a Claim to receive or retain any Distribution to be made to

26   such Holder under the Plan, the Distribution Agent, in lieu of making such Distribution to such

27   Holder, may make it instead into an escrow account for payment as ordered by the Bankruptcy

28   Court or as the interested parties to such dispute may otherwise agree among themselves.

Any such Holder who fails to raise such dispute by filing an appropriate request for relief with the Bankruptcy Court prior to the issuance of such disputed Distribution by the Distribution Agent shall be deemed to have forever waived any right to dispute such Distribution or to enjoin, impair or otherwise restrict the use of any such Distribution.

**9.**     *Setoffs.*

The Distribution Agent may, but shall not be required to, set-off against any Distributions to be made pursuant to the Plan to a Holder of an Allowed Claim, Claims of any nature whatsoever that the Debtor may have, or may have had, against such Holder that have not been previously released, but neither the failure to do so, nor the allowance of any Claim held by such Holder shall constitute a waiver or release by the Distribution Agent of any such Claim, the Debtor or New Borrower may have, or may have had, against such Holder.

**10.**     *Withholding Taxes.*

The Distribution Agent shall be entitled to deduct any applicable federal or state withholding taxes from any payments made with respect to Allowed Claims, as appropriate, and shall otherwise comply with section 346 of the Bankruptcy Code.

**11.**     *Allocation of Distributions.*

Distributions on account of Allowed Claims shall, for tax purposes, be treated as allocated first to principal, and thereafter to interest only to the extent that the entire principal amount has been recovered, if applicable.

**E.**     **Certain Terminations and Releases.**

**1.**     *Certain Terminations.*

On the Effective Date, all instruments evidencing indebtedness of the Debtor that are Impaired by the Plan shall be deemed canceled as against the Debtor and New Borrower.

**2.**     *Rights If Plan Not Confirmed.*

If Confirmation of the Plan does not occur, the Plan shall be deemed null and void and, in such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any Person or Entity in any further proceedings involving the Debtor.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

3.    *Term of Bankruptcy Injunction or Stays.*

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date unless the Bankruptcy Court shall order otherwise.

4.    *Exculpation.*

None of the Releasees[63] or any of their respective Representatives shall have or incur any liability to any Holder of a Claim against or Interest in the Debtor, or any other party-in-interest, or any of their Representatives, or any of their successors or assigns, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of the Plan, or the consummation of the Plan, except and solely to the extent such liability is based on fraud.  The Releasees shall be entitled to reasonably rely upon the advice of counsel with respect to any of their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.  No Holder of a Claim against or Interest in the Debtor, or any other party-in-interest, including their respective Representatives, shall have any right of action against the Releasees or any of their Representatives, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan, except to the extent arising from willful misconduct, gross negligence or fraud.  Nothing in Section 7.6(b) of the Plan shall be deemed an exculpation by any Releasor[64] of any Releasee or any of its Representatives for any acts, omissions, transactions, events or other occurrences taking place after the Effective Date in connection with the Refinanced Secured Loan or any amounts owed under the Refinanced Secured

---

[63] Releasees is defined in the Plan as each of the (i) New Borrower, New Borrower Parent, Distribution Agent, the Second Lien Agent, the Second Lien Lenders, the Investors, and any past or current shareholders, subsidiaries, partners, members, affiliates or Representatives of the aforementioned parties, and (ii) Debtor Parties and their Professionals (solely in their capacity as Representatives of the Debtor Parties), *provided however*, that (a) Credit Suisse, Cayman Islands Branch, in all capacities including as predecessor First Lien Agent and Second Lien Agent, (b) FX Real Estate and Entertainment, Inc. and its Representatives, and (c) the Insiders shall not be Releasees in any respect.

[64] Releasors is defined in the Plan as each of the (i) New Borrower, New Borrower Parent, Distribution Agent, the Second Lien Agent, the Second Lien Lenders, the Investors, Holders of Claims that accept distributions under this Plan, and any past or current shareholders, subsidiaries, partners, members, affiliates or Representatives of the aforementioned parties, and (ii) Debtor Parties and their Professionals (solely in their capacity as Representatives of the Debtor Parties), *provided however*, that the Holders of Claims in Class 3 shall only be deemed to be Releasors to the extent such Holders vote in favor of the Plan.

44

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Loan Documents.

**5.** *Releases.*

As of the Effective Date, for good and valuable consideration including the Releasees substantial contributions in the Chapter 11 Case, the adequacy of which is hereby confirmed, to the fullest extent permissible, each Releasor will be deemed to release, waive and forever discharge all Released Liabilities against each Releasee and each Releasee's respective Representatives; *provided, however*, that the releases provided in <u>Section 7.5</u> of the Plan shall not constitute a release of any liability based on willful misconduct, gross negligence or fraud; *provided, further*, that nothing herein or in the Plan shall be deemed to constitute a release by any Releasor of any Releasee or any of its Representatives for any acts, omissions, transactions, events or other occurrences taking place after the Effective Date.

**6.** *Injunctions.*

**a.** <u>**Injunction Against Releasors**</u>.

All of the Releasors, along with any of their successors or assigns, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Releasees or any of their respective Representatives in respect of any Released Liabilities, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Releasees or any of their respective Representatives in respect of any Released Liabilities, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Releasees or any of their respective Representatives in respect of any Released Liabilities, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Releasees or any of their respective Representatives or against the property or interests in property of the Releasees or any of their respective Representatives, in respect of any Released Liabilities; *provided, however*, that nothing contained herein or in the Plan shall preclude such Releasors from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements and documents delivered under or in connection with the Plan; *provided, further*, that nothing contained herein or in the Plan shall be deemed to enjoin any Releasor from taking any action

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

45

against any Releasee or any of its Representatives based on the release exceptions contained in the two provisos at the end of Section 7.5(a) of the Plan.

### b.    Injunction Protecting Exculpation of Releasees.

All Holders of Claims against or Interests in the Debtor and any other parties-in-interest, along with any of their Representatives and any of their successors or assigns shall be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, (iii) creating, perfecting, or enforcing any encumbrance of any kind against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any Releasee or any of their respective Representatives or against the property or interests in property any Releasee or any of their respective Representatives, in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan; *provided, however*, that nothing contained herein or in the Plan shall preclude any Holder or other party-in-interest from exercising its rights pursuant to and consistent with the terms in the Plan and the contracts, instruments, releases and other agreements and documents delivered under or in connection with the Plan.

### c.    Injunction Against Interference With Plan.

Upon the Effective Date, all Holders of Claims against or Interests in the Debtor and its respective Representatives and any of its successors or assigns shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## F.    Executory Contracts and Unexpired Leases.

The Debtor shall be deemed to have assumed each Assumed Contract and to have assigned such contracts to New Borrower as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract

46

and lease assumptions and assignment to New Borrower as of the Effective Date.

