*Electronically Filed*
*August 20, 2010*

NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
E-Mail:    nleatham@klnevada.com
           ncox@klnevada.com

LENARD M. PARKINS, ESQ. (PRO HAC VICE)
HENRY FLORES, ESQ. (PRO HAC VICE)
TREVOR HOFFMANN, ESQ. (PRO HAC VICE)
JONATHAN HOOK, ESQ. (PRO HAC VICE)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone No. (212) 659-7300
Facsimile No. (212) 884-8226
E-Mail:    lenard.parkins@haynesboone.com
           henry.flores@haynesboone.com
           trevor.hoffmann@haynesboone.com
           jonathan.hook@haynesboone.com

Attorneys for
FIVE MILE CAPITAL POOLING
INTERNATIONAL LLC; SPECTRUM
INVESTMENT PARTNERS, L.P.; &
TRANSAMERICA LIFE INSURANCE
COMPANY

Attorneys for
FIVE MILE CAPITAL POOLING
INTERNATIONAL LLC; SPECTRUM
INVESTMENT PARTNERS, L.P.; &
TRANSAMERICA LIFE INSURANCE
COMPANY

LEE I. IGLODY, ESQ.
Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT, P.L.L.C.**
9555 S. Eastern Avenue, Suite 280
Las Vegas, Nevada 89123
Telephone No. (702) 425-5366
Facsimile No. (702) 446-5148
E-Mail:    lee@iglody.com;
           pbb@pbarnettlaw.com

JOSHUA J. ANGEL, ESQ. (PRO HAC VICE)
ANDREW C. GOLD, ESQ. (PRO HAC VICE)
FREDERICK E. SCHMIDT, JR., ESQ. (PRO HAC VICE)
**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, NY 10016
Telephone No. (212) 592-1400
Facsimile No. (212) 592-1500
E-Mail:    jangel@herrick.com
           agold@herrick.com
           eschmidt@herrick.com

Attorneys for
THE HUFF ALTERNATIVE FUND, L.P.
AND THE HUFF ALTERNATIVE
PARALLEL FUND, L.P.

Attorneys for
THE HUFF ALTERNATIVE FUND, L.P. AND
THE HUFF ALTERNATIVE PARALLEL FUND, L.P.

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| In re<br><br>FX LUXURY LAS VEGAS I, LLC, a<br>Nevada limited liability company,<br><br>Debtor. | Case No. BK-S-10-17015-bam<br><br>Chapter 11<br><br>**Hearing Date:  August 27, 2010**<br>**Hearing Time:  9:30 a.m. (PST)** |

**RESPONSE OF THE BACKSTOP INVESTORS TO OBJECTION OF LANDESBANK BADEN-WÜRTTEMBERG TO (I) MOTION OF THE BACKSTOP INVESTORS FOR**

**AN ORDER (A) APPROVING THE DISCLOSURE STATEMENT; (B) APPROVING SOLICITATION PROCEDURES; (C) APPROVING FORMS OF BALLOTS AND NOTICING PROCEDURES; AND (D) SCHEDULING CERTAIN DATES WITH RESPECT THERETO; AND (II) MOTION REQUIRING THE FIRST LIEN PARTIES TO MAKE AN ELECTION UNDER 11 U.S.C. § 1111(b)(2)**

Five Mile Capital Pooling International, The Huff Alternative Fund, L.P., The Huff Alternative Parallel Fund, L.P., Spectrum Investment Partners, L.P. and Transamerica Life Insurance Company, and certain of their respective affiliates (collectively, the "Backstop Investors"),[1] by and through their undersigned counsel, file this response (the "Response") to the Objection (the "Disclosure Statement Objection") of Landesbank Baden-Württemberg, New York Branch, as successor administrative agent ("LBBW") for the first lien lenders (the "First Lien Lenders"), to the motions, (I) for an order (A) Approving the Disclosure Statement; (B) Approving Solicitation Procedures; (C) Approving Forms of Ballots and Noticing Procedures; and (D) Scheduling Certain dates with Respect Thereto,[2] and (II) Requiring the First Lien Lenders to Make an Election Under 11 U.S.C. § 1111(b)(2),[3] filed by the Backstop Investors with respect to their plan of reorganization (as amended, supplemented, or otherwise modified, the "Backstop Investor Plan")[4] and its accompanying disclosure statement (the "Backstop Investor Disclosure Statement")[5] filed in the above-captioned bankruptcy case (the "Case") of the above-captioned Debtor. In support thereof, the Backstop Investors respectfully represent as follows:

