1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
E-Mail:    nleatham@klnevada.com
                ncox@klnevada.com

Attorneys for
**FIVE MILE CAPITAL POOLING
INTERNATIONAL LLC; SPECTRUM
INVESTMENT PARTNERS, L.P.; &
TRANSAMERICA LIFE INSURANCE
COMPANY**

LENARD M. PARKINS, ESQ. (*PRO HAC VICE*)
HENRY FLORES, ESQ. (*PRO HAC VICE*)
TREVOR R. HOFFMANN, ESQ. (*PRO HAC VICE*)
JONATHAN HOOK, ESQ. (*PRO HAC VICE*)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Telephone No. (212) 659-7300
Facsimile No. (212) 884-8226
E-Mail:    lenard.parkins@haynesboone.com
                henry.flores@haynesboone.com
                trevor.hoffmann@haynesboone.com
                jonathan.hook@haynesboone.com

Attorneys for
**FIVE MILE CAPITAL POOLING
INTERNATIONAL LLC; SPECTRUM
INVESTMENT PARTNERS, L.P.; &
TRANSAMERICA LIFE INSURANCE
COMPANY**

LEE I. IGLODY, ESQ.
Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT,
P.L.L.C.**
9555 S. Eastern Avenue, Suite 280
Las Vegas, Nevada 89123
Telephone No. (702) 425-5366
Facsimile No. (702) 446-5148
E-Mail:    lee@iglody.com
                pbb@pbarnettlaw.com

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P.
AND THE HUFF ALTERNATIVE
PARALLEL FUND, L.P.**

JOSHUA J. ANGEL, ESQ. (*PRO HAC VICE*)
ANDREW C. GOLD, ESQ. (*PRO HAC VICE*)
FREDERICK E. SCHMIDT, JR., ESQ. (*PRO HAC VICE*)
**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, New York 10016
Telephone No. (212) 592-1400
Facsimile No. (212) 592-1500
E-Mail:    jangel@herrick.com
                agold@herrick.com
                eschmidt@herrick.com

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P.
AND THE HUFF ALTERNATIVE
PARALLEL FUND, L.P.**

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>FX LUXURY LAS VEGAS I, LLC, a<br>Nevada limited liability company,<br><br>               Debtor. | Case No.  BK-S-10-17015-bam<br>Chapter 11<br><br>**SECOND AMENDED DISCLOSURE<br>STATEMENT FOR THIRD AMENDED<br>CHAPTER 11 PLAN OF<br>REORGANIZATION DATED OCTOBER<br>12, 2010**<br><br>Hearing Date:  November 8, 2010<br>Hearing Time:  9:00 a.m. (PST) |

**TABLE OF CONTENTS**

Page

ARTICLE I.    INTRODUCTION ..................................................................1

    A.    Preliminary Statement. ...........................................................1

    B.    Securities Law Matters. ..........................................................4

    C.    Forward-Looking Statements. ...............................................5

ARTICLE II.    SUMMARY OF TRANSACTIONS AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ..........................................5

    A.    Summary of Transactions Contemplated Under the Plan.........5

    B.    Summary of Treatment of Claims and Interests Under the Plan. ........6

ARTICLE III.    THE DEBTOR, THE CURRENT DEBT STRUCTURE AND PLAN OBJECTIVES ..........................................................7

    A.    Debtor's Capital Structure. .....................................................7

    B.    The Debtor's Business Operations. .........................................8

        1.    *The Property.* ..............................................................8

        2.    *Tenants, Rental Income and Expenses.* .......................9

        3.    *Motel Operations.* .....................................................10

    C.    The Loans Against the Property. ...........................................10

    D.    Events Leading Up to Bankruptcy. .......................................12

        1.    *Economic Crisis.* ......................................................12

        2.    *The Default.* .............................................................13

        3.    *Appointment of the Receiver.* ...................................13

        4.    *The Lock-Up Agreement, Insider Plan and Related Events.* ...................14

    E.    The Chapter 11 Case and the Backstop Investors' Objectives in Filing the Plan. ...........15

        1.    *The Chapter 11 Case.* ...............................................15

            a.    Bid Procedures. ................................................15

            b.    Cash Collateral. ................................................16

            c.    Stipulation for Turnover by Receiver. ...............18

            d.    Cash Management. ............................................19

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

i

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

e.  Motion Not to Convene Meeting of Creditors Pursuant to 11 U.S.C. § 341(a) and to Set Claim Bar Dates and the 341 Notice. ................................19

f.  Employment and Retention of Property Manager ................................20

g.  Retention Applications................................21

h.  Other Motions. ................................21

i.  Third Party Offer to Purchase Property. ................................21

2.  *The Backstop Investors' Actions* ................................21

a.  Motion to Terminate Exclusivity and Filing of Plan Documents. ................................21

b.  Trustee Motion. ................................22

c.  Intercreditor Adversary Proceeding. ................................23

3.  *The First Lien Lender Plan* ................................24

4.  *The Settlement Between the Backstop Investors and the First Lien Lenders and the Resulting Resolution with NexBank, SSB* ................................25

F.  The Debtor's Assets and Liabilities. ................................26

1.  *Assets.* ................................26

a.  The Real Property. ................................26

b.  Cash and Accounts Receivable. ................................27

c.  Other Personal Property. ................................27

2.  *Liabilities.* ................................27

ARTICLE IV.   DESCRIPTION OF CHAPTER 11 REORGANIZATION PLAN ................................28

A.  Overall Structure of the Plan. ................................28

B.  Classification and Treatment of Claims and Interests Under the Plan. ................................29

1.  *Unclassified Claims.* ................................29

a.  Administrative Claims. ................................29

b.  Priority Tax Claims. ................................30

2.  *Classified Claims.* ................................31

a.  Class 1 − Priority Claims. ................................31

b.  Class 2 − Other Secured Claims. ................................31

c.  Class 3 − First Lien Secured Claims. ................................32

ii

         (i)    General .................................................................... 32

         (ii)   Features of the New A-Note and New B-Note ..................... 33

    d.   Class 4 − Trade Unsecured Claims. ........................................ 33

    e.   Class 5 − Second Lien Loan Claims. ....................................... 34

    f.   Class 6 − Interests. ............................................................... 35

C.   Means of Implementation of Plan ................................................... 36

   1.   *Plan Implementation.* ..................................................... 36

   2.   *Reorganization.* ............................................................. 37

   3.   *Assumption of Liabilities.* ............................................. 38

   4.   *Cancellation of Interests.* .............................................. 39

   5.   *Subsequent Sale or Transfer of the Property.* ................ 39

   6.   *Discharge and Injunction.* ............................................ 40

    a.   Discharge of the Debtor. ...................................... 40

    b.   Injunction. .......................................................... 40

   7.   *Exemption From Certain Transfer Taxes and Further Transactions.* ...................... 41

   8.   *Final Decree.* ................................................................ 41

   9.   *Effectuating Documents, Further Transactions.* ............. 42

   10.  *Adequate Protection Liens.* ........................................... 42

D.   Provisions Concerning Plan Distributions .......................................... 43

   1.   *Distributions on Account of Claims Allowed as of the Effective Date.* ............... 43

   2.   *Distributions on Account of Claims Allowed After the Effective Date.* ............. 43

    a.   Payments and Distributions on Disputed Claims. ............ 43

    b.   Special Rules for Distributions to Holders of Disputed Claims. ........ 43

   3.   *Distributions to Second Lien Lenders.* ........................... 43

   4.   *Manner of Payment Under the Plan.* ............................. 43

   5.   *Whole Dollars.* ............................................................. 44

   6.   *Escheat.* ........................................................................ 44

   7.   *Delivery of Distributions.* ............................................. 44

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

|  | a. | Record Date for Distributions. | 44 |
|  | b. | Distribution Agent. | 44 |
|  | c. | Delivery of Distributions in General. | 44 |
| 8. | *Returned Distributions.* | | 45 |
| 9. | *Disputed Distributions.* | | 46 |
| 10. | *Setoffs.* | | 46 |
| 11. | *Withholding Taxes.* | | 46 |
| 12. | *Allocation of Distributions.* | | 47 |

E. Certain Terminations and Releases. ........ 47

| 1. | *Certain Terminations.* | | 47 |
| 2. | *Rights If Plan Not Confirmed.* | | 47 |
| 3. | *Term of Bankruptcy Injunction or Stays.* | | 47 |
| 4. | *Exculpation.* | | 47 |
| 5. | *Releases.* | | 48 |
| 6. | *Injunctions.* | | 49 |
|  | a. | Injunction Against Releasors. | 49 |
|  | b. | Injunction Protecting Exculpation of Releasees. | 49 |
|  | c. | Injunction Against Interference With Plan. | 50 |

F. Executory Contracts and Unexpired Leases. ........ 50

| 1. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.* | | 50 |
| 2. | *Rejection Claims.* | | 52 |
| 3. | *Filing of Rejection Claims.* | | 52 |
| 4. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* | | 52 |
| 5. | *Reservation of Rights.* | | 53 |

G. Procedures for Resolving Disputed Claims and Objections to Interests. ........ 53

| 1. | *Time Limit for Objections to Claims and Interests.* | | 53 |
| 2. | *Payments.* | | 53 |
| 3. | *Personal Injury Claims.* | | 54 |

4.    *Estimation of Claims.*..........................................................54

H.    Retention of Jurisdiction...........................................................54

    1.    *Retention of Jurisdiction.*..................................................54

    2.    *Jurisdiction Unaffected.*.....................................................57

I.    Certain Obligations of the Debtor and/or New Borrower. ..........57

J.    Conditions to Effective Date. ....................................................58

    1.    *Conditions to Occurrence of Effective Date.*......................58

    2.    *Nonconsensual Confirmation/Reservation of Right to Effectuate Confirmation of the Plan Using Cramdown under Bankruptcy Code Section 1129(b).*...............59

K.    Miscellaneous Provisions...........................................................60

    1.    *Modification of the Plan.*...................................................60

    2.    *Notices.*..............................................................................60

    3.    *Limitation of Notice.*.........................................................62

        a.    Notice of Entry of Confirmation Order..............63

        b.    Post-Confirmation Date Service List — Additional Persons Entitled to Notice.................63

    4.    *First Lien Lenders' Approval.*............................................63

    5.    *Headings.*...........................................................................63

    6.    *Exhibits.*.............................................................................63

    7.    *Non-Severability of Plan Provisions.*.................................64

    8.    *Waiver or Estoppel.*...........................................................64

    9.    *Conflicts.*............................................................................65

    10.    *Computation of Time.*.......................................................65

    11.    *Governing Law.*.................................................................65

    12.    *Successors and Assigns.*....................................................65

    13.    *Withdrawal or Modification of Plan and Plan Documents.*.........................65

    14.    *Other Agreements.*.............................................................66

ARTICLE V.  CERTAIN RISK FACTORS TO BE CONSIDERED ....................66

A.    Failure to Confirm the Plan. .....................................................66

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

v

B.   Potential Adverse Effects of Chapter 11. ...................................................66

C.   Risks Associated. .........................................................................................67

ARTICLE VI.   CONFIRMATION OF THE PLAN ...................................................67

A.   Voting Requirements. ...................................................................................68

B.   Voting on the Plan. .......................................................................................69

C.   Confirmation Requirements ..........................................................................70

    1.   *Acceptance by Impaired Classes.* .........................................................70

    2.   *Best Interests Test.* ...............................................................................72

    3.   *Feasibility of the Plan.* ..........................................................................73

    4.   *Classification.* .......................................................................................74

        a.   No Unfair Discrimination. ...............................................................74

        b.   Fair and Equitable Test. ..................................................................74

            (i)   Secured Creditors ........................................................................74

            (ii)   Unsecured Creditors ..................................................................75

            (iii)   Equity Interest Holders ............................................................75

    5.   *Confirmation Hearing.* ...........................................................................76

    6.   *Administrative Claims.* ..........................................................................77

ARTICLE VII.   ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ..........................................................................................................77

ARTICLE VIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSIDERATIONS OF THE PLAN ........................................................78

A.   Introduction. ..................................................................................................78

B.   Certain U.S. Federal Income Tax Consequences to the Debtor. ...................80

C.   Tax Consequences to Creditors. ....................................................................80

    1.   *Impact of the Restructuring.* ..................................................................80

    2.   *Consequence of Holding and Disposing of the New Secured A-Note and the New
Secured B-Note* .....................................................................................83

    3.   *Consequence of Holding and Disposing of the New Borrower Parent Units* .........85

    4.   *Tax Consequence Relating to the Rights* ...............................................87

    5.   *Backup Withholding* ...............................................................................87

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6.    *Importance of Obtaining Professional Tax Assistance* ................................. 87

ARTICLE IX.    FURTHER INFORMATION ................................................. 87

ARTICLE X.    RECOMMENDATION AND CONCLUSION ....................................... 88

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<div style="text-align: center;">LIST OF EXHIBITS</div>

EXHIBIT A — The Plan

EXHIBIT B — FX I Ownership Structure Chart

EXHIBIT C — FXRE's 10-K

EXHIBIT D — McHenry Declaration

EXHIBIT E — May 3, 2010 Receiver Report

EXHIBIT F — Debtor's Schedules and Statement of Financial Affairs

EXHIBIT G-1 — Form of New A-Note

EXHIBIT G-2 — Form of New B-Note

EXHIBIT H — Form of New Loan Credit Agreement

EXHIBIT I — Form of Mortgage

EXHIBIT J — Form of Interest Payment Guaranty

EXHIBIT K — Form of Contribution and Indemnity Agreement

EXHIBIT L — Form of New Borrower LLC Agreement

EXHIBIT M — Form of New Borrower Parent LLC Agreement

EXHIBIT N — Form of Offering Memorandum

EXHIBIT O — Form of Subscription Agreement

EXHIBIT P — Form of New Borrower Parent UPA

EXHIBIT Q — Form of Class 5 Rights Agreement

EXHIBIT R — Form of Class 6 Rights Agreement

EXHIBIT S — Liquidation Analysis

EXHIBIT T — Business Plan

EXHIBIT U — Schedule of Disputed Claims

EXHIBIT V — Schedule of Assumed Contracts

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1   THIS DISCLOSURE STATEMENT (AS AMENDED, SUPPLEMENTED, OR

2   OTHERWISE MODIFIED, THE "DISCLOSURE STATEMENT") IS THE PRODUCT OF A

3   NEGOTIATED RESOLUTION BETWEEN THE FIRST LIEN PARTIES (AS DEFINED

4   BELOW) AND FIVE MILE CAPITAL POOLING INTERNATIONAL LLC, SPECTRUM

5   INVESTMENT PARTNERS, L.P., TRANSAMERICA LIFE INSURANCE COMPANY, THE

6   HUFF ALTERNATIVE FUND, L.P., AND THE HUFF ALTERNATIVE PARALLEL FUND,

7   L.P.[1] AND CERTAIN OF THEIR RESPECTIVE AFFILIATES (COLLECTIVELY "BACKSTOP

8   INVESTORS"), INCLUDING IN THEIR CAPACITY AS SECOND LIEN LENDERS (DEFINED

9   BELOW) AND IS BEING SUBMITTED IN CONNECTION WITH THE SOLICITATION OF

10  VOTES ON A CHAPTER 11 PLAN OF REORGANIZATION EMBODYING SUCH

11  NEGOTIATED RESOLUTION (AS AMENDED, MODIFIED OR OTHERWISE

12  SUPPLEMENTED, THE "PLAN").  THIS DISCLOSURE STATEMENT HAS NOT BEEN

13  APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), OR ANY

14  OTHER REGULATORY AUTHORITY.

15                    **ARTICLE I.**

16                    **INTRODUCTION**

17  **A.**    **Preliminary Statement.**

18          FX LUXURY LAS VEGAS I, LLC ("DEBTOR" OR "FX I") IS A DEBTOR AND

19  DEBTOR-IN-POSSESSION IN THE ABOVE-CAPTIONED CASE UNDER TITLE 11 OF THE

20  UNITED STATES CODE (THE "BANKRUPTCY CODE").  THIS DISCLOSURE STATEMENT

21  IS BEING FILED IN CONNECTION WITH THE PLAN, WITH RESPECT TO WHICH THE

22  BACKSTOP INVESTORS SEEK TO SOLICIT VOTES.  A COPY OF THE PLAN IS

23  ATTACHED HERETO AS **EXHIBIT "A"** AND IS INCORPORATED HEREIN BY THIS

24  REFERENCE.  THE PLAN CONTEMPLATES THE REORGANIZATION OF THE DEBTOR.

25  . . .

26  . . .

27  . . .

28

---

[1] For purposes of this Disclosure Statement, the Huff parties will be collectively referred to as "Huff."

1

THE BACKSTOP INVESTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS SUBMIT BALLOTS ACCEPTING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.  IF THE REQUISITE ACCEPTANCES ARE RECEIVED, AND THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND IS CONSUMMATED, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR (WHETHER OR NOT SUCH HOLDERS SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TREATMENT AFFORDED SUCH HOLDERS THEREUNDER.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rules 3016 and 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of a case under the Bankruptcy Code.  This Disclosure Statement has been neither approved nor disapproved by the SEC, nor has the SEC passed judgment upon the accuracy or adequacy of the statements contained herein.

This Disclosure Statement has been prepared by the Backstop Investors and their advisors. Drafts of the Disclosure Statement have been shared with the First Lien Lenders, who have had the opportunity to review the Disclosure Statement and Plan.  The Backstop Investors have incorporated certain revisions suggested by the First Lien Lenders.  The First Lien Lenders and the Backstop Investors reserve their right to contest the accuracy of any statements contained herein or the adequacy of any statements contained herein in the event that the settlement fails or the Plan is not confirmed or consummated.

This Disclosure Statement is being provided to Holders of Impaired Claims and Interests entitled to vote on the Plan (*i.e.*, (i) Class 3 (First Lien Loan Claims), (ii) Class 5 (Second Lien Loan Claims), and (iii) Class 6 (Old Membership Interests)) in connection with the solicitation of their votes on the Plan.[2]  The Disclosure Statement is designed to provide information deemed by the

---

[2] The specific procedures set forth for voting on the Plan, including copies of the ballots that will be provided to creditors entitled to vote on the Plan (the "Ballots") and other solicitation information, are attached to the Motion of the Backstop Investors for Entry of an Order (A) Approving Solicitation Procedures; (B) Approving Forms of Ballots and Noticing Procedures; and (C) Scheduling Certain Dates With Respect Thereto (the "Motion to Approve Solicitation Procedures").  The Motion to Approve Solicitation Procedures was filed with the Court on October 12, 2010

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Backstop Investors, in consultation with the Debtor and the First Lien Parties, to be material and necessary to enable such creditors and interest holders to make a reasonably informed decision in the exercise of their rights to vote on the Plan.  In making a decision in connection with the Plan, Holders of Claims and Interests must rely on their own examination of the Debtor and the terms of the Plan, including the merits and risks involved.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW ALL OF THE TERMS AND CONDITIONS OF THE PLAN CAREFULLY, NOT RELY SOLELY ON THE SUMMARY IN THIS DISCLOSURE STATEMENT AND CAREFULLY REVIEW THE VOTING INSTRUCTIONS SET FORTH IN ARTICLE VI HEREIN AND THE MOTION TO APPROVE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES, ASSUMING SUCH MOTION IS APPROVED BY THE BANKRUPTCY COURT.

Capitalized terms in this Disclosure Statement not defined herein shall have the meaning ascribed to them in the Plan, the Bankruptcy Code or the Bankruptcy Rules, as applicable, unless the context hereof requires a different meaning.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON FINANCIAL AND OTHER INFORMATION DEVELOPED BY THE DEBTOR AND/OR THE BACKSTOP INVESTORS.  WHILE THE BACKSTOP INVESTORS HAVE REASONABLY ENDEAVORED TO OBTAIN AND SUPPLY ALL MATERIAL INFORMATION, SOME OF THE INFORMATION CONTAINED HEREIN (SOME OF WHICH IS INCORPORATED HEREIN BY REFERENCE), HAS BEEN OBTAINED FROM (I) THE SEC FILINGS OF THE DEBTOR'S ULTIMATE PARENT FX REAL ESTATE AND

contemporaneously with this Disclosure Statement.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

ENTERTAINMENT, INC. ("FXRE"), AND (II) THE BANKRUPTCY FILINGS OF THE DEBTOR AND ESTATE PROFESSIONALS.  SUCH INFORMATION HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT OR INDEPENDENT REVIEW BY THE BACKSTOP INVESTORS EXCEPT WHERE EXPRESSLY INDICATED.  ACCORDINGLY, THE BACKSTOP INVESTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY OR IS COMPLETE, AND RESERVE ALL RIGHTS WITH RESPECT THERETO.