**1.** ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

Any of the Assumed Contracts that are, or may be, alleged to be in default, shall be Cured either in the ordinary course of business or on the Effective Date. Except with respect to Assumed Contracts with respect to which the Debtor or New Borrower and the applicable counterparties have stipulated in writing the appropriate Cure, all requests of Cure that differ from the amounts and treatment proposed by the Debtor or New Borrower must be Filed with the Bankruptcy Court on or before the Cure Bar Date. Any request for payment or other Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Debtor or New Borrower, without the need for any objection by the Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary. New Borrower may also settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If a counterparty objects to any Cure or any other matter related to assumption and assignment, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of New Borrower to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of an order resolving such dispute, approving such assumption and/or assignment, or as may be agreed upon by the Debtor or New Borrower and the counterparty to the Assumed Contract, with the consent of New Borrower Parent, which consent shall not be unreasonably withheld or denied. Any counterparty to an Assumed Contract that fails to object timely to the proposed assumption and assignment of any such contract will be deemed to have consented to such assumption and assignment. The Debtor reserves the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty (30) days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

executory contract or unexpired lease.

Assumption of any Assumed Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults with respect to provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the effective date of assumption and assignment.  Any Proofs of Claim Filed with respect to an Assigned Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**2.    *Rejection Claims.***

Any Holder of a Claim whose Claim arises from the rejection of an executory contract or unexpired lease with the Debtor shall have the rights of Holder of a Trade Unsecured Claim and shall receive the treatment provided to Holders of Class 4 Trade Unsecured Claims as set forth in Section 2.3 of the Plan.

**3.    *Filing of Rejection Claims.***

Any Person or Entity who believes it is entitled to assert an Administrative Claim or a Priority Claim against the Debtor by virtue of the rejection of an executory contract or unexpired lease pursuant to Article VIII of the Plan or a Final Order entered after the Confirmation Date, may File a Claim with the Clerk of the Bankruptcy Court not later than twenty (20) days after the date of any such rejection or such later time as may be set forth for the filing of such Claim in said Final Order.  If such Claim is not so Filed, it shall be forever barred from assertion against the Debtor, New Borrower or any of the Assets.  Nothing in Section 7.4 of the Plan shall affect the right of any party-in-interest to object to any Claim which has been improperly Filed or not Filed on a timely basis.

**4.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Unless otherwise provided in the Plan Supplement, each Assumed Contract that is assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Contract, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges,

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to pre-petition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.      *Reservation of Rights.***

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor, New Borrower or the Investors that any such contract or lease is in fact an executory contract or unexpired lease or that the Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, New Borrower shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**G.      Procedures for Resolving Disputed Claims.**

**1.      *Time Limit for Objections to Claims.***

Unless otherwise ordered by the Bankruptcy Court, objections to Priority Claims, Priority Tax Claims, Administrative Claims and General Unsecured Claims shall be Filed by the Debtor, New Borrower or the Backstop Investors with the Bankruptcy Court and served upon each Holder of each of the Claims to which objections are made not later than (i) sixty (60) days after the Effective Date, or (ii) thirty (30) days after such Claim(s) are timely Filed, whichever is later.  The Debtor and/or New Borrower shall be solely responsible for pursuing objections to Claims and otherwise litigating, settling or otherwise resolving all Disputed Claims.

**2.      *Payments.***

Payments and Distributions to each Holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provision of the Plan with respect to the Class of Creditors to which the respective Holder of an Allowed Claim belongs.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

### 3. *Personal Injury Claims.*

All objections to Claims Filed for personal injury tort damages, if any, shall be determined by the United States District Court for the District of Nevada.

### 4. *Estimation of Claims.*

The Debtor and/or New Borrower, shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or New Borrower may elect to pursue any supplemental proceedings to object to the allowance of such Claim.

## H. Retention of Jurisdiction.

### 1. *Retention of Jurisdiction.*

Except to the extent otherwise expressly set forth in the Plan, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case following the Confirmation Date for the following purposes, it being expressly intended that such retention of jurisdiction shall in all cases hereafter set forth, extend to any actions or proceedings commenced prior or subsequent to the Confirmation Date and/or the Effective Date whether by the Debtor or the parties specified herein:

(a) To hear and determine any objections to the allowance of Claims, including any objections by New Borrower with respect to any Claims which have been reinstated or assumed in accordance with the terms of the Plan;

(b) To determine any and all applications for compensation for any Professionals and similar fees to the extent made specifically subject to a hearing under the Plan and applicable provisions of the Bankruptcy Code.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

(c)     To determine any and all applications for the rejection or assumption and assignment of executory contracts or for the rejection or assumption and assignment, as the case may be, of unexpired leases to which the Debtor is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising there from;

(d)     To determine any and all applications, motions, adversary proceedings, and contested or litigated matters properly before the Bankruptcy Court;

(e)     To modify the Plan pursuant to section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order to the extent authorized by the Bankruptcy Code;

(f)     To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan, any agreements or instruments issued under or relating to the Plan, including the Intercreditor Agreement, or any other documentation evidencing the terms of the Plan;

(g)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court entered in the Chapter 11 Case;

(h)     To adjudicate all controversies concerning the classification of any Claim;

(i)     To liquidate damages in connection with any disputed, contingent or unliquidated Claim;

(j)     To adjudicate all Claims to a security or ownership interest in any of the Assets, or in any proceeds thereof,

(k)     To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor;

(l)     To determine all questions and disputes regarding recovery of and entitlement to any property of the Debtor, or in any proceeds thereof and determine all Claims and Interests and related disputes between or among the Debtor, First Lien Parties, Second Lien Parties, New Borrower and any other Entity or Person, whether or not subject to an action pending as of the Confirmation Date;

(m)     To adjudicate all Causes of Action to which the Debtor is a party, whether or

51

1  not such Claim or controversy is raised or filed before or after the Confirmation Date;

2  　　　　(n)　　To determine issues and disputes concerning entitlement to Distributions to

3  be made under and pursuant to the Plan;

4  　　　　(o)　　To enter any order, including injunctions, necessary to enforce the title, rights

5  and powers of the Debtor or the rights of any Entity hereunder and to impose such limitations,

6  restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may

7  deem necessary or appropriate;

8  　　　　(p)　　To determine such other matters as may be provided for in the Confirmation

9  Order and the Plan, or as may from time to time be authorized under the provisions of the

10  Bankruptcy Code or any other applicable law;

11  　　　　(q)　　To enter a Final Decree closing the Chapter 11 Case;

12  　　　　(r)　　To enforce the provisions of any Administrative Claim Bar Date entered by

13  the Bankruptcy Court; and

14  　　　　(s)　　To make such orders as are necessary or appropriate to carry out the

15  provisions of the Plan, including but not limited to orders interpreting, clarifying or enforcing the

16  provisions thereof.

17  　　　Notwithstanding the forgoing, any disputes with respect to the Refinanced Secured Loan

18  Documents arising after the Effective Date shall be adjudicated pursuant to the terms of the

19  Refinanced Secured Loan Documents and in accordance with the provisions related to the choice of

20  law, jurisdiction and venue contained therein.