## PRELIMINARY STATEMENT

1. Despite all of the legal maneuvering that has taken place to date in this Case, in the end, this Case is a real estate, "dirt" case. As the Court itself observed, there is no need for the Backstop Investor Disclosure Statement to be an 'SEC' prospectus. There are two major

---

[1] The Backstop Investors are also lenders (the "Second Lien Lenders") under the Second Lien Credit Agreement dated as of July 6, 2007 (the "Second Lien Credit Agreement"), under which NexBank, SSB is acting as successor administrative and collateral agent.
[2] Docket No. 376.
[3] Docket No. 395.
[4] Docket No. 479.
[5] Docket No. 480.

N-826441                                  - 2 -

1  creditor constituencies in this (*i.e.*, the First Lien Lenders and the Second Lien Lenders), and
2  both of them are sophisticated, fully engaged and informed. Nevertheless, in an effort to provide
3  adequate information to all voting constituencies, the Backstop Investors prepared a
4  comprehensive 80-page disclosure statement. The Backstop Investors also filed numerous
5  supporting documents, including governance documents, other documents necessary for
6  effectuating the Backstop Investor Plan and information relevant to the Debtor's operation and
7  history. In short, the Backstop Investors, in good faith, filed a fulsome disclosure statement
8  containing more than adequate information required to enable a hypothetical investor in each
9  class entitled to vote to determine whether or not to support the Backstop Investor Plan.

10     2.     On August 13, 2010, LBBW filed the Disclosure Statement Objection with the
11 Court. Despite the Court's rejection of LBBW's attempt to litigate its confirmation objections at
12 the lift stay hearing on July 21, 2010 (the "July 21 Hearing"), the Disclosure Statement
13 Objection contains approximately a number of pages with the exact same confirmation
14 objections, and complains that the 80-page Backstop Investor Disclosure Statement lacks
15 adequate disclosure.

16     3.     LBBW's fundamental problem is that it believes that the Bankruptcy Code does
17 not permit the First Lien Lenders to be crammed down. Therefore, LBBW has consistently and
18 aggressively advanced its position since before this Case began – it wants and believes it
19 deserves all of the real value of the Debtor's Property[6] – and rejects the concept that other
20 constituents may also recover value so long as LBBW receives its entitlement under Bankruptcy
21 Code section 1129(a) and (b).[7] LBBW is incorrect.

---

[6] The Property is approximately 17.89 contiguous acres of land located at the southeast corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada and extending south almost to Tropicana Avenue.

[7] On August 13, 2010, LBBW filed its own plan (the "LBBW Plan") on behalf of the First Lien Lenders. While LBBW has now abandoned its prior arrangement to sell the Property to the Debtor's Insiders, the current LBBW Plan shares one thing in common with the original LBBW/Insider plan – both are structured to give substantially all of the value to the First Lien Lenders, and to provide little or no recovery to anyone else. The Backstop Investors believe that the proposed post-effective date corporate structure set forth in the LBBW Plan is flawed and will likely result in the Property ending up back in bankruptcy, receivership and/or foreclosure. The Backstop Investors will provide a more fulsome recitation of the flaws in the LBBW Plan at the appropriate time (*i.e.,* in the context of a confirmation objection – if the LBBW Plan gets that far). In the meantime, the Backstop Investors intend to file a disclosure statement objection objecting to, among other things, the real disclosure issues that exist in the LBBW Disclosure Statement (such as LBBW's failure to adequately describe the plan treatment to be afforded the Second Lien Lenders).