The Ballots will not be used for any purpose other than (x) to determine votes for acceptance or rejection of the Plan (and any permitted modified version thereof) under the Bankruptcy Code and (y) with respect to (i) Class 5 creditors voting to accept the Plan, the election of the Class 5 Equity Option or Cash Option, and (ii) the Class 6 Interest Holder, assuming it votes in favor of the Plan, whether it will elect to exercise the Class 6 Purchase Option and/or accept the Class 6 Rights, all as provided in the Plan.

**B.**     **Securities Law Matters.**

Pursuant to section 1145(a) of the Bankruptcy Code, the issuance of securities under a chapter 11 plan in exchange for a claim against or interest in a debtor is exempt from registration under the Securities Act of 1933 (the "Securities Act").  The issuance of the  New Borrower Interests, the New Borrower Parent Units, and the Rights satisfy the requirements of Bankruptcy Code section 1145(a) and therefore will be exempt from registration under the Securities Act.

Pursuant to the Plan, New Borrower, a Nevada limited liability company, will issue 100% of its equity (*i.e.,* the New Borrower Interest) to New Borrower Parent in consideration of (i) an investment by New Borrower Parent in the amount of the Initial Capital Contribution, which will be used for, among other things, Distributions to Creditors and the funding of the costs and expenses to be expended to consummate the Plan, (ii) the Capital Commitments that will be made available to New Borrower to make tenant improvements, capital expenditure enhancements, and for leasing commissions, and (iii) the Investment Costs.  Class A Units of New Borrower Parent, a Delaware limited liability company (the "New Borrower Parent Units"), will be issued to the (x) Backstop Investors, subject to (y) assuming their respective Classes vote in favor of the Plan (i) Class 5

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

creditors that, among other requirements, elect the Class 5 Equity Option, and (ii) the Class 6 Holder if it, among other requirements, votes for the Plan and exercises the Class 6 Purchase Option.  The Class 5 Rights will be issued to Class 5 creditors that elect the Class 5 Equity Option, assuming Class 5 votes in favor of the Plan.  The Class 6 Rights will be issued to the Class 6 Holder, assuming Class 6 votes in favor of the Plan.  There are certain contractual restrictions on transferability of the New Borrower Parent Units provided in the New Borrower Parent LLC Agreement.  The Rights will not be transferable or assignable except to affiliates of the Holders thereof or other members of New Borrower Parent.

**C.**     **Forward-Looking Statements.**

The information presented in this Disclosure Statement includes forward-looking statements as well as historical information.  These statements involve known and unknown risks and relate to future events, future financial performance or projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein.  Although the Backstop Investors believe that the expectations reflected in the forward-looking statements are reasonable, they cannot guarantee future results, events, levels of activity, performance or achievements and they expressly disclaim a duty to update any of the forward-looking statements.

**ARTICLE II.**

**SUMMARY OF TRANSACTIONS AND TREATMENT OF
CLAIMS AND INTERESTS UNDER THE PLAN**

**A.**     **Summary of Transactions Contemplated Under the Plan.**

The Plan contemplates the Debtor's restructuring, the salient terms of which include:

1.  The Debtor will be reorganized, will own the Property, and will be the New Borrower under the New Secured Loan Documents;

5

2.  New Borrower will be owned 100% by New Borrower Parent and the Property will be managed by the New Property Manager;

3.  New Borrower Parent will be owned by the (i) Backstop Investors, in exchange for the Total Capital Contribution, (ii) Holders of Allowed Class 5 Claims that properly elect the Class 5 Equity Option, in the event Class 5 votes to accept the Plan, and (iii) the Class 6 Interest Holder, in the event it votes to accept the Plan and elects to be the Class 6 Investor;

4.  The Holders of First Lien Loan Claims will receive their respective interests in the New Secured Notes comprised of (i) the New A-Note in the principal amount of $188 million, and (ii) the New B-Note in the principal amount of $71 million *plus* an amount not greater than $7.5 million reflecting certain unpaid interest as of the Effective Date. The interests in the New Secured Notes will be distributed to the First Lien Agent for allocation to the First Lien Lenders in accordance with the First Lien Credit Agreement and the Co-Lender Agreement (both as defined herein);

5.  Administrative Claims, Priority Claims (including Priority Tax Claims), Trade Unsecured Claims, and Other Secured Claims will not be Impaired under the Plan and will either be paid in cash in full on the Effective Date, paid in the ordinary course, or treated as agreed by the respective Holders and New Borrower; and

6.  Executory Contracts, except for limited Excluded Contracts, will be assumed.

The Initial Capital Contribution will be used to fund Distributions to Creditors holding Allowed Claims and to fund the costs and expenses necessary to consummate the Plan, in accordance with the terms and conditions of the Plan. The Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 1 Priority Claims will be paid in full in cash or the obligations will be assumed by the New Borrower. Holders of Allowed Class 2 Other Secured Claims shall have such Claims reinstated pursuant to section 1124(2) of the Bankruptcy Code and/or assumed by New Borrower such that the Claim is rendered unimpaired, except to the extent that the Holder agrees to less favorable treatment thereof. Class 3 (First Lien Loan Claims), Class 4 (Trade Unsecured Claims), Class 5 (Second Lien Loan Claims) and Class 6 (Old Membership Interests) will also receive Distributions under the Plan (in the case of Class 6, to the extent such Holder votes in favor of the Plan), to be approved by the Bankruptcy Court.

**B.**     **Summary of Treatment of Claims and Interests Under the Plan.**

The following summary of the Plan is qualified in its entirety by reference to the detailed explanations set forth in this Disclosure Statement and the Plan itself. For a more detailed description of the Plan, see Article IV hereof and the Plan.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

6

Allowed Priority Tax Claims are not designated as Classes under the Plan. The Holders of such unclassified Claims will be paid in full under the Plan or assumed by New Borrower, consistent with the requirements of section 1129(a)(9)(A) of the Bankruptcy Code, and they are not entitled to vote on the Plan. The Plan classifies all other Claims against and Interests in the Debtor, into six (6) separate Classes. Set forth below is a chart summarizing the classification and treatment of Claims and Interests under the Plan.

| Class | Description | Treatment | Estimated Amount of Claims[3] |
|-------|-------------|-----------|------------------------------|
| Class 1: | Priority Claims | Not Impaired. Paid in full in cash or assumed by New Borrower. *See* Section IV.B.2.a. | $1,731.23 |
| Class 2: | Other Secured Claims | Not Impaired. Reinstated or assumed by New Borrower. *See* Section IV.B.2.b. | $23,821.32 |
| Class 3: | First Lien Secured Claims | Impaired. New Secured Loan. *See* Section IV.B.2.c. | $270,752,852.35[4] |
| Class 4: | Trade Unsecured Claims | Not Impaired. Paid in full in cash or assumed by New Borrower. *See* Section IV.B.2.d. | $347,459.46 |
| Class 5: | Second Lien Loan Claims | Impaired. Assuming Class 5 votes in favor of the Plan, Holders of Allowed Claims can elect either (i) the Cash Option or (ii) the Class 5 Equity Option. If Class 5 does not vote in favor of the Plan, the Holders of Allowed Claims in Class 5, including the Backstop Investors in their capacity as Second Lien Lenders, will receive their *Pro Rata* share of the Cash Option. *See* Section IV.B.2.e. | $233,155,094.16;[5] |
| Class 6: | Old Membership Interests | Impaired. If Class 6 votes in favor of the Plan, (i) the Class 6 Rights, and/or (ii) the Class 6 Purchase Option. If Class 6 does not vote in favor of the Plan, the Class 6 Holder will not receive a Distribution under the Plan. *See* Section IV.B.2.f | N/A |

For a more detailed description of the treatment of the foregoing Classes of Claims and Interests, see Section IV.B.2. below.

### ARTICLE III.

### THE DEBTOR, THE CURRENT DEBT STRUCTURE AND PLAN OBJECTIVES

A.    **Debtor's Capital Structure.**

---

[3] Unless specified otherwise, these amounts were compiled by combining the list of undisputed Claims listed on the Debtor's bankruptcy schedules and accounting for payments made or to be made during the Bankruptcy Case. As such, these amounts may change as Proofs of Claims are filed and the adjudication or other resolution of pending contingent, unliquidated and/or Disputed Claims occurs.

[4] As asserted by the First Lien Agent in the Lift Stay Motion (defined below).

[5] This amount represents the Second Lien Loan Claims, including principal and accrued interest until the Petition Date.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

As disclosed in the *Omnibus Declaration of Mitchell J. Nelson Filed in Support of First Day Motions* (the "Nelson First Day Dec."),[6] FX I[7] is a limited liability company formed under the laws of the state of Nevada on December 26, 2001.  FX I is wholly-owned by FX Luxury, LLC ("FX LLC"), a non-debtor limited liability company formed under the laws of the state of Delaware on April 13, 2007.

FX LLC is, in turn, owned by (i) FXL, Inc., a non-debtor corporation incorporated under the laws of the State of Delaware on December 21, 2009, which is wholly owned by FXRE, a non-debtor publicly traded C-corporation incorporated under the laws of the State of Delaware on June 15, 2007, and (ii) FXL Priority Corp., a non-debtor corporation formed under the laws of the state of Delaware on December 21, 2009.  A chart outlining the ownership structure of FX I and its affiliates is attached hereto as **Exhibit "B"** and is incorporated herein by reference.  A history of the Debtor's business operations and its non-debtor affiliates is detailed in FXRE's 10-K annexed to the Nelson First Day Dec., which is attached hereto as **Exhibit "C"** and is incorporated herein by reference.

**B.      The Debtor's Business Operations.**

    **1.      *The Property.***

As disclosed in the Nelson First Day Dec., the Debtor owns and operates real property consisting of nine contiguous tax parcels,[8] comprised of six leasable parcels, covering approximately 17.89 contiguous acres of land (collectively, the "Property") located at the southeast corner of Las Vegas Boulevard and Harmon Avenue in Las Vegas, Nevada and extending south almost to Tropicana Avenue.  The Property is currently comprised of a motel operation and several commercial and retail tenants with a mix of short and long-term leases, including well-known

---

[6] Docket No. 21.

[7] In August 2008, FX I changed its name from Metroflag BP, LLC, to FX Luxury Las Vegas I, LLC.  At the same time, affiliated entities BP Parent, LLC, and Metroflag Cable, LLC, changed their names to FX Luxury Las Vegas Parent, LLC ("Las Vegas Parent"), and FX Luxury Las Vegas II, LLC ("FX II"), respectively.  On November 5, 2009, FX II merged its assets and operations into FX I. Subsequently, also on November 5, 2009, Las Vegas Parent merged its assets and operations into FX I.  The merger of FX II and Las Vegas Parent into FX I accomplished a more accurate reflection of the actual business operations of the entities, which the Debtor states have always been consolidated and effectively operated as a single enterprise.

[8] The Assessor's Office for Clark County, Nevada identifies the tax parcels by Assessor Parcel Numbers 162-21-301-001, 162-21-301-003, 162-21-301-009, 162-21-301-014, 162-21-301-016, 162-21-301-017, 162-21-301-018, 162-21-301-019 and 162-21-301-020.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

establishments such as Smith & Wollensky, McDonald's, Fatburger, Walgreen's, and Sunglass Hut. Prepetition, the Debtor and its affiliates had commenced design and planning for the Property's redevelopment plan that included a hotel, casino, entertainment, retail, commercial and residential development project. As a result of the disruption of the capital markets and the economic downturn in the U.S. in general, and Las Vegas in particular, the Debtor decided not to proceed with its originally proposed redevelopment plan.

The Property consists of six parcels described as follows:

a) Parcel 1 – is comprised of 0.996 acres. One tenant currently occupies parcel 1. The lease is terminable at any time by either party upon one hundred twenty (120) days' prior written notice and without the payment of a termination fee.

b) Parcel 2 – is comprised of 5.135 acres. The land is occupied by a Travelodge motel, which FX I owns in fee, as well as several retail, billboard and parking lot tenants. The Travelodge motel is being operated by WW Lodging Limited, LLC ("WW Lodging"), pursuant to a management agreement (the "WW Agreement"). The WW Agreement is terminable upon thirty (30) days' prior notice and a termination fee equal to 4% of the trailing twelve (12) months room revenue multiplied by 200%. The property's retail, billboard and parking lot leases are month-to-month.

c) Parcel 3 – is comprised of 2.356 acres. This parcel currently hosts the Hawaiian Marketplace, which consists of multiple retail tenants. All but six of the leases on this property are terminable at any time upon thirty (30) days' (in one instance one hundred eighty (180) days') advance written notice and without payment of a termination fee. The six leases not terminable with notice are terminable by FX I at any time upon the exercise of options to either repurchase, recapture or relocate the premises.

d) Parcel 4 – is comprised of 4.49 acres. It is currently occupied by several tenants. The leases are month-to-month, except for a lease with a single tenant whose lease term expires in July 2014.

e) Parcel 5 – is comprised of 3.008 acres. The property accommodates 51,414 square feet of retail space and is currently occupied by several restaurant and retail tenants. One lease term expires in January 2012, but is terminable earlier upon one hundred twenty (120) days' advance written notice and requires payment of an early termination fee of $200,000. A second lease term expires in August 2012, with the tenant holding an option to extend the lease for an additional five years. A third lease term expires in May 2059.

f) Parcel 6 - is comprised of 1.765 acres. The property accommodates 2,094 square feet of retail space and is currently occupied by a restaurant and several retail tenants. One lease term expires in December 2013, another lease term expires in April 2011 and a third lease term expires in February 2014, with the tenant holding an option to extend the lease term for an additional five years. A fourth lease term expires in May 2045.

**2.     Tenants, Rental Income and Expenses.**

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

9

As disclosed by the Debtor,[9] as of March 2010, there are a total of ninety (90) leasable spaces with sixty-three (63) occupied spaces and twenty-seven (27) vacant spaces, and the Property was generating approximately $1,263,569.58 in monthly revenues from rents, billboards, parking, common area maintenance charges and other sources (collectively, the "Rents").  *See also* Rent Roll Dated March 2010 annexed to the McHenry Dec. as Exhibit 1.  Since March 2010, the monthly revenues from Rents have increased and the Debtor anticipated its June monthly revenues from rents will be $1,288,148.37.  McHenry Dec. at ¶¶ 6-9; *see also* Appraisal Report of Kent Appraisal Services dated March 4, 2010, p.27 (FX Luxury Las Vegas Property Net Operating Income) (the "Kent Report")[10] and Report from Receiver dated May 3, 2010 (the "May 3 Receiver Report"),[11] at Exhibit A.  A true and correct copy of the May 3 Receiver Report is attached hereto as **Exhibit "E."**

### 3.    *Motel Operations.*

As disclosed in the Nelson First Day Dec., the motel situated on the Property, branded as a Travelodge, is a 125-room limited service motel wholly-owned by the Debtor and managed by WW Lodging, pursuant to the WW Agreement.  Pursuant to the WW Agreement, all Travelodge employees are employed directly by WW Lodging.  As of the Petition Date, WW Lodging controlled all revenues and paid the expenses of, and FX I was receiving no revenues from, the Travelodge operation.  Revenues available for distribution, if any, would have been sent directly to a lockbox account (the "Lockbox Account") controlled by Landesbank Baden-Württemberg, New York Branch ("LBBW"), as administrative agent and as collateral agent ("First Lien Agent") for the senior secured lenders ("First Lien Lenders," and together with First Lien Agent, the "First Lien Parties") holding a first priority Lien against the Property.

## C.    The Loans Against the Property.

---

[9] *See Omnibus Declaration of Gary McHenry Filed in Support of (1) Emergency Motion for Entry of Second Amended Interim Order (I) Authorizing and Approving Debtor's Use of Cash Collateral and (II) Scheduling a Hearing for Entry of a Final Order Authorizing and Approving Such Use; and (2) Landesbank Bade-Würtemberg, New York Branch's Motion for Relief from Automatic Stay* (the "McHenry Dec.") (Docket No. 338).  The McHenry Dec. is attached hereto as **Exhibit "D."**

[10] The Kent Report was annexed to the *Declaration of Mitchell J. Nelson in Support of Debtor's Motion for Entry of Order Establishing Bid Procedures and Deadlines in Connection with the Sale of Substantially All of the Assets of the Bankruptcy Estate* as Exhibit 1 (Docket No. 277-1) as is incorporated herein by reference.  The Backstop Investors do not concede the accuracy of the Kent Report's conclusions and reserve all of their rights with respect thereto.

[11] Docket No. 88.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    As disclosed in the Nelson First Day Dec., the Property is encumbered by Liens securing

2   loans having an aggregate principal balance of approximately $475 million as of December 31,

3   2008, including (i) two-tranche senior secured first priority loans (the "First Lien Loan") in the

4   initial principal amounts of approximately $250 million (the "Note A Tranche") and $30 million

5   (the "Note B Tranche") made by the First Lien Lenders, pursuant to that certain Amended and

6   Restated Credit Agreement, dated as of July 6, 2007 (as amended, modified or supplemented from

7   time to time, the "First Lien Credit Agreement," and together with the Loan Documents (as defined

8   in the First Lien Credit Agreement), the "First Lien Loan Documents") and that certain Co-Lender

9   Agreement, dated as of July 6, 2007, by and between Column Financial, Inc., Münchener

10  Hypothekenbank eG ("MHB") and Deutsche Hypothekenbank (Actien-Gesellschaft) ("Deutsche

11  Hypo"), with the Note B Tranche to at all times be junior, subject and subordinate to the Note A

12  Tranche; and (ii) secured second priority loans in the initial principal amount of approximately $195

13  million (the "Second Lien Loan," and together with the First Lien Loan, the "Loans") made by and

14  among the lenders thereof (the "Second Lien Lenders"), the Debtor Parties and Nexbank SSB, as

15  successor-in-interest to Credit Suisse, Cayman Islands Branch ("CS"), as second lien administrative

16  agent and collateral agent (the "Second Lien Agent" and together with the Second Lien Lenders, the

17  "Second Lien Parties"), pursuant to that certain Amended and Restated Credit Agreement, dated as

18  of July 6, 2007 (as amended, the "Second Lien Credit Agreement").

19    On May 11, 2007, the First Lien Lenders recorded a First Lien Deed of Trust, Security

20  Agreement, Assignment of Rents and Leases and Fixture Filing (the "First Lien Deed of Trust")

21  against the Property, as Book No. 20070511, Instrument 0004533, in the Official Records of the

22  Office of the County Recorder, Clark County, Nevada (the "Official Records").  In connection with

23  the First Lien Deed of Trust, the First Lien Agent recorded the following financing statements in the

24  Official Records on May 11, 2007: Book No. 20070511, Instrument 0004534; Book No. 20070511,

25  Instrument 0004535; Book No. 20070511, Instrument 0004537; and Book No. 20070511,

26  Instrument 0004538.

27    Also on May 11, 2007, the Second Lien Agent recorded a Second Lien Deed of Trust,

28  Security Agreement, Assignment of Rents and Leases and Fixture Filing against the Property as

1  Book No. 20070511, Instrument 0004536, in the Official Records, as amended by that certain First

2  Amendment to Second Lien Deed of Trust, Security Agreement, Assignment of Rents and Leases

3  and Fixture Filing, dated as of July 6, 2007, and recorded on July 6, 2007, in Book 20070706 as

4  Instrument 0004185 in the Official Records (as amended, amended and restated, modified or

5  supplemented from time to time, the "Second Lien Deed of Trust").

6          Pursuant to the terms of that certain Assignment Agreement, dated as of December 17, 2007,

7  (i) Deutsche Hypo assigned a portion of its interest in the Note A Tranche in an amount of $80

8  million to LBBW and (ii) MHB assigned a portion of its interest in the Note A Tranche in an

9  amount of $50 million to LBBW and LBBW acquired its interest as a First Lien Lender, subject to

10  the First Lien Credit Agreement and the other First Lien Loan Documents.