21  　　　**2.**　　***Jurisdiction Unaffected.***

22  　　　The occurrence of the Effective Date and/or the entry of a Final Decree shall not divest the

23  Bankruptcy Court of any jurisdiction otherwise retained under <u>Article X</u> of the Plan or the

24  Confirmation Order.

25  **I.**　　**Certain Obligations of the Debtor.**

26  　　　The Debtor, in addition to performance of its other obligations as may be required by the

27  Bankruptcy Code and prior orders of the Bankruptcy Court, shall:

28  　　　　(a)　　After the Confirmation Date, take such action and execute such documents as

52

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

may be reasonably required to consummate the Plan;

(b)    Maintain insurance on all of its Assets up to the Effective Date;

(c)    Maintain all of its books, records and accounting systems in accordance with past practices up to the Effective Date;

(d)    Not sell or dispose of any of its Assets, or any proceeds thereof, except pursuant to a Sale or as contemplated by the Plan, or as permitted pursuant to the Refinanced Secured Loan Documents, or as otherwise may be authorized by order of the Bankruptcy Court up to the Effective Date;

(e)    As of the date of the Final Decree, each of the Debtor's (i) remaining officers and directors shall be deemed to have resigned, and (ii) Professionals, including lawyers and financial advisors, shall conclude their engagements as soon as practicable after the Effective Date and shall File their final fee applications to be set for hearing before the Bankruptcy Court as soon as practicable after the Effective Date, but in no event later than as otherwise required by the terms of the Plan or any applicable orders of the Bankruptcy Court.

**J.    Conditions to Effective Date.**

**1.    *Conditions to Occurrence of Effective Date.***

Each of the following are conditions to be met on or before the Effective Date, which conditions must be satisfied or waived in writing by the Debtor, New Borrower and the Investors (to the extent such entities are affected by any such condition):

(a)    That the Confirmation Order shall have become a Final Order;

(b)    That the Confirmation Order authorizes the assumption of all Assumed Contracts;

(c)    New Borrower and/or the Debtor has paid the Allowed Administrative Claims and Allowed Priority Claims in full or has assumed the amounts owed, unless otherwise agreed by the Holder of such Allowed Administrative and Allowed Priority Claims and New Borrower;

(d)    New Borrower and any other applicable parties thereto, shall be ready, willing and able to close the Refinanced Secured Loan in accordance with the Plan, the Refinanced

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Secured Loan Documents and the other relevant Key Transaction Documents and such parties shall have satisfied all conditions to closing or effectiveness of the Refinanced Secured Loan Documents and the other relevant Key Transaction Documents, to the extent such other conditions are within their control and have not been waived;

(e)    The Property shall be in the condition described in the Plan Supplement, to the extent not waived by New Borrower, subject to the terms of the Refinanced Secured Loan Documents;

(g)    The Certificate of Merger shall be filed in Nevada (including, to the extent necessary, the real property records of Clark County, Nevada) and Delaware.

(h)    The Mortgage shall constitute a valid first priority Lien over the Property subject only to any Permitted Encumbrances;

(i)    The Total Capital Contribution shall have been funded to New Borrower for (i) the funding of the Paydown Amount, (ii) the establishment of the Refinanced Secured Loan Reserves, and (iii) payment of any other requisite sums under the Plan.

(j)    The Paydown Amount shall be transferred to the First Lien Agent for the benefit of the First Lien Lenders and the Refinanced Secured Loan Reserves shall be established; and

(k)    That any outstanding fees of the United States Trustee under 28 U.S.C. § 1930 shall have been paid in full.

**2.    *Nonconsensual Confirmation/Reservation of Right to Effectuate Confirmation of the Plan Using Cramdown under Bankruptcy Code Section 1129(b).***

As to Classes 3, 4, 5, and 6, in the event one, but not all, vote to accept the Plan, the Backstop Investors are seeking confirmation of the Plan in accordance with the cramdown provisions of section 1129(b) of the Bankruptcy Code either under the terms provided in the Plan or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

**K.**    **Miscellaneous Provisions.**

    **1.**    *Modification of the Plan.*

The Backstop Investors reserve the right, in accordance with Bankruptcy Code section 1127, to amend and/or modify the Plan before or after the Confirmation Date, including to make any amendments or modifications to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

    **2.**    *Notices.*

Except as otherwise set forth in <u>Section 13.2</u> of the Plan, all notices, requests, elections or demands in connection with the Plan, including any change of address of any Holder of a Claim for the purposes of receiving any Distributions under the Plan, shall be in writing and shall be delivered personally or by facsimile or electronic mail (confirmed by first class mail or express mail) or if mailed by first class mail, seven (7) days after the date of mailing, or if express mailed, the next Business Day following the date of mailing and addressed to the following:

    (a)  If to the Debtor, to:

        c/o FX Real Estate and Entertainment Inc.
        650 Madison Avenue
        New York, New York 10022
        Attention:  Mitchell Nelson
        Email:  mitchell.nelson@flagluxury.com
        Facsimile: (212) 750-3034

        with copies to:

        Fox Rothschild LLP
        3800 Howard Hughes Parkway, Suite 500
        Las Vegas, Nevada 89169
        Attention:  Brett A. Axelrod, Esq.
        Email:  BAxelrod@foxrothschild.com
        Facsimile: (702) 597-5503

    (b)  If to First Lien Agent, to:

        Landesbank Baden-Württemberg, New York Branch
        280 Park Avenue, 31st Floor – West Building
        New York, New York 10017
        Attention:  Robert Dowling
        Email:  robert.dowling@lbbwus.com
        Facsimile:  (212) 584-1759

        with copies to:

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

55

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention:  Robert W. Fagiola, Esq.
                 Andrew Tenzer, Esq.
Email:  rfagiola@shearman.com
            atenzer@shearman.com
Facsimile:  (646) 848-7606
                 (646) 848-8283

Lionel Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Attention:  Rodney M. Jean, Esq.
Email:  rjean@lionelsawyer.com
Facsimile:  (702) 383-8845

(c)  If to Second Lien Agent:

c/o NexBank, SSB
13455 Noel Road, 22nd Floor
Dallas, Texas 75240
Attention:  Jeff Scott
                 Marcia Kaufman
Email:  jeff.scott@nexbank.com
            marcia.kaufman@nexbank.com
Facsimile:  (972) 934-4790
                 (972) 934-4785

with copies to:

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Attention:   Lenard M. Parkins, Esq.
                 Trevor R. Hoffmann, Esq.
                 Jonathan Hook, Esq.
Email:  lenard.parkins@haynesboone.com
            trevor.hoffmann@haynesboone.com
            jonathan.hook@haynesboone.com
Facsimile:  (212) 884-8226
                 (212) 884-8211

Kolesar & Leatham, Chtd.
3320 West Sahara Ave., Suite 380
Las Vegas, Nevada  89102
Attention:   Elliott R. Eisner, Esq.
Email:  EEisner@klnevada.com

Facsimile:  (702) 362-9472

(d)    If to New Borrower or Investors:

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Attention:   Lenard M. Parkins, Esq.
                    Trevor R. Hoffmann, Esq.
                    Jonathan Hook, Esq.
Email:    lenard.parkins@haynesboone.com
              trevor.hoffmann@haynesboone.com
              jonathan.hook@haynesboone.com
Facsimile:  (212) 884-8226
                    (212) 884-8211

Kolesar & Leatham, Chtd.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada  89102
Attention:  Elliott R. Eisner, Esq.
Email:   EEisner@klnevada.com
Facsimile:  (702) 362-9472

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention:  Joshua J. Angel
                  Frederick E. Schmidt, Jr.
Facsimile:  (212) 545-3497
                   (212) 545-3474
Email:   jangel@herrick.com
             eschmidt@herrick.com

All notices and requests to Holders of Claims or Interests of any Class shall be sent to them

at their known address.  Any Holder of a Claim or Interest of any Class may designate in writing

any other address for purposes of Section 13.2 of the Plan, which designation shall be effective

upon receipt.