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

4.       After the Court granted the motion of certain Second Lien Parties[8] to terminate the Debtor's exclusivity, true to their word, the Backstop Investors filed their reorganization plan.  Perhaps the most attractive feature of the Backstop Investor Plan is that it proposes a rehabilitation of the Property through the infusion of more than $20 million in new money including millions of dollars for capital expenditures and tenant improvements.  The Property is to be managed by a successful, responsible and nationally recognized operator, which will itself be investing up to $5 million, and will utilize the tools provided to it to maximize the Property's value for all stakeholders.  Under the Backstop Investor Plan, the Backstop Investors and the Proposed Property Manager (defined below) who are investing the new money, have every incentive to make the Backstop Investor Plan and the Property succeed.  This and a functional corporate structure ensures that the interests of all interested parties who receive equity under the Backstop Investor Plan are aligned.

5.       Indeed, the Backstop Investor Plan is structured to provide the First Lien Lenders the full value of the stipulated secured claim of $188 million-- ***which is far more valuable than the $150 million LBBW proposes to give the First Lien Lenders on account of its secured claim under the LBBW Plan*** – and is consistent with the treatment required under Bankruptcy Code section 1129 (and section 1111(b) if LBBW makes such election), while providing value to all of the Debtor's other constituents.  In fact, the note being given to the First Lien Lenders under Backstop Investor Plan ***provides the First Lien Lenders with $5 million of value in excess of what LBBW believes the Property is worth at this time***.

6.       Despite the foregoing, LBBW now seeks to defeat the Backstop Investor Disclosure Statement primarily on the grounds that:  (i) the Backstop Investor Disclosure Statement does not describe (a) the LBBW Plan filed less than seven (7) days ago, and (b) the identity of the post-bankruptcy manager of the Property, its projections and its plans for operating the Property (the "<u>Business Plan</u>"); and (ii) it believes the Backstop Investor Plan is "patently unconfirmable" based on (a) the same objections it raised unsuccessfully in its lift stay

---

[8] The Backstop Investors comprise a subset of the Second Lien Parties.

pleadings and (b) its belief that the LBBW Plan is better than the Backstop Investor Plan (collectively, the "Objections"). None of these Objections have merit.

7. The Backstop Investor Disclosure Statement contains adequate information, a fact demonstrated in part when LBBW filed a strikingly similar disclosure statement describing the LBBW Plan. LBBW's complaints of "missing" information are disingenuous. For example, the Backstop Investors provided a draft of their Business Plan to LBBW weeks ago (other than the names of prospective new tenants and other information deemed to be commercially sensitive and confidential). A redacted version of the Business Plan is annexed to the Declaration of Paul D. Motta (the "Motta Dec."),[9] of Urban Retail Properties, LLC (the "Proposed Property Manager"). Realizing that the Backstop Investors are intently focused on having the Property succeed and in recognition of the quality of the Proposed Property Manager, LBBW now concedes in the LBBW Plan that the Backstop Investors should control the day-to-day operations of the Property post-bankruptcy, including appointing the manager.

8. The other LBBW complaints as to the adequacy of the Backstop Investor Disclosure Statement and the confirmability of the Backstop Investor Plan also do not bar the approval of the Backstop Investor Disclosure Statement and should be rejected. Notwithstanding, the Backstop Investors have addressed each Objection in the chart annexed hereto as **Exhibit "A"** (the "Chart"). As specified in the Chart, in response to each Objection, the Backstop Investors will either describe the information that they will be adding to the Backstop Investor Disclosure Statement and/or Backstop Investor Plan, or specify why the Objection is without merit.

9. The Backstop Investors maintain that the Backstop Investor Plan is not patently unconfirmable and the Backstop Investor Disclosure Statement provides adequate information under Bankruptcy Code section 1125 that would allow a hypothetical investor to make a reasoned decision on whether to vote for or against the Backstop Investor Plan. Therefore, and because the Backstop Investors believe it is in the best interests of the Debtor's constituents and

---

[9] The Motta Dec. will be filed concurrently with this Response.