11          Pursuant to the terms of that certain Assignment Agreement, dated as of June 25, 2009,

12  MHB assigned a portion of its interest in the Note A Tranche in an amount of $50 million to Great

13  Lakes Reinsurance (UK) PLC ("Great Lakes") and Great Lakes acquired its interest as a First Lien

14  Lender, subject to the First Lien Credit Agreement and the other First Lien Loan Documents.

15          The Debtor Parties subsequently entered into that certain Amended and Restated

16  Intercreditor Agreement dated July 6, 2007, with CS, as collateral agent for the First Lien Lenders

17  and the Second Lien Lenders (the "Intercreditor Agreement"). The Intercreditor Agreement was

18  intended to establish the rights and obligations between the First Lien Parties and the Second Lien

19  Parties, including lien priorities and the enforcement of remedies with respect to the collateral

20  securing the Loans. The beneficial interests under the First Lien Deed of Trust were subsequently

21  assigned to the First Lien Agent by recordation on March 23, 2009, of an Assignment of Deed of

22  Trust dated March 20, 2009, as Book No. 20090323, Instrument 0004872, in the Official Records.

23  **D.      Events Leading Up to Bankruptcy.**

24          **1.      *Economic Crisis.***

25          As disclosed in the Nelson First Day Dec., the current global financial crisis has had a

26  particularly grave impact on the Las Vegas real estate market, including a substantial reduction in

27  the number of visitors and per visitor spending, the abandonment of, and/or loan defaults related to,

28  several major new hotel and casino development projects, as well as publicly expressed concerns

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

12

regarding the financial viability of several of the largest hotel and casino operators in the Las Vegas market.  The economic climate adversely affected the Property's commercial leasing activities and, as a result, the Debtor failed to maintain its previously high tenant occupancy rates amid these market conditions.  In addition, market forecasts indicate Las Vegas may experience a prolonged decline in developing new hotels and other entertainment venues, which could adversely affect any potential redevelopment of the Property for the immediate future.

       **2.**     ***The Default.***

As disclosed in the Nelson First Day Dec., FX I, as the surviving Entity following the merger of the Debtor Parties, is currently in default on the Loans as a result of the Debtor Parties' failure to repay the full amounts due and owing at maturity on January 6, 2009.

On January 30, 2009, the First Lien Agent seized the cash collateral reserve accounts from which the Debtor Parties had been drawing working capital funds to meet ordinary operational expenses at the Property.  At that time, the First Lien Lenders applied $21 million of the cash collateral reserve to the outstanding principal of the First Lien Loan, leaving, as of March 27, 2009, an outstanding principal balance of approximately $259 million under the First Lien Loan.  The principal amount of $195 million under the Second Lien Loan remained outstanding.  In addition, the First Lien Parties directed the Property's existing tenants to make all monthly lease payments directly to them.  In addition, the First Lien Agent revoked the Debtor's license to collect, receive, use and enjoy the Rents, and instructed the Debtor to deposit any rents it might receive into the Lockbox, which practice continued through the Petition Date

Subsequent to the default on the First Lien Loan, the First Lien Agent issued a Notice of Breach and Election to Sell, which was recorded April 9, 2009, in the Official Records as Book No. 20090409, Instrument 0003049, Foreclosure Proceeding #A9-03-0016 FCL.

On or about May 12, 2009, the Debtor Parties, as borrowers on the Loans, and FX LLC, as guarantor, entered into that certain Pre-Negotiation Agreement with the First Lien Parties and Second Lien Parties, in order to explore negotiations for a consensual resolution to the issues surrounding the existing default on the Loans.

       **3.**     ***Appointment of the Receiver.***

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

As disclosed in the Nelson First Day Dec., the First Lien Agent later commenced an action in the Eighth Judicial District Court, Clark County, Nevada ("Nevada District Court"), as case no. A-09-591831-B, Dept. No.: XIII, and obtained the appointment of a receiver (the "Receiver"), pursuant to Nevada District Court order dated June 22, 2009, as amended by an order dated August 6, 2009 (the "Receivership Order"). Among other things alleged by the First Lien Agent in support of the Receiver's appointment was mismanagement and excessive management charges by the Debtor's managers (i.e., Paul C. Kanavos ("Kanavos")) and, upon information and belief, Brett Torino ("Torino") with respect to the Property. The Receiver took possession of the Property on or about June 23, 2009.

Nevada Title Company, as duly substituted trustee under and pursuant to the First Lien Credit Agreement and the First Deed of Trust, issued a Notice of Trustee's Sale, dated July 7, 2009, and recorded July 10, 2009, in the Official Records as Book No. 20090710, Instrument 0002151, Trustee Sale #A9-03-0016 FCL.

On September 9, 2009 (and on numerous occasions thereafter), the First Lien Agent caused a Certificate of Postponement to be issued, extending the date of the foreclosure sale of the Property.

While the Property is generating revenues, the Las Vegas tourism and real estate market financial crises have resulted in the Property's depressed leasing capacity which, in turn, has severely impacted the Debtor's ability to re-negotiate or repay the past-due amounts currently due and owing on the Loans. As a whole, these factors necessitated the Debtor's filing the Chapter 11 Case.

### 4.    *The Lock-Up Agreement, Insider Plan and Related Events.*

Following the First Lien Agent's noticing of the foreclosure sale, on October 27, 2009, a Lock Up and Plan Support Agreement (the "Lock-Up Agreement") was executed among: (i) the Debtor Parties; (ii) the First Lien Parties, and (iii) the LIRA Entities, entities created by Robert F.X. Sillerman, Kanavos and Torino (collectively, the "Insiders"), who are directors, executive officers and/or greater than 10% stockholders and collectively own and control at least 73% of FXRE.[12]

---

[12] The Lock-Up Agreement, as amended, is annexed to the Nelson First Day Dec.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

The Lock-Up Agreement contemplated the Debtor filing for bankruptcy, and implementing a two-step disposition transaction as follows:  (1) at the outset of the Chapter 11 Case, the Debtor sought to conduct an auction of the Property; and (2) if the auction did not yield a cash bid equal to or greater than $256 million, the Debtor would have sought to effectuate a prearranged sale of the Assets to the LIRA entities via a pre-packaged liquidation plan (the "Insider Plan").

On November 12, 2009, in response to the Lock-Up Agreement, the Second Lien Agent filed a complaint in the Southern District of New York for, among other things, breach of fiduciary duty against, among others, the Debtor and its Insiders.

Thereafter, certain of the Second Lien Parties entered into settlement negotiations with, among others, the Debtor, the Insiders and the First Lien Parties.  In connection with such settlement negotiations, the Second Lien Agent and the Lock-Up parties entered into a lock-up agreement and a stipulation pursuant to which the Second Lien Agent agreed to (and did) voluntarily dismiss the complaint, without prejudice.  Ultimately, however, settlement negotiations failed.

On April 8, 2010, certain of the Second Lien Lenders entered into a lock-up agreement with Huff to propose or otherwise support an alternative restructuring, including a competing plan of reorganization, which would allow for participation by all claim and equity holders.

**E.**    **The Chapter 11 Case and the Backstop Investors' Objectives in Filing the Plan.**

**1.**    ***The Chapter 11 Case.***

On the Petition Date, the Debtor sought entry of several "first day orders" and filed applications or motions, and supporting pleadings with the Bankruptcy Court.  First day orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.  The following summary details many of the first day orders that were sought and the disposition of such orders after presentation to the Bankruptcy Court.

**a.**    **Bid Procedures.**

On the Petition Date, in addition to filing the Insider Plan, the Debtor filed a Motion for an

Order (i) approving bidding procedures in connection with the sale of the Property, (ii) scheduling an auction in connection thereto, and (iii) approving the form and manner of notice of the auction (the "Original Bid Procedure Motion").  By the Original Bid Procedure Motion, the Debtor sought authorization to sell substantially all of the Assets via an auction that would have required, among other things, a minimum cash bid of $256 million (the "Minimum Bid Threshold").  The Original Bid Procedure Motion provided that if no bids satisfying the Minimum Bid Threshold were received, the Lock-Up Agreement parties would have proceeded to effectuate the prearranged sale of the Property to a new entity owned by the Insiders under the Insider Plan.

Certain objectors, including certain of the Second Lien Parties, filed objections to the Original Bid Procedure Motion on several grounds, including that the procedures chilled, rather than encouraged bidding.[13]  On May 26, 2010, the Bankruptcy Court entered an Order denying the Original Bid Procedures Motion.[14]  On June 2, 2010, the Debtor filed a motion seeking approval of, among other things, amended bid procedures (the "Amended Bid Procedures Motion").[15]  On June 25, 2010, the Debtor withdrew the Amended Bid Procedures Motion.[16]

### b.    Cash Collateral.

On the Petition Date, the Debtor filed a motion for interim and final orders authorizing the Debtor's use of cash collateral and granting adequate protection in connection thereto (the "Cash Collateral Motion").[17]  According to the Debtor, it needed the ability to use cash collateral so that it could operate as a debtor and debtor in possession.  As of the Petition Date, the First Lien Lenders had enforceable Liens on all or substantially all of the Assets, including the Debtor's Cash on hand as of the Petition Date, and all Cash received by the Debtor during the Chapter 11 Case, which Cash constitutes "cash collateral" of the First Lien Lenders (the "Cash Collateral").  Under the Bankruptcy Code, the Debtor is prohibited from using, selling, or leasing cash collateral unless either the appropriate Creditors consent to such use of cash collateral, or the Bankruptcy Court approves the use of the cash collateral after notice and a hearing.  The Debtor negotiated with the

---

[13] *See, e.g.,* Docket No. 96.
[14] Docket No. 253.
[15] Docket No. 276.
[16] Docket No. 333.
[17] Docket No. 13.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1  First Lien Agent, on behalf of the First Lien Lenders, a stipulated consensual use of the Cash

2  Collateral.

3  By the Cash Collateral Motion, the Debtor sought to grant adequate protection to the First

4  Lien Agent on behalf of the First Lien Lenders for and equal in amount to the aggregate diminution

5  in value of the Prepetition Collateral, including, among other things, replacement liens in post-

6  petition collateral, payment of interest, professional fees and expenses and accrual of interest not

7  otherwise paid.  The Debtor also sought to grant adequate protection replacement liens to the

8  Second Lien Agent on behalf of the Second Lien Lenders.

9  On April 30, 2010, the Bankruptcy Court approved the Cash Collateral Motion on an interim

10  basis, subject to objection and a final order.[18]  On May 4 and 5, 2010, responses were filed,

11  including by certain of the Second Lien Parties, to the Cash Collateral Motion including on the

12  grounds that, as an undersecured creditor (*i.e.*, the First Lien Loan Claims significantly exceeded

13  the collateral securing such claims), the First Lien Lenders could not receive payment and accrual

14  of interest and payment of fees and expenses.  The Cash Collateral Motion was scheduled to be

15  heard by the Bankruptcy Court on May 10, 2010, but after the Bid Procedures Motion was denied,

16  the Debtor and the First Lien Parties adjourned the hearing to consider the Cash Collateral Motion

17  to June 11, 2010.  On June 11, 2010, after the Court granted the Exclusivity Motion (defined

18  below), the Debtor and the First Lien Parties again adjourned the hearing to consider the Cash

19  Collateral Motion, this time to July 7, 2010.

20  On June 10, 2010, the First Lien Agent filed a motion for relief from the automatic stay (the

21  "Lift Stay Motion")[19] to enable it to foreclose on the Property in the event the Bankruptcy Court,

22  among other things, granted the Exclusivity Motion (defined below).  Upon the Bankruptcy Court's

23  entry of the Exclusivity Order (defined below), the Lift Stay Motion was "triggered."

24  Thereafter, on June 25, 2010, the Debtor filed its (i) opposition to the Lift Stay Motion,

25  asking the Bankruptcy Court to allow the Plan to proceed to confirmation and (ii) emergency

26  motion for, among other things, the authority and approval to use cash collateral (the "Emergency

27

28  [18] Docket No. 83.
    [19] Docket No. 300.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

17

1 | Cash Collateral Motion").[20]

2 |     On July 9, 2010, the First Lien Agent filed (i) an amended motion for relief from the

3 | automatic stay (the "Amended Lift Stay Motion"),[21] and (ii) an objection to the Emergency Cash

4 | Collateral Motion (the "Cash Collateral Objection"),[22] both of which were scheduled for hearing on

5 | July 21, 2010 (the "July 21 Hearing").  On July 16, 2010, (i) the Second Lien Agent and the

6 | Backstop Investors, and (ii) the Debtor, each filed objections to the Amended Lift Stay Motion

7 | (together, the "Amended Lift Stay Objections").[23]  On July 19, 2010, the First Lien Agent filed an

8 | omnibus response to the Amended Lift Stay Objections,[24] and on July 20, 2010, the Second Lien

9 | Agent and the Backstop Investors filed their surreply to the First Lien Agent's omnibus response

10 | (the "Surreply").[25]

11 |     At the July 21 Hearing, the Court explained the legal burdens the First Lien Agent would

12 | have to satisfy in order to prevail on its Amended Lift Stay Motion.  Consequently, the parties

13 | agreed to continue the Amended Lift Stay Motion to the hearing to consider the Disclosure

14 | Statement.  The parties are in the process of attempting to negotiate a stipulated consensual use of

15 | cash collateral.

16 |            **c.**    **Stipulation for Turnover by Receiver.**

17 |     By stipulation filed on April 23, 2010 (the "Turnover Stipulation"), the Debtor, First Lien

18 | Agent and Receiver agreed, pursuant to Bankruptcy Code Section 543(a), that the Receiver's

19 | authority terminated and he was not to make any disbursement from, or take any action, in the

20 | administration of the Debtor's property.

21 |     Pursuant to Bankruptcy Code Section 543(b)(2) and the Turnover Stipulation, the May 3

22 | Receiver's Report contained a preliminary accounting detailing all property of the Debtor, including

23 | the Property, or proceeds, product, offspring, rents, or profits of such property, that, at any time,

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[20] The Debtor has been operating under consensual cash collateral stipulations agreed to by and between the Debtor, the First Lien Agent and the Second Lien Agent until the hearing to consider the Cash Collateral Motion on a final basis is conducted.
[21] Docket No. 378.
[22] Docket No. 373.  On July 19, 2010, the Debtor filed a reply to the Cash Collateral Objection (Docket No. 447).
[23] Docket Nos. 426 and 429.
[24] Docket No. 450.
[25] Docket No. 463.

came into the possession, custody or control of Receiver was filed.

On April 26, the Bankruptcy Court "So-Ordered" the Turnover Stipulation.[26]

### d.    Cash Management.

On the Petition Date, the Debtor filed a motion[27] seeking a Bankruptcy Court order approving continuation of its pre-petition cash management procedures and pre-petition bank accounts (the "Cash Management System"),[28] which Order was entered on April 30, 2010.[29]

### e.    Motion Not to Convene Meeting of Creditors Pursuant to 11 U.S.C. § 341(a) and to Set Claim Bar Dates and the 341 Notice.

On the Petition Date, the Debtor filed a motion requesting entry of an Order that the United States Trustee not convene a meeting of the Debtor's Creditors or Interest Holders pursuant to Bankruptcy Code Section 341(a) or (b) and setting bar dates for the respective Proofs of Claims to be filed (the "341 Motion").[30]  In the 341 Motion, the Debtor argued there was no need or basis for convening a meeting of Creditors or Interest Holders because (i) prior to commencing the Chapter 11 Case, the Debtor solicited acceptance of the Plan from the First Lien Lenders, the only Impaired Class entitled to vote to accept or reject the Insider Plan and (ii) the Second Lien Lenders would serve as a significant safeguard for the interests of the Holders of unsecured claims.

In addition, the 341 Motion sought to establish the following claim bar dates:  (i) a Priority Claims Bar Date, no later than 25 days prior to the date of the Confirmation Hearing, for the filing of Priority Claims or Priority Tax Claims; (ii) a deadline of thirty (30) days after the Effective Date of the Plan, for Filing requests for payment of Administrative Claims incurred after the Petition Date through the Effective Date, except Professional Fees; and (iii) a deadline of no later than twenty (20) days after the Effective Date of the Plan for Filing all final applications for compensation for Professional Fees.  Under the 341 Motion, failure to file a Proof of Claim by the applicable deadlines by any Holder of a Claim or Interest, whose Claim or Interest is not scheduled

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[26] Docket No. 60.

[27] Docket No. 9.

[28] According to the Debtor, prior to the Petition Date, the Debtor implemented the Cash Management System to provide an efficient means of moving funds through its corporate structure to cover its expenses and debts, as well as provide funds on an as-needed basis.

[29] Docket No. 84.

[30] Docket No. 12.

1    or scheduled as disputed, contingent, or unliquidated would result in disallowance of the Claim or

2    Interest and no Distribution to the Claim Holder.  The 341 Motion did not seek to establish a bar

3    date for general unsecured claims because the Insider Plan proposed to wipe out all general

4    unsecured claims.  The 341 Motion also sought to obviate the need for the Holders of First Lien

5    Loan Claims and Second Lien Loan Claims to file proofs of claim (the "Deemed Filed Request").

6        At the hearing to consider the 341 Motion, the Debtor withdrew its request to not convene a

7    341 meeting of creditors, and on May 7, 2010, the Bankruptcy Court entered an order granting the

8    341 Motion as it pertained to Priority (June 30, 2010) and Administrative Claim Bar Dates and the

9    Deemed Filed Request.[31]

10       Separately, in the Notice of Meeting of Creditors,[32] August 27, 2010 was set as the deadline

11   for all creditors, including General Unsecured Creditors, to file proofs of claim against the Debtor,

12   other than for governmental units who have a deadline of November 27, 2010.

13                **f.**       **Employment and Retention of Property Manager**

14       On the Petition Date, the Debtor filed an application for an Order authorizing the

15   employment of Commerce CRG of NV, LLC, doing business as CCRG/Cushman & Wakefield

16   Alliance ("C&W"), as property manager other than for the real property upon which the

17   Travelodge motel is situated (the "C&WApplication").[33]  Prior to the Petition Date, at the

18   Receiver's discretion and pursuant to the Receivership Order, the Receiver executed a property

19   management agreement with C&W to manage the Property.  In the C&W Application, the Debtor

20   opined that in its business judgment, (i) a property manager is essential to the Debtor's ability to

21   realize the value of the Property for the benefit of all Creditors and Interest Holders in the Chapter

22   11 Case, (ii) retention of C&W was necessary because the Debtor did not possess the requisite

23   licensing or expertise to manage the Property independently, and (iii) such services were necessary

24   to maintain the Debtor's shopping center facility, pending further action in the Chapter 11 Case.

25       On May 7, 2010, the Bankruptcy Court entered an interim Order,[34] and on May 13, 2010, the

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[31] Docket No. 146.
[32] Docket No. 3.
[33] Docket No. 10.
[34] Docket No. 145.

20

Bankruptcy Court entered a final Order, granting the C&W Application.[35]

### g.    Retention Applications

The Court also ruled on the following motions/applications filed by the Debtor, as follows:

    i.    Fox Rothschild LLP as the Debtor's general bankruptcy counsel-granted;[36]

    ii.    Greenberg Traurig, LLP as the Debtor's special real estate counsel-granted;[37]

    iii.    Sierra Consulting, LLC as the Debtor's financial advisor-granted;[38]

    iv.    Kent Appraisal Services as the Debtor's appraiser ("Kent")-granted;[39]

    v.    Employment/compensation of ordinary course professionals-denied.[40]

### h.    Other Motions.

On the Petition Date, the Debtor filed motions for entry of Orders with respect to the payment of certain employee claims and treatment of utility providers. On May 7, 2010 and May 10, 2010, the Court entered Orders granting those respective motions.[41]

### i.    Third Party Offer to Purchase Property.

On July 20, 2010, the Debtor received a Letter of Intent from Calmwater Capital, LLC ("Calmwater") proposing to purchase the Property on terms stated in the letter. The proposed purchase price for the Property in the Letter of Intent was $188,000,000, and Calmwater requested the following financing terms:

        Interest Rate: LIBOR + 2%
        Term: 10 years
        Amount: $173,000,000
        Non-recourse

The Letter of Intent stated that "In the event that Buyer does not receive Seller's countersignature below by 5:00 pm PST on July 30, 2010, this Letter of Intent shall automatically terminate." The Letter of Intent was not countersigned.

### 2.    The Backstop Investors' Actions

### a.    Motion to Terminate Exclusivity and Filing of Plan Documents.

---

[35] Docket No. 217.
[36] Docket No. 242.
[37] Docket No. 264 (as amended).
[38] Docket No. 216.
[39] Docket No. 215.
[40] Docket No. 190.
[41] Docket Nos. 144 and 191.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

The Second Lien Agent and certain of the Second Lien Lenders filed a motion for an order terminating the Debtor's exclusive periods to file, and solicit acceptances for, a plan (the "Exclusivity Motion").[42]  At the June 11 hearing to consider the Exclusivity Motion, the Court granted the Exclusivity Motion.  Thereafter on June 14, 2010, the Debtor withdrew the Insider Plan.[43]  On June 22, 2010, the Bankruptcy Court entered an Order granting the Exclusivity Motion (the "Exclusivity Order").[44]

On July 9, 2010, the Backstop Investors filed their first Plan,[45] Disclosure Statement[46] and the Motion to Approve Disclosure Statement and Solicitation Procedures,[47] along with their respective exhibits.