3.    *Limitation of Notice.*

The Backstop Investors shall give the following notice with regard to the following matters,

which notice shall be deemed to be good and sufficient notice of such matters, with no requirement

for any additional or further notice:

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a.    Notice of Entry of Confirmation Order.

Notice of the entry of the Confirmation Order shall be sufficient if mailed to all known Holders of Claims (which have not become Disallowed Claims) and Interests within five (5) Business Days of the entry of Confirmation Order.

### b.    Post-Confirmation Date Service List — Additional Persons Entitled to Notice.

Except as set forth in Section 13.2 of the Plan, from and after the date the Confirmation Order becomes a Final Order, notices of appearances and demands for service of process Filed with the Bankruptcy Court prior to such date shall no longer be effective, and no further notices, other than Notice of Confirmation Order, shall be required to be sent to such parties, unless such parties File a new notice of appearance and demand for service of process dated subsequent to the Effective Date, which subsequent notice and demand must be Filed with the Bankruptcy Court and served upon the Persons and Entities listed in Section 13.2 of the Plan.

### 4.    *Requisite First Lien Lenders' Approval.*

Where First Lien Lender approval is referred to anywhere in the Plan, the Person or Entity seeking such First Lien Lender approval shall be entitled to direct the request for approval solely to First Lien Agent, which shall then be responsible for determining whether or not such approval has or has not been obtained.

### 5.    *Headings.*

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the provisions of the Plan.

### 6.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are made a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Backstop Investors' counsel at the address above or by downloading such exhibits and documents

58

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

from the Bankruptcy Court's website at http://www.nvb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**7.**     ***Nonseverability of Plan Provisions.***

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, at the request of the Investors and subject to the consent of any party adversely affected thereby, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor and any other Person or Entity affected by such provision; and (3) nonseverable and mutually dependent.

**8.**     ***Waiver or Estoppel.***

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

**9.**     ***Conflicts.***

Except as set forth in the Plan, to the extent that any provision of this Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing),

conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

### 10.    *Computation of Time.*

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 11.    *Governing Law.*

Except to the extent that the Bankruptcy Code or any other Federal law is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada.

### 12.    *Successors and Assigns.*

The rights and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person or Entity.

### 13.    *Withdrawal or Modification of Plan and Plan Documents.*

The Backstop Investors reserve the right at any time to revoke or withdraw the Plan prior to the Confirmation Date or to File subsequent plans of reorganization.  If the Investors revoke or withdraw the Plan, or if Confirmation does not occur:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests relating to the Debtor; (b) prejudice in any manner the rights of the Investors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Investors or any other Entity.

In addition, the Backstop Investors reserve all of their rights to amend or modify the Plan, the Disclosure Statement or any of the documents, including the Operative Documents, that may be annexed to the Disclosure Statement.  Such amended documents will be filed with the Bankruptcy Court, as promptly as possible including as exhibits to the Plan Supplement.

14.    *Other Agreements.*

Nothing contained herein or in the Plan shall alter, limit or otherwise affect the rights and obligations of any party to the Operative Documents pursuant to the terms thereof.

### ARTICLE V.

### CERTAIN RISK FACTORS TO BE CONSIDERED

Parties-in-interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

A.    **Failure to Confirm the Plan.**

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to chapter 7 liquidation.  In fact, the Backstop Investors believe that absent confirmation of the Plan, the likely result will be a foreclosure sale and/or piecemeal liquidation of the Assets.  If that were to occur, Holders of Claims and Interests would likely receive a fraction of what they would receive under this Plan, if anything.

B.    **Potential Adverse Effects of Chapter 11.**

While the Backstop Investors will seek to effectuate the Plan as quickly as possible so as to minimize any potential disruption to the Debtor's business operations and goodwill, it is possible that despite the belief and intent of the Backstop Investors, the Chapter 11 Case could be delayed and such delay can materially adversely affect relationships among the Debtor (and its successor New Borrower) and its Creditors, tenants and employees.

C.    **Risks Associated.**

There are several risks which include, but are not limited to, the following:

1.    One or more Investors fails to perform its obligations under the New Borrower Parent UPA.

2.    One or more parties-in-interest may commence litigation to challenge the propriety of the Plan and the transactions contemplated therein.

3.    The costs, expenses and Distributions that will be required to be paid under

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

the Plan exceed in a material respect the amounts presently contemplated by the Backstop Investors to be paid under the Plan. Affecting factors include, but are not limited to, (i) changed economic components and terms of the Refinanced Secured Note, (ii) the Allowed amount of Trade Unsecured Claims exceeds $375,000, and (iii) significant Administrative Claims.

4.     The economic conditions may worsen. The financial crisis and global recession has resulted in a significant decline in the amount of tourism and discretionary consumer spending in Las Vegas. The tenants in the Property are primarily retailers and, as such, are heavily reliant on tourism and discretionary consumer spending in Las Vegas. The Property's commercial leasing activities could be adversely affected because of the failure to maintain high tenant occupancy rates amid these market conditions. In addition, Las Vegas may experience a prolonged decline in the development of new hotels and other entertainment venues, which could adversely affect any potential redevelopment of the Property.

*See the Private Offering Memorandum for additional risk factors associated with electing the Equity Option or the Class 6 Purchase Option and making an investment in the New Borrower Parent Units.*

### ARTICLE VI.

### CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Interests, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Backstop Investors have complied with applicable provisions of the Bankruptcy Code, (d) the Backstop Investors have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of Creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all Holders of Claims or Interests in each Impaired Class, and (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    fees on the Effective Date.

2    *To the extent required, the Backstop Investors reserve the right to proceed to confirmation*

3    *of the Plan through the use of cramdown pursuant to section 1129(b) of the Bankruptcy Code.*

4    **A.    Voting Requirements.**

5    Under the Bankruptcy Code, only Classes of Claims and Interests that are "Impaired" (as

6    that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to

7    accept or reject the Plan.  A Class is Impaired if the Plan modifies the legal, equitable or contractual

8    rights of Holders of Claims or Interests in the Class (other than by curing defaults and reinstating

9    debt).  Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are

10   unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the

11   Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Interests whose

12   Holders will not receive or retain any property under the Plan are deemed to have rejected the Plan

13   and are not entitled to vote on the Plan.  An Impaired Class of Claims will have accepted the Plan if

14   (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of

15   at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to

16   accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the

17   Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such

18   Class have voted to accept the Plan.  As noted above, there are five (5) Classes of Claims in the

19   Plan and one (1) Class of Interests.  The classes of Claims and Interests that are Impaired and

20   entitled to vote to accept or reject the Plan is Class 3 (First Lien Loan Claims), Class 4 (Trade

21   Unsecured Claims), Class 5 (Non-Trade Unsecured Claims) and Class 6 (Old Membership

22   Interests).  All other Classes are either not Impaired or are deemed to have accepted the Plan, and

23   their votes will not be solicited.

24   A Ballot to be used to vote on the Plan will be enclosed with the Motion to Approve

25   Disclosure Statement and Solicitation Procedures and will be separately mailed to Holders of Class

26   3, Class 4, and Class 5 Claims and Class 6 Interests.