N-826441                                - 5 -

1  the estate, the Backstop Investors respectfully request that Court approve the Disclosure

2  Statement and deny the Disclosure Statement Objection in all respects.

### BACKGROUND

4      10.    On May 5, 2010, the Second Lien Agent and certain of the Second Lien Lenders

5  filed an application for an order terminating the Debtor's exclusive periods to file, and solicit

6  acceptances for, a plan (the "Exclusivity Motion").[10]

7      11.    On June 10, 2010, the night before the hearing to consider the Exclusivity Motion,

8  LBBW filed its Motion for Relief From Automatic Stay.[11]

9      12.    At the June 11, 2010 hearing to consider the Exclusivity Motion, the Court

10  granted the Exclusivity Motion. Thereafter, on June 14, 2010, the Debtor withdrew the

11  LBBW/Insider plan.[12] On June 22, 2010, the Bankruptcy Court entered an Order granting the

12  Exclusivity Motion.[13]

13      13.    On July 9, 2010, the Backstop Investors filed their initial Chapter 11 Plan of

14  Reorganization Dated July 9, 2010, Disclosure Statement for Chapter 11 Plan of Reorganization

15  Dated July 9, 2010, Disclosure Statement,[14] and Motion for Entry of an Order (A) Approving

16  Disclosure Statement; (B) Approving Solicitation Procedures; (C) Approving Form of Ballots

17  and Noticing Procedures; and (D) Scheduling Certain Dates with Respect Thereto.[15]

18      14.    Also on July 9, 2010, LBBW filed its Amended Motion for Relief from the

19  Automatic Stay to foreclose on the Property (the "Amended Lift Stay Motion").[16]

20      15.    At the July 21 Hearing to consider the Amended Lift Stay Motion, the Court

21  explained the legal burdens LBBW would have to satisfy in order to prevail on its Amended Lift

22  Stay Motion. Consequently, the parties agreed to continue the Amended Lift Stay Motion to the

23  Disclosure Statement Hearing.

---

[10] Docket No. 118.
[11] Docket No. 300.
[12] Docket No. 318.
[13] Docket No. 324.
[14] Docket No. 375.
[15] Docket No. 376.
[16] Docket No. 378.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

N-826441

16.     On July 30, 2010, the Backstop Investors filed the current versions of the Backstop Investor Plan and the Backstop Investor Disclosure Statement.

17.     On August 13, 2010, LBBW filed the Disclosure Statement Objection, the LBBW Plan, the LBBW Disclosure Statement and a motion for approval of, among other things, the LBBW Disclosure Statement.[17]

18.     The hearing to consider the Backstop Investor Disclosure Statement and the LBBW Disclosure Statement is set for August 27, 2010 (the "Disclosure Statement Hearing").

## RESPONSE

### I.     The Backstop Investor Disclosure Statement Contains Adequate Information

19.     The Backstop Investor Disclosure Statement contains more than the adequate information as required by the Bankruptcy Code.  The adequacy of a disclosure statement should not measured by "kitchen sink" objections created by creditors who have already determined to block the underlying plan at all costs.  Instead, it is "measured by an objective standard drawn from … section 1125(a) that asks what the hypothetical reasonable investor typical of holders of claims or interests of the relevant class would want to know in order to make an informed judgment about the plan."  *In re Michelson*, 141 B.R. 715, 725 (Bankr. E.D. Cal. 1992).  Moreover, "adequate information need not include such information about any other possible or proposed plan .…"  *Id.*; *see also* 7 COLLIER ON BANKRUPTCY ¶1125.02 (15th rev. ed. 2010) ("[Section 1125] clearly provides that a disclosure statement does not have to disclose the existence of other plans or the terms of such plans), and "a disclosure statement is not required to speculate as to future uncertainties, such as the consequences of possible outcomes of pending litigation."  *In re PC Liquidation Corp.*, 383 B.R. 856, 866 (E.D.N.Y. 2008).