On July 13, 2010, the Backstop Investors filed an application seeking, among other things, a determination (i) that the Property Value as of the Effective Date is $188 million, (ii) that, subject to an 1111(b) Election, the First Lien Loan Claims are secured in the amount of $188 million as of the Effective Date, and (iii) of the amount of the First Lien Loan Claims (the "506 Application").[48]  On July 14, 2010, the Backstop Investors filed their first amended Plan.  On July 30, 2010, the Backstop Investors filed their second amended Plan.  The Backstop Investors' third amended Plan, filed contemporaneously herewith, is attached hereto as **Exhibit "A."**

At the July 21 Hearing, the Court set the hearing to consider the Disclosure Statement, the Motion to Approve Disclosure Statement and Solicitation Procedures and the 506 Application for August 27, 2010 and later continued the hearing to September 27, 2010 at 9:30 a.m. (PST) (the "September 27 Hearing").

        **b.**      **Trustee Motion.**

---

[42] Docket No. 118.
[43] Docket No. 318.
[44] Docket No. 324.
[45] Docket No. 374.
[46] Docket No. 375.
[47] Docket No. 376.
[48] Docket No. 395.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

On May 4, 2010, Huff filed a motion seeking the appointment of a chapter 11 trustee based on, among other things, the Insiders' alleged complete control of the Debtor, their alleged breach of fiduciary duties and their alleged self-dealing (the "Trustee Motion").[49]  On June 2, 2010, the Debtor[50] and the First Lien Agent[51] filed objections to the Trustee Motion.  The hearing to consider the Trustee Motion was later continued to July 19, 2010.  On June 28, 2010, the parties entered into, and submitted to the Bankruptcy Court, a stipulation seeking to continue the hearing on the Trustee Motion to a date after September 1, 2010.

### c.    Intercreditor Adversary Proceeding.

On April 30, 2010, the Second Lien Agent commenced an adversary proceeding (No. 10-01157-bam) (the "Adversary Proceeding") by filing a complaint against the First Lien Agent alleging that the First Lien Parties breached the Intercreditor Agreement, and therefore, the Second Lien Parties should not be bound by the Intercreditor Agreement.[52]

On June 7, 2010, the First Lien Agent filed an answer in the Adversary Proceeding,[53] and on June 28, 2010, the First Lien Agent filed an amended answer in the Adversary Proceeding and asserted certain counterclaims therein (the "Amended Answer").[54]  On July 19, 2010, the Second Lien Agent filed a motion to dismiss the counterclaims in the Amended Answer (the "Motion to Dismiss").[55]  On August 13, 2010, the First Lien Agent filed its opposition to the Motion to Dismiss (the "MTD Opposition")[56] and a motion for summary judgment in the Adversary Proceeding (the "SJ Motion").[57]  On August 20, 2010, the Second Lien Agent filed its reply to the MTD

---

[49] Docket No. 112.
[50] Docket No. 265.
[51] Docket No. 267.
[52] Docket No. 82.
[53] Docket No. 17.
[54] Docket No. 28.
[55] Docket No. 36.  The hearing to consider the Motion to Dismiss is currently scheduled for August 27, 2010.
[56] Docket No. 46.
[57] Docket No. 48.

1    Opposition.[58]  The Motion to Dismiss and the SJ Motion were both set to be heard at the September

2    27 Hearing.  A pre-trial conference is set for November 29, 2010 at 9:00 a.m. (PST) and the trial is

3    set for December 1-3, 2010, beginning each day at 9:30 a.m. (PST) other than December 2, 2010,

4    which will begin at 1:30 p.m. (PST).[59]

5         In connection with facilitating the settlement dialogue that led to the filing of this Plan

6    supported by the First Lien Lenders, the relevant parties, including the Debtor, the Backstop

7    Investors, and the First Lien Parties agreed to continue objection/response deadlines and hearing

8    dates in the Adversary Proceeding.  As set forth in the Stipulation and Order entered by the Court

9    on September 27, 2010,[60] the parties have agreed to abate all deadlines in the Adversary Proceeding

10   while they are pursuing confirmation and consummation of this Plan.

11        **3.    *The First Lien Lender Plan***

12        On August 13, 2010, LBBW filed the *First Lien Lenders' Chapter 11 Plan of*

13   *Reorganization Dated August 13, 2010* (the "First Lien Lender Plan")[61] and related *Disclosure*

14   *Statement for First Lien Lenders' Plan of Reorganization Dated August 13, 2010*  (the "First Lien

15   Lender Disclosure Statement").[62]  Immediately thereafter, LBBW filed its *Motion of LBBW for*

16   *Entry of an Order Approving (I) Disclosure Statement; (II) Solicitation Procedures; (III) Forms of*

17   *Ballots and Noticing Procedures; and (IV) Certain Dates with Respect Thereto*[63] along with a

18   motion for an order shortening time to consider it (the "First Lien Lender Disclosure Statement

19   Approval Motion").[64]  Four days later, the Court granted the motion for an order shortening time to

20

21

22

23

24

25   ---

     [58] Docket No. 63.
26   [59] *See Stipulation and Order Modifying Schedule in Adversary Proceeding* (Docket No. 33).
     [60] Docket No. 79.
27   [61] Docket No. 496.
     [62] Docket No. 497.
     [63] Docket No. 498.
28   [64] Docket No. 499.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

consider the First Lien Lender Disclosure Statement Approval Motion at a hearing on August 27, 2010.[65]

### 4. *The Settlement Between the Backstop Investors and the First Lien Lenders and the Resulting Resolution with NexBank, SSB*

In an effort to resolve the disputes underlying the competing plans filed by First Lien Parties and the Backstop Investors as well as the Adversary Proceeding, the First Lien Lenders and the Backstop Investors engaged in comprehensive settlement negotiations. The Court entered a Stipulation and Order to continue the August 27 Hearing to facilitate such negotiations.[66] Thereafter, the hearing to consider the matters previously set for the August 27 Hearing was rescheduled to September 27, 2010 at 9:30 a.m. (PST) and later rescheduled again to November 8, 2010 at 9:00 a.m. (PST).

Thereafter, the First Lien Parties and the Backstop Investors continued their settlement dialogue and, on September 21, 2010, the parties reached a settlement in principle, which is embodied in the Backstop Investor Plan. This Disclosure Statement describes that consensual Plan.

The Plan embodies a business plan to effectuate a rehabilitation and revitalization of the Property, including through the infusion of new money, to be committed to New Borrower in the form of the Capital Commitments, to fund tenant improvements, capital expenditures, leasing commissions, and the retention of a nationally recognized property manager, Urban Retail Properties, LLC ("Urban").

Equally as important, the Plan is the product of a negotiated settlement between the Backstop Investors and the First Lien Parties and will obviate the need for continued litigation both in the plan confirmation and Adversary Proceeding context. The First Lien Parties have agreed to be treated as secured lenders and will receive the New Secured Notes under the Plan. The Backstop Investors, in exchange for the Total Capital Contribution, will receive 100% of the New Borrower

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[65] Docket No. 509.
[66] Docket No. 532.

Parent Units, subject to the equity grants, purchase options and rights to be Distributed to the Holders in Class 5 and Class 6, to the extent such classes vote in favor of the Plan.

The Plan maximizes value for all of the Debtor's constituents and, by virtue of the resolution of the plan and Adversary Proceeding litigation that could have jeopardized the Debtor's reorganization, provides the best chance for the Debtor's constituents to receive Distributions in the most cost-effective and efficient process.  In the same vein, concurrently with the filing of the Plan and this Disclosure Statement:

(i)  the First Lien Parties will be supporting the Plan; and

(ii)  the Backstop Investors, in cooperation with the First Lien Parties will be filing a motion seeking expedited consideration of the Plan and this Disclosure Statement pursuant to Local Bankruptcy Rule 3017.

**F.**   **The Debtor's Assets and Liabilities.**

On the Petition Date, the Debtor filed its Schedules and Statements of Financial Affairs (as amended, the "Schedules").  On July 8, 2010, the Debtor filed amended Schedules.  Copies of the Schedules are attached hereto as **Exhibit "F."**  The Schedules, which may be amended from time to time, identify the Debtor's known assets and liabilities as of the Petition Date.  Pursuant to the Schedules, the Debtor's Assets are valued at approximately $137,700,000 and the Debtor has scheduled approximately sixty (60) creditors with Claims totaling approximately $502,600,000.  Among the more significant assets and liabilities listed in the Schedules are the following:

**1.**   *Assets.*

**a.**   **The Real Property.**

The Debtor owns the Property described above.  On June 2, 2010, the Debtor filed the Kent Report valuing the Property as follows:  (1) assuming a number of factors including the Debtor's net operating income doubling to $14,970,676, a fair value of $235,095,000; and (2) a liquidation value of $137,700,000.  On July 9, 2010, the First Lien Agent filed the (i) *Declaration of Keith*

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

*Harper*, which attached an appraisal of Snyder Valuation, the First Lien Agent's retained appraiser, who valued the Property at $183 million,[67] and (ii) *Declaration of Randall A. Fine* ("Fine Dec."), in which Mr. Fine opined that the Property Value declined by approximately $5 million since the Petition Date.[68]

### b.    Cash and Accounts Receivable.

According to the Debtor:  (1) as of March 29, 2010, the Debtor had approximately: $1,500.00 in cash in its Travelodge Daily Opening Cash Drawer, $205,313.98 in the Travelodge Account, and $4,839.27 in the Debtor's Operating Account;[69] and (2) as of February 28, 2010, there was $767,133.47 in the Security Deposit Account.[70]  The Schedules list approximately $521,816.83 in accounts receivable as of February 28, 2010, the collectible amount of which is unknown.

### c.    Other Personal Property.

According to the Debtor, all of its other assets such as office equipment, furnishing, and supplies are *de minimis* in value.  Other personal property such as prepaid expenses will be in the approximate amount of $545,302, as of March 29, 2010.

### 2.    *Liabilities.*

According to the Debtor, it has two primary liabilities:  the First Lien Loan Claims in the approximate amount of $270,752,852.35 and the Second Lien Loan Claims in the approximate amount of $233,155,094.16.  In addition, the Debtor owes approximately $347,459.46 to Holders of Trade Unsecured Claims.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

---

[67] Docket No. 382.
[68] *See* Docket No. 380.  The Backstop Investors do not believe or concede that the Property Value has decreased in any respect since the Petition Date.
[69] The "Debtor's Operating Account" means the FX I account at Bank of America (Account No. 004964929401).
[70] "Security Deposit Account" means the restricted account to be established by New Borrower to hold security deposits received from tenants of the Property.

On July 29th, 2010, the Court approved a stipulated order terminating the automatic stay to allow a lawsuit to proceed against the Debtor.[71]  Pursuant to the stipulated order, the plaintiffs will be allowed to pursue the Debtor only as a nominal defendant, and "any portion of the [plaintiffs'] claims or causes of action that are not fully satisfied by the available insurance policy of Debtor are forever waived and discharged as against Debtor, even if the [plaintiffs] are unable to obtain any recovery from the insurance policy."

On August 13, 2010, a separate personal injury lawsuit was filed naming the Debtor among the defendants.  The lawsuit was filed while the automatic stay was in effect, and the plaintiffs have not filed any claim in the Chapter 11 Case, nor have the plaintiffs filed any motion to modify the automatic stay.  The Debtor has authorized its counsel to offer the plaintiffs the opportunity to enter into a stipulation and order similar to the one entered on July 29, 2010, which would modify the stay on a *nunc pro tunc* basis so that the plaintiffs' suit may proceed as to the Debtor, provided, however, that the plaintiffs agree that they will only seek damages against the Debtor up to insurance policy limits.

<div align="center">

**ARTICLE IV.**

**DESCRIPTION OF CHAPTER 11 REORGANIZATION PLAN**

</div>

**A.**     **Overall Structure of the Plan**.

Under the Plan, Claims against, and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.  If the Bankruptcy Court confirms the Plan and it is consummated, the Holders of Allowed Administrative, Allowed Priority Tax, Allowed Priority Claims, and Allowed Trade Unsecured Claims will receive Distributions in Cash equal to the full amount of their Claims or have their Claims assumed by New Borrower (or otherwise be unimpaired under the Plan).  The First Lien Loan Claims, the Second Lien Loan Claims, and the Old Membership Interests are Impaired and will receive Distributions (in the case of the Old

---

[71] Docket No. 484.

<div style="writing-mode: vertical">

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

</div>

Membership Interests, in the event it votes in favor of the Plan) as described herein and in the Plan.

**B.    Classification and Treatment of Claims and Interests Under the Plan.**

Section 1123 of the Bankruptcy Code provides that a plan must classify the Claims and Interests of a debtor's Creditors and Interest Holders.  Therefore, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Backstop Investors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest in that Class is Allowed and has not been paid, released or otherwise settled prior to the Effective Date.

**1.    *Unclassified Claims.***

**a.    Administrative Claims.**

Administrative Claims are unpaid Claims for costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses, including but not limited to, Professional Fees, Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estate pursuant to chapter

29

123 of the Judicial Code and 28 U.S.C. § 1930; and (d) all Bankruptcy Court-approved requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

As set forth in Section 2.2(a) of the Plan, subject to sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Claim shall either:  (i) be paid in Cash in the Allowed amount of any such Claim on, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date upon which such Administrative Claim becomes Allowed, or (c) such date as is otherwise agreed by New Borrower and the Holder of such Claim; or (ii) have such Claim assumed by New Borrower, to be paid in Cash in the Allowed amount of any such Claim on, or as soon as reasonably practicable after, the later of (a) the date upon which such Administrative Claim becomes Allowed, (b) the date on which such Administrative Claim becomes due in the ordinary course of business, or (c) such date as is otherwise agreed by the Debtor, New Borrower and the Holder of such Claim.  Notwithstanding the foregoing or anything to the contrary in the Plan:  (1) Debtor shall pay, or cause to be paid, all accrued fees payable under 28 U.S.C. § 1930 on or before the Effective Date of the Plan; (2) all final applications for Fee Claims constituting amounts due for services rendered on or before the Effective Date shall be Filed no later than twenty (20) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; and (3) following the Effective Date, the Debtor shall be responsible for timely payment of all United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Final Decree closing the Chapter 11 Case is entered and all quarterly fees due as of the Confirmation Date are paid in full.  Notwithstanding anything to the contrary in the Plan, the Debtor shall File with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the Chapter 11 Case remains open in such format as reasonably may be required by the United States Trustee.

### b.    **Priority Tax Claims**.

Priority Tax Claims are any Claims that are entitled to priority under section 502(i) or section 507(a)(8) of the Bankruptcy Code.  Priority Tax Claims do not include *ad valorem* tax Claims if such Claims under applicable state law are Secured by a Lien on the Assets.  The legal

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

30

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    and equitable rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan.  Each

2    Holder of an Allowed Priority Tax Claim shall, subject to <u>Section 2.2(b)</u> of the Plan, either:  (i) be

3    paid the Allowed amount of such Claim in Cash on the Effective Date, (ii) have such Claim assumed

4    by New Borrower, to be paid by New Borrower in Cash in the Allowed amount of any such Claim

5    on the date on which such Claim is payable under applicable law or any agreement relating thereto;

6    or (iii) receive such other treatment as is agreed by the Holder of the Allowed Priority Tax Claim,

7    the Debtor, and New Borrower.

8        **2.**    ***Classified Claims.***

9          **a.**    <u>**Class 1 − Priority Claims**</u>**.**

10        Class 1 consists of Priority Claims against the Debtor which are Allowed Claims entitled to

11    priority under sections 502(a)(2) through (7) of the Bankruptcy Code.  The legal and equitable

12    rights of the Holders of Allowed Priority Claims are unaltered by the Plan.  As set forth in <u>Section</u>

13    <u>2.3(a)</u> of the Plan, each Holder of an Allowed Priority Claim shall, either: (a) be paid the Allowed

14    amount of such Claim in Cash on the Effective Date, (b) have such Claim assumed by New

15    Borrower, to be paid by New Borrower in Cash in the Allowed amount of any such Claim on the

16    date on which such Claim is payable under applicable law or any agreement relating thereto; or (c)

17    receive such other treatment as is agreed by the Holder of the Allowed Priority Claim and the

18    Debtor or New Borrower.

19        Class 1 is not Impaired and the Holders of Allowed Priority Claims are conclusively deemed

20    to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the

21    Holders of Class 1 are not entitled to vote to accept or reject the Plan.

22          **b.**    <u>**Class 2 − Other Secured Claims**</u>**.**

23        Class 2 consists of Other Secured Claims against the Debtor.  As set forth in <u>Section 2.3(b)</u>

24    of the Plan, Holders of Allowed Other Secured Claims shall have such Claim reinstated pursuant to

25    section 1124(2) of the Bankruptcy Code and/or assumed by New Borrower on the Effective Date

26    such that the Claim is rendered unimpaired, except to the extent that the Holder agrees to less

27    favorable treatment.  The failure of the Debtor, New Borrower, or any other party-in-interest

28    (including the First Lien Lenders or New Borrower Parent) to File an objection, prior to the

Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan shall be without prejudice to the rights of New Borrower or any other party-in-interest (including New Borrower Parent) to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable) when and if such Claim is sought to be enforced. Any Cure amount that the Debtor and/or New Borrower may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder and the Debtor or New Borrower.

Class 2 is not Impaired and the Holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 are not entitled to vote to accept or reject the Plan.

<div align="center">

**c.**    <u>**Class 3 − First Lien Secured Claims.**</u>

</div>

<div align="center">

(i)   <u>General</u>

</div>

Class 3 consists of the First Lien Loan Claims against the Debtor. As set forth in <u>Section 2.3(c)</u> of the Plan, on the Effective Date, each First Lien Lender shall receive, in full satisfaction, settlement, release and exchange for Allowed First Lien Secured Claims, a Distribution, subject to the terms of the New Co-Lender Agreement, of the New Secured Loan evidenced by the New Secured Notes. The New Secured Notes will be distributed as follows:

(a)    Holders of the First Lien A-Note Claims shall receive a *pro rata* distribution of:

     i.   100% of the New A-Note based on their *pro rata* share of the First Lien A-Note Claims; and

     ii.   The A-Note Percentage of the New B-Note based on their *pro rata* share of the First Lien A-Note Claims; and

(b)    Holders of the First Lien B-Note Claims shall receive a *pro rata* distribution of the B-Note Percentage of the New B-Note.

In addition, the Property Upside Profits Interest and the Equity Upside Profits Interest will be Distributed to the First Lien Lenders (or otherwise become effective) as set forth in the New Secured Credit Agreement and the New Borrower Parent LLC Agreement.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

(ii)    Features of the New A-Note and New B-Note

a.    New A-Note – Original principal amount of $188 million, bearing a fixed interest rate of 3.95% per annum (subject to adjustments in accordance with the New Secured Credit Agreement).

b.    New B-Note – Original principal amount of $71 million *plus* an amount not greater than $7.5 million reflecting certain unpaid interest as of the Effective Date, bearing a fixed interest rate of 2.50% per annum (subject to adjustments in accordance with the New Secured Credit Agreement).

c.    The New A-Note and the New B-Note will be secured by the same collateral that currently serves as the First Lien Lenders' collateral (including the Property).

d.    100% of the interest payments made on the New B-Note will amortize the principal amount of the New B-Note on a dollar-for-dollar basis.

e.    The form of the New A-Note is attached hereto as **Exhibit "G-1,"** the form of the New B-Note is attached hereto as **Exhibit "G-2,"** and the form of the New Secured Credit Agreement is attached hereto as **Exhibit "H."**  In addition, the Investors will enter into, on a joint and several basis, an Interest Payment Guaranty in connection with the New A-Note and the New B-Note substantially in the form attached hereto as **Exhibit "J."**  A form of the Contribution and Indemnity Agreement that will be executed and delivered by the Investors in connection with the Interest Payment Guaranty is attached hereto as **Exhibit "K."**

Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

Notwithstanding anything else contained in the Plan, all Distributions to be made to Holders of Allowed Class 3 Claims shall be subject to the terms and conditions of the Co-Lender Agreement.

d.    **Class 4 − Trade Unsecured Claims.**

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Class 4 consists of General Unsecured Claims against the Debtor that are not Second Lien Loan Claims.  The legal and equitable rights of the Holders of Allowed Trade Unsecured Claims are unaltered by this Plan.  As set forth in <u>Section 2.3(d)</u> of the Plan, each Holder of an Allowed Trade Unsecured Claim shall, either: (i) be paid the Allowed amount of such Claim in Cash on the Effective Date, (ii) have such Claim assumed by New Borrower, to be paid by New Borrower in the amount and on the date on which such Claim is payable under applicable law or any agreement relating thereto; or (iii) receive such other treatment as is agreed by the Holder of the Allowed Trade Unsecured Claim, Debtor, and the First Lien Agent.