27   As set forth in the Motion to Approve Disclosure Statement and Solicitation Procedures, the

28   Backstop Investors will send Holders of Claims whose Claims or Interests are subject to an

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

objection on the Record Date a *Notice of Non-Voting Status with Respect to Disputed Claims* (the

"Disputed Claim/Interest Notice").  The Disputed Claim Notice will inform relevant Holders that

their respective Claim or Interest is subject to an objection, and that the Holder of such Claim or

Interest cannot vote any disputed portion of its Claim or Interest unless one or more of the following

events have taken place at least five (5) business days before the Voting Deadline:  (i) an order of

the Bankruptcy Court is entered allowing such Claim or Interest pursuant to section 502(b) of the

Bankruptcy Code, after notice and a hearing; (ii) an order of the Bankruptcy Court is entered

temporarily allowing such Claim or Interest for voting purposes only pursuant to Bankruptcy Rule

3018(a), after notice and a hearing; (iii) an order of the Bankruptcy Court is entered approving a

stipulation or other agreement by the Holder of such Claim or Interest and the Debtor, with the

consent of the Backstop Investors, resolving the objection and allowing such Claim or Interest in an

agreed upon amount; (iv) a stipulation or other agreement is executed by the Holder of such Claim

or Interest with the Debtor, with the consent of the Backstop Investors, temporarily allowing the

Holder of such Claim or Interest to vote in an agreed upon amount; or (v) the pending objection to

such Claim or Interest is voluntarily withdrawn by the objecting party (each, a "Resolution Event").

No later than two (2) business days after a Resolution Event, counsel for the Backstop Investors

shall distribute a Solicitation Package and a pre-addressed, postage pre-paid envelope to the

relevant Holder of such temporarily allowed Claim or Interest that has been allowed for voting

purposes only by such Resolution Event, which must be returned according to the instructions on

the Ballot by no later than the Voting Deadline.

However, if the Holder of a Claim or Interest receives a Solicitation Package, but the

Backstop Investors or the Debtor object to such Claim or Interest after the Record Date but before

fifteen (15) days prior to the Confirmation Hearing, the notice of objection will inform such Holder

of the rules applicable to Claims or Interests subject to a pending objection, and the procedures for

temporary allowance for voting purposes.  Furthermore, if the Holder of a Claim or Interest receives

a Solicitation Package (as defined in the Motion to Approve Disclosure Statement and Solicitation

Procedures), but the Backstop Investors object to such Claim or Interest after fifteen (15) days prior

to the Confirmation Hearing, the Holder's Claim shall be deemed temporarily allowed for voting

purposes only without further action by the Holder of such Claim or Interest and without further order of the Bankruptcy Court.

In addition, Holders of Claims in certain Classes may have asserted, in their respective Proofs of Claim, Claims for interest accrued after the Petition Date.  The Backstop Investors do not necessarily agree that post-petition interest should be allowed on such Claims and may object to any such portions of these Claims.  The Backstop Investors thus propose that Holders of Claims only be entitled to vote the portion of their Claims that does not include any interest accrued after the Petition Date.  However, to the extent the Backstop Investors object to the post-petition interest asserted on account of a particular Claim, the Backstop Investors propose that the Holder of such Claim would be allowed to vote the principal amount of its Claim without a Resolution Event.

**B.**     **Voting on the Plan.**

AS SET FORTH IN THE MOTION FOR APPROVAL OF DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES, THE PERIOD DURING WHICH BALLOTS WITH RESPECT TO THE PLAN WILL BE ACCEPTED BY THE BACKSTOP INVESTORS WILL TERMINATE AT 5:00 P.M. PACIFIC DAYLIGHT TIME, ON _____ __, 2010 (THE "VOTING DEADLINE"), UNLESS THE VOTING DEADLINE IS EXTENDED PURSUANT TO A LETTER SENT BY THE BACKSTOP INVESTORS TO THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE, IN WHICH EVENT SUCH SOLICITATION PERIOD WILL TERMINATE AT SUCH EXTENDED TIME AND DATE.  EXCEPT TO THE EXTENT THE BACKSTOP INVESTORS SO DETERMINE, AS PERMITTED BY THE BANKRUPTCY COURT, BALLOTS THAT ARE RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED BY THE BACKSTOP INVESTORS IN CONNECTION WITH THE BACKSTOP INVESTORS' REQUEST FOR CONFIRMATION OF THE PLAN (OR ANY PERMITTED MODIFICATION THEREOF).

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE MOTION FOR APPROVAL OF DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES SO THAT IT IS RECEIVED BY THE VOTING DEADLINE.  PLEASE FOLLOW CAREFULLY ALL

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

INSTRUCTIONS CONTAINED IN THE MOTION FOR APPROVAL OF DISCLOSURE

STATEMENT AND SOLICITATION PROCEDURES.  ANY BALLOTS RECEIVED WHICH

DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT

BE COUNTED.

If you have any questions about the procedure for voting, or if you did not receive a Ballot,

received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of

this Disclosure Statement, please contact Haynes and Boone, LLP, Attention: Jonathan Hook, Esq.,

1221 Avenue of the Americas, 26th Floor, New York, New York 10020, or call (212) 659-4981, or

e-mail jonathan.hook@haynesboone.com.

AS SET FORTH IN THE MOTION FOR APPROVAL OF DISCLOSURE STATEMENT

AND SOLICITATION PROCEDURES, BALLOTS MUST BE MAILED, HAND DELIVERED

OR ELECTRONICALLY MAILED TO Haynes and Boone, LLP, Attention: Jonathan Hook, Esq.,

1221 Avenue of the Americas, 26th Floor, New York, New York 10020;

jonathan.hook@haynesboone.com.

Consistent with the provisions of Bankruptcy Rule 3018, the Backstop Investors have fixed

the voting Record Date -- the time and date for the determination of Holders of record of Claims

who are entitled to vote on the Plan -- as 5:00 P.M., Pacific Daylight Time, on _____ __, 2010.

**C.**    **Confirmation Requirements.**

**1.**    *Acceptance by Impaired Classes.*

The Backstop Investors intend to count all validly executed Ballots received prior to the

Voting Deadline for purposes of determining whether each Impaired voting Class has accepted or

rejected the Plan, pursuant to the Bankruptcy Code and the procedures set forth in the Motion for

Approval of Disclosure Statement and Solicitation Procedures.  Bankruptcy Rule 3018(b) prescribes

the conditions that must be satisfied in order to count the ballots cast with respect to a plan prior to

the commencement of a Chapter 11 case.  The rule requires that for the ballot of a Creditor to count

(i) such Chapter 11 plan and a disclosure statement must be distributed to substantially all Creditors

of the same Class, (ii) the time prescribed for voting on such a plan must not be unreasonably short

and (iii) the solicitation must be conducted in compliance with section 1126 of the Bankruptcy

1  Code, which section requires that the solicitation be conducted in compliance with all applicable

2  nonbankruptcy laws, rules, or regulations or, if there are no such applicable laws, rules, or

3  regulations, that the disclosure statement for such plan contains "adequate information."  Under

4  section 1125 of the Bankruptcy Code, "adequate information" is defined as information of a kind

5  and in sufficient detail to the extent it is reasonably practicable in light of the nature and history of a

6  company and the condition of such company's books and records, that would enable a hypothetical

7  reasonable investor typical of holders of claims or equity interests of the relevant class to make an

8  informed judgment about the Plan.