20.     LBBW is the only party-in-interest that filed any objection to the thorough Backstop Investor Disclosure Statement.  It is axiomatic that an adequate disclosure determination is determined based on the recipient's need and ability to assess that information. *See In re Keisler*, Case No. 08-34321, 2009 Bankr. LEXIS 1814, at *12 (Bankr. E.D. Tenn. June

---

[17] Docket No. 498.

N-826441                                                   - 7 -

1  29, 2009) ("The court's primary concern in the adequacy stage is not whether a plan is feasible

2  or in the best interests of creditors – it is simply whether creditors have been provided with

3  sufficient information to make an informed decision as to whether they should accept or reject

4  the [p]lan."). In addition, "[w]hile complete disclosure is integral to the Chapter 11 process,

5  'overly technical and extremely numerous additions' to a disclosure statement suggested by an

6  objecting party may be rejected if such additions decrease the clarity and understandability of the

7  disclosure statement to the claimholders who will be called upon to accept or reject the plan." *In*

8  *re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988) (internal citations omitted).

9      21.    Courts should employ a flexible standard in assessing whether adequate

10  information has been provided, and such a determination is made, in the discretion of the

11  bankruptcy court, on a case-by-case basis. *In re PC Liquidation Corp.*, 383 B.R. at 865.

12  Moreover, Congress has made it clear that "the disclosure required depends on the circumstances

13  of the case, the relative sophistication of the creditors, and their access to other sources of

14  information about the plan." *See* H.R. Rep. No. 595 95th Cong. 1st Sess. at 226 (1977) as

15  reprinted in 1978 U.S.C.C.A.N. 5963, 6186; *see also Oneida Motor Freight, Inc. v. United*

16  *Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("[F]rom the legislative history of § 1125 we

17  discern that adequate information will be determined by the facts and circumstances of each

18  case.").

19      22.    Here, LBBW and the First Lien Lenders are sophisticated financial institutions

20  with full access to information and any resources needed to calculate and evaluate their potential

21  recovery. The other constituents are either the Debtor's equity holders (who perhaps have more

22  information than anyone else), the Second Lien Lenders (also all sophisticated parties) or small

23  trade creditors who are getting paid the principal amount of their claims in full under Backstop

24  Investor Plan. In any event, the Backstop Investor Disclosure Statement provides information so

25  that all affected parties can evaluate the Backstop Investor Plan.

26      23.    As clearly set forth in the Backstop Investor Disclosure Statement (Section IV.B),

27  creditors and the interest holder will be treated as follows:

28      a.    The First Lien Lenders' treatment (Class 3) depends on whether Class 3

N-826441      - 8 -

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1 makes an election under Bankruptcy Code section 1111(b).  *See* para. 28 below.

2       b.     Trade Unsecured Claims (Class 4) (*i.e.*, general unsecured claims that are
3 not claims under the Second Lien Credit Agreement or a Deficiency Claim) will be paid in cash
4 in full.

5       c.     Non-Trade Unsecured Claims (Class 5) (claims under the Second Lien
6 Credit Agreement or a Deficiency Claim, if applicable) can elect to receive a distribution of their
7 share of one of the following:  (i) the "Equity Option" which includes (a) 12% of the equity of
8 the 100% owner of the post-bankruptcy owner of the Property (the "New Equity"), (b) an
9 opportunity to purchase up to 78% of the New Equity, and (c) an opportunity to purchase
10 additional 3% of New Equity which right resembles a warrant; or (ii) $250,000 (the Backstop
11 Investors can not elect to receive the cash).

12       d.     Old Membership Interests (Class 6) will receive an opportunity to
13 purchase up to 10% of the New Equity, if Class 6 votes in favor of the Plan, and (c) an
14 opportunity to purchase additional 6.5% of New Equity which right resembles a warrant.

15     24.    Contrary to LBBW's arguments, the Backstop Investor Plan is not overly
16 complicated and the Backstop Investor Disclosure Statement more than adequately describes the
17 construct embodied in the Backstop Investor Plan.  It clearly describes what choices every
18 distributee can make and what their resulting distributions would be.