If you hold a Trade Unsecured Claim and timely filed a proof of claim in the Chapter 11 Case, New Borrower will retain the right under the Plan to contest the validity of your Claim after the Effective Date.  No Distribution will be made on any such Disputed Claim on the Effective Date.

Class 4 is not Impaired and the Holders of Trade Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 are not entitled to vote to accept or reject the Plan.

e.    <u>Class 5 − Second Lien Loan Claims.</u>

Class 5 consists of Second Lien Loan Claims.  As set forth in <u>Section 2.3(e)</u> of the Plan, assuming Class 5 votes to accept the Plan, each Holder of a Second Lien Loan Claim shall, in full satisfaction, settlement, release and exchange for such Allowed Second Lien Loan Claim be entitled to elect to receive one of the following two treatments:  (A) Distribution of the Class 5 Equity Option consisting of (i) a *Pro Rata* right to participate in the Class 5 Purchase Option, (ii) a *Pro Rata* Distribution of the Class 5 Equity Grant, and (iii) *a Pro Rata* Distribution of the Class 5 Rights; or (B) a *pro rata* sharing of the Cash Option based on the amount of Allowed Class 5 Claims that elect the Cash Option.  The Backstop Investors, in their capacity as Second Lien

Lenders, shall be deemed to have elected the Class 5 Equity Option and waived their respective rights to elect to participate in the Cash Option.

Notwithstanding, in the event Class 5 does not vote for the Plan, each Holder of a Second Lien Loan Claim, including the Backstop Investors in their capacity as Second Lien Lenders, shall, in full satisfaction, settlement, release and exchange for such Allowed Second Lien Loan Claim, be deemed to have elected and shall receive its *Pro Rata* share of the Cash Option.

Notwithstanding anything to the contrary, all Distributions to be made under this Plan to Second Lien Lenders shall be made to the Second Lien Agent to be distributed in accordance with and subject to the terms and conditions of the Second Lien Credit Agreement including satisfaction of obligations to pay fees and expenses of the Second Lien Agent.

Class 5 is Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

### f.    Class 6 − Interests.

Class 6 consists of all Interests held in the Debtor, which class includes any: (a) equity security, including all membership interests together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company or similar interest.  As set forth in Section 2.3(f)(ii) of the Plan, the treatment of the Allowed Interests in Class 6 depends on whether Class 6 votes in favor of the Plan, as follows:

(a) If Class 6 votes to accept the Plan, the Holder of the Old Membership Interests, in full satisfaction, settlement, cancellation, release and exchange for the Old Membership Interests, shall receive (i) the Class 6 Rights, and (ii) the Class 6 Purchase Option.

(b) If Class 6 does not vote to accept the Plan, the Holder of the Old Membership Interests will not receive any Distribution under the Plan.

Whether treated under Section 2.3(f)(ii)(A) or (B) of the Plan, upon the Effective Date, the Old Membership Interests shall be extinguished and cancelled without further action by the Debtor

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

35

or notice to such Holder being necessary.  Class 6 is Impaired and Holders of Class 6 Interests are entitled to vote to accept or reject the Plan.

**C.**     **Means of Implementation of Plan.**

   **1.**     *Plan Implementation.*

   The Plan shall be implemented in all respects in a manner that is consistent with the terms and conditions of the Operative Documents, including the LLC agreements governing New Borrower and New Borrower Parent and as described in the Plan and this Disclosure Statement. Forms of the New Borrower LLC Agreement and the New Borrower Parent LLC Agreement are attached hereto as **Exhibits "L" and "M,"** respectively.  In order to implement the Plan, the Investors will invest the Initial Capital Contribution of up to $1.75 million in New Borrower Parent to be paid to New Borrower to pay costs and expenses to consummate the Plan.

   The New Borrower Parent Units will be owned 100% by the Backstop Investors, subject to the following:  (i) 6% of the New Borrower Parent Units will be offered for sale to the Holder of the Old Membership Interests in the form of the Class 6 Purchase Option; (ii) 84% of the New Borrower Parent Units will be offered for sale to the Second Lien Loan Creditors in the form of the Class 5 Purchase Option; and (iii) 10% of the New Borrower Parent Units will be granted to the Second Lien Loan Creditors in the form of the Class 5 Equity Grant.  The Offering Memorandum, Subscription Agreement and the New Borrower Parent UPA, substantially in the forms that will describe and be used to implement the sale and allocation of the New Borrower Parent Units are attached hereto as **Exhibits "N," "O"** and **"P,"** respectively.  In addition the Rights will be issued (a) assuming Class 5 votes to accept the Plan, to the Holders of Allowed Claims in Class 5 that elect the Class 5 Equity Option and (b) assuming Class 6 votes to accept the Plan, to the Holder of the Old Membership Interests in Class 6.  The Class 5 Rights Agreement and the Class 6 Rights Agreement, substantially in the form that will be used to issue and allocate the Rights, are attached hereto as **Exhibits "Q" and "R,"** respectively.

   On July 30, 2010, the Backstop Investors selected Urban as the New Property Manager, and began setting a framework for the New Property Manager Agreement, under which the New Property Manager will manage the Property after the Effective Date.  The Business Plan that has

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

been prepared by Urban is attached hereto as **Exhibit "T."** The Backstop Investors will be filing a form of the New Property Management Agreement as an exhibit to the Plan Supplement.

Urban is a privately held company, headquartered in Chicago, Illinois with a long and successful track record of providing third-party management and leasing services to large institutional clients for retail properties nationwide. Urban's retail portfolio includes 43 properties with more than 13.8 million square feet of space in 20 states. Aside from its expertise in managing and leasing a variety of retail assets including regional malls, community centers, big box, strip centers, and mixed-use projects, Urban has Las Vegas-specific expertise through its prior management of the Desert Passage at the Aladdin shopping center situated immediately to the South of the Property on Las Vegas Boulevard. In addition, Ron Simkin, a member of Urban's leasing team was previously responsible for leasing at the Belz Outlet Mall in Las Vegas. Urban has agreed to assign a team of seasoned management and leasing professionals to managing the Property, including Mr. Simkin. For more than 35 years, Urban has developed highly effective and proven asset transfer, cost containment, tenant stabilization, and leasing strategies. These key strategies, combined with management oversight, regional office support, robust accounting and financial reporting systems, onsite personnel and strong retail relationships, will allow Urban to effectively stabilize, run and lease the Property, thereby enhancing its value and profitability.

The Backstop Investors have each agreed to sell to Urban a non-ownership interest in their distributions to be received from New Borrower, including the distributions from the sale or refinancing of the Property. Urban and the Backstop Investors will execute a separate agreement setting forth the terms of this transaction.

**2.      *Reorganization.***

On the Effective Date, the Debtor shall be reorganized and shall be the New Borrower under the New Secured Loan Documents. Simultaneously therewith, the Mortgage, as amended and restated, shall be recorded in Clark County, Nevada. The form of Mortgage is attached hereto as **Exhibit "I."** The Debtor and New Borrower shall have all the power to take all actions necessary to effectuate and consummate the transaction contemplated by the Plan under applicable state laws in addition to all the rights, powers and responsibilities conferred by the Bankruptcy Code, the Plan

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

37

and any Final Orders of the Bankruptcy Court.  Except as expressly agreed to otherwise by New Borrower or as provided in the Plan or the New Secured Loan Documents, beginning on the Effective Date, the Assets will be owned by New Borrower free and clear of all Liens (except for the Mortgage and any Liens for *ad valorem* taxes not yet due and payable and Permitted Encumbrances) and Claims (other than Claims which have been assumed by New Borrower), but subject to easements, restrictions, conditions and limitations of record that affected the title to the Property as of the Petition Date, any Liens securing Other Secured Claims that are reinstated or assumed by New Borrower, and any such matters arising after the Petition Date which have been approved by New Borrower.  The Confirmation Order shall, among other things, constitute an Order authorizing the managers, officers, and agents of the Debtor, New Borrower, and New Borrower Parent to execute and deliver the Operative Documents, as applicable (to the extent they have not already been executed and delivered), including without limitation all documents necessary to, on or prior to the Effective Date, rename New Borrower as may be agreed by the Backstop Investors, without requiring any further corporate authorizations and notwithstanding the requirements under any applicable non-bankruptcy law.  The Confirmation Order shall, among other things, provide that: (i) the First Lien Lenders, New Borrower, New Borrower Parent, and the Investors have acted in good faith; (ii) the Distributions and/or consideration received by the Investors and the Holders of Allowed Claims shall not be subject to avoidance, turnover, or disgorgement in any subsequent insolvency proceeding by any Entity; and (iii) the Mortgage constitutes a valid first priority Lien, subject only to any Permitted Encumbrances.

   **3.    *Assumption of Liabilities.***

   On the Effective Date, and subject to any applicable bar dates described herein, unless such Claims shall be paid or Disallowed on or prior to such date, New Borrower shall be deemed to have assumed any Claim that is an Administrative Claim, a Priority Tax Claim, a Trade Unsecured Claim, or a Priority Claim (including any such Claims that are Disputed Claims or with respect to which any applicable period for asserting a Claim has not expired), and all Other Secured Claims will be reinstated and assumed by New Borrower pursuant to and in accordance with the terms of the Plan.  New Borrower shall be obligated to honor and satisfy all such assumed or reinstated

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Claims solely if and to the extent such Claims are Allowed Claims or become Allowed Claims.  The failure of the New Borrower to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan or with respect to any Claims that are assumed by New Borrower under the Plan, shall be without prejudice to the rights of New Borrower or any other party-in-interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court or any other applicable state or federal court) when and if such Claim is sought to be enforced.  Except as set forth in the Operative Documents and the Plan, New Borrower shall have no liability for Claims against or Interests in the Debtor (whether or not currently known) stemming from the Debtor's reorganization, unless such Claims have expressly been assumed pursuant to the terms of the Plan.

**4.**    ***Cancellation of Interests.***

On the Effective Date, the Old Membership Interests shall be cancelled and be of no further force or effect, without any further action being required to effect such cancellation.  Following the cancellation of the Old Membership Interests, the Holder of such Interests shall have no rights arising from or relating to such Interests or the cancellation thereof unless as otherwise set forth in the Plan.

**5.**    ***Subsequent Sale or Transfer of the Property.***

The Property Upside Profits Interest shall, under certain conditions, provide that some proceeds from an initial sale or transfer of the Property be paid to the First Lien Agent.  The New Secured Credit Agreement and the formation documents for New Borrower and New Borrower Parent will provide that proceeds of any sale or transfer of the Property, any refinancing of the indebtedness, or receipt of specified excess casualty or condemnation proceeds under the New Secured Credit Agreement, shall be applied in accordance with a waterfall to be set forth in the New Secured Credit Agreement.  After giving effect to such waterfall, excess proceeds will then be distributed four percent (4%) to the First Lien Agent and ninety-six percent (96%) to the transferor up to certain values and thereafter ten percent (10%) to the First Lien Agent and ninety percent (90%) to the transferor.  Proceeds received by the First Lien Agent pursuant to the Property Upside

Profits Interest will be reduced to the extent that prior to such sale, transfer or refinancing of the Property there were certain transfers of membership interests in New Borrower Parent subject to the Equity Upside Profits Interest.

The Equity Upside Profits Interest shall, under certain conditions, provide that some proceeds from specified direct or indirect sales or transfers of the membership interests in New Borrower Parent will be distributed four percent (4%) to the First Lien Agent and ninety-six percent (96%) to the transferor up to certain values and thereafter ten percent (10%) to the First Lien Agent and ninety percent (90%) to the transferor.

**6.** ***Discharge and Injunction.***

**a.** **Discharge of the Debtor.**

Except as provided in the Plan or Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims and Interests.  Except as provided in the Confirmation Order, Confirmation discharges the Debtor and/or New Borrower from all Claims or Interests, or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:  (a) a proof of claim based on such debt is filed or deemed to be filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim based on such debt has accepted the Plan.

**b.** **Injunction.**

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all Entities and Persons that have held, currently hold or may hold a debt, Claim, other liability or Interest against or in the Debtor are permanently enjoined from taking any of the following actions on account of such debt, Claim, liability, Interest or right:  (i) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, liability,

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Interest or right against Assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a Distribution with respect to such Assets or the proceeds thereof as provided under the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any Assets retained by New Borrower or distributed to Holders of Claims under the Plan, other than as permitted under subparagraph (i) above; and (iii) creating, perfecting or enforcing any Lien or encumbrance against any Assets retained by New Borrower or distributed under this Plan, other than as permitted by the Plan.

On and after the Effective Date, each Holder of any Claim against or Interest in the Debtor is permanently enjoined from taking or participating in *any* action that would interfere or otherwise hinder the Debtor from implementing the Plan, the Confirmation Order or any Operative Documents in accordance with the terms thereof.

**7.** *Exemption From Certain Transfer Taxes and Further Transactions.*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance or exchange of any security, or the making or delivery of any instrument of transfer under, in furtherance, or in connection with the Plan, including, but not limited to, any deeds, bills of sale, assignments or other instruments of transfer (including those with respect to the Property), shall not be subject to any stamp tax, real estate transfer tax or similar tax. As such, the New Borrower Interests and the New Borrower Parent Units issued in connection with the Plan are exempt under section 1146(a) of the Bankruptcy Code.

**8.** *Final Decree.*

Notwithstanding otherwise applicable law, the Debtor shall not request entry of the Final Decree, unless such provision(s) are waived by the Backstop Investors and the First Lien Agent, until:

(a) All adversary proceedings and contested matters pending before the Bankruptcy Court have been resolved by a Final Order;

(b) All Claims have either: (i) become Allowed Claims and have been paid in accordance with the treatment to be given such Allowed Claim pursuant to the Plan; (ii) been disallowed by a Final Order or deemed to be a Disallowed Claim in accordance with the terms of

41

the Plan; or (iii) been assumed by New Borrower or reinstated;

(c)    All Distributions to be made by the Debtor to Holders of Allowed Claims shall have been made by the Distribution Agent in accordance with the requirements of the Plan; and

(d)    The Initial Capital Contribution, to the extent applicable, has been disbursed to New Borrower to be distributed in accordance with the Plan and the New Borrower Interests, the New Borrower Parent Units, and the Rights have been issued.

(e)    The Operative Documents are finalized.

## 9.    *Effectuating Documents, Further Transactions.*

On and after the Effective Date, New Borrower, New Borrower Parent, the Investors and the agents, officers, and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of New Borrower and New Borrower Parent, as applicable, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.  Without limitation of the foregoing, on the Effective Date, (a) New Borrower is authorized and directed to effectuate cancellation of the Old Membership Interests and issue the New Borrower Interests, (b) New Borrower Parent is authorized and directed to issue the New Borrower Parent Units and the Rights and (c) the agents, managers and officers of New Borrower and New Borrower Parent are authorized and directed to execute and file the Amendments to the Certificate of Formation of New Borrower (including, if required, to reflect the appropriate change of name of New Borrower) with the Secretary of State of Nevada and to execute and file, if required, all other documents, instruments and agreements necessary to effectuate the Plan.

## 10.    *Adequate Protection Liens.*

As of the Effective Date, any replacement liens granted as adequate protection pursuant to the terms of Interim Cash Collateral Order and the Final Cash Collateral Order shall be deemed to be eliminated and of no further force and effect.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

D.      **Provisions Concerning Plan Distributions.**

     1.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Effective Date.

     2.      *Distributions on Account of Claims Allowed After the Effective Date.*

        a.      **Payments and Distributions on Disputed Claims.**

In the event that there are Disputed Administrative Claims or Disputed Priority Claims requiring adjudication and resolution and such Claims have not become Allowed or Disallowed prior to the Effective Date, then the obligation to satisfy such Claims will be assumed by New Borrower, subject to Allowance or Disallowance by the Bankruptcy Court.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Agent, any Disputed Claim that becomes Allowed after the Effective Date shall be satisfied or performed by New Borrower in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

        b.      **Special Rules for Distributions to Holders of Disputed Claims.**

Except as otherwise provided in the Plan and except as otherwise agreed by the relevant parties:  (i) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

     3.      *Distributions to Second Lien Lenders.*

Notwithstanding anything to the contrary, all Distributions to be made to Second Lien Lenders under the Plan shall be made to the Second Lien Agent to be distributed in accordance with and subject to the terms and conditions of the Second Lien Credit Agreement including satisfaction of obligations to pay fees and expenses of the Second Lien Agent.

     4.      *Manner of Payment Under the Plan.*

Distributions of Cash to be made by the Distribution Agent pursuant to the Plan shall be

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

43

made, at the discretion of the Distribution Agent, by check drawn on the Distribution Agent's bank account or by wire transfer from a domestic bank.

**5.** *Whole Dollars.*

Any other provision of the Plan to the contrary notwithstanding, no payments of cents will be made. Whenever any payment of cents would otherwise be called for, the actual payment may reflect a rounding of such fraction to the nearest whole dollar (up or down).

**6.** *Escheat.*

Holders of Allowed Claims shall have three (3) months from the check date to negotiate Distribution checks issued by the Distribution Agent under the terms of the Plan, otherwise payment on such checks may at the Distribution Agent's sole discretion be stopped and the funds shall escheat to the Distribution Agent and shall be promptly distributed to New Borrower, in accordance with section 347 of the Bankruptcy Code.

**7.** *Delivery of Distributions.*

**a.**    <u>Record Date for Distributions</u>.

On the Distribution Record Date, the Claims Register shall be closed and any Person responsible for making Distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make Distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

**b.**    <u>Distribution Agent</u>.

The Distribution Agent and/or New Borrower shall make all Distributions required under the Plan.

**c.**    <u>Delivery of Distributions in General</u>.

Notwithstanding any other provision of the Plan (including <u>Sections 6.7 and 6.9</u>), all Distributions of Cash or other consideration to Holders of (i) Claims in Class 3 shall be made to First Lien Agent for the benefit of First Lien Lenders or as otherwise directed by First Lien Agent,

44

and (ii) Second Lien Loan Claims shall be made to the Second Lien Agent to be distributed pursuant to the terms and conditions of the Second Lien Credit Agreement including satisfaction of obligations to pay fees and expenses of the Second Lien Agent.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, Distributions to all other Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date:  (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtor has been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Case on the Holder's behalf.  Except as otherwise provided in the Plan, Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  Absent willful misconduct or gross negligence, the Debtor, New Borrower, New Borrower Parent, the Investors, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, and the Distribution Agent, as applicable, shall not incur any liability on account of any Distributions made under the Plan.

### 8.     *Returned Distributions.*

In the case of Cash Distributions to the Holders of Allowed Claims that are returned to the Distribution Agent due to an incorrect or incomplete address, the Distribution Agent shall retain any such returned Cash Distribution in a segregated account established by the Distribution Agent to keep track of any returned Distributions.  Unless the Holder of the Allowed Claim relating to any such returned Cash Distribution contacts the Distribution Agent (or its designee) within three (3) months from the date on which such Cash Distribution was returned and provides the Distribution Agent (or its designee) with acceptable proof of identity and an accurate address, such Holder shall

forfeit all rights thereto, and to any and all future Cash Distributions or rights under the Plan. In such event, the Claim for which such Cash Distributions was issued shall be treated as a Disallowed Claim and the Cash Distribution on account of such Disallowed Claim shall promptly be distributed to New Borrower.

**9.      *Disputed Distributions.***

In the event of any dispute between or among Holders of Claims or Interests as to the right to any Holder of a Claim or Interest to receive or retain any Distribution to be made to such Holder under the Plan, the Distribution Agent or New Borrower, in lieu of making such Distribution to such Holder shall hold such Distribution pending the resolution thereof.

Any party in interest that fails to raise such dispute by filing an appropriate request for relief with the Bankruptcy Court prior to the issuance of such disputed Distribution by the Distribution Agent shall be deemed to have forever waived any right to dispute such Distribution or to enjoin, impair or otherwise restrict the use of any such Distribution.

**10.      *Setoffs.***

The Distribution Agent may, but shall not be required to, set-off against any Cash Distributions to be made pursuant to the Plan to a Holder of an Allowed Claim, Claims of any nature whatsoever that the Debtor may have, or may have had, against such Holder that have not been previously released, but neither the failure to do so, nor the allowance of any Claim held by such Holder shall constitute a waiver or release by the Distribution Agent of any such Claim, the Debtor may have, or may have had, against such Holder.