9       Except as described herein or in the Motion for Approval of Disclosure Statement and

10  Solicitation Procedures, the Bankruptcy Code generally requires, as a condition to confirmation,

11  that each class of Claims or Interests that is Impaired under the Plan accept the Plan.  A Class of

12  Claims has accepted the Plan if the Plan has been accepted by Holders of Claims that hold at least

13  two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class

14  that actually vote to accept or reject the Plan.  Holders of Claims that fail to vote are not counted as

15  either accepting or rejecting the Plan.  A Class of Interests has accepted the Plan if the Plan has

16  been accepted by Holders of at least two-thirds in amount of the Allowed Interests in that Class that

17  actually vote to accept or reject the Plan.

18       For the reasons discussed below, the Backstop Investors believe that all the requirements of

19  Bankruptcy Rule 3018(b) will be satisfied.  Votes will be solicited from the ultimate beneficial

20  Holders of Impaired Claims and Interests in Class 3, Class 4, Class 5 and Class 6.  The Backstop

21  Investors also believe that this Disclosure Statement contains adequate information within the

22  meaning of section 1125 of the Bankruptcy Code.

23       **2.**   *Best Interests Test.*

24       Before the Plan may be confirmed, the Bankruptcy Court must find with respect to any

25  Impaired Class containing members that have rejected the Plan, that the Plan provides that each

26  Holder of a Claim will receive or retain under the Plan on account of such Claim property that has a

27  value, as of the Effective Date of the Plan, that is not less than the value of the distribution each such

28  Entity would receive or retain if the Debtor were liquidated on the Effective Date under chapter 7 of

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

the Bankruptcy Code.  The Backstop Investors believe that this test will be satisfied.

To determine what members of each Impaired Class of Claims would receive if the Debtor were liquidated under chapter 7, the Court must consider the values that would be generated from a liquidation of the assets and properties of the Debtor in the context of a hypothetical liquidation case under chapter 7.  In the absence of a confirmed plan, the Estate would incur the costs of a trustee on top of other expenses of administering the liquidation process, and the risk of a distressed sale could substantially depress the value of the Assets, including the Property.  In addition, failure to abide by the agreed upon distribution allocations reflected in the Plan could generate inter-Creditor litigation which would increase costs, thereby reducing as well as delaying distributions to Creditors. Holders of Class 4 and Class 5 Claims or Class 6 Interests would receive less distributions, if any, under either liquidation or an out-of-court foreclosure.

A conversion of the Chapter 11 Case to chapter 7 would entail the mandatory appointment of a trustee.  To administer the Estate responsibly, a chapter 7 trustee, and the trustee's staff and professionals, would necessarily devote substantial time and effort to familiarizing themselves with the affairs of the Debtor and the Chapter 11 Case, including asset dispositions and investigation of Claims in addition to performing the same services to be performed by the Distribution Agent.  This could entail hundreds of hours of additional professional services and concomitant expense.  Thus, the costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants, or other professionals and costs and expenses of the Debtor and any committee.  Such Administrative Claims would have to be paid in Cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay Allowed Priority Claims and Allowed Unsecured Claims from the Chapter 11 Case.  Not only will the costs increase as a result thereof, but the Creditors will suffer a loss on the time value of their money as the chapter 7 trustee will necessarily require more time to liquidate the Assets, resolve Disputed and unliquidated Claims and ultimately make distributions to Creditors.  Finally, Holders of Claims and Interests in Class 4, Class 5 and

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    Class 6 would likely receive no distributions.

2        Therefore, the Backstop Investors believe that in a chapter 7 liquidation there would (i) be an

3    additional layer of administrative expense (including the trustee's commissions and fees for

4    professionals) and would, correspondingly, reduce the funds available to satisfy Claims, (ii) likely

5    be significant delays in distributions and (iii) be no increment in value and might be significant

6    reductions in recoverable value of the Assets due to the conversion of the case.  A copy of the

7    Liquidation Analysis is attached hereto as **Exhibit "Q"** and is incorporated herein by this reference.

8    Thus the Backstop Investors believe that the Plan meets the "best interests" test by providing each

9    Holder of an Impaired Claim, including the First Lien Secured Claim Holders, with a recovery that

10   is not less than it would receive pursuant to the Debtor's liquidation under chapter 7 of the

11   Bankruptcy Code as of the Effective Date.

12       **3.    *Feasibility of the Plan.***

13       Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of a plan is

14   not likely to be followed by the liquidation, or the need for further financial reorganization, of the

15   Debtor or any successor-in-interest.  To determine whether the Plan meets this feasibility

16   requirement, the Backstop Investors have analyzed their ability to meet their respective obligations

17   under the Plan, including the debt-service obligations of New Borrower in connection with the

18   Refinanced Secured Note.  As part of this analysis, the Backstop Investors have utilized the

19   Debtor's projections and other published information, as well as their analysis of same, and

20   therefore submit that New Borrower, as successor to the Debtor under the Plan, is unlikely to be

21   liquidated or require further financial reorganization following confirmation of the Plan as projected

22   cash flows from the Assets are sufficient to cover the New Borrower's projected operating costs and

23   debt service obligations.

24       **4.    *Classification.***

25       Section 1122 of the Bankruptcy Code sets forth the requirements relating to classification of

26   claims.  Section 1122(a) of the Bankruptcy Code provides that Claims or Interests may be placed in

27   a particular Class only if they are substantially similar to the other Claims or Interests in that Class.

28   The Backstop Investors believe that all Classes under the Plan satisfy the requirements of section

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1122(a) of the Bankruptcy Code.

Class 3, Class 4, Class 5 and Class 6 are all Impaired and each Class may vote to reject the Plan. The Bankruptcy Court may nevertheless confirm the Plan if all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, and if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect thereto.

### a. No Unfair Discrimination.

This test applies to Classes of Claims or equity Interests that are of equal priority and are receiving different treatment under a plan or reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." Since Distributions being made to Classes 4-6 are gifts from the Backstop Investors and are not being distributed according to the Bankruptcy Code "absolute priority" strictures, none of the Creditors or Interest Holders are being treated in an unfair discriminatory manner.

### b. Fair and Equitable Test.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest Holders as follows:

### (i) Secured Creditors

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (i) that each holder in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or is transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such holder's interest in the estate's interest in such property; (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph; or (iii) that each holder in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim.

70

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

### (ii)  Unsecured Creditors

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that:  (i) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

### (iii)  Equity Interest Holders

A plan of reorganization is fair and equitable as to an impaired class of equity interests that rejects the plan if the plan provides that:  (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such Holder is entitled, or (C) the value of the equity interest; or (ii) the holder of any equity interest that is junior to the equity interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Backstop Investors believe the Plan is fair and equitable as to Holders of Claims and Interests in Classes that may vote to reject the Plan because the Plan provides that their Allowed Claims or Interests will be either unimpaired, or they will receive their "absolute priority" entitlements under the Bankruptcy Code.  Any distributions made outside of "absolute priority" entitlements are gifts from the Backstop Investors and are not subject to the Bankruptcy Code "absolute priority" strictures.