19 **II.**    **The Backstop Investor Plan is Not Patently Unconfirmable**

20     25.    As with its lift stay pleadings, LBBW Disclosure Statement Objection cites
21 numerous confirmation objections.  Rather than turn the hearing to consider the Backstop
22 Investor Disclosure Statement into a mini-confirmation hearing, the Court should reject LBBW's
23 confirmation Objections, and find that Backstop Investor Disclosure Statement contains adequate
24 information and the Backstop Investor Plan is not patently unconfirmable on its face.  *In re*
25 *Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also* Transcript of July 21
26 Hearing, 23:5-17 ("I may very well not confirm the plan … [but] I certainly don't think I'm
27 going to say that … [with respect to] a disclosure statement … The cases in the Ninth Circuit
28 with respect to denying approval of a disclosure statement and thus not having confirmation …

N-826441     - 9 -

are those cases where there is a structural problem in the plan that legally prevents confirmation …)

26. Moreover, the Court should view inferences drawn from the underlying facts and matters contained in the Backstop Investor Plan and Backstop Investor Disclosure Statement in a light most favorable to the Backstop Investors, as plan proponents. *See In re Spanish Lake Assocs.*, 92 B.R. 875, 877 (Bankr. E.D. Mo. 1988). As set forth in the Chart, the Backstop Investor Plan is not patently unconfirmable and LBBW's arguments to the contrary should be rejected.[18]

27. One of LBBW's confirmation Objections, however, bears highlighting. In the Disclosure Statement Objection, LBBW incorrectly asserts that the Backstop Investors are not actually paying the stated 5.5% rate of interest under the Refinanced Secured Note (as defined in the Backstop Investor Plan). *See* Disclosure Statement Objection at p.7-8.

28. For clarity on this point, to the extent not already clear, the Backstop Investors will be amending the Refinanced Secured Note, consistent with the Backstop Investor Plan and the Backstop Investor Disclosure Statement, to reflect:

A. <u>The Note</u>

   i) <u>The First Lien Lenders elect under Bankruptcy Code section 1111(b)</u> –the First Lien Lenders will receive a note with a (1) face amount equal to the First Lien Loan Claims (*i.e.* $270,752,852.35) *minus* the Refinanced Secured Note Deduction (*i.e.*, a $10 million pay down), or $260,752,852.35, and (2) net present value equal to the Property Value (*i.e.,* $188 million), *minus* the Refinanced Secured Note Deduction, or $178 million; or

   ii) <u>The First Lien Lenders do not elect under Bankruptcy Code section 1111(b)</u> - the First Lien Lenders will receive a note with a face amount and with a net present value equal to the Property Value (*i.e.,* $188 million) *minus* the Refinanced Secured Note Deduction, or $178 million. In addition, the First Lien Lenders will have an unsecured claim in the approximate amount of $82.75 million which will be treated as a Non-Trade Unsecured Claim.

B. <u>Other Note Features</u>

---

[18] In addition, the Backstop Investors hereby incorporate by reference the arguments raised in the *Objection of NexBank, SSB and Certain Second Lien Lenders to LBBW's Motion for Relief from Automatic Stay* (Docket No. 329) and *Objection of NexBank, SSB and the Backstop Investors to Amended Motion of LBBW for Relief from Automatic Stay* (Docket No. 426) with respect to LBBW's confirmation objections.

i) Regardless of the form of note they receive, the Refinanced Secured Note will be secured against the same collateral that currently serves as the First Lien Lenders' collateral.

ii) Regardless of the form of note they receive, the Refinanced Secured Note will have a NPV of $178 million, which represents the stipulated Property value of $188 million minus a $10 million pay down.

iii) Regardless of the form of note they receive, the pay rate of interest on the Refinanced Secured Note will be fixed at 5.5% per annum, paid in arrears, which will ensure that the Refinanced Secured Note will have a value of $178 million, consistent with Bankruptcy sections 1129 and 1111(b).

iv) Regardless of the form of note they receive, the 5.5% pay rate of interest will always be paid against $178 million during the term of the Refinanced Secured Note.

v) In the event the First Lien Lenders elect under Bankruptcy Code section 1111(b),

1. all interest payments made on the Refinanced Secured Note will also serve to pay down the face amount of the Refinanced Secured Note over the term;

2. the stream of payments on the Refinanced Secured Note at maturity must at least equal the face amount of the Refinanced Secured Note.