**11.      *Withholding Taxes.***

The Distribution Agent shall be entitled to deduct any applicable federal or state withholding taxes from any payments made with respect to Allowed Claims, as appropriate, and shall otherwise comply with section 346 of the Bankruptcy Code.  In connection with the consummation of the Plan, the Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  In the event that any Holder of an Allowed Claim fails to provide the Distribution Agent with tax or withholding information (such as

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

46

a completed W-9 form) within three (3) months from the date of the Distribution Agent's initial request for such information from such Holder, then such Holder shall forfeit any and all rights to receive any distribution otherwise provided for under this Plan.

**12.**     *Allocation of Distributions.*

Distributions on account of Allowed Claims shall, for tax purposes, be treated as allocated first to principal, and thereafter to interest only to the extent that the entire principal amount has been recovered, if applicable.

**E.**     **Certain Terminations and Releases.**

**1.**     *Certain Terminations.*

On the Effective Date, all instruments evidencing Claims against, or Interests in the Debtor held by Holders of Claims or Interests that are Impaired by the Plan shall be deemed canceled as against the Debtor and New Borrower.

**2.**     *Rights If Plan Not Confirmed.*

If Confirmation of the Plan or the Effective Date does not ultimately occur, the Plan shall be deemed null and void and, in such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any Person or Entity in any further proceedings involving the Debtor.

**3.**     *Term of Bankruptcy Injunction or Stays.*

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or orders entered in adversary proceedings or contested matters or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date unless the Bankruptcy Court shall order otherwise.

**4.**     *Exculpation.*

None of the Releasees[72] or any of their respective Representatives shall have or incur any

---

[72] Releasees is defined in the Plan as each of the (i) New Borrower, New Borrower Parent, Distribution Agent, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Investors, and any past or current shareholders, subsidiaries, partners, members, affiliates or Representatives of the aforementioned parties, and (ii) Debtor Parties and their Professionals (solely in their capacity as Representatives of the Debtor Parties), *provided however*, that (a) Credit Suisse, Cayman Islands Branch, in all capacities including as predecessor First Lien Agent and

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

liability to any Holder of a Claim against or Interest in the Debtor, or any other party-in-interest, or any of their Representatives, or any of their successors or assigns, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the Adversary Proceeding, the Intercreditor Agreement, the pursuit of confirmation of the Plan, or the consummation of the Plan, except and solely to the extent such liability is based on fraud, gross negligence, or willful misconduct.  The Releasees shall be entitled to reasonably rely upon the advice of counsel with respect to any of their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.  No Holder of a Claim against or Interest in the Debtor, or any other party-in-interest, including their respective Representatives, shall have any right or action against the Releasees or any of their Representatives, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of, the Chapter 11 Case, the Adversary Proceeding, the Intercreditor Agreement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan, except to the extent arising from fraud.  Nothing in <u>Section 7.4</u> of the Plan shall be deemed an exculpation by any Releasor[73] of any Releasee or any of its Representatives for any acts, omissions, transactions, events or other occurrences taking place after the Effective Date or an exculpation by the First Lien Agent, the First Lien Lenders, or any other party in connection with the New Secured Loan or any amounts owed under the New Secured Loan Documents.

**5.** *Releases.*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasor will be deemed to release, waive and forever discharge all Released Liabilities against each Releasee and each Releasee's respective Representatives; *provided, however*, the releases provided in <u>Section 7.5</u> of the Plan shall not constitute a release of any liability based on willful misconduct, gross negligence or fraud; *provided, further*, that nothing

---

Second Lien Agent, (b) FX Real Estate and Entertainment, Inc. and its Representatives, and (c) the Insiders shall not be Releasees in any respect.

[73] Releasors is defined in the Plan as each of the (i) New Borrower, New Borrower Parent, Distribution Agent, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Investors, Holders of Claims or Interests that accept distributions under this Plan, and any past or current shareholders, subsidiaries, partners, members, affiliates or Representatives of the aforementioned parties, and (ii) Debtor Parties and their Professionals (solely in their capacity as Representatives of the Debtor Parties).

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

herein or in the Plan shall be deemed to constitute a release by any Releasor of any Releasee or any of its Representatives for any acts, omissions, transactions, events or other occurrences taking place after the Effective Date unless such acts, omissions, transactions, events, or other occurrences are taken as provided for in the Plan and this Disclosure Statement; and *provided further*, that any party who is rightly included in the definition of Releasee that challenges the Plan or its implementation shall no longer be classified as a Releasee.

### 6. *Injunctions.*

#### a. <u>Injunction Against Releasors.</u>

All of the Releasors, along with any of their respective Representatives, successors or assigns, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Releasees or any of their respective Representatives in respect of any Released Liabilities, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Releasees or any of their respective Representatives in respect of any Released Liabilities, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Releasees or any of their respective Representatives in respect of any Released Liabilities, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Releasees or any of their respective Representatives or against the property or interests in property of the Releasees or any of their respective Representatives, in respect of any Released Liabilities; *provided, however*, that nothing contained herein or in the Plan shall preclude such Releasors from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements and documents delivered under or in connection with the Plan; *provided, further*, that nothing contained herein or in the Plan shall be deemed to enjoin any Releasor from taking any action against any Releasee or any of its Representatives based on the release exceptions contained in the three provisos at the end of <u>Section 7.5</u> of the Plan.

#### b. <u>Injunction Protecting Exculpation of Releasees.</u>

All Holders of Claims against or Interests in the Debtor and any other parties-in-interest, along with any of their Representatives and any of their successors or assigns are permanently

49

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, (iii) creating, perfecting, or enforcing any encumbrance of any kind against Releasees or any of their respective Representatives in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any Releasee or any of their respective Representatives or against the property or interests in property any Releasee or any of their respective Representatives, in respect of any potential liability for which exculpation is granted pursuant to Section 7.4 of the Plan; *provided, however*, that nothing contained herein or in the Plan shall preclude any Holder or other party-in-interest from exercising its rights pursuant to and consistent with the terms in the Plan and the contracts, instruments, releases and other agreements and documents delivered under or in connection with the Plan.

### c.    **Injunction Against Interference With Plan**.

Upon the Effective Date, all Holders of Claims against or Interests in the Debtor and its Representatives (solely in their capacity as a Representative of the Debtor) and any of their successors or assigns are permanently enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### F.    **Executory Contracts and Unexpired Leases**.

The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions for all Assumed Contracts, which shall automatically be deemed assumed by New Borrower as of the Effective Date.

### 1.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*.

Any of the Assumed Contracts that are, or may be, alleged to be in default, shall be Cured either in the ordinary course of business or on the Effective Date.  Except with respect to Assumed Contracts with respect to which the Debtor, New Borrower and the applicable counterparties have

stipulated in writing the appropriate Cure, all requests of Cure that differ from the Cure amounts calculated by the Debtor and treatment proposed by New Borrower, as set forth in the Schedule of Assumed Contracts attached hereto as **Exhibit "V,"** must be Filed with the Bankruptcy Court on or before the Cure Bar Date. Any request for payment or other Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Debtor or New Borrower, without the need for any objection by the Debtor or New Borrower or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or New Borrower of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary. The Debtor or New Borrower also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If a counterparty objects to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of New Borrower to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then the Cure shall occur as soon as reasonably practicable after entry of an order resolving such dispute, approving such assumption, or as may be agreed upon by the Debtor, New Borrower, and the counterparty to the Assumed Contract, with the consent of the First Lien Agent, which consent shall not be unreasonably withheld or denied. Any counterparty to an Assumed Contract that fails to object timely to the proposed assumption of any such contract or unexpired lease will be deemed to have consented to such assumption. The Debtor and New Borrower reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty (30) days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

Assumption of any Assumed Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults with respect to provisions restricting the change in control or ownership interest

51

composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 2.    *Rejection Claims.*

Any Holder of a Claim whose Claim arises from the rejection of an executory contract or unexpired lease with the Debtor shall have the rights of a Holder of a Trade Unsecured Claim and shall receive the treatment provided to Holders of Class 4 Trade Unsecured Claims as set forth in Section 2.3 of the Plan.

### 3.    *Filing of Rejection Claims.*

Any Person or Entity who believes they are entitled to assert a Claim against the Debtor by virtue of the rejection of an executory contract or unexpired lease pursuant to Article VIII of the Plan or a Final Order entered after the Confirmation Date, may File a Claim with the Clerk of the Bankruptcy Court not later than twenty (20) days after the date of any such rejection or such later time as may be set forth for the filing of such Claim in said Final Order.  If such Claim is not so Filed, it shall be forever barred from assertion against New Borrower or any of the Assets.  Nothing in Section 8.4 of the Plan shall affect the right of any party-in-interest to object to any Claim which has been improperly Filed or not Filed on a timely basis.

### 4.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Contract, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to pre-petition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.**      *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Schedule of Assumed Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtor or any other party that any such contract or lease is in fact an executory contract or unexpired lease or that the Debtor or New Borrower has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, Debtor and New Borrower shall have thirty (30) days following entry of the relevant order to resolve such dispute to alter their treatment of such contract or lease.

**G.**      **Procedures for Resolving Disputed Claims and Objections to Interests.**

**1.**      *Time Limit for Objections to Claims and Interests.*

Unless otherwise ordered by the Bankruptcy Court, objections to Priority Claims, Priority Tax Claims, Administrative Claims, General Unsecured Claims, and Interests shall be Filed with the Bankruptcy Court and served upon each Holder of each of the Claims and Interests to which objections are made not later than (i) sixty (60) days after the Effective Date, or (ii) thirty (30) days after such Claim(s) of Interest(s) are timely Filed, whichever is later.  Neither the Debtor nor New Borrower shall be required to file any objection to any Claim listed in the Schedule of Disputed Claims attached hereto as **Exhibit "U,"** and all such Claims shall be treated as Disputed Claims and shall be subject to resolution after the Effective Date.  The fact that a Claim is not listed in the Schedule of Disputed Claims shall not be deemed an admission by any party that a Claim is valid. After the Effective Date, New Borrower shall be solely responsible for pursuing objections to Claims and Interests and otherwise litigating, settling or otherwise resolving all Disputed Claims.

**2.**      *Payments.*

Payments and Distributions to each Holder of a Disputed Claim that ultimately becomes an

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

53

Allowed Claim shall be made in accordance with the provision of the Plan with respect to the Class of Creditors to which the respective Holder of an Allowed Claim belongs.

**3.    *Personal Injury Claims.***

All objections to Claims Filed for personal injury tort damages, if any, shall be determined by the United States District Court for the District of Nevada.

**4.    *Estimation of Claims.***

The Debtor shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor may elect to pursue any supplemental proceedings to object to the allowance of such Claim.

**H.    Retention of Jurisdiction.**

**1.    *Retention of Jurisdiction.***

Except to the extent otherwise expressly set forth in the Plan, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case following the Confirmation Date for the following purposes, it being expressly intended that such retention of jurisdiction shall in all cases hereafter set forth, extend to any actions or proceedings commenced prior or subsequent to the Confirmation Date and/or the Effective Date whether by the Debtor or the parties specified herein:

(a)    To hear and determine any objections to the allowance of Claims and

54

Interests, including any objections by New Borrower with respect to any Claims which have been reinstated or assumed in accordance with the terms of this Plan (unless such Claims are pursued in an alternative forum or venue);

(b)     To determine any and all applications for compensation for any Professionals and similar fees to the extent made specifically subject to a hearing under this Plan and applicable provisions of the Bankruptcy Code;

(c)     To determine any and all applications for the rejection or assumption and assignment of executory contracts or for the rejection or assumption and assignment, as the case may be, of unexpired leases to which the Debtor is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising there from;

(d)     To determine any and all applications, motions, adversary proceedings, and contested or litigated matters properly before the Bankruptcy Court;

(e)     To modify this Plan pursuant to section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order to the extent authorized by the Bankruptcy Code;

(f)     To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of this Plan, any agreements, documents, or instruments issued under or relating to this Plan, including any documentation evidencing the terms of this Plan;

(g)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Bankruptcy Court entered in this Chapter 11 Case;

(h)     To adjudicate all controversies concerning the classification of any Claim or Interest;

(i)     To liquidate damages in connection with any disputed, contingent or unliquidated Claim;

55

(j)     To adjudicate all Claims to a security or ownership interest in any of the Assets, or in any proceeds thereof,

(k)     To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by Debtor;

(l)     To determine all questions and disputes regarding recovery of and entitlement to any property of the Debtor, or in any proceeds thereof and determine all Claims and related disputes between or among the Debtor, First Lien Agent, First Lien Lenders, Second Lien Agent, Second Lien Lenders, and any other Entity or Person;

(m)     To adjudicate all Causes of Action with respect to which the Debtor is a party, whether or not such Claim or controversy is raised or filed before or after the Confirmation Date;

(n)     To determine issues and disputes concerning entitlement to Distributions to be made under and pursuant to this Plan;

(o)     To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor or the rights of any Entity hereunder and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary or appropriate;

(p)     To determine such other matters as may be provided for in the Confirmation Order and this Plan, or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(q)     To enter a Final Decree closing the Chapter 11 Case;

(r)     To enforce the provisions of any claims bar date established in the Chapter 11 Case; and

(s)     To make such orders as are necessary or appropriate to carry out the provisions of this Plan and the Operative Documents, including but not limited to orders

56

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

interpreting, clarifying or enforcing the provisions thereof.

Notwithstanding the foregoing, any disputes with respect to the New Secured Loan Documents arising after the Effective Date shall be adjudicated pursuant to the terms of the New Secured Loan Documents and in accordance with the provisions related to the choice of law, jurisdiction and venue contained therein.

**2.** *Jurisdiction Unaffected.*

The occurrence of the Effective Date and/or the entry of a Final Decree shall not divest the Bankruptcy Court of any jurisdiction otherwise retained under Article X of the Plan or the Confirmation Order.

**I.**  **Certain Obligations of the Debtor and/or New Borrower.**

The Debtor, New Borrower, New Borrower Parent, and/or the Investors, where applicable, in addition to performance of their other obligations as may be required by the Plan, the Bankruptcy Code and prior orders of the Bankruptcy Court, shall:

(a)     After the Confirmation Date, take such action and execute such documents as may be reasonably required to consummate the Plan;

(b)     Maintain insurance on all of its Assets up to the Effective Date;

(c)     Maintain all of its books, records and accounting systems in accordance with past practices up to the Effective Date; and

(d)     Not sell or dispose of any of its Assets, or any proceeds thereof, except pursuant to a Sale or as contemplated by the Plan, or as permitted pursuant to the New Secured Credit Agreement, or as otherwise may be authorized by order of the Bankruptcy Court up to the Effective Date.

As of the Effective Date, the Debtor's (i) remaining officers shall be deemed to have resigned and replaced by the new officers of New Borrower, and (ii) each of the Debtor's Professionals, including lawyers and financial advisors, shall conclude their engagements by Debtor

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

as soon as practicable after the Effective Date and shall File their final fee applications to be set for hearing before the Bankruptcy Court as soon as practicable after the Effective Date, but in no event later than as otherwise required by the terms of the Plan or any applicable orders of the Bankruptcy Court.

**J.**     **Conditions to Effective Date.**

   **1.**     ***Conditions to Occurrence of Effective Date.***

   Each of the following are conditions to be met on or before the Effective Date, which conditions must be satisfied or waived in writing by the Debtor, the First Lien Agent, New Borrower, New Borrower Parent, and the Investors (to the extent such entities are affected by any such condition, it being understood that, with respect to item (a) below, only the written waiver of the First Lien Agent and the Backstop Investors shall be required):

   (a)     That the Confirmation Order shall have become a Final Order;

   (b)     That the Confirmation Order authorizes the assumption of all Assumed Contracts;

   (c)     To the extent Allowed Administrative Claims and Allowed Priority Claims have not been paid in Cash in full, New Borrower has assumed or will pay the remaining amounts unless otherwise agreed by the Holder of such Allowed Administrative and Allowed Priority Claims and New Borrower;

   (d)     All conditions precedent to the closing of the New Secured Loan Documents have been satisfied or waived in accordance with the terms thereof and executed copies of the New Secured Loan Documents and the New Co-Lender Agreement shall have been delivered;

   (e)     The Property shall be in the condition described in the Plan Supplement, to the extent not waived by New Borrower, subject to the terms of the New Secured Loan Documents;

   (f)     The Mortgage shall be recorded in Clark County Nevada and shall constitute a valid first priority Lien over the Property subject only to any Permitted Encumbrances and a

58

provider of title insurance reasonably acceptable to the First Lien Agent shall be prepared to provide title insurance as required under the New Secured Loan Documents;

(g)    The Initial Capital Contribution shall have been funded to New Borrower to fund Distributions and any other requisite payments under the Plan;

(h)    First Lien Agent, New Borrower Parent, the Investors and New Borrower shall have agreed to the amounts and recipients of the final Distributions to be made on the Effective Date and the Funds Flow Memo shall be in form and substance reasonably acceptable to the First Lien Agent and the Backstop Investors;

(i)    First Lien Agent, New Borrower Parent, the Investors and New Borrower shall have agreed to the amounts in the New Borrower budget;

(j)    The Operative Documents shall be in form and substance reasonably acceptable to the First Lien Agent;

(k)    That any outstanding fees of the United States Trustee under 28 U.S.C. § 1930 shall have been paid in full; and

(l)    The Effective Date shall have occurred not later than December 15, 2010, unless such date is extended by mutual agreement of the First Lien Agent and the Backstop Investors.

**2.    *Nonconsensual Confirmation/Reservation of Right to Effectuate Confirmation of the Plan Using Cramdown under Bankruptcy Code Section 1129(b).***

As to Class 3 Claims, Class 5 Claims, and/or Class 6 Interests, if the requisite number and amount of votes in favor of the Plan are not achieved as to any of those classes, the Backstop Investors will seek confirmation of this Plan in accordance with section 1129(b) of the Bankruptcy Code either under the terms provided herein or upon such terms as may exist if this Plan is modified in accordance with section 1127(a) of the Bankruptcy Code.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

**K.**    **Miscellaneous Provisions.**

    **1.**    *Modification of the Plan.*

    The Investors reserve the right, subject to the consent of New Borrower and the First Lien Agent (notwithstanding section 1127 of the Bankruptcy Code), in accordance with the Bankruptcy Code, to amend, amend or modify this Plan, the Disclosure Statement and the Operative Documents before or after the Confirmation Date, including to make any amendments or modifications to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

    **2.**    *Notices.*

    Except as otherwise set forth in <u>Sections 13.2 and 13.3</u> of the Plan, all notices, requests, elections or demands in connection with the Plan, including any change of address of any Holder of a Claim for the purpose of receiving any Distributions under the Plan, shall be in writing and shall be delivered personally or by facsimile, electronic mail or overnight courier (confirmed by first class mail or express mail) or mailed by first class mail.  Such notice shall be deemed to have been given when received or, if mailed by first class mail, seven (7) days after the date of mailing, or if express mailed, the next Business Day following the date of mailing and addressed to the following:

    (a)  If to the Debtor, to:

        c/o FX Real Estate and Entertainment Inc.
        650 Madison Avenue
        New York, New York 10022
        Attention:  Mitchell Nelson
        Email:  mitchell.nelson@flagluxury.com
        Facsimile: (212) 750-3034

        with copies to:

        Fox Rothschild LLP
        3800 Howard Hughes Parkway, Suite 500
        Las Vegas, Nevada 89169
        Attention:  Brett A. Axelrod, Esq.
        Email:  BAxelrod@foxrothschild.com
        Facsimile: (702) 597-5503

    (b)  If to First Lien Agent, to:

        Landesbank Baden-Württemberg, New York Branch
        280 Park Avenue, 31st Floor – West Building
        New York, New York 10017
        Attention:  Robert Dowling

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Email:  robert.dowling@lbbwus.com
Facsimile:  (212) 584-1759

with copies to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention:  Robert W. Fagiola, Esq.
                    Andrew Tenzer, Esq.
Email:  rfagiola@shearman.com
              atenzer@shearman.com
Facsimile:  (646) 848-7606
                    (646) 848-7799

Lionel Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Attention:  Rodney M. Jean, Esq.
Email:  rjean@lionelsawyer.com
Facsimile:  (702) 383-8845

(c)  If to Second Lien Agent:

c/o NexBank, SSB
13455 Noel Road, 22nd Floor
Dallas, Texas 75240
Attention:  Jeff Scott
                    Marcia Kaufman
Email:  jeff.scott@nexbank.com
              marcia.kaufman@nexbank.com
Facsimile:  (972) 934-4790
                    (972) 934-4785

with copies to:

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Attention:   Lenard M. Parkins, Esq.
                    Trevor R. Hoffmann, Esq.
                    Jonathan Hook, Esq.
Email:  lenard.parkins@haynesboone.com
              trevor.hoffmann@haynesboone.com
              jonathan.hook@haynesboone.com
Facsimile:  (212) 884-8226
                    (212) 884-8211

Kolesar & Leatham, Chtd.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

61

3320 West Sahara Ave., Suite 380
Las Vegas, Nevada 89102
Attention:   Elliott R. Eisner, Esq.
Email:  EEisner@klnevada.com
Facsimile:  (702) 362-9472

(d)      If to New Borrower or Backstop Investors:

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Attention:   Lenard M. Parkins, Esq.
                   Trevor R. Hoffmann, Esq.
                   Jonathan Hook, Esq.
Email:   lenard.parkins@haynesboone.com
             trevor.hoffmann@haynesboone.com
             jonathan.hook@haynesboone.com
Facsimile:   (212) 884-8226
                  (212) 884-8211

Kolesar & Leatham, Chtd.
3320 West Sahara Ave., Suite 380
Las Vegas, Nevada 89102
Attention:  Elliott R. Eisner, Esq.
Email:   EEisner@klnevada.com
Facsimile:   (702) 362-9472

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention:  Joshua J. Angel, Esq.
                  Frederick E. Schmidt, Jr., Esq.
Facsimile:  (212) 545-3497
                 (212) 545-3474
Email:   jangel@herrick.com
             eschmidt@herrick.com

All notices and requests to Holders of Claims or Interests of any Class shall be sent to them

at their known address.  Any Holder of a Claim or Interest of any Class may designate in writing

any other address for purposes of Section 13.2 of the Plan, which designation shall be effective

upon receipt.