As a further condition to approving a cramdown, the Bankruptcy Court must find that the Plan does not "discriminate unfairly" in its treatment of dissenting Classes.  A plan does not "discriminate unfairly" if (a) the Plan does not treat any dissenting Impaired Class of Claims or Interests in a manner that is materially less favorable than the treatment afforded to another Class with similar legal Claims against or Interests in the Debtor and (b) no Class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests.  The Backstop

1    Investors believe the Plan meets all the requirements of the fair and equitable standard, and that it

2    does not discriminate unfairly as to any Impaired Class of Claims or Interests.

3        The Backstop Investors believe that the proposed Plan is in the best interest of its Creditors

4    because under the Plan it is expected that Holders of Claims and Interests will receive in excess of

5    what otherwise would be recovered by such Holders if the Debtor was liquidated under chapter 7 or

6    if the Bankruptcy Case was dismissed.

7        **5.    *Confirmation Hearing.***

8        Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

9    hold a hearing on confirmation of the Plan after the Ballots have been cast.  The Confirmation

10   Hearing may be postponed from time to time by the Bankruptcy Court without further notice

11   except for an announcement of the postponement made at the Confirmation Hearing.  Section

12   1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of

13   the Plan.

14       At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

15   whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have

16   been satisfied.

17       The Backstop Investors believe that, upon acceptance of the Plan by one of Class 3, 4, 5 or

18   6, the Plan will satisfy all of the applicable Bankruptcy Code requirements, that the Backstop

19   Investors have complied or will have complied with all of the Bankruptcy Code requirements and

20   that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.

21

22                                    **ARTICLE VII.**

23   **ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

24       The Backstop Investors believe that the Plan affords Holders of Allowed Claims and

25   Interests the potential for a fair realization of the value of Assets that is more than would be realized

26   under a chapter 7 liquidation and therefore is in the best interest of such Holders.  In the opinion of

27   the Backstop Investors, no other feasible alternative is presently known to the Backstop Investors

28   that would afford Holders of Claims and Interests the returns and potential upside that may be

72

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

achieved under the Plan.

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, under which a trustee would be appointed to liquidate the Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery by Holders of Claims and Interests is set forth under "Best Interests Test," *see supra* Section VI.C.2.  Based on the liquidation analysis discussed herein, the Backstop Investors believe that a chapter 7 liquidation would result in distributions to Holders of Claims and Interests that are substantially less than those proposed in the Plan and, in fact, most Holders of Claims and Interests would receive nothing in a chapter 7 liquidation.

Alternatively, if no plan can be confirmed, the Chapter 11 Case may be dismissed, or followed by a foreclosure.  In such event, Class 3 will likely not be paid in full, and all other Claims and Interests will likely receive no distribution.

THE BACKSTOP INVESTORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.  ACCORDINGLY, THE BACKSTOP INVESTORS URGE HOLDERS OF CLASS 3 (FIRST LIEN SECURED CLAIMS), CLASS 4 (TRADE UNSECURED CLAIMS), CLASS 5 (NON-TRADE UNSECURED CLAIMS), AND CLASS 6 (OLD MEMBERSHIP INTERESTS) TO VOTE TO ACCEPT THE PLAN BY SO INDICATING ON THEIR BALLOTS AND RETURNING THEM AS SPECIFIED IN THE NOTICE.

### ARTICLE VIII.

### CERTAIN UNITED STATES FEDERAL INCOME TAX <u>CONSIDERATIONS OF THE PLAN</u>

A.    **<u>Introduction.</u>**

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF

2  CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON

3  HOLDERS OF CLAIMS UNDER THE INTERNAL REVENUE CODE; (B) SUCH

4  DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR

5  MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE BACKSTOP

6  INVESTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C)

7  HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR

8  PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

9       A summary description of certain material U.S. federal income tax consequences of the Plan

10  is provided below.  This description is for informational purposes only and, due to a lack of

11  definitive judicial or administrative authority or interpretation, substantial uncertainties exist with

12  respect to various tax consequences of the Plan as discussed herein.  Only the principal

13  consequences of the Plan for Holders of Claims who are entitled to vote to accept or reject the Plan

14  are described below.  No opinion of counsel has been sought or obtained with respect to any tax

15  consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or

16  any other tax authorities have been or will be sought or obtained with respect to any tax

17  consequences of the Plan, and the discussion below is not binding upon the IRS or such other

18  authorities.  No assurance can be given that the IRS would not assert, or that a court would not

19  sustain, a different position from any discussed herein.  No representations are being made

20  regarding the particular tax consequences of the confirmation or implementation of the Plan as to

21  any Holder of a Claim.

22       The discussion of U.S. federal income tax consequences below is based on the Internal

23  Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder,

24  judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect

25  on the date hereof and all of which are subject to change or differing interpretations (possibly with

26  retroactive effect).

27       The following discussion does not address foreign, state or local tax consequences of the

28  Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

74

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  classes of taxpayers (*e.g.*, banks and certain other financial institutions, insurance companies, tax-

2  exempt organizations, Holders of Claims or Interests who are (or who hold their Claims through)

3  pass-through entities, persons whose functional currency is not the U.S. dollar, foreign persons,

4  dealers in securities or foreign currency, and persons holding claims that are a hedge against, or that

5  are hedged against, currency risk or that are part of a straddle, constructive sale or conversion

6  transaction).  The following discussion does not address U.S. federal taxes other than income taxes.

7  **Each Holder of a Claim or Interest is urged to consult its own tax advisor regarding**

8  **the U.S. federal, state, local and any foreign tax consequences of the transactions described**

9  **herein or in the Plan.**

10  **B.**    **Certain U.S. Federal Income Tax Consequences to the Debtor.**

11  Because the Debtor is treated as a disregarded entity for U.S. federal income tax purposes,

12  the Debtor will have no federal income tax consequences as a result of the Plan.  Because the Assets

13  are deemed to be owned, for federal income tax purposes, by FX LLC, the tax effects to FX LLC as

14  a result of the Plan would include FX LLC's realization of a substantial amount of discharge of

15  indebtedness income.  In addition, FX LLC will recognize income or loss upon the disposition of its

16  real estate equal to the difference between the fair market value of the real estate and FX LLC's

17  adjusted tax basis in the real estate.  The treatment of FX LLC, and its partners, with respect to the

18  recognition of this income or loss is beyond the scope of this Disclosure Statement.

19  **C.**    **Tax Consequences to Creditors.**

20  **1.**    *General.*

21  The U.S. federal income tax consequences of the transactions contemplated by the Plan to

22  Holders of Allowed Claims (including the character, timing and amount of income, gain or loss

23  recognized) generally will depend upon, among other things:  (1) the manner in which a Holder

24  acquired the Claim on account of which it receives a Distribution; (2) the length of time such Claim

25  has been held; (3) the Holder's method of tax accounting; (4) whether the Holder of a Claim has

26  taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or

27  prior years; (5) whether the Claim was acquired at a discount; (6) whether the Holder of a Claim has

28  previously included accrued but unpaid interest with respect to the Claim; (7) whether the Claim is

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1   an installment obligation for U.S. federal income tax purposes; and (8) whether the Claim

2   constitutes a "security" for U.S. federal income tax purposes.  Therefore, Holders of Claims should

3   consult their own tax advisors for information that may be relevant to their particular situations and

4   circumstances and the particular tax consequences to them of the transactions contemplated by the

5   Plan.

6        The term of the First Lien Loan and the Second Lien Loan was eighteen (18) months in each

7   case.  Based on the term of each of the Loans, the Debtor does not believe that the Loans would be

8   treated as securities for federal income tax purposes.  The following description of the U.S. federal

9   income tax effects to creditors of implementing the Plan assumes that the Loans are not securities

10   for U.S. federal income tax purposes.