*See, e.g.*, *In re Weinstein*, 227 B.R. 284 (9th Cir. B.A.P. 1998); *see generally* 7 COLLIERS ON BANKRUPTCY ¶1111.03 and ¶1129.03 (15th rev. ed. 2010).

29. Therefore, the Refinanced Secured Note will in fact pay the 5.5% stated rate of interest against $178 million and satisfies the Bankruptcy Code requirements for a cram-down note.

### III. The LBBW Plan is not Superior to the Backstop Investor Plan

30. LBBW spends pages of the Disclosure Statement Objection explaining why it believes that the LBBW Plan is superior to the Backstop Investor Plan; however such Objection is a Bankruptcy Code section 1129(c) issue, and should not be entertained at the Disclosure Statement Hearing.

31. In any event, the LBBW Plan is not superior to the Backstop Investor Plan. The Backstop Investor Plan is a complete and integrated plan, ***with all constituents' interests aligned*** to increase the net operating income and value of the Property for the benefit of all stakeholders. Forms of the LLC agreements with a thoughtful, workable, and detailed corporate governance construct and documents detailing the issuance of equity, including a private offering memorandum, a subscription agreement and a unit purchase agreement, were filed as exhibits to

1 the Backstop Investor Disclosure Statement almost six (6) weeks ago so that affected parties-in-
2 interest could review them.

### IV. The Backstop Investor Plan Will Be Amended

32. Despite the fact that the Backstop Investors strongly believe that the Backstop Investor Plan is confirmable and already superior to the LBBW Plan *even as to the treatment of LBBW's own secured claim*, the Backstop Investors are considering amending the Backstop Investor Plan to address issues raised by LBBW in the Disclosure Statement Objection. The Backstop Investors will be filing an amended disclosure statement and plan prior to the Disclosure Statement Hearing.[19]

### RESERVATION OF RIGHTS

33. The Backstop Investors expressly reserve their rights to supplement and amend this Response and to introduce evidence at any hearing relating to the Backstop Investor Disclosure Statement.

. . .

. . .

. . .

---

[19] In addition, the Backstop Investors will be filing their Plan Supplement 25 days prior to the hearing to consider confirmation of the Backstop Investor Plan rather than three (3) days prior to the Disclosure Statement Hearing.

N-826441 - 12 -

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

## CONCLUSION

For the foregoing reasons, the Backstop Investors respectfully request that the Court (i) approve the Backstop Investor Disclosure Statement, (ii) overrule the Disclosure Statement Objection, and (iii) grant such other and further relief as the Court deems just and proper.

Dated this 20th day of August, 2010.

By:/s/ Lenard M. Parkins
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
                and
LENARD M. PARKINS, ESQ. (PRO HAC VICE)
HENRY FLORES, ESQ. (PRO HAC VICE)
TREVOR HOFFMANN, ESQ. (PRO HAC VICE)
JONATHAN HOOK, ESQ. (PRO HAC VICE)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, NY 10020

Attorneys for
FIVE MILE CAPITAL POOLING INTERNATIONAL LLC, SPECTRUM INVESTMENT PARTNERS, L.P. AND TRANSAMERICA LIFE INSURANCE COMPANY

and

JOSHUA J. ANGEL, ESQ. (PRO HAC VICE)
ANDREW C. GOLD, ESQ. (PRO HAC VICE)
FREDERICK E. SCHMIDT, JR., ESQ. (PRO HAC VICE)
**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, NY 10016
                and
LEE I. IGLODY, ESQ.
Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT, P.L.L.C.**
9555 S. Eastern Avenue, Suite 280
Las Vegas, Nevada 89123

Attorneys for
THE HUFF ALTERNATIVE FUND, L.P. AND THE HUFF ALTERNATIVE PARALLEL FUND, L.P.