3.      *Limitation of Notice.*

The Debtor shall give the following notice with regard to the following matters, which

notice shall be deemed to be good and sufficient notice of such matters, with no requirement for any additional or further notice:

### a.    Notice of Entry of Confirmation Order.

Notice of the entry of the Confirmation Order shall be sufficient if mailed to all known Holders of Claims (which have not become Disallowed Claims) and Interests within five (5) Business Days of the Confirmation Order becoming a Final Order.

### b.    Post-Confirmation Date Service List — Additional Persons Entitled to Notice.

Except as set forth in Section 13.2 of the Plan, from and after the date the Confirmation Order becomes a Final Order, notices of appearances and demands for service of process Filed with the Bankruptcy Court prior to such date shall no longer be effective, and no further notices, other than Notice of Confirmation Order, shall be required to be sent to such parties, unless such parties File a new notice of appearance and demand for service of process dated subsequent to the Effective Date, which subsequent notice and demand must be Filed with the Bankruptcy Court and served upon the Persons and Entities listed in Section 13.2 of the Plan.

### 4.    *First Lien Lenders' Approval.*

Where the First Lien Lenders' consent or approval is referred to anywhere in the Plan, the Person or Entity seeking such approval shall be entitled to direct the request for approval solely to First Lien Agent, on behalf of the First Lien Lenders, which shall then be responsible for determining and communicating whether such approval has or has not been obtained. Any statement by the First Lien Agent to any Person or Entity concerning consent or approval of the First Lien Lenders required under the Plan may be relied upon by such Person or Entity.

### 5.    *Headings.*

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the provisions of the Plan.

### 6.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date and made available to the First Lien Parties, the Second Lien Lenders (posted on "Interlink" website maintained by the Second Lien Agent), and the Holder of the Old Membership Interests (via overnight courier).  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at http://www.nvb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

## 7.    *Non-Severability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, at the request of a party in interest and subject to the consent of any party adversely affected thereby, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor and any other Person or Entity affected by such provision; and (3) nonseverable and mutually dependent.

## 8.    *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the

64

Debtor or its counsel, Investors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

**9.** *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Confirmation Order conflicts with or is in any way inconsistent with any provision of the Plan, including from and after the Effective Date, the Confirmation Order shall govern and control, unless expressly set forth therein. Furthermore, the final form of documents executed on the Effective Date, including the New Secured Loan Documents, shall govern and control on the matter contained therein in the event of any conflict between such documents and the Plan or Disclosure Statement.

**10.** *Computation of Time.*

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**11.** *Governing Law.*

Except to the extent that the Bankruptcy Code or any other Federal law is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada.

**12.** *Successors and Assigns.*

The rights and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person or Entity.

**13.** *Withdrawal or Modification of Plan and Plan Documents.*

The Backstop Investors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date (including if the Operative Documents are not finalized prior the Plan Supplement Filing Date) and to File subsequent plans of reorganization.  If the Backstop Investors revoke or withdraw the Plan, or if Confirmation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement

65

executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests relating to the Debtor; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

In addition, the Backstop Investors reserve all of their rights to amend or modify the Plan, the Disclosure Statement or any of the documents, including the Operative Documents, that may be attached to the Disclosure Statement.  Such amended documents will be filed with the Bankruptcy Court, as promptly as possible including as exhibits to the Plan Supplement.

**14.**     *Other Agreements.*

Nothing contained herein or in the Plan shall alter, limit or otherwise affect the rights and obligations of any party to the Operative Documents pursuant to the terms thereof.

<div align="center">

**ARTICLE V.**

**<u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>**

</div>

Parties-in-interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

**A.     <u>Failure to Confirm the Plan</u>.**

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to chapter 7 liquidation.  In fact, the Backstop Investors believe that absent confirmation of the Plan, the likely result will be a foreclosure sale and/or piecemeal liquidation of the Assets.  If that were to occur, Holders of Claims and Interests would likely receive a fraction of what they would receive under this Plan, if anything.

**B.     <u>Potential Adverse Effects of Chapter 11</u>.**

While the Backstop Investors will seek to effectuate the Plan as quickly as possible so as to minimize any potential disruption to the Debtor's business operations and goodwill, it is possible that despite the belief and intent of the Backstop Investors, the Chapter 11 Case could be delayed and such delay can materially adversely affect relationships among the Debtor (and its successor

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

New Borrower) and its Creditors, tenants and employees.

**C.      Risks Associated.**

There are several risks which include, but are not limited to, the following:

1.      One or more Investors fails to perform its obligations under the New Borrower Parent UPA.

2.      One or more parties-in-interest may commence litigation to challenge the propriety of the Plan and the transactions contemplated therein.

3.      The Backstop Investors and the First Lien Parties can disagree about the terms and conditions of certain of the Operative Documents including the New Secured Loan Documents.

4.      The costs, expenses and Distributions that will be required to be paid under the Plan exceed in a material respect the amounts presently contemplated by the Backstop Investors to be paid under the Plan.  Affecting factors include, but are not limited to, (i) the Allowed amount of Trade Unsecured Claims exceeds $375,000 and (ii) significant Administrative Claims.

5.      The economic conditions may worsen.  The financial crisis and global recession has resulted in a significant decline in the amount of tourism and discretionary consumer spending in Las Vegas.  The tenants in the Property are primarily retailers and, as such, are heavily reliant on tourism and discretionary consumer spending in Las Vegas.  The Property's commercial leasing activities could be adversely affected because of the failure to maintain high tenant occupancy rates amid these market conditions.  In addition, Las Vegas may experience a prolonged decline in the development of new hotels and other entertainment venues, which could adversely affect any potential redevelopment of the Property.

*See the Offering Memorandum for additional risk factors associated with electing the Equity Option or the Class 6 Purchase Option and making an investment in the New Borrower Parent Units.*

### ARTICLE VI.

### CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Interests, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Backstop Investors have complied with applicable provisions of the Bankruptcy Code, (d) the Backstop Investors have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of Creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all Holders of Claims or Interests in each Impaired Class, and (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

*To the extent required, the Backstop Investors reserve the right to proceed to confirmation of the Plan through the use of cramdown pursuant to section 1129(b) of the Bankruptcy Code.*

A.    **Voting Requirements.**

Under the Bankruptcy Code, only Classes of Claims and Interests that are "Impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is Impaired if the Plan modifies the legal, equitable or contractual rights of Holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt).  Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Interests whose Holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.  An Impaired Class of Claims will have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  As noted above, there are five (5) Classes of Claims in the Plan and one (1) Class of Interests.  The classes of Claims and Interests that are Impaired and entitled to vote to accept or reject the Plan are Class 3 (First Lien Loan Claims), Class 5 (Second Lien Loan Claims) and Class 6 (Old Membership Interests).  All other Classes are either not Impaired or are deemed to have accepted the Plan, and their votes will not be solicited.

A Ballot to be used to vote on the Plan will be enclosed with the *Motion of the Backstop Investors for Entry of an Order (A) Approving Solicitation Procedures; (B) Approving Forms of Ballots and Noticing Procedures; and (C) Scheduling Certain Dates with Respect Thereto* (the "Motion to Approve Solicitation Procedures") and will be separately mailed to Holders of Class 3 Claims, and Class 5 Claims, and Class 6 Interests.

Holders of Claims in certain Classes may have asserted, in their respective Proofs of Claim, Claims for interest accrued after the Petition Date.  The Backstop Investors do not necessarily agree that post-petition interest should be allowed on such Claims and may object to any such portions of these Claims.  The Backstop Investors thus propose that Holders of Claims only be entitled to vote the portion of their Claims that does not include any interest accrued after the Petition Date.  However, to the extent the Backstop Investors object to the post-petition interest asserted on account of a particular Claim, the Backstop Investors propose that the Holder of such Claim would be allowed to vote the principal amount of its Claim.

**B.**     **Voting on the Plan.**

AS SET FORTH IN THE MOTION FOR APPROVAL OF DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES, THE PERIOD DURING WHICH BALLOTS WITH RESPECT TO THE PLAN WILL BE ACCEPTED BY THE BACKSTOP INVESTORS WILL TERMINATE AT 5:00 P.M. PACIFIC DAYLIGHT TIME, ON OCTOBER 27, 2010 (THE

69

1    "VOTING DEADLINE").  EXCEPT TO THE EXTENT THE BACKSTOP INVESTORS SO

2    DETERMINE, AS PERMITTED BY THE BANKRUPTCY COURT, BALLOTS THAT ARE

3    RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED BY

4    THE BACKSTOP INVESTORS IN CONNECTION WITH THE BACKSTOP INVESTORS'

5    REQUEST FOR CONFIRMATION OF THE PLAN (OR ANY PERMITTED MODIFICATION

6    THEREOF).

7          TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED,

8    AND TRANSMITTED IN THE MANNER SPECIFIED IN THE MOTION TO APPROVE

9    SOLICITATION PROCEDURES SO THAT IT IS RECEIVED BY THE VOTING DEADLINE.

10   PLEASE FOLLOW CAREFULLY ALL INSTRUCTIONS CONTAINED IN THE MOTION TO

11   APPROVE SOLICITATION PROCEDURES.  ANY BALLOTS RECEIVED THAT DO NOT

12   INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE

13   COUNTED.

14         If you have any questions about the procedure for voting, or if you did not receive a Ballot,

15   received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of

16   this Disclosure Statement, please contact Haynes and Boone, LLP, Attention: Jonathan Hook, Esq.,

17   1221 Avenue of the Americas, 26th Floor, New York, New York 10020, or call (212) 659-4981, or

18   e-mail jonathan.hook@haynesboone.com.

19         BALLOTS MUST BE MAILED OR HAND DELIVERED TO Haynes and Boone, LLP,

20   Attention: Jonathan Hook, Esq., 1221 Avenue of the Americas, 26th Floor, New York, New York

21   10020.

22         Consistent with the provisions of Bankruptcy Rule 3018, the Backstop Investors have fixed

23   the voting Record Date – the time and date for the determination of Holders of record of Claims

24   who are entitled to vote on the Plan – as 5:00 P.M., Pacific Daylight Time, on June 15, 2010.

25   **C.    Confirmation Requirements.**

26         **1.    *Acceptance by Impaired Classes.***

27         The Backstop Investors intend to count all validly executed Ballots received prior to the

28   Voting Deadline for purposes of determining whether each Impaired Class entitled to vote has

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

accepted or rejected the Plan, pursuant to the Bankruptcy Code and the procedures set forth in the Motion for Approval of Disclosure Statement and Solicitation Procedures. Bankruptcy Rule 3018(b) prescribes the conditions that must be satisfied in order to count the ballots cast with respect to a plan prior to the commencement of a Chapter 11 case. The rule requires that for the ballot of a Creditor to count (i) such Chapter 11 plan and a disclosure statement must be distributed to substantially all Creditors of the same Class, (ii) the time prescribed for voting on such a plan must not be unreasonably short and (iii) the solicitation must be conducted in compliance with section 1126 of the Bankruptcy Code, which section requires that the solicitation be conducted in compliance with all applicable nonbankruptcy laws, rules, or regulations or, if there are no such applicable laws, rules, or regulations, that the disclosure statement for such plan contains "adequate information." Under section 1125 of the Bankruptcy Code, "adequate information" is defined as information of a kind and in sufficient detail to the extent it is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the Plan.

Except as described herein or in the Motion for Approval of Disclosure Statement and Solicitation Procedures, the Bankruptcy Code generally requires, as a condition to confirmation, that each class of Claims or Interests that is Impaired under the Plan accept the Plan. A Class of Claims has accepted the Plan if the Plan has been accepted by Holders of Claims that hold at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that actually vote to accept or reject the Plan. Holders of Claims that fail to vote are not counted as either accepting or rejecting the Plan. A Class of Interests has accepted the Plan if the Plan has been accepted by Holders of at least two-thirds in amount of the Allowed Interests in that Class that actually vote to accept or reject the Plan. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon all creditors and interest holders if it is accepted by one of the Impaired Classes of Claims and it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.

For the reasons discussed below, the Backstop Investors believe that all the requirements of

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Bankruptcy Rule 3018(b) will be satisfied. Votes will be solicited from the ultimate beneficial Holders of Impaired Claims and Interests in Class 3, Class 5 and Class 6. The Backstop Investors also believe that this Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.

    **2.**    ***Best Interests Test.***

Before the Plan may be confirmed, the Bankruptcy Court must find with respect to any Impaired Class containing members that have rejected the Plan, that the Plan provides that each Holder of a Claim will receive or retain under the Plan on account of such Claim property that has a value, as of the Effective Date of the Plan, that is not less than the value of the distribution each such Entity would receive or retain if the Debtor were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. The Backstop Investors believe that this test will be satisfied.

To determine what members of each Impaired Class of Claims would receive if the Debtor were liquidated under chapter 7, the Court must consider the values that would be generated from a liquidation of the assets and properties of the Debtor in the context of a hypothetical liquidation case under chapter 7. In the absence of a confirmed plan, the Estate would incur the costs of a trustee on top of other expenses of administering the liquidation process, and the risk of a distressed sale could substantially depress the value of the Assets, including the Property. Holders of Class 4 and Class 5 Claims or Class 6 Interests would receive less distributions, if any, under either liquidation or an out-of-court foreclosure.

A conversion of the Chapter 11 Case to chapter 7 would entail the mandatory appointment of a trustee. To administer the Estate responsibly, a chapter 7 trustee, and the trustee's staff and professionals, would necessarily devote substantial time and effort to familiarizing themselves with the affairs of the Debtor and the Chapter 11 Case, including asset dispositions and investigation of Claims in addition to performing the same services to be performed by the Distribution Agent. This could entail hundreds of hours of additional professional services and concomitant expense. Thus, the costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case that would

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants, or

2    other professionals and costs and expenses of the Debtor and any committee.  Such Administrative

3    Claims would have to be paid in Cash, in full from the liquidation proceeds before the balance of

4    those proceeds could be made available to pay Allowed Priority Claims and Allowed Unsecured

5    Claims from the Chapter 11 Case.  Not only will the costs increase as a result thereof, but the

6    Creditors will suffer a loss on the time value of their money as the chapter 7 trustee will necessarily

7    require more time to liquidate the Assets, resolve Disputed and unliquidated Claims and ultimately

8    make distributions to Creditors.  Finally, Holders of Claims and Interests in Class 4, Class 5 and

9    Class 6 would likely receive no distributions.

10        Therefore, the Backstop Investors believe that in a chapter 7 liquidation there would (i) be an

11   additional layer of administrative expense (including the trustee's commissions and fees for

12   professionals) and would, correspondingly, reduce the funds available to satisfy Claims, (ii) likely

13   be significant delays in distributions and (iii) be no increment in value and might be significant

14   reductions in recoverable value of the Assets due to the conversion of the case.  A copy of the

15   Liquidation Analysis is attached hereto as **Exhibit "S"** and is incorporated herein by this reference.

16   Thus the Backstop Investors believe that the Plan meets the "best interests" test by providing each

17   non-accepting Holder of an Impaired Claim with a recovery that is not less than it would receive

18   pursuant to the Debtor's liquidation under chapter 7 of the Bankruptcy Code as of the Effective

19   Date.

20        **3.    *Feasibility of the Plan.***

21        Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of a plan is

22   not likely to be followed by the liquidation, or the need for further financial reorganization, of the

23   Debtor or any successor-in-interest.  To determine whether the Plan meets this feasibility

24   requirement, the Backstop Investors have analyzed their ability to meet their respective obligations

25   under the Plan, including the debt-service obligations of New Borrower in connection with the New

26   A-Note and the New B-Note.  As part of this analysis, the Backstop Investors have utilized the

27   Debtor's projections and other published information, as well as their analysis of same, and

28   therefore submit that New Borrower, as successor to the Debtor under the Plan, is unlikely to be

73

liquidated or require further financial reorganization following confirmation of the Plan as projected cash flows from the Assets are sufficient to cover the New Borrower's projected operating costs and debt service obligations.

### 4. *Classification.*

Section 1122 of the Bankruptcy Code sets forth the requirements relating to classification of claims. Section 1122(a) of the Bankruptcy Code provides that Claims or Interests may be placed in a particular Class only if they are substantially similar to the other Claims or Interests in that Class. The Backstop Investors believe that all Classes under the Plan satisfy the requirements of section 1122(a) of the Bankruptcy Code.

Class 3, Class 5, and Class 6 are all Impaired and each Class may vote to reject the Plan. The Bankruptcy Court may nevertheless confirm the Plan if all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, and if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect thereto.

### a. <u>No Unfair Discrimination</u>.

This test applies to Classes of Claims or equity Interests that are of equal priority and are receiving different treatment under a plan or reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." Since Distributions being made to Classes 4-6 are gifts from the Backstop Investors and are not being distributed according to the Bankruptcy Code "absolute priority" strictures, none of the Creditors or Interest Holders are being treated in an unfair discriminatory manner.

### b. <u>Fair and Equitable Test</u>.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest Holders as follows:

#### (i) <u>Secured Creditors</u>

For a plan of reorganization to be fair and equitable as to an impaired class of secured claims that rejects the plan, the plan must provide: (i) that each holder in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

74

property subject to those liens is retained by the debtor or is transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such holder's interest in the estate's interest in such property; (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph; or (iii) that each holder in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim.

### (ii)  Unsecured Creditors

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that:  (i) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

### (iii)  Equity Interest Holders

A plan of reorganization is fair and equitable as to an impaired class of equity interests that rejects the plan if the plan provides that:  (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such Holder is entitled, or (C) the value of the equity interest; or (ii) the holder of any equity interest that is junior to the equity interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Backstop Investors believe the Plan is fair and equitable as to Holders of Claims and Interests in Classes that may vote to reject the Plan because the Plan provides that their Allowed Claims or Interests will be either unimpaired, or they will receive their "absolute priority" entitlements under the Bankruptcy Code.  Any distributions made outside of "absolute priority"

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

1    entitlements are gifts from the Backstop Investors and are not subject to the Bankruptcy Code

2    "absolute priority" strictures.

3         As a further condition to approving a cramdown, the Bankruptcy Court must find that the

4    Plan does not "discriminate unfairly" in its treatment of dissenting Classes.  A plan does not

5    "discriminate unfairly" if (a) the Plan does not treat any dissenting Impaired Class of Claims or

6    Interests in a manner that is materially less favorable than the treatment afforded to another Class

7    with similar legal Claims against or Interests in the Debtor and (b) no Class receives payments in

8    excess of that which it is legally entitled to receive for its Claims or Interests.  The Backstop

9    Investors believe the Plan meets all the requirements of the fair and equitable standard, and that it

10   does not discriminate unfairly as to any Impaired Class of Claims or Interests.

11        The Backstop Investors believe that the proposed Plan is in the best interest of Creditors

12   because under the Plan it is expected that Holders of Claims and Interests will receive in excess of

13   what otherwise would be recovered by such Holders if the Debtor was liquidated under chapter 7 or

14   if the Bankruptcy Case was dismissed.

15        **5.    *Confirmation Hearing.***

16        Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

17   hold a hearing on confirmation of the Plan after the Ballots have been cast.  The Confirmation

18   Hearing may be postponed from time to time by the Bankruptcy Court without further notice

19   except for an announcement of the postponement made at the Confirmation Hearing.  Section

20   1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of

21   the Plan.