11        The Plan provides that, to the extent that any Allowed Claim entitled to a Distribution under

12   the Plan is comprised of indebtedness and accrued but unpaid interest on such indebtedness, such

13   Distribution will, to the extent permitted by applicable law, be allocated for U.S. federal income tax

14   purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds

15   the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid

16   interest.  However, current U.S. federal income tax law is unclear on this point and no assurance can

17   be given that the IRS will not challenge this position.

18        Holders of Allowed Administrative and Priority Claims will receive Cash in satisfaction of

19   such Allowed Claims as soon as practicable after the Effective Date.  Each such Holder of a Claim

20   will recognize gain or loss equal to the difference between the Cash it receives and its adjusted tax

21   basis in such Claim.  Any gain or loss will be capital or ordinary, depending on whether the Claim

22   is a capital asset in the hands of a Holder.  If such Claim is a capital asset, the gain or loss will be

23   long-term if the Claim has been held for more than one year.

24        Holders of Class 2 Claims whose Claims are being reinstated should have no U.S. federal

25   income tax consequences as a result of such reinstatement.  The treatment of any Cure amounts paid

26   to Holders of Class 2 Claims will depend upon the classification of such payments as principal or

27   interest, and whether such amounts have previously been included in income under the Holder's

28   method of accounting.  Holders of Class 2 Claims who will receive payment in satisfaction,

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

settlement, release and exchange for its Allowed Secured Claims, will have gain or loss equal to the difference between the amount received by each Holder and the Holder's adjusted tax basis in its Claim.  Any gain or loss will be capital or ordinary, depending on whether the Claim is a capital asset in the hands of a Holder.  If such Claim is a capital asset, the gain or loss will be long-term if the Claim has been held for more than one year.  To the extent that the Claim constitutes interest not previously included in the Holder's income, such amount will be treated as ordinary interest income.

Holders of Class 3 First Lien Loan Claims, Class 4 Trade Unsecured Claims, and Class 5 Non-Trade Unsecured Claims receiving Distributions, in full satisfaction, settlement, release and exchange for their Allowed Claims, will have gain or loss equal to the difference between the amount of Cash and/or the fair market value of the Distributions received by each Holder and the Holder's adjusted tax basis in its Claim.  Any gain or loss will be capital or ordinary, depending on whether the Claim is a capital asset in the hands of a Holder.  If such Claim is a capital asset, the gain or loss will be long-term if the Claim has been held for more than one year.  To the extent that the Claim constitutes interest which the Holder of the Claim has not previously included in the Holder's income, such amount will be treated as ordinary interest income.

Also, to the extent a debt instrument is acquired after its original issuance for less than the issue price of such instrument, however, it will have market discount.  A holder of a Claim with market discount generally must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim.

     **2.**     *Original Issue Discount.*

The Refinanced First Lien Note may be issued with original issue discount, or "OID," for U.S. federal income tax purposes.  If the Refinanced First Lien Note is treated as having been issued with OID, the payee will be required to include OID in gross income for U.S. federal income tax purposes in advance of the receipt of cash attributable to that income regardless of its method of tax accounting.  The amount of OID includible in income with respect to each note will be the sum of the daily portions of OID with respect to the note for each day during the taxable year or portion of the taxable year in which the payee holds the note.  The daily portion will be determined by

allocating to each day in an "accrual period" a pro rata portion of the OID allocable to that accrual period.  The amount of OID allocable to an accrual period will equal the excess of (a) the product of the note's adjusted issue price at the beginning of the accrual period and the note's yield to maturity (as determined by us, and properly adjusted for the length of the accrual period) over (b) the sum of the payments of stated interest on the note allocable to the accrual period.  The "adjusted issue price" of the Refinanced First Lien Note at the beginning of any accrual period will equal the issue price of the note increased by the amount of accrued OID allocable to all prior accrual periods.

### 3.   *Backup Withholding.*

Certain payments, including Distributions or payment in respect of Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the IRC's backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan, unless the Holder (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrate this fact or (2) provide a correct U.S. taxpayer identification number and make certain certifications under penalties of perjury.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability and such Holder may obtain a refund of any excess amounts withheld under backup withholding rules typically by filing a U.S. federal income tax return.

### 4.   *Importance of Obtaining Professional Tax Assistance.*

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  BECAUSE TAX CONSEQUENCES ARE UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISERS ABOUT THE U.S.**

78

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE IX.

## FURTHER INFORMATION

If you have any questions or require further information about the voting procedures for voting your Claim or Interest, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any Exhibits to such documents (at your own expense, unless otherwise specifically required by Fed. R. Bankr. P. 3017(d)), please contact Haynes and Boone, LLP, Attention:  Jonathan Hook, Esq., 1221 Avenue of the Americas, 26th Floor, New York, New York 10020 or call (212) 659-4981, or e-mail jonathan.hook@haynesboone.com.

## ARTICLE X.

## RECOMMENDATION AND CONCLUSION

The Backstop Investors believe that the Plan provides the best possible recoveries for Creditors that can be achieved in any reasonable time frame and that possible alternatives are likely to result in delayed Distributions for all and diminished recoveries for other Holders of Claims or Interests.  Therefore, the Backstop Investors urge all Holders of Claims in Class 3, 4, 5 and 6 to vote to accept the Plan.

Dated this 30th day of July, 2010.

By: /s/ Lenard M. Parkins
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
-and-
LENARD M. PARKINS, ESQ. (*PRO HAC VICE*)
HENRY FLORES, ESQ. (*PRO HAC VICE*)
TREVOR R. HOFFMANN, ESQ. (*PRO HAC VICE*)
JONATHAN HOOK, ESQ. (*PRO HAC VICE*)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, New York 10020

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

Attorneys for
**FIVE MILE CAPITAL POOLING**
**INTERNATIONAL LLC; SPECTRUM**

2

**INVESTMENT PARTNERS, L.P.; &**
**TRANSAMERICA LIFE INSURANCE**

3

**COMPANY**

4

-and-

5

6

JOSHUA J. ANGEL, ESQ. (*PRO HAC VICE*)
ANDREW C. GOLD, ESQ. (*PRO HAC VICE*)
FREDERICK E. SCHMIDT, JR., ESQ. (*PRO HAC VICE*)

7

**HERRICK, FEINSTEIN LLP**
2 Park Avenue

8

New York, New York 10016
-and-

9

LEE I. IGLODY, ESQ.

10

Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT,**

11

**P.L.L.C.**
9555 S. Eastern Avenue, Suite 280

12

Las Vegas, Nevada 89123

13

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P.**

14

**AND THE HUFF ALTERNATIVE**
**PARALLEL FUND, L.P.**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

80