22        At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

23   whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have

24   been satisfied.

25        The Backstop Investors believe that, upon acceptance of the Plan by one of Class 3 or 5, the

26   Plan will satisfy all of the applicable Bankruptcy Code requirements, that the Backstop Investors

27   have complied or will have complied with all of the Bankruptcy Code requirements and that the Plan

28

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

is being proposed and will be submitted to the Bankruptcy Court in good faith.

### 6.    *Administrative Claims.*

The Backstop Investors believe that the Plan adequately addresses all Allowed Administrative Claims.  The Debtor has indicated, with respect to prior plans in this case that proposed limitations on the payment of amounts incurred by the Debtor's professionals (*i.e.*, the Fee Cap) may make the Plan unconfirmable.  The Backstop Investors understand that the Debtor and its professionals have agreed to limit their fees to amounts not in excess of the Fee Cap and that any amounts in excess of such Fee Cap very likely do not constitute "necessary expenses" of the estate and may be objectionable for these and other reasons.  If the Debtor cannot resolve their dispute with respect to the payment of legal fees in excess of the capped amounts previously agreed by the Debtor, and if the Court finds that fees in excess of the Fee Cap are "necessary expenses," such amounts may need to be satisfied in Cash prior to the Effective Date in order for the Plan to be confirmed.

### ARTICLE VII.

### ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Backstop Investors believe that the Plan affords Holders of Allowed Claims and Interests the potential for a fair realization of the value of Assets that is more than would be realized under a chapter 7 liquidation and therefore is in the best interest of such Holders.  In the opinion of the Backstop Investors, no other feasible alternative is presently known to the Backstop Investors that would afford Holders of Claims and Interests the returns and potential upside that may be achieved under the Plan.

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, under which a trustee would be appointed to liquidate the Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery by Holders of Claims and Interests is set forth under "Best Interests Test," *see supra* Section VI.C.2.  Based on the

77

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

liquidation analysis discussed herein, the Backstop Investors believe that a chapter 7 liquidation would result in distributions to Holders of Claims and Interests that are substantially less than those proposed in the Plan and, in fact, most Holders of Claims and Interests would receive nothing in a chapter 7 liquidation.

Alternatively, if no plan can be confirmed, the Chapter 11 Case may be dismissed, or followed by a foreclosure.  In such event, Class 3 will likely not be paid in full, and all other Claims and Interests will likely receive no distribution.

THE BACKSTOP INVESTORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.  ACCORDINGLY, THE BACKSTOP INVESTORS URGE HOLDERS OF CLASS 3 (FIRST LIEN LOAN CLAIMS), CLASS 5 (SECOND LIEN LOAN CLAIMS), AND CLASS 6 (OLD MEMBERSHIP INTERESTS) TO VOTE TO ACCEPT THE PLAN BY SO INDICATING ON THEIR BALLOTS AND RETURNING THEM AS SPECIFIED IN THE NOTICE.

## ARTICLE VIII.

### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN

**A.** **Introduction.**

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE INTERNAL REVENUE CODE;[74] (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE BACKSTOP

---

[74] "Internal Revenue Code" means Title 26 of the United States Code, 26 U.S.C. §§ 1-9833.

1    INVESTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C)

2    HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR

3    PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

4         A summary description of certain material U.S. federal income tax consequences of the Plan

5    is provided below.  This description is for informational purposes only and, due to a lack of

6    definitive judicial or administrative authority or interpretation, substantial uncertainties exist with

7    respect to various tax consequences of the Plan as discussed herein.  Only the principal

8    consequences of the Plan for Holders of Claims who are entitled to vote to accept or reject the Plan

9    are described below.  No opinion of counsel has been sought or obtained with respect to any tax

10   consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or

11   any other tax authorities have been or will be sought or obtained with respect to any tax

12   consequences of the Plan, and the discussion below is not binding upon the IRS or such other

13   authorities.  No assurance can be given that the IRS would not assert, or that a court would not

14   sustain, a different position from any discussed herein.  No representations are being made

15   regarding the particular tax consequences of the confirmation or implementation of the Plan as to

16   any Holder of a Claim.

17        The discussion of U.S. federal income tax consequences below is based on the Internal

18   Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder,

19   judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect

20   on the date hereof and all of which are subject to change or differing interpretations (possibly with

21   retroactive effect).

22        The following discussion does not address foreign, state or local tax consequences of the

23   Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special

24   classes of taxpayers (*e.g.*, banks and certain other financial institutions, insurance companies, tax-

25   exempt organizations, Holders of Claims or Interests who are (or who hold their Claims through)

26   pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities

27   or foreign currency, and persons holding claims that are a hedge against, or that are hedged against,

28   currency risk or that are part of a straddle, constructive sale or conversion transaction).  The

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

79

following discussion does not address U.S. federal taxes other than income taxes.

**Each Holder of a Claim or Interest is urged to consult its own independent tax advisor regarding the U.S. federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

**B.    Certain U.S. Federal Income Tax Consequences to the Debtor.**

Because the Debtor is treated as a disregarded entity for U.S. federal income tax purposes, the Debtor will have no federal income tax consequences as a result of the Plan.  Because the Assets are deemed to be owned, for federal income tax purposes, by FX LLC, the tax effects to FX LLC as a result of the Plan would include FX LLC's realization of a substantial amount of discharge of indebtedness income.  In addition, FX LLC will recognize gain or loss upon the disposition of its real estate equal to the difference between the fair market value of the real estate and FX LLC's adjusted tax basis in the real estate.  All such gain or loss realized and/or recognized by FX LLC will flow through to and be includible in the income of its partners.  The treatment of FX LLC's partners with respect to the recognition of this income, gain or loss, is beyond the scope of this Disclosure Statement.

**C.    Tax Consequences to Creditors.**

**1.    *Impact of the Restructuring.***

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Holders of Allowed Claims (including the character, timing and amount of income, gain or loss recognized) generally will depend upon, among other things:  (i) the manner in which a Holder acquired the Claim on account of which it receives a Distribution; (ii) the length of time such Claim has been held; (iii) the Holder's method of tax accounting; (iv) whether the Holder of a Claim has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior years; (v) whether the Claim was acquired at a discount; (vi) whether the Holder of a Claim has previously included accrued but unpaid interest with respect to the Claim; and (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes.  Therefore, Holders of Claims should consult their own independent tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

transactions contemplated by the Plan.

The Plan provides that, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest on such indebtedness, such Distribution will, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  However, current U.S. federal income tax law is unclear on this point and no assurance can be given that the IRS will not challenge this position.

**U.S. Holders**.  A U.S. Holder is any Holder that is for U.S. federal tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation or other entity treated as a corporation that is created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income tax regardless of its source and (iv) a trust (A)  if a court within the United States is able to exercise primary supervision over the administration of the trust, and one or more United States persons have the authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

U.S. Holders of Allowed Administrative and Priority Claims will receive Cash in satisfaction of such Allowed Claims as soon as practicable after the Effective Date.  Each such U.S. Holder will recognize gain or loss equal to the difference between the Cash it receives and its adjusted tax basis in such Claim.  Any gain or loss will be capital or ordinary, depending on whether the Claim is a capital asset in the hands of the U.S. Holder.  If such Claim is a capital asset, the gain or loss will be long-term if the Claim has been held for more than one year.  Net long-term capital gains of non-corporate U.S. Holders currently are eligible for reduced rates of taxation. The deductibility of capital losses is subject to significant limitations.

U.S. Holders of Class 2 Claims whose Claims are being reinstated should have no U.S. federal income tax consequences as a result of such reinstatement.  The treatment of any Cure amounts paid to U.S. Holders of Class 2 Claims will depend upon the classification of such payments as principal or interest, and whether such amounts have previously been included in

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

81

income under the Holder's method of accounting.  U.S. Holders of Class 2 Claims who receive payment in satisfaction, settlement, release and exchange for its Allowed Secured Claims, will have gain or loss equal to the difference between the amount received by each Holder and the Holder's adjusted tax basis in its Claim.  Any gain or loss will be capital or ordinary, depending on whether the Claim is a capital asset in the hands of the U.S. Holder.  If such Claim is a capital asset, the gain or loss will be long-term if the Claim has been held for more than one year.  Net long-term capital gains of non-corporate U.S. Holders currently are eligible for reduced rates of taxation. The deductibility of capital losses is subject to significant limitations.  To the extent that the Claim constitutes interest not previously included in the U.S. Holder's income, such amount will be treated as ordinary interest income.

U.S. Holders of Class 3 First Lien Loan Claims, Class 4 Trade Unsecured Claims, and Class 5 Second Lien Loan Claims receiving Distributions, in full satisfaction, settlement, release and exchange for their Allowed Claims, will (subject to the potential application of the installment sale rules) have gain or loss equal to the difference between the amount of Cash and/or the fair market value (or in the case of the New A-Note and the New B-Note, their issue price) of the Distributions received by each U.S. Holder and the Holder's adjusted tax basis in its Claim.  Any gain or loss generally will be capital or ordinary, depending on whether the Claim is a capital asset in the hands of the U.S. Holder.  If such Claim is a capital asset, the gain or loss will be long-term if the Claim has been held for more than one year.  Net long-term capital gains of non-corporate U.S. Holders currently are eligible for reduced rates of taxation.  The deductibility of capital losses is subject to significant limitations.

To the extent that the Claim constitutes interest which the U.S. Holder of the Claim has not previously included in the Holder's income, such amount will be treated as ordinary interest income.  Moreover, to the extent a debt instrument or Claim is acquired after its original issuance for less than the issue price, such instrument or Claim will have market discount.  A U.S. Holder of a Claim with market discount generally must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim.

82

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

**Non-U.S. Holders**. A non-U.S. Holder is any Holder that is an individual, corporation (or entity treated as a corporation for U.S. tax purposes), estate or trust that is not a U.S. Holder. A non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain realized as a result of the restructuring unless (i) the gain is effectively connected with the non-U.S. Holder's conduct of a trade or business within the United States (and, under certain income tax treaties, is attributable to a U.S. permanent establishment) or (ii) the non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are satisfied.

A non-U.S. Holder whose gain is effectively connected with the non-U.S. Holder's conduct of a trade or business within the United States generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder with respect to the restructuring. Specifically, if any gain from the sale, exchange, redemption or other taxable disposition of the Claims is effectively connected with a U.S. trade or business conducted by a non-U.S. Holder, the income or gain recognized by such non-U.S. Holder will be subject to U.S. federal income tax at regular graduated U.S. income tax rates, unless an applicable income tax treaty provides otherwise. Corporate non-U.S. Holders may also be subject to a "branch profits tax" at a rate of 30% (although an applicable income tax treaty may provide for a lower rate) on the portion of the non-U.S. Holder's earnings and profits that is effectively connected with its U.S. trade or business.

A non-U.S. Holder who is present in the United States for 183 days or more in the taxable year of disposition and meets certain other requirements will be subject to a flat 30% U.S. federal income tax on the gain derived from the restructuring, which may be offset by U.S. source capital losses of the non-U.S. Holder.

**2.**    *Consequence of Holding and Disposing of the New Secured A-Note and the New Secured B-Note*

**U.S. Holders**. The New Secured Notes may be issued with original issue discount, or "OID," for U.S. federal income tax purposes. Consequently, in addition to recognizing income for any stated interest payable under the New Secured Notes, U.S. Holders of the New Secure Notes may be required to include OID in gross income for U.S. federal income tax purposes in advance of

83

the receipt of cash attributable to that income regardless of its method of tax accounting.  The amount of OID includible in income with respect to each note will be the sum of the daily portions of OID with respect to the New Secured Notes for each day during the taxable year or portion of the taxable year in which the U.S. Holder holds the New Secured Notes.  The daily portion will be determined by allocating to each day in an "accrual period" a pro rata portion of the OID allocable to that accrual period.  The amount of OID allocable to an accrual period with respect to each of the New Secured Notes will equal the excess of (a) the product of the applicable note's adjusted issue price at the beginning of the accrual period and the note's yield to maturity (properly adjusted for the length of the accrual period) over (b) the sum of the payments of stated interest on the applicable note allocable to the applicable accrual period.  The "adjusted issue price" of each of the New Secured Notes at the beginning of any accrual period will equal the issue price of the applicable note increased by the amount of accrued OID allocable to all prior accrual periods.

U.S. Holders generally will recognize gain or loss upon the sale, exchange, redemption, retirement or other disposition of the New Secured Notes in an amount equal to the difference between the U.S. Holder's amount realized (less an amount attributable to accrued and unpaid interest, which will be taxable as ordinary interest income to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the New Secured Notes.  A U.S. Holder's adjusted tax basis in the New Secured Notes will, in general, be the issue price of the applicable notes increased by any OID previously included in income by the U.S. Holder with respect to such notes. Any gain or loss will be capital or ordinary, depending on whether the New Secured Notes constitute a capital asset in the hands of the U.S. Holder.

**Non-U.S. Holders**.  Payments of interest (which for purposes of this discussion includes any OID) to a non-U.S. Holder on the New Secured Notes generally will be exempt from U.S. federal withholding tax under the "portfolio interest" provided the non-U.S. Holder properly certifies as to its foreign status and certain other requirements are satisfied.  If interest paid to a non-U.S. Holder does not qualify as "portfolio interest," the interest payments generally will be subject to U.S. federal withholding tax at a rate of 30%, unless the non-U.S. Holder properly claims an exemption from (or a reduction of) withholding under the benefit of an income tax treaty, or the payments of

84

interest are effectively connected with the non-U.S. Holders conduct of a trade or business in the United States and certain certification requirements are satisfied, in which case, the non-U.S. Holder will be subject to U.S. federal income tax in the same manner as a U.S. Holder with respect to such interest income.

A non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain realized upon the sale, exchange, redemption, retirement or other disposition of the New Secured Notes unless (i) the gain is effectively connected with the non-U.S. Holder's conduct of a trade or business within the United States (and, under certain income tax treaties, is attributable to a U.S. permanent establishment) or (ii) the non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are satisfied. (**See "Tax Consequences to Creditors, Impact of the Restructuring, Non-U.S. Holders."**)

**3.** ***Consequence of Holding and Disposing of the New Borrower Parent Units***

**U.S. Holders**. As a partnership for U.S. federal income tax purposes, the Parent will not itself be subject to U.S. federal income tax.  Parent will file an annual partnership information return with the IRS that reports the results of its operations for each taxable year.  Each U.S. Holder of the New Borrower Parent Units will be required to report separately on its income tax return its distributive share of Parents net long-term and short-term capital gain or loss and net ordinary income and deductions and credits.  Each Holder of the New Borrower Parent Units will be liable for any taxes owed upon its distributive share of the income or gains realized by Parent, and may claim deductions for its distributive share of Parent's losses and deductions and credits, to the extent allowed under the Code, whether or not it has received or will receive a distribution from Parent.

Distributions from Parent in respect of the New Borrower Parent Units generally will not be treated as taxable income to a U.S. Holder of the New Borrower Parent Units.  Instead, distributions will be treated first as reducing the U.S. Holder's adjusted tax basis in its New Borrower Parent Units.  Distributions of cash or marketable securities in excess of the adjusted tax basis, however, will give rise to gain.  Any such gain will be capital or ordinary, depending on whether the New Borrower Parent Units constitute capital assets in the hands of the U.S. Holder and nature of

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

Parent's direct or indirect assets for which the cash or marketable securities could be deemed to be exchanged in connection with such distribution.

Upon the sale or taxable exchange of the New Borrower Parent Units (an "Equity Disposition"), a U.S. Holder will recognize gain or loss equal to the difference between (i) the sum of the amount of cash, the fair market value of any property received with respect to such disposition and such U.S. Holder's share of Parent's direct and indirect liabilities outstanding at the time of the Equity Disposition; and (ii) the U.S. Holder's adjusted tax basis in the New Borrower Parent Units. Any such gain will be capital or ordinary, depending on whether the New Borrower Parent Units constitute capital assets in the hands of the U.S. Holder and nature of Parent's direct or indirect assets.

**Non-U.S. Holders**. Parent is expected to derive all or substantially all of its income from real property investments that constitute a U.S. trade or business. Accordingly, all or substantially all of the income that non-U.S. Holder derives with respect to Parent likely will constitute income that is effectively connected with the conduct of a U.S. trade or business. Non-U.S. Holders will subject to U.S. federal income tax on such income on a net income basis in a manner similar to a U.S. Holder, as discussed above, and corporate non-U.S. Holder may also be subject to a branch profits tax at a rate of 30% (although an applicable income tax treaty may provide for a lower rate) on the portion of its income from such U.S. trade or business. The net-income basis tax on effectively connected income generally will be collected by means of withholding by Parent. This tax must be paid without regard to whether Parent makes actual distributions to the non-U.S. Holder.

As discussed above with regard to U.S. Holders, distributions by Parent to a Holder of the New Borrower Parent Units generally will not be subject to tax. However, gains or losses, if any, from a distribution with respect to the New Borrower Parent Units or a disposition of the New Borrower Parent Units generally will constitute effectively connected U.S. trade or business income, upon which non-U.S. Holders will be subject to U.S. tax in a manner similar to a U.S. Holder of the New Borrower Parent Units. Corporate non-U.S. Holders may also be subject to a branch profits tax at a rate of 30% (although an applicable income tax treaty may provide for a

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

lower rate) on such income.

### 4. *Tax Consequence Relating to the Rights*

The tax consequences relating to the issuance and exercise of the Rights are unclear under current law.  Because the Treasury Regulations relating to non-compensatory options and warrants currently are in proposed form and have not yet been finalized, each Holder should consult its own tax advisor regarding the particular U.S. federal, state, local and foreign tax consequences attributable to receiving, holding and disposing of the Rights.

### 5. *Backup Withholding*

Certain payments to be made to Holders, including Distributions or payment in respect of Claims pursuant to the Plan, and payments with respect to the New Secured Notes and/or the New Borrower Parent Units, likely will be subject to information reporting by the payor to the IRS. Moreover, such reportable payments also may  be subject to backup withholding under certain circumstances.  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability and such Holder may obtain a refund of any excess amounts withheld under backup withholding rules typically by filing a U.S. federal income tax return.

### 6. *Importance of Obtaining Professional Tax Assistance*

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  BECAUSE TAX CONSEQUENCES ARE UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR INDEPENDENT TAX ADVISERS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### ARTICLE IX.

### FURTHER INFORMATION

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

If you have any questions or require further information about the voting procedures for voting your Claim or Interest, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any Exhibits to such documents (at your own expense, unless otherwise specifically required by Fed. R. Bankr. P. 3017(d)), please contact Haynes and Boone, LLP, Attention: Jonathan Hook, Esq., 1221 Avenue of the Americas, 26th Floor, New York, New York 10020 or call (212) 659-4981, or e-mail jonathan.hook@haynesboone.com.

## ARTICLE X.

## RECOMMENDATION AND CONCLUSION

The Backstop Investors believe that the Plan provides the best possible recoveries for Creditors that can be achieved in any reasonable time frame and that possible alternatives are likely to result in delayed Distributions for all and diminished recoveries for other Holders of Claims or Interests. Therefore, the Backstop Investors urge all Holders of Claims or Interests in Classes 3, 5 and 6 to vote to accept the Plan.

Dated this 12th day of October, 2010.

By:/s/ Lenard M. Parkins
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
-and-
LENARD M. PARKINS, ESQ. (*PRO HAC VICE*)
HENRY FLORES, ESQ. (*PRO HAC VICE*)
TREVOR R. HOFFMANN, ESQ. (*PRO HAC VICE*)
JONATHAN HOOK, ESQ. (*PRO HAC VICE*)
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, New York 10020

Attorneys for
**FIVE MILE CAPITAL POOLING
INTERNATIONAL LLC; SPECTRUM
INVESTMENT PARTNERS, L.P.; &
TRANSAMERICA LIFE INSURANCE
COMPANY**

-and-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

JOSHUA J. ANGEL, ESQ. (*PRO HAC VICE*)
ANDREW C. GOLD, ESQ. (*PRO HAC VICE*)
FREDERICK E. SCHMIDT, JR., ESQ. (*PRO HAC VICE*)
**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, New York 10016
                    -and-
LEE I. IGLODY, ESQ.
Nevada Bar No. 007757
**THE LAW OFFICES OF PARAS B. BARNETT,
P.L.L.C.**
9555 S. Eastern Avenue, Suite 280
Las Vegas, Nevada 89123

Attorneys for
**THE HUFF ALTERNATIVE FUND, L.P.
AND THE HUFF ALTERNATIVE
PARALLEL FUND, L.P.**

89